UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMANDER ERIC C. CASH<br>15617 Copper Beech Dr.<br>Upper Marlboro, MD 20774<br><br>       Plaintiff<br>  v.<br><br>The Honorable CARLOS DEL TORO<br>in his official capacity as the Secretary of<br>the Navy,<br>1200 Navy Pentagon<br>Washington, DC  20350-1200<br><br>The Honorable LLOYD J. AUSTIN, III,<br>in his official capacity as Secretary of Defense<br>1000 Defense Pentagon<br>Washington, DC 20310-1000<br><br>UNITED STATES NAVY<br>1200 Navy Pentagon<br>Washington, DC 20350-2000,<br><br>BOARD FOR CORRECTION OF<br>NAVAL RECORDS (BCNR)<br>701 S. Courthouse Road<br>Building 12, Suite 1001<br>Arlington, VA  22204-2490<br><br>And, United States of America<br><br>       Defendants | Case No.:<br><br>COMPLAINT FOR SETTING ASIDE<br>FINAL AGENCY DECISION AS<br>UNLAWFUL UNDER THE<br>ADMINISTRATIVE PROCEDURE ACT. |

**COMPLAINT FOR SETTING ASIDE FINAL AGENCY DECISION AS UNLAWFUL
UNDER THE ADMINISTRATIVE PROCEDURE ACT**

    Plaintiff, Commander (ret.) Eric C. Cash ("Plaintiff"), brings forth this action under the

Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*, for judicial review of a final agency

decision denying his request to remove adverse information, including a punitive letter of

reprimand, from his Official Military Personnel File ("OMPF"). Six weeks after Plaintiff took command of the troubled USS *San Antonio* there was a tragic incident where a sailor died following an accident during the launching of a small boat. All procedures then required had been followed, and the personnel performing and supervising the operation were properly trained and qualified. The investigation revealed that the accident was due to significant technical and operational problems with the *San Antonio* and its sister ships in its class. Following the death, the Navy implemented new standard procedures for small boat operations and engaged in a significant reform and upgrade program for the *San Antonio* class. Plaintiff underwent counseling for his role in the incident, and his commanding officers considered this more than sufficient correction. Everyone closest to the incident and the *San Antonio* class agreed that responsibility for the death lying first and foremost with the flaws of the class, and how the Navy chose to man and operate them.

More than one year after the incident, Admiral John Harvey ("ADM Harvey"), then commander of the United States Fleet Forces Command, was facing Congressional hearings into Naval readiness. As part of his preparation for the hearings, he sought to levy charges under Article 92, for dereliction of duty against both Plaintiff and his executive officer, then Lieutenant Commander, now Captain, Sean Kearns ("LCDR Kearns"). The specifications were negligence in failing to issue a special watchbill for the small boat operation, and in ensuring appropriate supervision of the operation. The former was despite the fact that Plaintiff and LCDR Kearns had followed standard Navy operating procedure. This was in clear contradiction to the recommendations of those closest to the incident, Plaintiff's commanding officers, who believed that counseling was sufficient.

LCDR Kearns refused non-judicial punishment and elected for a court-martial, thanks to the significantly greater evidentiary rigor of the court-martial process, and the much deeper inquiry, he was found not guilty on the charges. Expert witness testimony established that no special watchbill was required and that the proper personnel were supervising the operation, and that they had the proper training and qualifications. LCDR Kearns, his records cleared from ADM Harvey's attempted stain, proceeded to have a thriving career in the USN. He was promoted to Commander, and then Captain, and is now the head of an NROTC department at the Maine Maritime Academy.

Plaintiff was not so fortunate. He was still at sea when the charges were levied, meaning that he was not granted the opportunity to elect for court-martial. ADM Harvey had the option to grant him a court-martial, regardless, but ensured that Plaintiff underwent the much less rigorous inquiry, and lower standards, of NJP. Following this, despite the lack of evidence to establish the necessary elements of the charges, Plaintiff was found guilty *in absentia*. ADM Harvey levied a punitive letter of reprimand against him. Despite stellar officer evaluations, Plaintiff's career was over. He failed to make captain and was forced to retire in 2015.

In 2017 Plaintiff challenged this wrongful action against him. In 2018, the BCNR, in full contradiction of the clear evidence on the record, chose to uphold the wrongful NJP. This was despite the fact that a court-martial on the same charges and nexus of fact, a significantly deeper and more rigorous factual inquiry, found that charges were unsubstantiated. In large part this decision was based on speculation as to what *may* have been submitted before the NJP, as compared to the hard evidence of what had actually been reviewed on court martial.

Plaintiff now comes before this Court to overturn this decision under the Administrative Procedure Act. The finding that a special watchbill was "clearly required" at the time was

unsupported by substantial evidence, as was the finding that Plaintiff had failed to ensure appropriate supervision. Due to the record compelling a reasonable mind to find to the contrary, the necessary elements for the Article 92 charges against Plaintiff were not established by sufficient evidence, rendering the BCNR's upholding of them contrary to law. This requires overturning under the APA. In addition, the clear injustice levied against Plaintiff, who was turned into a scapegoat for the Navy's failings, is so egregious as to render the BCNR's refusal to set it aside arbitrary and capricious.

## I.    JURISDICTION AND VENUE

1. This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal jurisdiction question), 1346(a)(2) (civil action against the United States…founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department….), and 1361 (action to compel an officer or employee of the United States to perform his duty). <u>Hatheway v. Secretary of the Army</u>, 641 F.2d 1376, 1379-80 (9th Cir. 1981), <u>cert. denied</u>, 454 U.S. 864 (1981).

2. Venue in this district is proper pursuant to §§ 1391(e) and 1402(a) because the Defendants are located at the addresses stated in the caption and no real property is involved in the action.

## II.    THE PARTIES

3. Plaintiff is a decorated Commander ("CDR") in the United States Navy with over 27 years of military service.

4. Defendant, Carlos Del Toro, is the Secretary of the Navy ("Secretary Del Toro") and is named solely in his official capacity.

5. Mr. Del Toro is authorized by 10 U.S.C. § 1552 to act through a board of civilians under the procedures established by him, to correct any military record of a member of the Navy when he considers it necessary to correct an error or remove an injustice.

6. Defendant United States Navy has responsibility for the administration, control, and operation of the United States Navy ("USN")

7. Defendant Board for Correction of Naval Records ("BCNR") is the highest administrative level of review of personnel actions taken by lower levels of the Navy.

8. The BCNR is the board of civilians established by the Secretary of the Navy, which, pursuant to 10 U.S.C. § 1552, considers applications filed before it for the purpose of determining whether an applicant's Navy military record should be changed to correct an error or injustice.

9. Defendant Lloyd J. Austin, III, acts on behalf of the United States of America in his official capacity as the Secretary of the Defense.

10. Defendant United States of America is the U.S. government.

## III.   STATEMENT OF THE FACTS

11. Plaintiff is a graduate of the United States Naval Academy who was first commissioned as an Ensign in the Navy on May 29, 1991.

12. Plaintiff has since had a long and decorated career as a Naval Officer, earning five Navy-Marine Corps Commendation Medals, a Meritorious Service Medal, and a Navy-Marine Corps Achievement Medal. Exhibit 1, Collected Medals of CDR Cash.

13. In December 2008, Plaintiff took command of the USS *San Antonio*, an LPD-17 class ship.

14. His executive officer, then Lieutenant Commander, now Captain, Sean Kearns ("LCDR Kearns") was already previously deployed to the ship.

15. Notoriously, the Navy's LPD-17 class of ships have suffered from systemic structural and procedural deficiencies. Exhibit 2, LPD 17 Class Wholeness Task Force Report dated September 17, 2010.

16. The numerous deficiencies of the LPD-17 class ships stem from a lack of funding, poor construction quality, insufficient manning, and a lack of adequate training procedures. *Id.*

17. Before Plaintiff took command of the *San Antonio*, the ship's immediate preceding commander, CDR Kurt Kastner stated, in a personal email to his wife dated September 22, 2008, that the ship "was on the verge of major incident or failure and it is very uncomfortable." Exhibit 3, Email from CDR Kastner dated September 22, 2008.

18. This email was forwarded to the Plaintiff by CDR Kastner several years after CDR Kastner had originally sent it. *Id.*

19. In 1998, a full decade before the relevant incident aboard the *San Antonio*, the implantation and the installation of an enhanced crane system was recommended for all LDP-17 class ships during an LDP-17 Boat Issue Workshop. Exhibit 4, Record of Trial from Court-Martial of LCDR Kearns at 107-108 (November 4, 2010, pages 77-79).

20. However, this system was not implanted by 2008 when Plaintiff took command of the *San Antonio*. *Id.*

21. In fact, unknown to the subsequent commanders of the *San Antonio*, including Plaintiff, the USN had discovered several safety issues during the workshop, including the issues that would lead to the incident here, but had never informed the commanders of the ships about them. *Id.* at 107 (November 4, 2010, page 77) ("So, several safety concerns were addressed in 1998 and the ship was actually never told about them?" "Yes—to my knowledge, yes, sir.")

22. This enhanced crane system would have removed the need for line handlers onboard the *San Antonio*, which was one of the issues present during the relevant accident that resulted in the death of Engineman First Class ("ENI") Theophilus Ansong on February 4, 2009. *See id.* at 334-336 (November 2, 2010, page 17-19); *see id.* at 107 (November 4, 2010, at 77-79).

23. Before the accident, on February 4, 2009, while on an anti-piracy mission in the Gulf of Aden, the *San Antonio* was directed to conduct a staff transfer by Admiral McKnight. *Id.* at 849-50 (November 3, 2010, at 298-299).

24.  The Plaintiff recommended the transfer be executed by way of helicopter transport to ensure safety and efficiency. *Id.*

25. Despite the recommendation of Plaintiff, Admiral McKnight directed the staff transfer be executed via small boats including 11-m Rigid-hulled inflatable boats ("RHIB"). *Id.*

26. The night prior to the transfer, Plaintiff held a Daily Operations and Intel Brief to discuss all watchbill evolutions for relevant personnel, equipment, and procedural issues to reduce operational risk. *Id.* at 852-4 (November 3, 2010, at 301-303).

27. Commander Cash's preparation for the evolution of the 11-meter RHIB small boat, which was to be utilized in the transfer, was the same procedure applied by the prior commanding officer CDR Kastner, had been used for numerous small boat operations in the six weeks prior during Plaintiff's command, and followed USN standard operating practices at the time. *Id.* at 855-6 (November 3, 2010, at 304-305).

28. At the time of the accident, there was no USN special watchbill requirement for small boat operations. *Id.*

29. The only requirement was that a watch team replacement plan be in place. *Id.*

30. CDR signed all watch bills required of him by the Navy Standard Organization and Regulations Manual ("SORM"). *Id.*

31. The watch bills signed by Plaintiff were certified as sufficient in scope, meeting requirements, and accountability. *Id.*

32. Additionally, Plaintiff properly followed protocol by enacting a watch team replacement plan. *Id.*

33. Due to a turnover gap between first lieutenants, Plaintiff and LCDR Kearns entrusted Boatswain Shawn Stacey ("Boatswain Stacey") with supervision of the operation. *Id.* at 1208-9 (November 4, 2010, at 214-5).

34. Boatswain Stacey was described as "imminently qualified" for the task at hand. *Id.*

35. Plaintiff's responsibilities ended at granting permission for the operation to proceed. *Id.* at 876-7, 879-80 (November 3, 2010 at 325-6, 328-9).

36. After granting permission to proceed, he briefly left the bridge to grab sunscreen, as it was going to be a long day of operations, and was absent for only a few minutes. *Id.*; *Id.* at 433 (November 2, 2010, at 116).

37. The officer on deck supervising the operation remained on the bridge. *Id.* at 879-80 (November 3, 2010 at 328-9).

38. During the operation, a technical issue occurred as a RHIB was lowered into the water to test its engines. *Id.* at 641 (November 3, 2010, at 93).

39. The engines of the RHIB failed to start after entering the water, which disabled the boat from maintaining the sea painter line, which had also malfunctioned. *Id.* at 486-489 (November 2, 2010, at 169-72).

40. Because of these malfunctions, the RHIB drifted aft, and struck the portside accommodation ladder of the USS San Antonio, causing three sailors to abandon the RHIB. *Id.*

41. Plaintiff immediately returned to the bridge upon hearing the call of man overboard. *Id.* at 876-7 (November 3, 2010 at 325-6).

42. Two of the sailors were recovered, but tragically, the third sailor, EN1 Ansong, was never found, despite a ten-hour search and rescue mission. *Id.* at 486-489 (November 2, 2010, at 169-72).

43. The Department of the Navy acknowledged that the ship's crew followed the most current operating procedure to launch the RHIB.

44. Only after the incident did the Naval Sea Systems Command issued a fleet-wide emergency safety message with a corrected procedure for all ships in the class to follow.

45. Subsequent to the accident, Commander, U.S. Fleet Forces Command sponsored a Wholeness Task Force Report study of LPD 17 ship class, which ended with over $1 billion dollars in recommended actions to bring the USS San Antonio class ships within U.S. Navy manning, training, and equipping standards. Exhibit 2.

46. To inquire into the causes of the incident, an NCIS investigation was led by Captain Larry Grippin ("CAPT Grippin"), which determined that the manning, training, and equipment of

the *San Antonio* were the causal factors leading to the incident. Exhibit 5, Grippin NCIS Investigation.

47. The NCIS investigation was closed on October 21, 2009, after the Death Review Board voted unanimously to close the investigation. *Id.*

48. CAPT Grippin endorsed disciplinary action for Plaintiff, executive officer Lieutenant Commander ("LCDR") Sean Kearns, and the Boatswain Stacey. Exhibit 6, Affidavit of CDR Cash.

49. After this recommendation, the commanders of Task Force 151 and Fifth Fleet concluded that Captain Brian T. Smith ("CAPT Smith"), Plaintiff's immediate superior, was in the best position to review accountability for the accident. *Id.*

50. CAPT Smith elected to take administrative action based on the circumstances, but not punitive action against Plaintiff, resulting in a counseling session. *Id.*

51. RADM Quinn, commander of Naval Surface Force Atlantic and CAPT Grippin subsequently recommended that the administrative action taken in by CAPT Smith in April 2009 was sufficient and punitive action was not necessary. *Id.*

52. In the spring of 2010, it became apparent that Congress would hold hearings on Naval fleet readiness, in particular sparked by incidents like what happened on the *San Antonio*, and the wider problems with the *San Antonio* class. Exhibit 7, *Fleet Readiness: Hearing Before the Subcomm. on Readiness Meeting Jointly with Subcomm. on Seapower and Expeditionary Forces of the House Comm. on Armed Services*, 111th Congress (July 28, 2010).

53. ADM Harvey was one of the officers called to testify. *Id.*

54. On May 13, 2010, ADM Harvey brought charges against both Plaintiff and LCDR Kearns for an Article 92, UCMJ, 10 U.S.C. § 892 (failure to obey order or regulation) violation, with the specifications of dereliction of duty by failing to issue a special watchbill and failing to ensure appropriate supervision. Exhibit 8, Punitive Letter of Reprimand dated May 13, 2010.

55. This took place over 15 months after the incident aboard the San Antonio, over a year after Capt. Smith's counseling to Plaintiff, and in contradiction to the recommendations by Capt. Grippin and RADM Quinn that no further action was necessary. *Id.*

56. The charge for dereliction via negligence by failing to issue a special watchbill was despite, at the time of the incident, there being no USN requirement for a special watchbill for small boat operations. *Id.*; Exhibit 4 at 855-6 (November 3, 2010, at 304-305).

57. In addition, all of the officers supervising the operation were properly trained and highly qualified. Exhibit 4 at 1208-9 (November 4, 2010, at 214-5).

58. Because Plaintiff was still attached to the *San Antonio*, he was not given the option to demand trial by court martial in lieu of nonjudicial punishment. Exhibit 8.

59. ADM Harvey still had the opportunity to grant him court martial, but deliberately chose to ensure that disciplinary proceedings ensued under the lower evidentiary standards of NJP. Exhibit 8.

60. LCDR Kearns was no longer attached to the ship and elected to refuse nonjudicial punishment and undergo court-martial. *See, e.g.,* Exhibit 4.

61. His court martial occurred in November of 2010 and resulted in substantial expert testimony concerning whether a special watchbill was required at the time for small boat operations, as well as the supervisory requirements for small boat operations. *Id.*

62. In November of 2010 he was acquitted of the Article 92, UCMJ, 10 U.S.C. § 892 violations that arose of the same nexus of facts as Plaintiff's case. *Id.* at 1552 (November 5, 2010, at 227).

63. By contrast, following a much less evidentiarily rigorous NJP, which he was absent for, Plaintiff found guilty of violating Article 92 and was issued by ADM Harvey a punitive letter of reprimand for the Article 92 violation. Exhibit 8.

64. Despite his unwarranted nonjudicial punishment, Plaintiff continued to flourish as a leader and as a sailor. Exhibit 10, Officer Evaluation Reports.

65. In the evaluation period from May 9, 2009, to September 30, 2009, CAPT Grippin, the same officer that investigated Plaintiff for the incident aboard the USS San Antonio, stated Plaintiff "is one of the best commanding officers I've observed and consistently led with vision, energy, unflagging resolve and a winning attitude to achieve mission success despite first of ship class challenges."

66. CAPT Grippin recommended Plaintiff for promotion to Captain and selection for Major Command Afloat.

67. From June of 2010 to April of 2012, he was twice given the highest possible marks in every assessment category by two different reporting seniors, Captain R.L. Russel and Captain M.R. Graham. Exhibit 10.

68. Despite this and many other glowing recommendations for promotion to Captain, Plaintiff was not promoted, due to ADM Harvey's unwarranted punitive letter of reprimand that was issued for the incident aboard the *San Antonio*. *See Id.* (stellar evaluations at each turn).

69. This resulted in Plaintiff's forced retirement in 2015, after being passed over on review for promotion to Captain.

70. By contrast, LCDR Kearns, who was able to clear his good name through a much more rigorous process, was subsequently promoted to Commander, and then Captain, holding the prestigious post of commanding the USS *Constitution*, the oldest ship in the fleet, and now holding command of the NROTC program at Maine Maritime Academy.

71. 10 U.S.C. § 1552 mandates that the Secretary of each military department act "through boards of civilians," under procedures established by the Secretary, to correct any military record of any current or former member of that department when he or she considers it necessary to correct an error or remove an injustice; pursuant to this mandate, Defendant Secretary of the Navy has established Defendant BCNR to consider and act on any requests to make such corrections.  *See* 32 C.F.R. § 723.2.

72. The relief available to current and former Navy military personnel through application to the Board is broad and includes the correction of military records: (a) to change the reason for discharge; (b) to reinstate a veteran to military service (which may include back pay and allowances); (c) to void a pass-over of a candidate for promotion; and (d) to take other actions as may be necessary to correct material error or injustice.

73. Plaintiff petitioned Defendant BCNR on February 24, 2017, requesting (1) removal of the nonjudicial punishment from Plaintiff's OMPF; (2) removal of the Punitive Letter of Reprimand from his OMPF; (3) removal of the failures of selection ("FOS") incurred by Active-Duty Captain Line Promotion Selection Boards; and (4) grant a Special Selection Board for promotion; Plaintiff included extensive documentation to the BCNR in support of his application. Exhibit 11, Plaintiff's BCNR Application.

74. Plaintiff's BCNR application contained several justified grounds for relief including:

    - The preponderance of evidence did not support that Plaintiff was derelict in his duties.
    - There was no watchbill requirement for small boat operations and Plaintiff had ensured proper supervision for the small boat operation on the day of the incident.
    - Negligence or dereliction of duty was not the proximate cause of the accident.
    - The Punitive Letter of Reprimand was an affront to justice and fairness because the Executive Officer on the USS SAN ANTONIO was allowed a court-martial, rather than nonjudicial punishment and found not guilty
    - There was no evidence of record to support Plaintiff was guilty of violating Article 92 of the UCMJ.
    - Plaintiff was not negligent in performing any *required* watchbill or supervisory duties.
    - All personnel were properly certified, and acted in accordance with Department of the Navy requirements.
    - Systematic and training problems were revealed during the incident investigation and concluded with over one billion dollars in recommended actions to bring the class of ships within U.S. Navy manning, training, and equipping standards. *Id.*

75. In an Advisory Opinion ("AO") dated February 2, 2018, the Office of Legal Counsel of the U.S. Navy (USN OLC) agreed that Plaintiff made a compelling claim that his NJP lacked sufficient evidence. Exhibit 12, Advisory Opinion dated February 2, 2018.

76. However, it still found that it could not support a legal holding of insufficient evidence because NJPs, being much less rigorous than court-martials, lack formal records of trial and as such it was unclear what evidence ADM Harvey may have considered. *Id.*

77. The AO also conceded that Plaintiff made a compelling case as to the disparate results between his NJP and the court-martial of LCDR Kearns, involving the same nexus of facts and charge, which resulted in an acquittal. *Id.*

78. However, the OLC again argued that there was insufficient evidence that this disparity was unjust or unfair due to the lack of a formal record of trial and added the additional factor that an NJP has a lower standard of proof. *Id.*

79. ADM Harvey's deliberate actions to ensure that Plaintiff was forced to undergo, *in absentia*, a much less rigorous process resulted in his actions being obscured from proper scrutiny. *See id.*

80. On August 5, 2018, a three-member panel of the Defendant BCNR denied Plaintiff's application for correction of his record, substantially concurring with the comments contained in the advisory opinions from Navy Personnel Command: Performance Evaluation (PERS-32), Post Selection Board Matters (PERS-833), and the Office of Legal Counsel (PERS-00J). Exhibit 13, BCNR 17-002451.

81. Despite being a civilian board lacking in specialized knowledge, the Board still concluded that the evidence from the CI report revealed that a special watchbill was "clearly needed" in the case of small boating operations, and that it was Plaintiff's responsibility to issue one. *Id.*

82. The BCNR found this "clear need" despite the Navy having never seen, up until that point, the need for special watch bills for small boating operations, a very common occurrence. *Id.*

83. In addition, this was also in spite of the fact that substantial expert testimony in LCDR Kearns court-martial established that a special watchbill was not required at the time. *Id.*

84. Despite the heavy weight of specialized Navy practice showing that special watch bills were not required at the time, the civilians of the BCNR concluded:

> "You did not properly plan or anticipate problems. Despite your contention that you did not have an implicit or explicit duty to ensure a special evolutions watchbill was in place to support small boating operations, the Board determined that the evidence in the CI Report revealed that a special watchbill was clearly needed and it was your responsibility as the CO to ensure proper safeguards were in place." *Id.*

85. The Board failed to adequately address why it found that there was a preponderance of the evidence to support a finding that a special watchbill was necessary at the time, despite significant expert testimony that it was not. *Id.*

86. Nor did it explain its finding that Plaintiff had failed to ensure adequate supervision of the operation. *Id.*

87. Instead, it issued a blanket upholding of the NJP, and also held that there was not sufficient evidence of injustice in the matter. *Id.*

88. This was despite LCDR Kearns, who was able to undergo court-martial, being acquitted of the same charges for the same nexus of fact, while Plaintiff, who was denied the opportunity to fully defend himself, being found guilty. *Id.*

## **CLAIM FOR RELIEF**

**Administrative Procedure Act, 5 U.S.C. § 706**

**Claim 1: The BCNR's decision in BCNR 2017-002451 must be set aside as under the A.P.A. as contrary to law, as the record compelled a reasonable mind to find a contrary conclusion to the BCNR's holding that there was sufficient evidence to establish the necessary elements of the charges against Plaintiff.**

89. The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), permits the reviewing court to hold unlawful and set aside agency findings held to be arbitrary, capricious, or contrary to law.

90. As decisions by the BCNR are reviewed on the record of an agency hearing, their findings must be supported by substantial evidence under 5 U.S.C. § 706(2)(E). *Chappell v. Wallace*, 462 U.S. 296 at 303 (1983).

91. "Substantial evidence" requires that a reasonable mind could find adequate evidence within the evidentiary record to support the particular conclusion reached by the agency. *See Dickenson v. Zurko*, 527 U.S. 150, 162 (U.S. 1999).

92. Or, to place it from the plaintiff's perspective, an administrative finding must be set aside when the evidentiary record would compel a reasonable mind to arrive at a contrary conclusion. *See, e.g., Palace Sports & Entertainment, Inc. v. NLRB*, 411 F.3d 212, 220 (D.C. Cir. 2005).

93. Plaintiff was charged under Article 92 of the UCMJ (2008), 10 U.S.C. § 892, for dereliction in the performance of his duties.

94. This required establishing, via a preponderance of the evidence, that Plaintiff:

    a. Had certain duties;

    b. Knew or reasonably should have known of these duties; and

    c. Was willfully, through neglect or culpable inefficiency, derelict in the performance of these duties.

    MCM (2008) at IV-23-4.

95. The specific alleged duties in question, under the specification at his NJP, was that Plaintiff had a duty to:

    a. Establish a special watchbill for small boat operations; and

    b. Ensure adequate supervision of the small boat operation.

    Exhibit 8.

96. Plaintiff, in addition, had to either have known, or should have known, that he had these duties and then be derelict in the performance of said duties.

97. For the BCNR to uphold the NJP and the punishment that ensued, the evidentiary record of the administrative proceeding must contain substantial evidence to support their findings that these two duties existed at the time of the incident, that Plaintiff knew or should have known of these duties, and that he was derelict in the performance of said duties.

98. Thus, if the record compels a reasonable person to find to the contrary, that these duties did not exist at the time, that Plaintiff did not know, or should have known, about those duties, or that he was not derelict in his performance of these duties, then the BCNR has not established that a preponderance of the evidence was met to satisfy the necessary elements of the charges. *Palace Sports*, 411 F.3d at 220; 5 U.S.C. § 706(2)(E).

99. To uphold the decision of an NJP where the necessary elements were not met is contrary to law under the A.P.A. and must be set aside. 5 U.S.C. § 706(2)(A).

**The evidentiary record would compel a reasonable mind to find that there was no duty to issue special watchbill at the time of the incident, and that Plaintiff did not know, or should have known, about said duty.**

100. The first specification concerned whether Plaintiff was under a duty to issue a special watchbill for small boat operations. Exhibit 8.

101. The civilians of the BCNR, in their decision, found that a special watchbill, based on the evidence from the Command Investigation, was clearly needed and that it was Plaintiff's responsibility to issue one. Exhibit 13.

102. The evidentiary record would clearly compel a reasonable factfinder to find otherwise, that Plaintiff did not know, or should have known, at the time of the incident that a special watchbill was needed.

103. First and foremost, it is critical to consider that this issue was litigated, including through expert testimony, in a much more evidentiarily rigorous manner, where it was found that no special watchbill was required at the time. Exhibit 4 at 1552 (November 5, 2010, at 227).

104. Plaintiff's lack of issuance of a special watchbill was in line with the procedures of his predecessor in command of the *San Antonio*, CDR Kastner. *Id.* at 855-6 (November 3, 2010, at 304-305).

105. This was in line with wider Navy procedures at the time, which did not impose a requirement for a special watchbill in regard to small boat operations. *Id.*

106. The launching of the RHIB was in line with Navy procedure at the time. *Id.*

107. It was only *after* the incident that the Navy took the step to create new measures requiring a special watchbill, and also engaged in a substantial investigation into the ship class and suggest a one-billion-dollar manning, training, and equipping program to bring the class into line. Exhibit 2.

108. In short, the incident was a freak accident which revealed errors in the Navy's standard procedure and equipment for the launching of small boats from the *San Antonio* class. *Id.*

109. In short, for Plaintiff to have known, or should have known, that a special watchbill was required would be to ask for him to discover, six weeks into the command of his ship, something that the entire Navy, throughout the entire history of the class's service, had not discovered themselves. *See* Exhibit 4 at 855-6 (November 3, 2010, at 304-305).

110. It is also important to consider that what safety problems the Navy did know about the LPD-17 class had not been communicated to the commanders of the ships. *Id.* at 107 (November 4, 2010, page 77).

111. The clear evidence in the record as to how Plaintiff had clearly followed standard procedure, and how the errors in said procedure were only discovered as a result of a freak incident, would clearly compel a reasonable person to find that Plaintiff did not know, or should have known, that a special watchbill was required at the time.

112. Instead, the civilians of the BCNR substituted their own apparent expertise in naval procedure for that of more than a decade of Navy professionals and held that Plaintiff should have known that a special watchbill was "clearly needed." Exhibit 13.

113. This finding that a special watchbill was "clearly needed" is particularly puzzling given that the NCIS criminal investigation of the incident specifically laid the responsibility for the incident on the fact that the engines on the RHIB failed to start, which caused the RHIB to drift and strike the boat, and that EN1 Ansong was wearing too large of a life preserver. Exhibit 5.

114. If a special watchbill was "clearly needed" one would have expected to find a levying of responsibility for EN1 Ansong's death against either Plaintiff or LCDR Kearns. *Id.*

115. In short, the record clearly compels a reasonable person to find that Plaintiff was following standard Navy procedures at the time by not issuing a special watchbill, meaning that he was not negligent in his actions, and the BCNR's finding to the contrary must be set aside.

**The evidentiary record would compel a reasonable mind to find that Plaintiff had ensured appropriate supervision of the operation.**

116. The expert evidence at LCDR Kearn's court martial clearly established that neither executive officers, nor commanders, were required to personally supervise small boat operations on ships. Exhibit 4 at 1552 (November 5, 2010, at 227).

117. The commanding officer's responsibilities for small boat operations were explicitly limited to granting permission to move forward with the operation, after that the supervisory duties passed exclusively to the subject matter expert, the boatswain. *Id.* at 876-7, 879-80 (November 3, 2010 at 325-6, 328-9).

118. Plaintiff was only briefly absent from the bridge, and only did so after his own duties, the granting of permission to proceed, had been exercised. *Id.*

119. The record also clearly established that Plaintiff had ensured proper supervision of the operation, through the use of highly trained and qualified personnel at each of the key positions. *See, e.g. Id.* at 1208-9 (November 4, 2010, at 214-5); *see id.* at 1552 (November 5, 2010, at 227).

120. As has been clearly established above, the responsibility for EN1 Ansong's death in a freak accident primarily lies at the feet of problems with the San Antonio class, something which can be further seen by the Navy's significant programs to update the class following the incident. Exhibit 2.

121. This is reinforced by the fact that LCDR Kearns, similarly was found not guilty on this specification, following a trial with substantially greater amounts of evidence and at a much higher level of rigor. Exhibit 4 at 1552 (November 5, 2010, at 227).

122. In short, the record clearly compels a reasonable person to find that Plaintiff was not negligent in his own personal supervisory duties, or in his duties to ensure appropriate supervision of the operation.

123. The BCNR's findings to the contrary must thus be set aside. 5 U.S.C. § 706(2)(E).

**The BCNR's speculation about the evidence that *may* have been before ADM Harvey must be set aside as unsupported by substantial evidence.**

124. As stated above, the substantial evidence standard requires adequate evidence in the record to support a specific conclusion. *See Dickenson v. Zurko*, 527 U.S. 150, 162 (U.S. 1999).

125. The Advisory Opinion to the BCNR contained significant speculation as to what *may* have been submitted to the NJP proceedings in order to uphold their findings. Exhibit 12.

126. The BCNR then used this AO made the blanket decision to find that the evidence supported the charges levied against Plaintiff, despite completely failing to cite anything within the record to support its findings. Exhibit 13.

127. Given that the BCNR has failed to point to *any* evidence in the record to support its blanket conclusion that the NJP contained sufficient evidence to support the charges, this finding must be set aside as not supported by substantial evidence. *Id.*

**The BCNR's upholding of Plaintiff's NJP must be set aside, as the record compels a reasonable mind to find that the necessary elements of both specifications of the Article 92 charge levied against him were not established.**

128. Given that the record compels a finding that Plaintiff was not negligent in failing to issue a special watchbill, and had also ensured appropriate supervision of the operation, the necessary elements of the charges levied against him have clearly not been established.

129. Given this, the BCNR's upholding of those charges, and the punishment that ensued, must be set aside as contrary to law as the charges clearly violate the requirements for conviction under UCMJ Article 92. 5 U.S.C. § 706(2)(A); MCM (2008) at IV-23-4.

**Claim 2:** The BCNR's decision in BCNR 2017-002451 must be set aside as under the A.P.A. as arbitrary and capricious, as the injustice levied against Plaintiff by using him as a scapegoat was so great as to require overturning under *Kreis*.

130. ADM Harvey, in the shadow of upcoming congressional hearings, deliberately chose to force Plaintiff to undergo proceedings with a lower standard of proof. Exhibit 6; Exhibit 7.

131. These proceedings took place more than a year after Plaintiff had already faced discipline for the incident. Exhibit 8.

132. The actual incident had occurred 15 months prior. *Id.*

133. Plaintiff's superiors, closest to the situation, clearly believed that counseling had been sufficient. Exhibit 6; Exhibit 9.

134. The Navy's reaction clearly shows that the incident was due to problems with the equipment and manning of the *San Antonio* class of ships, with the program to solve the issues having an estimated $1 billion cost. Exhibit 2.

135. This is reinforced by the NCIS investigation's findings, which levied responsibility for the incident on the engine failure of the RHIB and the life vest for ENI Ansong being too large. Exhibit 5.

136. LCDR Kearns, who underwent a significantly more evidentiary substantive and rigorous proceeding, was found not guilty on the same charges for the same nexus of facts. Exhibit 4 at 1552 (November 5, 2010, at 227).

137. The Navy in fact sought to hide the records of LCDR Kearns' court martial from Plaintiff when he sought them via FOIA.

138. At first the USN claimed that the transcript didn't exist; Plaintiff was subsequently informed by someone in the know that a transcript had been made immediately after the court-martial.

139. Upon revelation of this information to the USN by Plaintiff, he received the transcript the next day, with LCDR Kearns also soon receiving a copy.

140. Plaintiff was clearly used as a scapegoat for the death of EN1 Ansong, in order to try and shift responsibility off of the errors of the Navy in the design, construction, manning, and operation of the *San Antonio* class of ships.

141. Despite the colossal injustice clearly levied against Plaintiff, the BCNR still chose to uphold the clearly wrongful actions that lead to his punitive letter of reprimand. Exhibit 13.

142. This letter of reprimand functionally ended Plaintiff's career, resulting in him failing to make Captain. *See* Exhibit 10 (evaluations which would have otherwise more than qualified him for promotion).

143. By contrast, LCDR Kearns was able to clear his name from the stain of ADM Harvey's wrongful charges thanks to being able to undergo an evidentiarily rigorous court-martial.

144.  This allowed his career to continue to flourish, resulting in his promotion to Captain, a rank he continues to hold in the active Navy to this day, and prestigious command positions like that of the *Constitution*.

145.  The only difference between their two life paths is that ADM Harvey denied Plaintiff the opportunity to reveal the full truth of the incident, while LCDR Kearns was free to fully defend his good name.

146.  This finding that this was not an injustice which required correcting is the type of "most egregious" decision by the BCNR which requires overturning as arbitrary and capricious under *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1514-5 (D.C. Cir. 1989).

**Claim 3:   Should the NJP charges be cleared from Plaintiff's files, the pass over for promotion to Captain should also be removed, and Plaintiff should be sent before a Special Selection Board.**

147.  It is clear from Plaintiff's records, including his excellent officer evaluations, and LCDR Kearns' career, that, were it not for the wrongful punitive letter of reprimand, he would have been promoted to Captain.

148.  Instead, due to the letter, he was passed over on review, resulting in his mandatory retirement in 2015.

149.  This Court should hold that, should the NJP charges be cleared from Plaintiff's records, the pass over in his records should be cleared as well, as it stems from the letter of reprimand.

150.  In addition, this Court should hold that Plaintiff is due a special selection board, should his NJP charges be cleared.

**Conclusion**

WHEREFORE, the Plaintiff humbly requests that this Court issue an order:

1)   Finding that the BCNR's finding that Plaintiff was under a duty to issue a special watchbill was unsupported by substantial evidence;

2)   Finding that the BCNR's finding that Plaintiff had not ensured adequate supervision of the operation was unsupported by substantial evidence;

3)   Setting aside the BCNR's upholding of Plaintiff's NJP proceedings as contrary to law under the APA, as the necessary elements under the UCMJ were not established;

4)   Removing the punitive letter of reprimand that ensued from this NJP from Plaintiff's records;

5)   Setting aside the BCNR's finding that there was not sufficient injustice in Plaintiff's matter as to require correction as arbitrary and capricious under the APA;

6)   Holding that Plaintiff's pass over on review for command should be cleared from his records should his NJP charges be cleared;

7)   Holding that Plaintiff is due a special selection board, should the NJP charges be cleared; and

8)   Remanding this matter to the BCNR for further proceedings in line with the order.

In addition, Plaintiff notifies this Court that he intends to file for attorney's fees and expenses, should he prevail, under the Equal Access to Justice Act.

Respectfully submitted,

*/s/DavidP.Sheldon*

David P. Sheldon (DC Bar # 446039)
Law Offices of David P. Sheldon, P.L.L.C.
100 M. St. SE, Suite 600
Washington, DC 20003
Tel: 202.546.9575
Fax: 202.546.0135
*Attorney for Petitioner*

Dated: January 13, 2021.