**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
701 S. COURTHOUSE ROAD, SUITE 1001
ARLINGTON, VA 22204-2490

JMP
Docket No. 2735-24

From: Chairman, Board for Correction of Naval Records
To: Secretary of the Navy

Subj: REVIEW OF NAVAL RECORD OF COMMANDER ERIC C. CASH, USN, XXX-XX-[redacted] (RET)

Ref: (a) 10 U.S.C. § 1552
(b) JAGINST 5800.7E (with Change 2), Manual of the Judge Advocate General, 16 September 2008
(c) MILPERSMAN 1611-010, Officer Performance and Separations for Cause

Encl: (1) Order, in the case of *[Petitioner] v. Carlos Del Toro, Secretary of the Navy*, in the United States District Court for the District of Columbia, Case No. 22-cv-0093 (ACR), filed 11 March 2024
(2) DD Form 149 (Docket No. 2735-24), 10 April 2024 (with attachments)
(3) Memorandum, subj: Command Investigation into the Death of [EN1 T.K.A.] … that Occurred Onboard USS SAN ANTONIO (LPD 17) on 4 February 2009, Revision 1, 11 March 2009
(4) Amphibious Squadron FOUR CO Memo 5800 Ser N00/070, First Endorsement on Enclosure (3), subj: Investigation into the Circumstances Surrounding the Death of Engineman First Class (Surface Warfare) [T.K.A.] on 4 February 2009, 15 March 2009
(5) Memorandum, subj: Investigation into the Circumstances Surrounding the Death of Engineman First Class (Surface Warfare) [T.K.A.] on 4 February 2009, 16 April 2009
(6) Amphibious Squadron FOUR CO Memo 5800 Ser N00/089, First Endorsement on Enclosure (5), subj: Investigation into the Circumstances Surrounding the Death of Engineman First Class (Surface Warfare) [T.K.A.] on 4 February 2009, 17 April 2009
(7) Task Force FIVE ONE CO Memo 5800 Ser N00J/04, Second Endorsement on Enclosure (5), subj: Investigation into the Circumstances Surrounding the Death of Engineman First Class (Surface Warfare) [T.K.A.] on 4 February 2009, 20 April 2009
(8) U.S. FIFTH Fleet CO Memo 5830 Ser N00/276, Third Endorsement on Enclosure (5), subj: Investigation into the Circumstances Surrounding the Death of Engineman First Class (Surface Warfare) [T.K.A.] on 4 February 2009, 5 August 2009
(9) Naval Surface Force Atlantic CO 5800 Ser N00/031, subj: Investigation into Events Onboard USS SAN ANTONIO (LPD 17) on 4 February 2009, 10 March 2010
(10) U.S. Fleet Forces Command CO Memo 5812 Ser N00/144, First Endorsement on Enclosure (13), subj: Appeal from Non-Judicial Punishment, 3 June 2010
(11) NAVPERS 1626/7, Report and Disposition of Offense(s), 4 May 2010
(12) U.S. Fleet Forces Command CO Memo 5800 Ser N00/129, subj: Punitive Letter of Reprimand, 13 May 2010
(13) Petitioner's Memo, subj: NJP Appeal, 21 May 2010
(14) VCNO Memo 5800 Ser N09D/0U118097, subj: Appeal from Non-Judicial Punishment ICO [Petitioner], 21 June 2010

(15) U.S. Fleet Forces Command CO Memo 1611 Ser N00/197, subj: Report of Non-Judicial Punishment (NJP) ICO [Petitioner], 2 August 2010
(16) Petitioner's Memo 1611, First Endorsement on Enclosure (15), subj: Report of Non-Judicial Punishment (NJP) ICO [Petitioner], 1 September 2010
(17) U.S. Fleet Forces Command CO Memo 1611 Ser N00/236, Second Endorsement on Enclosure (15), subj: Report of Non-Judicial Punishment ICO [Petitioner], 22 September 2010
(18) Record of the Special Court-Martial Case of *United States v. [LCDR S.D.K]*, 29 September 2010
(19) Navy Personnel Command CO Memo 1920 Ser 834D/775, subj: Status in the U.S. Navy, 15 November 2010
(20) NPC (PERS-801) 5420 PERS-80, subj: Request for Advisory Opinion ICO [Petitioner], 11 December 2017
(21) DD Form 214
(22) DD Form 149 (Docket No. 2451-17), 23 February 2017 (with attachments)
(23) NPC Office of Legal Counsel Memo, subj: Request for Comments and Recommendations ICO [Petitioner], 2 February 2018
(24) Petitioner's Counsel's Letter, RE: Docket No. 2451-17, 14 May 2018 (with enclosures)
(25) BCNR Letter JDR Docket No. 2451-17, 5 August 2018
(26) Complaint for Setting Aside Final Agency Decision as Unlawful under the Administrative Procedure Act, in the case of *[Petitioner] v. The Honorable Carlos Del Toro, in his official capacity as the Secretary of the Navy, et. al.*, in the United States District Court for the District of Columbia, filed 13 January 2022
(27) Declaration of [B.J.G.], in the case of *[Petitioner] v. Carlos Del Toro, et al.*, in the United States District Court for the District of Columbia, Case No. 22-cv-0093 (FYP), 14 June 2022
(28) OJAG Memo 1070 Ser 20/030, subj: Advisory Opinion in the case of [Petitioner], 2 August 2024
(29) Petitioner's Counsel's Letter, RE: Rebuttal to Advisory Opinion provided by the Director of the Criminal Law Division (Code 20) re: CDR Cash's Application for Correction of Records, Memorandum in Support of Application for Correction of Records, and Accompanying Exhibits, 29 August 2024

1. By Order dated 11 March 2024, the United States District Court for the District of Columbia (D.D.C.) remanded the case filed by the Subject, hereinafter referred to as Petitioner, to the Board for Correction of Naval Records, hereinafter referred to as the Board, to reconsider its previous denial of Petitioner's request for relief in Docket No. 2451-17.[1] Specifically, the D.D.C. directed the Board to reconsider its decision in Docket No. 2451-17 in light of the issues raised in Petitioner's complaint; address any other issues submitted by Petitioner to the Board in writing; and determine and explain whether Petitioner is entitled to any relief based on any errors or injustices found. See enclosure (1).

2. A three-member panel of the Board, meeting in executive session, reviewed Petitioner's

[1] See paragraph 4d below for discussion of the Board's decision in Docket No. 2451-17.

allegations of error or injustice in accordance with its governing policies and procedures and the Order of the D.D.C. on 26 September 2024, and found sufficient evidence of an injustice warranting corrective action. The Board's conclusions in this regard are discussed in more detail in paragraph 5 below. Documentary material considered by the Board included the enclosures; relevant portions of Petitioner's naval record; and applicable statutes, regulations, and policies.

3. Factual Background. The relevant factual background of Petitioner's case, based upon his naval records and the matters he provided for review, is summarized as follows:

a. Petitioner assumed command of the USS SAN ANTONIO (LPD 17) in December 2008. See enclosure (2).

b. On 4 February 2009, an 11-meter Rigid-Hulled Inflatable Boat (RHIB) assigned to the USS SAN ANTONIO was involved in a mishap while being lowered into the water via the onboard crane system in support of operational testing of the RHIBs engines.[2] As a result, three Sailors had to abandon the RHIB. One of these Sailors was never located during the ensuing 10-hour search and rescue mission.[3] See enclosure (3).

c. A command investigation (CI) was appointed on the same date as the incident described in paragraph 3b above by the Amphibious Squadron FOUR commander to inquire into the circumstances surrounding this incident.[4] The report of this CI was published on 11 March 2019. Among its findings was the conclusions discussed in footnote 3. However, this CI offered no findings of fact or opinions regarding the responsibility of the USS SAN ANTONIO commander or leadership for the mishap.[5] See enclosure (3).

d. By memorandum dated 15 March 2019, the Amphibious Squadron FOUR commander endorsed the CI report referenced in paragraph 3c above, but added several findings of facts and opinions.[6] Among these additional findings of fact was that Petitioner, as the USS SAN ANTONIO commander, failed to ensure the generation and commanding officer-level approval of a Special Evolution Watch Bill to cover small boat operations; that the existing USS SAN ANTONIO Boat Bill had not been signed by Petitioner as required by COMNAVSURFORINST 3502.1D; and that the deck log provided to the CI did not indicate that boat operations were

---

[2] The RHIB engines failed to start upon entering the water. At the same time, the crane system malfunctioned in that it would not immediately retract the RHIB from the water. As a result, the RHIB was being pulled by the crane system alongside the USS SAN ANTONIO while the crew could exercise no control. At approximately 0806, the RHIB struck the USS SAN ANTONIO's port-side accommodation ladder twice and became pinned against it. The RHIB turned sideways and started taking on water. See enclosure (4).

[3] Subsequent investigation found that the missing Sailor was likely rendered unconscious after hitting his head on the USS SAN ANTONIO's port accommodation ladder, and that he slipped out of his inflatable life preserver in this unconscious state and sunk into the water because the life preserver was too large. The missing Sailor's life preserver was recovered inflated, zipped-up, and with the buckle and chest snap fastened. However, three snaps on both the left and right sides were unfastened, and the life preserver was found to be several sizes larger than the Sailor's uniform size.

[4] A Navy Lieutenant Commander (O-4) was appointed to conduct this CI.

[5] This omission is unsurprising given that the appointed investigating officer was subordinate to Petitioner. Per reference (b), an investigating officer should be senior in rank to any individual whose conduct is subject to inquiry whenever practicable.

[6] This endorsement, along with the original CI report, was forwarded to the U.S. FIFTH Fleet commander.

occurring at any point prior to noting the "man overboard" at 0806 local time. Among the additional opinions provided was that probable causes of the missing Sailor's death included Petitioner's failure to provide an approved watch bill and to ensure proper supervision of a Special Evolution detail that was stationed to conduct small boat operations; and that supervisory failures allowed the RHIB to enter the water without its engines running, for a line handler to improperly handle the line without intervention, and for the missing Sailor to don a life preserver that was too large. The Amphibious Squadron FOUR commander further opined that Petitioner's issuance of a Special Evaluation Watch Bill, as required by COMNAVSURFORINST 3502.1D, would have ensured that qualified personnel filled all positions, that unqualified personnel were assigned qualified monitors, that qualified supervisors were stationed at all locations involved in the boat launching process, and that dedicated qualified safety observers were posted at all locations involved in the boat launching process. Accordingly, the Amphibious Squadron FOUR commander added a recommendation for disciplinary action against Petitioner for failing to ensure that an approved Special Evolution Watch Bill was in place to support small boat operations. See enclosure (4).

e. On 6 April 2009, a reinvestigation of the circumstances of 4 February 2009 was ordered with a more senior investigating officer.[7] By memorandum dated 15 April 2009, the newly appointed investigating officer issued his report of investigation, opining that the missing Sailor's likely cause of death was that discussed in footnote 3 above and that contributing factors to the Sailor's death were: (1) the Petitioner's failure to provide an approved watch bill and the lack of proper supervision of a special evolution detail that was stationed to conduct small boat operations; (2) supervisory failure that allowed the RHIB to enter the water without engines running; (3) supervisory failure that allowed the sea painter line handler to improperly handle the sea painter without intervention; and (4) supervisory failure that allowed the missing Sailor to don a life preserver which was too large. Amongst the recommendations made by the investigating officer was disciplinary action for Petitioner for his failure to ensure an approved Special Evolutions watchbill was in place to support small boat operations. See enclosure (5).

f. By memorandum dated 17 April 2009, the Amphibious Squadron FOUR commander endorsed the findings, opinions, and recommendation of the CI referenced in paragraph 3e above.[8] See enclosure (6).

g. By memorandum dated 20 April 2009, the Task Force FIVE ONE commander endorsed the findings, opinions, and recommendation of the CI referenced in paragraph 3e with one

---

[7] This reinvestigation was ordered by the Task Force FIVE ONE commander because of issues that were not sufficiently addressed in the original CI. Three areas identified to require further investigation were boat crew qualifications, required safety protocols and whether they were followed, and causal factors contributing to the loss of the missing Sailor. This order for further investigation also directed that an O-6 Surface Warfare Officer be appointed as a new investigating officer to ensure an officer with sufficient experience and seniority evaluated all relevant matters related to the incident.

[8] The Amphibious Squadron FOUR commander reportedly counseled Petitioner on 28 April 2009, but this counseling is not documented in Petitioner's naval record. When recommendations were later made for disciplinary action against Petitioner, the Amphibious Squadron FOUR commander determined that this previous action was sufficient to address the situation.

relevant exception.[9] Specifically, he found the opinion referenced in paragraph 3e above that supervisory failure allowed the RHIB to enter the water without its engines running to be inappropriate since the evidence shows that one of the Sailors onboard attempted to start the engines as soon as the RHIB was waterborne. Accordingly, the Task Force FIVE ONE commander amended this opinion to reflect that "[s]upervisory failure for failing to ensure effective supervision of boating operations" was a contributing factor to the missing Sailor's death. He offered no opinion regarding the recommendation for disciplinary action against Petitioner, noting that this decision was within the discretion of the Amphibious Squadron FOUR commander and his administrative chain of command.[10] See enclosure (7).

h. By memorandum dated 5 August 2009, the U.S. FIFTH Fleet commander approved the findings, opinions, and recommendations of the reinvestigated CI forwarded to him for review, subject to certain modifications. Among these modifications was that he relabeled what were described as "contributing factors" to the missing Sailor's death (see paragraph 3e above) as "probable causes" to the death. He also disapproved the amended opinion made by the Task Force FIVE ONE commander referenced in paragraph 3g above, thus restoring the original opinion which had been modified. Finally, the U.S. FIFTH Fleet commander approved the recommendations of the investigating officer, noting that Petitioner's actions (and those of his Executive Officer (XO) and the ship's Boatswain) may constitute violations of Article 92, Uniform Code of Military Justice (UCMJ), for dereliction of duty, and referred initial disposition on these recommendations to the Amphibious Squadron FOUR commander. See enclosure (8).

i. In March 2010, the Naval Surface Force Atlantic commander informed the Commander, U.S. Fleet Forces Command, that he had reviewed the CI as approved by the U.S. FIFTH Fleet commander and determined that the administrative action taken against Petitioner in April 2009 (see footnote 8 above) was appropriate and sufficient.[11] See enclosure (9).

j. After receiving the response to his inquiry referenced in paragraph 3i above, the Commander, U.S. Fleet Forces Command, determined that Petitioner warranted non-judicial punishment (NJP) for dereliction of duty. See enclosure (10). Accordingly, on 4 May 2010 he charged Petitioner with dereliction of duty in violation of Article 92, UCMJ.[12] See enclosure (11).

k. On 13 May 2010, Petitioner received NJP from the Commander, U.S. Fleet Forces

---

[9] The Task Force FIVE ONE commander also added a recommendation for revision to a Navy technical manual which is irrelevant to the present matter.

[10] The Task Force FIVE ONE commander was in Petitioner's operational chain of command at the time of the incident, but was not in his administrative chain of command.

[11] Enclosure (9) also reflects that the then-current Amphibious Squadron FOUR commander, who coincidentally was the officer who conducted the reinvestigation discussed in paragraph 3e above and made the recommendation for disciplinary action, elected not to take any further action against Petitioner. This information was requested by the Commander, U.S. Fleet Forces Command, in the context of resolving the promotion delay pertaining to Petitioner's XO.

[12] Specifically, Petitioner was charged with being "derelict in the performance of [his duties as the USS SAN ANTONIO commander] in that he negligently failed to ensure effective supervision of boating operations and to ensure a Special Evolutions watchbill was in place to support small boat operations as it was his duty to do, and as a result, improper actions and the participation of unqualified personnel during the launching of the 11 meter RHIB contributed to a mishap in which a Sailor under his command was lost at sea."

Command, for the charge referenced in paragraph 3j above. Specifically, he received a punitive letter of reprimand (PLOR).[13] See enclosures (11) and (12).

l. By memorandum dated 21 May 2010, Petitioner appealed the NJP referenced in paragraph 3k above to the Vice Chief of Naval Operations (VCNO).[14] Specifically, while acknowledging that he was accountable for his success or failure in executing his duties and that his performance is measured against established standards, he asserted that imposition of a PLOR over 14 months after the incident occurred was unjust and that he was properly held accountable by his immediate commander at the time. He also asserted that "[s]ignificant design, technical documentation, and procedural issues known and not corrected or unforeseen by cognizant Department of the Navy officials had significant impact on the boating accident that a special evolutions watch bill alone could not mitigate," and that manning and training issues were also either contributing or causal factors in the accident. See enclosure (13).

m. By memorandum dated 3 June 2010, the Commander, U.S. Fleet Forces Command, responded to Petitioner's appeal of the NJP referenced in paragraph 3l above. Specifically, he noted that Petitioner was afforded the opportunity to raise the design, technical documentation, and procedural issues that he raised for the first time on appeal during his NJP hearing, but declined to do so. He also noted that Petitioner acknowledged his accountability for the actions and inactions of his crew, and that he was not aware of the qualifications of the crewmembers involved in the evolution but believed them to be qualified. Even considering the new issues raised by Petitioner for the first time on appeal, the Commander, U.S. Fleet Forces Command, insisted that his decision to impose NJP was correct. Petitioner did not have a Special Evolutions watchbill in place and there were unqualified individuals serving as signalman, crane operator, and crewmembers on the RHIB. Further, neither Petitioner nor his XO were on the bridge maintaining oversight of the evolution at the time of the mishap, and that the measures which Petitioner enacted in the immediate aftermath of the incident were those which he should have had in place prior to the incident. Accordingly, the Commander, U.S. Fleet Forces

---

[13] This PLOR, also dated 13 May 2010, read in relevant part as follows:

> 2. The 11-meter RHIB launching evolution on 4 February 2009 was deficient in a number of respects. First and foremost, it occurred without adequate supervision and oversight. Neither you nor your Executive Officer had eyes on the event, despite knowing that the First Lieutenant billet was gapped and that there were other evolutions ongoing that created an overall situation warranting continuous command leadership involvement. In addition, no special evolution watchbill was promulgated and some of the crew participating in the RHIB launching evolution did not have appropriate training and qualifications. Furthermore, errors were made by line handlers, signalmen, crane operators, and safety observers, resulting in the small boat tipping and its crewmembers entering the water. One of the crewmembers … was lost at sea after he struck the accommodation ladder and slipped from his flotation vest, which was too large and improperly fastened.
>
> 3. The authority with which you were entrusted as Commanding Officer carried with it the absolute responsibility for the welfare of your ship and crew. You were ultimately responsible for the safe conduct and supervision of small boat operations. The investigation report and your subsequent acceptance of responsibility at Mast clearly demonstrate that your performance fell short of that expected of a Commanding Officer. Pursuant to [Article 15, UCMJ, Paragraph 5 of Part V, Manual for Courts-Martial, and paragraph 0114 of reference (b)], you are hereby reprimanded for dereliction in the performance of your duties.

See enclosure (12).

[14] Although Petitioner appealed his NJP, he did not submit a statement in response to the PLOR.

Command, recommended that Petitioner's appeal be denied. See enclosure (10).

n. By memorandum dated 21 June 2010, the VCNO denied Petitioner's appeal of his NJP. Specifically, the VCNO found that the imposition of NJP complied with all legal requirements; that Petitioner was afforded all procedural rights; that the Commander, U.S. Fleet Forces Command, had a basis in law and fact for his action; and that the punishment awarded was appropriate considering the nature of the offense and neither unjust nor disproportionate to the offense committed. See enclosure (14).

o. By memorandum dated 2 August 2010, the Commander, U.S. Fleet Forces Command, prepared a Report of NJP in accordance with references (b) and (c). He did not recommend Petitioner for Detachment for Cause, and further recommended that Petitioner not be required to show cause for retention in the Navy. See enclosure (15).

p. By memorandum dated 1 September 2010, Petitioner provided a statement in response to the Report of NJP referenced in paragraph 3o above. He insisted that he was not guilty of the alleged offense, and expressed concerns regarding the accuracy of the documentation supporting the NJP. Specifically, he reiterated his arguments from his NJP appeal regarding the actual causes of the accident, and attacked virtually all of the conclusions reached by the CI. Petitioner denied negligently violating, supporting, or encouraging deviations from procedures or regulations,[15] and insisted that he signed all watchbills required by the Navy Standard Operating Regulations Manual which were unit level certified as sufficient in scope, meeting requirements, and accountability. Petitioner further insisted that sufficient action was taken at the unit level for issues and that his command and the Naval Safety Center did not cite the causal factors related to Petitioner's supervision which were raised in the CI. See enclosure (16).

q. By memorandum date 22 September 2010, the Commander, U.S. Fleet Forces Command, endorsed and forwarded Petitioner's response to the Report of NJP referenced in paragraph 3p above, noting that the matters raised by Petitioner were the same as those raised and ultimately rejected by the VCNO in his NJP appeal. He also noted that many of the issues raised by Petitioner were included in the CI report which he considered when awarding NJP, and that the failure of intermediate commanders to take punitive action did not limit his right as a superior commander to do so. Finally, he asserted that none of Petitioner's assertions affected his conclusion that Petitioner was negligently derelict in the performance of his duties as the USS SAN ANTONIO commander. See enclosure (17).

r. On 1 November 2010, a special court-martial convened to consider a dereliction of duty charge arising from the same event at issue in the present case against Petitioner's XO.[16] See enclosure (18).

s. By memorandum dated 15 November 2010, the Commander, Navy Personnel Command (NPC), notified Petitioner that he would not be required to show cause for retention in the naval

---

[15] Petitioner was not accused of violating, supporting or encouraging such deviations.
[16] Petitioner's XO was presumably court-martialed for dereliction of duty because he refused NJP and demanded trial by court-martial. As Petitioner remained attached to the USS SAN ANTONIO at that time, he did not have the same right to refuse NJP and demand trial by court-martial pursuant to the "vessel exception" of Article 15, UCMJ.

service, but that this determination did not in any way preclude or limit the use of information and opinions contained in the Report of NJP in future administrative or other proceedings, to include promotion selections. Petitioner was also informed that the Report of NJP would be filed in his naval record, and that he could submit a statement in response to the adverse material inserted into this record. See enclosure (19).

t. Presumably due to the adverse information present in his record, Petitioner failed of selection (FOS) by each of the Navy Active-Duty Captain (Line) promotion selection boards (PSB) for Fiscal Years (FY) 2013 – 2016.[17] See enclosure (20).

u. On 30 September 2015, Petitioner was honorably retired from the Navy in the rank of Commander (O-5) with more than 24 years of service. See enclosure (21).

4. Procedural Background.

a. In March 2017, Petitioner submitted his first application to the Board requesting the following relief: (1) Removal of the PLOR from his naval record; (2) removal of any adverse information pertaining to his NJP from his naval record; (3) removal of his FOS for promotion and the convening of Special Selection Boards (SSB); and (4) any other relief that the Board deemed fit. He asserted that this relief was warranted because the preponderance of the evidence supported the conclusion that he was not derelict in his duty aboard the USS SAN ANTONIO and that all notions of fairness and justice are affronted by the illegitimate PLOR.

(1) In support of his contention that he was not derelict in his duty, Petitioner asserted that he had no duty to sign a Special Evolutions watchbill to support small boating operations, and that he had signed all watchbills required of him by the Navy Standard Organization and Regulations Manual (SORM).[18] He also asserted that the procedures that he utilized were the same utilized on the USS SAN ANTONIO by his predecessor, and that he ensured that sufficient supervision was established for small boat operations on the day of the incident in question. Petitioner also objected to the conclusion that any failures on his part contributed to the accident, asserting that the incident was the result of a technical deficiency in the LPD-17 class ships.[19]

(2) In support of his contention that issuance of the PLOR was unfair and unjust, Petitioner cited to his exemplary record of service and the fact that his XO was acquitted of the same offense based upon the same facts after being afforded the full rights and protections of a special court-martial which was denied to Petitioner.

---

[17] The FY 2013 Navy Active-Duty Captain (Line) PSB convened on or about 11 January 2012.

[18] Petitioner's predecessor in command testified at the court-martial of Petitioner's XO that there was no watchbill requirement for small boat operations. Rather, the only requirement was that a watch team replacement plan was in place. He also asserted that the prosecution's expert witness on amphibious ship deck evolutions and operations testified there was no watchbill requirement for small boat operations. However, review of this testimony in the court-martial record provided by Petitioner for review on remand revealed that this expert testified that he could not recall where there was a requirement for such a watch bill, and that he could not "quote or direct attention" to any such requirement.

[19] Petitioner noted that deficiencies in the crane system for the LPD 17 class ships and in the flotation device utilized by the missing Sailor had been identified years earlier, but that no corrective action was taken.

See enclosure (22).

b. By memorandum dated 2 February 2018, the NPC Office of Legal Counsel (OLC) provided an advisory opinion (AO) for the Board's consideration, recommending that Petitioner's request for relief be denied. This AO found that while Petitioner made a compelling case that he had no duty to perform the acts that he was charged with being derelict in negligently failing to perform, it is difficult to determine that there was insufficient evidence to support the charge since there is no formal record of NJP proceedings. As a result, there is no way to know what evidence the Commander, U.S. Fleet Forces Command, relied upon in reaching the conclusion that Petitioner was derelict in his duties. This AO also found compelling Petitioner's argument that it was unfair that Petitioner's XO was afforded the protections of a court-martial while Petitioner was denied those protections due to the vessel exception to Article 15, UCMJ, but noted that there was any number of reason for the disparate results in their respective cases. It also noted that Petitioner had different duties as the commander than did his XO. As such, the AO found that the evidence was simply insufficient to show that the disparate results between Petitioner's NJP and his XO's court-martial were unjust or unfair. See enclosure (23).

c. The Board originally convened to consider Petitioner's application in Docket No. 2451-17 on 30 April 2018, but determined that it needed to see a copy of the CI report to fairly decide Petitioner's case. Petitioner's counsel provided the report upon request by letter dated 14 May 2018. See enclosure (24).

d. The Board reconvened to consider Petitioner's case in Docket No. 2451-17 on 30 May 2018 and found insufficient evidence of any probable material error or injustice warranting relief.[20] Specifically, the Board concurred with the NPC OLC AO referenced in paragraph 4b above that there was simply insufficient evidence and basis for the Board to exercise its broad corrective powers as requested. The Board found that the CI revealed that a special watchbill for small boating operations were clearly needed, and that it was Petitioner's responsibility as the commander to ensure that proper safeguards were in place. With regard to Petitioner's argument regarding the disparate treatment and results between him and his XO, the Board found that the imposition of NJP complied with all procedural requirements and that Petitioner was afforded all of his procedural rights in that regard. See enclosure (25).

e. On 13 January 2022, Petitioner filed suit in the D.D.C. In this complaint, Petitioner reiterated the arguments made in his application to the Board in Docket No. 2451-17, but included assertions not previously made. Specifically, Petitioner implied that the Commander, U.S. Fleet Forces Command, administered NJP against Petitioner to "scapegoat" Petitioner ahead of Congressional hearings on naval readiness. Petitioner made the following claims for relief in this complaint:

(1) Docket No. 2451-17 must be set aside as contrary to law, as the record compelled a reasonable mind to find a contrary conclusion to the holding that there was sufficient evidence to establish the necessary elements of the charge against Petitioner. Specifically, Petitioner asserted

[20] The Board did not address Petitioner's request for an SSB, finding that he must first exhaust his administrative remedies by making such a request through NPC.

that the evidence reflected that there was no duty to issue a special watchbill at the time of the incident and that Petitioner ensured appropriate supervision of the operation.[21]

(2) Docket No. 2451-17 must be set aside as arbitrary and capricious, as the injustice levied against Petitioner by using him as a scapegoat was so great as to require overturning under *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508 (D.C. Cir. 1989). Specifically, Petitioner implied that the Commander, U.S. Fleet Forces Command, deliberately subjected Petitioner to the lower standard of proof inherent in NJP proceedings due to concerns regarding his upcoming congressional hearings, which resulted in a disparate outcome relative to his XO who was acquitted after being afforded the higher standard of proof at a court-martial. He also noted that the NJP was imposed approximately 15 months after the incident in question, that his immediate superiors believed that counseling was sufficient, and that the Navy's reaction showed that the incident occurred due to problems with the equipment and manning of the *San Antonio* class of ships.

(3) If the NJP charges are cleared from Petitioner's naval record, his FOS for promotion to Captain should also be removed and a SSB should be convened.

Based upon these allegations of error, Petitioner requested that the D.D.C. issue an order finding that the Board's decision in Docket No. 2451-17 was unsupported by substantial evidence by finding that Petitioner had a duty to issue a special watchbill and that Petitioner had not ensured adequate supervision of the small boat launching operation,[22] contrary to law since the elements of dereliction of duty in violation of Article 92, UCMJ, were not established, and arbitrary and capricious in finding insufficient evidence of an injustice; removing the PLOR and Petitioner's FOS for promotion to Captain from his naval record; direct convening of a SSB; and remand the matter to the Board for further proceedings. See enclosure (26).

f. Upon receipt of the complaint at enclosure (26), the Department of the Navy's (DON) Agency Counsel requested that the Board provide its case file for Docket No. 2451-17. Unfortunately, the electronic case file could not be discovered within the Board's electronic records management system or among the limited remaining paper records retained at the Board's location.[23] In lieu of the case file, the Board provide the documents remaining on the case examiner's computer.[24] The Board was able to recreate most of the case file in this manner, but it could not guarantee that these documents represented all of the documents considered by

---

[21] Petitioner also asserted that the Board's speculation in Docket No 2451-17 regarding the evidence that may have been before the Commander, U.S. Fleet Forces Command, must be set aside as unsupported by substantial evidence. The Board believed this argument to be without basis, as it is the Petitioner's burden to prove the existence of an error or injustice and he failed to do so in Docket No. 2451-17.

[22] In making these requests, Petitioner mischaracterized the Board's action in Docket No. 2451-17. The Board did not find that there was a duty for Petitioner to issue a special watchbill or that he ensured adequate supervision of the operation. That is not the Board's function. Rather, the Board simply found insufficient evidence of error or injustice in the determinations made by the naval officials who were responsible and qualified to make such findings.

[23] An informal internal inquiry concluded that the case file was most likely not available within the Board's electronic records management system because it was either not scanned or was filed under the wrong casefile by the contractors hired in the years since Docket No. 2451-17 was decided to digitize the Board's paper records.

[24] The case examiner coincidentally retained these documents in a file on her computer due to the request for the CI report referenced in paragraph 4c above.

the Board. See enclosure (27).

g. Due in part to the inability of the Board to guarantee that the administrative record for Docket No. 2451-17 provided for purposes of the pending litigation was complete, on 11 March 2024 the D.D.C. granted the Government's motion to voluntarily remand Petitioner's case for reconsideration.[25] See enclosure (1).

h. Under cover of a letter and an updated DD Form 149 both dated 10 April 2024, Petitioner provided additional matters for consideration by the Board pursuant to its reconsideration.[26] These matters included a 35-page legal brief signed by Petitioner's counsel and 33 attached exhibits.[27] Amongst these exhibits was the 1555-page record of trial for the court-martial of Petitioner's XO resulting in his acquittal.[28] His argument for relief in these matters generally followed that which he had raised in his first application and in his complaint to the COFC. Specifically, he asserted that the preponderance of the evidence demonstrated that he was not derelict in his duties as commander of the USS SAN ANTONIO because he had adequately supervised the launch of the RHIB, had no duty to issue a special watchbill for small boat operations, and did nothing to contribute to the accident; and that his PLOR was an injustice requiring correction. It was supplemented, however, by specific references to the testimony presented at his XO's court-martial and by his assertion that he was made a "scapegoat" by the Commander, U.S. Fleet Forces Command, in anticipation of Congressional scrutiny. See enclosure (2).

i. By memorandum dated 2 August 2024, the Criminal Law Division of the DON Office of the Judge Advocate General (OJAG Code 20) provided an AO for the Board's consideration. In summary, this AO found that the so-called "vessel exception" of Article 15, UCMJ, applied to Petitioner's NJP and that the Commander, U.S. Fleet Forces Command, was therefore within his authority to deny Petitioner the opportunity to demand trial by court-martial, and that a rational review of the evidence supports his finding that Petitioner was negligently derelict in the performance of his duty as the USS SAN ANTONIO commander.[29] See enclosure (28).

j. By letter dated 29 August 2024, Petitioner's counsel provided a rebuttal to the OJAG Code 20 AO referenced in paragraph 4i above. This response essentially reiterated Petitioner's previously made arguments that there was no Navy requirement for a special watchbill for small

---

[25] See paragraph 1 above for discussion of the specific instructions included in this remand order.
[26] These matters were received by the Board on 16 April 2024.
[27] By comparison, the brief provided for Docket No. 2451-17 was only 17 pages in length.
[28] This record of trial was not included in the matters originally submitted by Petitioner for Docket No. 2451-17.
[29] The OJAG Code 20 AO noted that the Commander, U.S. Fleet Forces Command, in reaching the conclusion that Petitioner was derelict in the performance of his duty at Commander, USS SAN ANTONIO, cited to the finding reached in the first CI that proper supervisory controls aboard the USS SAN ANTONIO contributed to the incident, to include the fact that the crane operator was under instruction but his instructor was not in the cab when the RHIB capsized; the fact that the signalman at the time that the Sailor went overboard was not qualified as a signalman; the USS SAN ANTONIO did not have a formal watchbill for the boat deck, with all personnel not on watch reporting for board evolutions; and the boat engineer for RHIB operations (i.e., the Sailor who went overboard) was not listed on the Engineering watchbills. The AO also noted that Petitioner was not on the bridge at the time of the incident despite the fact that multiple complex operations were occurring at the time of the RHIB launch, and that the second CI also cited the lack of sufficient supervisory controls and risk mitigation by Petitioner as a contributing factor in the incident.

boat operations on 4 February 2009 and that Petitioner adequately supervised the launch of the RHIB on that date. See enclosure (29).

5. Conclusions. Upon careful review and consideration of all the evidence of record, the Board found sufficient evidence of an injustice warranting equitable relief is warranted in the interests of justice.

a. The Board found no error in the imposition of NJP, or the resulting PLOR, when it was administered. The evidence available to the Commander, U.S. Fleet Forces Command, supported his finding that Petitioner was negligently derelict in the performance of his duties as the USS SAN ANTONIO commander. His finding in this regard was supported by the approved CI findings and by the members of Petitioner's chain of command. It was Petitioner's immediate commander who originally found that Petitioner had a duty to issue a Special Evolutions watchbill and that supervisory failures contributed to the death of the missing Sailor, as evidenced by his additional findings in enclosure (4) and by the fact that he counseled Petitioner for his failures, and that conclusion was supported by every member of both the operational and administrative chains of command. In fact, it was the U.S. Fifth Fleet commander, who was in the operational chain of command for the USS SAN ANTONIO at the time of the incident, who opined that Petitioner's supervisory failures may constitute dereliction of duty in violation of Article 92, UCMJ. Petitioner did not raise many of the issues which he subsequently raised on appeal and/or to the Board and the D.D.C. during his NJP hearing, so it was not unreasonable for the Commander, U.S. Fleet Forces Command, not to factor these arguments into his conclusion that Petitioner was negligently derelict in the performance of his duties as the USS SAN ANTONIO commander. Even so, neither the VCNO nor the Board in Docket No. 2451-17 agreed with Petitioner's contention that the design and procedural issues pertaining to *San Antonio* class ships absolved Petitioner of his duties in this regard. The Board agreed with these conclusions because Petitioner's argument in this regard confused the proximate causes of the accident with his actual duty. Petitioner argument in this regard fails because could have been derelict in his duty to issue a Special Evolutions watchbill and/or to adequately supervise an operation of his ship even if, *arguendo*, his failure to adequately perform such duty was not a proximate cause of the missing Sailor's death.

b. The Board also found no error or injustice in the fact that Petitioner was denied the opportunity to demand trial by court-martial, or that his case received different treatment in this regard than did the similar case pertaining to his XO. The Commander, U.S. Fleet Forces Command, was within his discretion to deny Petitioner the right to refuse NJP and to demand trial for court-martial on the charge of dereliction of duty in violation of Article 92, UCMJ, based upon the "vessel exception" of Article 15, UCMJ. Specifically, Petitioner was not entitled to refuse NJP because he was attached to the USS SAN ANTONIO at the time that NJP was imposed and the USS SAN ANTONIO was a vessel within the meaning of Article 15, UCMJ. The Board also found the decision of the Commander, U.S. Fleet Forces Command, to enforce the "vessel exception" in Petitioner's case to be reasonable for the very reason that the exception exists – Petitioner was the ship commander and operational mission requirements preclude the extended absence of the commander from any ship which court-martial proceedings would entail. The Board also finds no injustice in the fact that Petitioner was denied a right afforded to his XO in this regard based upon the circumstances of their respective cases. Specifically,

Petitioner's case was treated differently than was his XO's not due to a deliberate decision to discriminate against him, but rather because of their differing circumstances at the time. Petitioner's XO undoubtedly would also have been denied the right to refuse his NJP if he happened to remain attached to the USS SAN ANTONIO or any other vessel at the time that NJP was imposed.

c. Although the Board found no error in the imposition of NJP, or the resulting PLOR, based upon the evidence available at the time, it did find an injustice in the outcome based upon the newly presented evidence which was not previously provided to the Board. Specifically, the Board found that the testimony presented in during the court-martial of Petitioner's XO, which had not occurred at the time of Petitioner's NJP and which was not previously provided to the Board for consideration in Docket No. 2451-17, to be particularly compelling and supportive of Petitioner's assertion that he did not have duty to issue a Special Evolutions watchbill under the circumstances and that he did not fail to adequately supervise the RHIB launching operation. Specifically, Petitioner's XO presented the testimony of Petitioner's predecessor in command which revealed that Petitioner's conduct both before and during the launching of the RHIB on 4 February 2009 was consistent with the expectations of the ship commander in that regard. More specifically, he testified that he did not issue special watchbills or instructions for small boat operations when he was in command of the USS SAN ANTONIO. Another officer who had previously been stationed onboard the USS SAN ANTONIO testified that the commander did not necessarily remain on the bridge during preparation for small boat operations and that Petitioner returned to the bridge almost immediately after the occurrence of the mishap, which suggests that Petitioner was not derelict in being momentarily absent from the bridge at the time of the incident. The Director of Command and Sea Training at the Navy Surface Warfare Officer School could not identify any governing instruction requiring a special watchbill for small boat operations, and the prosecutor's expert witness on amphibious ship deck evolutions and operations could not identify any such requirement. Finally, a Navy expert in small boat operations did not testify to the requirement for a special evolutions watchbill for such operations, but did opine that such operations did not typically require the commander's "eyes on" attention. This testimony, combined with the results of the XO's court-martial, provided the Board with significant doubt as to whether Petitioner had a duty to issue a special evolutions watchbill on 4 February 2009 and that he was derelict in failing to adequately supervise this operation.

d. In addition to finding sufficient doubt in whether Petitioner was derelict in any duty associated with the incident on 4 February 2009, the Board also found the timing of Petitioner's NJP relative to upcoming congressional testimony regarding fleet safety to be suspicious. Approximately nine months passed between the final approval of the CI by the U.S. FIFTH Fleet commander on 5 August 2009 and the initiation of NJP by the U.S. Fleet Forces commander on 4 May 2010. Petitioner's immediate commander at the time and that commander's successor had previously determined that Petitioner's conduct warranted no more than administrative counseling, and the Naval Surface Force Atlantic commander agreed that that was an appropriate disposition after reviewing all of the evidence. As Petitioner noted for the first time in the present remand, the determination of the U.S. Fleet Forces commander that NJP was warranted for conduct which the entire chain of command had already determined should be disposed of through administratively counseling coincided with upcoming congressional testimony during

which he anticipated being questioned regarding fleet safety. Under these circumstances, the Board found it likely that the U.S. Fleet Forces commander's decision to charge both Petitioner and his XO was likely influenced by his desire to deflect allegations that no one had been held accountable for the missing Sailor's death. Combined with the fact that the evidence from the XO's court-martial suggested that the Petitioner was not derelict in any duty with regard to the events of 4 February 2009, the Board found an injustice in the NJP imposed by the U.S. Fleet Forces commander.

e. Having found the newly provided evidence sufficient to establish that Petitioner was not negligently derelict in his duties on 4 February 2009, the Board found an injustice in the fact that he received NJP for such conduct and that his otherwise promising career was sidetracked as a result of that action. The Board further finds that the presence of this unjust NJP in Petitioner's naval record, along with the PLOR which resulted from it, denied Petitioner fair consideration by the various PSBs which subsequently considered but FOS him for promotion to Captain. Accordingly, while the Board found no error in the NJP at the time it was issued and/or in the consequences which followed, it did find an injustice based upon the totality of the circumstances as they are now known warranting the corrective action recommended below.

6. Recommendations. In order to address the injustice identified in paragraph 5 above, the Board recommends that the following corrective actions be taken on Petitioner's naval record:

a. Remove from Petitioner's naval record the NJP of 13 May 2010, along with all associated documents. These associated documents include, but are not necessarily limited to, the PLOR dated 13 May 2010; Petitioner's NJP appeal and all subsequent endorsements; the Report of NJP, along with Petitioner's response thereto and all subsequent endorsements; and the Show Cause Authority's determination that Petitioner would not be required to show cause for retention, be removed from Petitioner's naval record.[30]

b. Remove from Petitioner's naval record all references to his FOS by the FY 2013 through FY 2016 Navy Active-Duty Captain Line PSBs.

c. Upon correction of Petitioner's naval record as directed herein, convene successive SSBs to reconsider Petitioner's corrected record for promotion to Captain pursuant to the criteria for each of the PSBs which FOS him for promotion, and take appropriate corrective action to implement the recommendation of these SSBs.[31] In this regard, appropriate action may include, but is not necessarily limited to, processing any favorable promotion recommendation through the confirmation and appointment process, correcting his naval record to reflect such promotion if so appointed and confirmed on the date that he otherwise would have been promoted but for the injustice identified herein, and correcting his DD Form 214 to reflect his final and retired

[30] NPC shall conduct a scrub of Petitioner's naval record to identify and remove any reference to or product of the NJP in his record.

[31] An SSB shall be convened to compare Petitioner's corrected naval record to each of the Active-Duty Navy Captain (Line) PSBs which FOS him for promotion to Captain, starting with the FY 2013 PSB and continuing sequentially through each until either one of the SSBs selects him for promotion to Captain or an SSB has been conducted for each.

date of rank based upon those results. However, FOS by each of these SSBs would result in no change to Petitioner's naval record.

d. Carefully scrub Petitioner's naval record to identify and remove any material or entries inconsistent with the Board's recommendation herein, and ensure that no such entries or material are added to that record in the future.

7. It is certified that a quorum was present at the Board's review and deliberations, and that the foregoing is a true and complete record of the Board's proceedings in the above titled matter.

8. In accordance with Sections 6e(1)(a) and 6e(1)(c)[32] of the Attachment to SECNAVINST 5420.193 and having assured compliance with the provisions of that regulation, the foregoing action of the Board is submitted for your review and action.

12/13/2024

X

ELIZABETH A. HILL
Executive Director

ASSISTANT GENERAL COUNSEL (MANPOWER AND RESERVE AFFAIRS) DECISION:

___ Board Recommendation Approved (Grant Relief – I concur with the Board's conclusion and therefore direct the relief recommended by the Board above.)

_X__ Board Recommendation Disapproved (Deny Relief – I do not concur with the Board's conclusions for the following reasons: See attached AGC memorandum)

X BIDWELL.CHARL ES.L.[redacted] Digitally signed by BIDWELL.CHARLES.L.[redacted] Date: 2025.03.06 15:57:53 -05'00'

CHARLES L. BIDWELL
Assistant General Counsel (M&RA)

[32] In accordance with Section 6e(2)(c) of the Attachment to SECNAVINST 5420.193, I have determined that the Board's conclusion and recommendations warrant Secretarial review.

THE ASSISTANT SECRETARY OF THE NAVY
(MANPOWER AND RESERVE AFFAIRS)
1000 NAVY PENTAGON
WASHINGTON, D.C. 20350-1000

1070
AGC
6 March 2025

To: Executive Director, Board for Correction of Naval Records
From: Assistant General Counsel (Manpower and Reserve Affairs)

Subj: REVIEW OF NAVAL RECORD OF COMMANDER ERIC C. CASH, USN, XXX-XX-[redacted](RET) (BCNR DOCKET NO. 2735-24)

Ref: (a) SECNAVINST 5420.193, Board for Correction of Naval Records, 19 November 1997
(b) ASN (M&RA) Memo, subj: "Delegation of Authority," 19 April 2011
(c) 10 U.S.C. § 1552
(d) ASN (M&RA) Memo, subj: "Delegation of Authority to the Board for Correction of Naval Records (BCNR) to Direct the Convening of a Special Selection Board (SSB), Supplemental All-Fully-Qualified Officers List (AFQOL), and Special AFQOL," 28 November 2017
(e) 10 U.S.C. § 628
(f) SECNAVINST 1402.1, Special Selection Boards, Supplemental All-Fully-Qualified-Officers Lists, and Special Boards, 29 April 2019
(g) DODI 1320.14, DoD Commissioned Officer Promotion Program Procedures, 16 December 2020
(h) DODI 1320.04, Military Officer Actions Requiring Presidential, Secretary of Defense, or Under Secretary of Defense for Personnel and Readiness Approval or Senate Confirmation, 3 January 2014
(i) MILPERSMAN 1611-010, Officer Performance and Separations for Cause

Encl: BCNR Docket No. 2735-24, 13 December 2024

1. Per reference (a), the authority to approve a decision of the Board for Correction of Naval Records, hereinafter referred to as the Board, is reserved to the Assistant Secretary of the Navy (Manpower and Reserve Affairs) (ASN (M&RA)) when comments by proper naval authority are inconsistent with the Board's recommendation and/or when the Board's Executive Director determines that the petition warrants Secretarial review. The Board's recommendation in the subject case was inconsistent with the comments offered by both the Navy Personnel Command Office of Legal Counsel in its advisory opinion (AO) of 2 February 2018 and the Criminal Law Division of the Office of the Judge Advocate General (OJAG Code 20) in its AO of 2 August 2024. Additionally, the Board's Executive Director indicated in paragraph 8 of the enclosure that she determined the subject case to warrant Secretarial review. Accordingly, the subject case falls within this reservation of approval authority. Per reference (b), the ASN (M&RA) delegated his authority to approve such decisions to the Assistant General Counsel (Manpower and Reserve Affairs).

2. Pursuant to this delegated authority, I hereby disapprove the recommendation of the Board in the subject case and direct that no corrective action be taken on the subject's naval record. I do not concur with the Board's finding of an injustice in the non-judicial punishment (NJP) issued by the Commander, U.S. Fleet Forces Command, or in Petitioner's resulting subsequent failures of selection for promotion to Captain. I also find that the Board's recommendation exceeds its authority and is contrary to naval regulations. This memorandum is provided to document my rationale for this determination.

3. The factual background of the subject case discussed in paragraphs 3 of the enclosure is adopted and incorporated by reference herein.

4. The Board's authority to direct the convening of Special Selection Boards (SSB) on behalf of the Secretary of the Navy is not derived from reference (c). Rather, it was delegated to the Board by the ASN (M&RA) in reference (d). However, the ASN (M&RA) specifically circumscribed this delegated authority by providing that the Board "shall fully comply with the statutory and regulatory requirements and limits related to SSB" when exercising it. As such, reference (d) specifically provides that the Board "shall not convene a SSB … for any person who, by maintaining reasonably careful records, may have discovered and taken steps to correct the error or omission on which the original [PSB] … based its decision against promotion."[1] Petitioner was aware of the final placement of the NJP and its related adverse material in his naval record upon receipt of the Show Cause Authority's determination of 15 November 2010 not to require him to show cause for retention in the Navy.[2] However, he took no subsequent action to correct this purported error prior to convening of the Fiscal Year 2013 Active-Duty Navy Captain (Line) Promotion Selection Board (PSB) on 11 January 2012, or prior to any of the three subsequent PSBs which considered but failed to select him for promotion. In fact, Petitioner's first effort to correct this purported error was when he first applied to the Board in March 2017, nearly 18 months after he was retired from the Navy. Accordingly, even if there were an injustice in the NJP which caused Petitioner not to be selected for promotion, he is no longer eligible for an SSB in accordance with reference (f) because he did not take any steps to correct the known issue in his naval record prior to any of the four PSBs which failed to select him for promotion to Captain. As such, the Board's recommendation that SSBs be convened to reconsider Petitioner's corrected record for promotion exceeds the Board's delegated authority and is contrary to the governing Department of the Navy regulation.

5. In addition to the fact that Petitioner's failure to take timely action to correct his naval record prior to the convening of any of the PSBs which failed to select him for promotion renders him ineligible for a SSB in accordance with reference (f), the reality is that Petitioner was unlikely to be promoted to Captain even if the Commander, U.S. Fleet Forces Command, had not imposed NJP against him. Reference (g) provides that "[a]dverse information will be presented to [PSBs] that consider officers for promotion to the grades of [captain]."[3] It also provides that such information "that has received significant media attention or is of interest to the Senate Armed

---

[1] This proscription is consistent with paragraph 1(c)(2) of Enclosure (4) to reference (f), which provides that "[a]n SSB will not be convened to consider any officer who, by maintaining reasonably careful records, might have discovered and taken steps to correct the error or omission in the official record prior to convening the PSB that considered by did not select the officer."
[2] See enclosure (19) to Docket No. 2735-24.
[3] See paragraph 3.2.c(5) of reference (g).

Services Committee … will be presented to [PSBs] that consider officers for promotion to the grades of [captain]."[4] The command investigation (CI) which found Petitioner to be derelict in his duty to issue a Special Evolutions watchbill and to adequately supervise the launching of the Rigid-Hulled Inflatable Board (RHIB) on 4 February 2009 is adverse information which met both of these criteria requiring presentation to the PSB, regardless of the decision to impose NJP against him.[5] Certainly Petitioner would have had the opportunity to contest such information prior to its presentation to a PSB, but given that the Board's present review was the first to find any doubt in the CI findings it is highly unlikely that his efforts would have been successful. Accordingly, the substantiated findings of the CI almost certainly would have been made available to the PSBs which considered but failed to select Petitioner for promotion to Captain even if the Commander, U.S. Fleet Forces Command, had not decided to impose NJP, and he would have failed of selection regardless.

6. Since Petitioner is not eligible for an SSB for the reasons discussed in paragraph 4 above and is no longer serving in the Navy, any error or injustice in the NJP issued to him in 2010 would now be moot. Petitioner's naval record, and the adverse material contained within it, is not accessible by the general public, so the presence of this adverse information in that naval record can have no further official adverse effect upon him. That being said, I do not concur with the Board's finding of an injustice in that NJP or its consequences. The evidence of record did, in fact, support the conclusion reached by every member of Petitioner's chain of command that Petitioner was derelict in his duty as commander of the USS SAN ANTONIO on 4 February 2009.

a. The Board applied undue weight to the result of the court-martial of Petitioner's Executive Officer (XO) to find that Petitioner's was not derelict in his duties on 4 February 2009. The duties of a ship XO are not the same as the duties of a ship commander, as those of the latter are far more broad and encompassing in scope than those of the former. Additionally, Petitioner's XO was not charged with the same omissions as was Petitioner. As such, the outcome of the XO's court-martial had virtually no probative value in regard to Petitioner's performance of his duties as the ship commander on 4 February 2009.

b. The Board's conclusion, as well as Petitioner's argument, that Petitioner had no duty to issue a Special Evolutions watchbill for small boat operations inappropriately relies upon the fact that such a duty is not specifically prescribed in writing in any instruction or doctrine. However, the duties of a naval commander are not so prescribed. While a naval commander is duty bound to comply with published requirements and standards, that is where a commander's duty only begins. The vast majority of a commander's duties will never appear in writing, but are dependent upon the circumstances in which the command finds itself. Neither I nor the Board are qualified to know whether Petitioner had a duty as the USS SAN ANTONIO commander to

---

[4] *Id.*

[5] "Adverse information is defined in reference (h) as "[a]ny substantiated adverse finding or conclusion from an officially documented investigation or inquiry or any other credible information of an adverse nature." To be credible, the information must be resolved and supported by a preponderance of the evidence. To be adverse, the information must be derogatory, unfavorable, or of a nature that reflects clearly unacceptable conduct, integrity, or judgment on the part of the individual." Every member of the chain of command which reviewed the evidence contained in the CI, up to and including the Vice Chief of Naval Operations found the allegation of dereliction of duty to be supported by a preponderance of the evidence, so it was certainly credible.

issue a Special Evolutions watchbill on 4 February 2009. However, the record of this case is replete with the opinions of experts imminently qualified to assess the duty of a ship commander at sea who did believe that Petitioner had such a duty. Petitioner's immediate commander at the time of the incident, the Amphibious Squadron FOUR commander, would have to be well versed in the duties of a ship commander in order to command a squadron of surface warships, and he certainly believed that Petitioner had such a duty. He was the first to find that Petitioner failed in this duty and to recommend that Petitioner receive disciplinary action for his failure in this regard.[6] Petitioner has endorsed the judgment of this officer, as he asserts that this officer's determination that administrative counseling was sufficient to address Petitioner's deficiency should overrule the judgment of the far more senior Commander, U.S. Fleet Forces Command. This officer's successor in command of Amphibious Squadron FOUR also believed that Petitioner had such a duty as the USS SAN ANTONIO commander on 4 February 2009, as he independently made this finding as the investigating officer for the CI reinvestigation on 15 April 2009.[7] The operational commander above Amphibious Squadron FOUR at the time of the incident, the Task Force FIVE ONE commander, who by virtue of his elevated position and experience, was likely even more qualified to assess the duties of a ship commander, concurred that Petitioner had such a duty when he endorsed the CI findings on 20 April 2009.[8] On 5 August 2009, the U.S. FIFTH Fleet commander, a highly experienced Navy flag officer who is certainly qualified to assess the duties of a ship commander, concurred that Petitioner had such a duty. In fact, he specifically relabeled Petitioner failures in this regard as "probable causes" of the death of the missing Sailor, as opposed to "contributing factors," and suggested that Petitioner's failures constituted dereliction of duty in violation of Article 92, UCMJ. The Commander, U.S. Fleet Forces Command, a four-star Navy flag officer imminently qualified to comment upon the duties of a surface ship commander, believed that Petitioner had such a duty when he imposed NJP on 13 May 2010. Finally, the VCNO, the second ranking officer in the U.S. Navy, apparently concurred with this assessment when he denied Petitioner's NJP appeal. In addition to the opinions of these imminently qualified and experienced senior naval officers, the duty of a commander to issue a Special Evolutions watchbill was endorsed by the Director of Command and Sea Training at the Navy Surface Warfare Officer School during his testimony at the court-martial of Petitioner's XO. As he is the officer responsible for the training of all surface warfare ship commanders in the Navy, his opinion of Petitioner's duty in this regard was highly persuasive. Each of these individuals was eminently qualified, and based upon their experience almost certainly more qualified than Petitioner, to assess the duties of a Navy surface warfare ship commander, and as noted by OJAG Code 20 their opinions in this regard were reasonably supported by the evidence in the record. Further, these expert opinions were essentially unrefuted in this regard since the results of the XO's court-martial were irrelevant to the duties of a ship commander.

c. The conclusion reached by the experts described in paragraph 6b above that Petitioner failed to adequately supervise the launching of the RHIB on 4 February 2009 was also supported by the evidence in the record. This was obviously a subjective determination, but the determination made by the Commander, U.S. Fleet Forces Command, in this regard was well supported by the evidence. In this regard, I did not find the evidence reflecting that Petitioner

---

[6] See enclosure (4) to Docket No. 2735-24.
[7] See enclosure (5) to Docket No. 2735-24.
[8] See enclosure (7) to Docket No. 2735-24.

performed his duties as his predecessor had done to be persuasive. If such procedures were not adequate to ensure the safety of Sailors in an inherently dangerous operation, Petitioner's adoption of such procedures would, in fact, be derelict.

7. The Board's conclusion that the Commander, U.S. Fleet Forces Command, may have charged Petitioner and his XO only to deflect anticipated criticism at impending Congressional testimony was entirely unsupported by the evidence. The Amphibious Squadron FOUR commander was obligated by reference (i) to report Petitioner's misconduct when he originally recommended disciplinary action against Petitioner, and then to submit a Report of No Misconduct when he decided to resolve that reported misconduct through non-punitive measures. However, he failed to submit such a report, and in doing so he deprived any superior officers in the chain of command of the information and opportunity necessary to exercise their own superior command authority to address the alleged offense. The record reflects that the Commander, U.S. Fleet Forces Command, sought information regarding the disposition of the allegations substantiated in the CI in the context of resolving the promotion withhold pending against Petitioner's XO. Since a Report of No Misconduct had not been submitted, that likely would have been the first time that the disposition of the substantiated allegation against Petitioner came to his attention. Frankly, it was entirely reasonable for him, as a senior naval leader, to find that administrative counseling was an insufficient sanction to address substantiated dereliction of duty by a ship commander which resulted in the death of a Sailor, and he was entirely within his right to exercise his authority as a commander to impose NJP. The suggestion that he exercised this authority only to "scapegoat" Petitioner in anticipation of upcoming Congressional testimony was pure speculation unsupported by any substantial evidence.

8. Conclusion. Multiple highly qualified senior naval leaders with considerable expertise in the duties of surface ship commanders determined that Petitioner was derelict in his duty to issue a Special Evolutions watchbill and to adequately supervise the launching of the ill-fated RHIB on 4 February 2019 after carefully reviewing the evidence and circumstances of the incident. These determinations were reasonably supported by the evidence, and are essentially unrefuted by any evidence other than Petitioner's argument to the contrary. Additionally, even assuming that Petitioner was not derelict in any such duties, he is ineligible for an SSB due to his failure to make efforts to correct such an error prior to the convening of any of the PSBs which failed to select him for promotion. As such, I do not concur with the Board's conclusion and direct that no corrective action be taken on Petitioner's naval record.

BIDWELL.CHARLES.L.[redacted] Digitally signed by BIDWELL.CHARLES.L[redacted] Date: 2025.03.06 15:53:46 -05'00'

CHARLES L. BIDWELL
Assistant General Counsel
(Manpower and Reserve Affairs)

**RECORDER'S LOG**

| | | |
|---|---|---|
| **BOARD MEMBERS:** | | **BOARD DATE:** 26 SEP 24 |
| Ms. Thompson | | **RECORDER:** Ms. Jane Ritchie |
| Ms. Wood | | **EXAMINER:** Mrs. Jessica Pyburn |
| Mr. Ures | | |

| | Last Name, First Name, MI | Docket No. | Grant | Deny Merit | Deny Statute | PA Req* | Comments |
|---|---|---|---|---|---|---|---|
| 1 | Cash, Eric | 2735-24 | GGG | | | * | REMAND / No PA / No procedural error<br>*ADM H and previous Board relied on CI, which noted a SWB s/h been done, but the CM transcript demonstrates a SWB was not required , not a duty; a reasonable person at the time (not using hindsight) would not have known it; Pet had been the CO for six weeks; had done 50-60 small boat operations; previous CO did not have a SWB; training done for class did not show one was needed.<br>*CM instructions did not allow for "hindsight" to be a substitute for "foresight"<br>*Discussions/emails/changes after the accident support the argument there was no duty to have a SWB or that Pet s/h known of such a duty – nor was Pet negligent in his supervision.<br>*Timing of the ADM's decision to take Pet to NJP – in absentia -- just before the Congressional hearings – is "most egregious" and is clearly using the CO & XO as the scapegoats for the glaring problems w/the ship class.<br>*New evidence provided overwhelming supports a finding of injustice and the reversal of the actions taken against Pet<br>*In the interests of justice to remove the NJP, PLOR, and related derogatory material<br>*Remove FY13-FY16 FOS (IZ&AZ)<br>*Reviewed the SECNAV SSB guidance and the delegation memo – and interpreted both to allow for them to direct a SSB because "justice requires a SSB to make Pet whole" and "making Pet go back to the Navy just continues the injustice he has experienced already" |

Enter "*" if hearing requested    Vote Key: **G** = Full Grant **P** = Partial Grant **D** = Deny

| | |
|---|---|
| GRANT (Full) | |
| GRANT (Partial) | |
| DENY | |
| TOTAL | |

9/26/2024

X Jane Ritchie

Recorder or Board Chair
Signed by: RITCHIE.JANE.D.[redacted]

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

**Military Status:** Retired / CDR / USN

**Issue Category:** derogatory material, NJP, removal of FOS, SSB

**Personal Appearance Requested:** Yes **Personal Appearance Granted:** Yes / No _____

**Claims of Error/Injustice/Clemency:** Error and Injustice

**SPECIFIC ISSUES: N/A**

**JUDICIAL PROCEDURES:** United States District Court for the District of Columbia

- Motion for Voluntary Remand granted at 11 MAR 24 hearing – with the following directions:
  - The Board shall reconsider its decision in 2451-17, including in light of the issues raised by P in his complaint in this action;
  - The Board shall address any other issues P submits in writing to the Board on a timeline to be agreed by the parties and the Board, and consider any evidence or arguments in P's submission; and
  - The Board shall determine and explain whether P is entitled to any relief based on any errors or injustices found.
- Complaint for Setting Aside Final Agency Decision as Unlawful under the Administrative Procedure Act – see case file Federal Court documents for complete complaint

  Per Court order, the issues/contentions raised in the Complaint must be considered by the Board.
  - See timeline below for background and bookmarked statement of facts from Complaint
  - The finding that a special watchbill was "clearly required" at the time was unsupported by substantial evidence, as was the finding that P had failed to ensure appropriate supervision.
  - The necessary elements of the ART 92 charges against P were not established by sufficient evidence, rendering the BCNR's upholding of them contrary to law.
  - The clear injustice against P, who was turned into a scapegoat for the Navy's findings, is so egregious as to render the BCNR's refusal to set it aside arbitrary and capricious.
    - ADM H's deliberate actions to ensure P was forced to undergo, in absentia, a much less rigorous process resulted in the ADM's actions being obscured from proper scrutiny.
  - Despite P continuing to flourish as a leader and sailor, P did not promote to CAPT due to ADM H's unwarranted PLOR – resulting in P's forced retirement in 2015 after being passed over on review for promotion to CAPT.

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

Claims for Relief – see Complaint for full discussion

CLAIM 1: The Board's decision in 2451-17 must be set aside under the APA as contrary to law, as the record compelled a reasonable mind to find a contrary conclusion to the Board's holding that there was sufficient evidence to establish the necessary elements of the charges against P.

- For the Board to uphold the NJP and the punishment that ensued, the evidentiary record of the administrative proceeding must contain substantial evidence to support their findings that these two duties existed at the time of the incident, that P knew or should have known of these duties, and that he was derelict in the performance of said duties.

- **The evidentiary record would compel a reasonable mind to find that there was no duty to issue a special watchbill at the time of the incident and that P did not know, or should have known, about said duty.**

  - It is critical to consider that this issue was litigated, including through expert testimony, in a much more evidentiary rigorous manner, where it was found that no special watchbill was required at the time.

  - P's lack of issuance of a special watchbill was in line with the procedures of his predecessor in command (Examiner's note: P assumed command just six weeks earlier) --- which was in line with wider Navy procedures at the time (which did not impose a requirement for a special watching in regard to small boat operations).

  - The launching of the RHIB was in line with Navy procedure at the time. It was only AFTER the incident that the Navy took the step to create new measures requiring a special watchbill and also engaged in a substantial investigation into the ship class and suggest a one-billion-dollar manning, training, and equipping program to bring the class into line.

  - For P to have known that a special watchbill was required would be to ask for him to discover, six weeks into command of his ship, something that the entire Navy, throughout the entire history of the class's service, had not discovered themselves.

  - The clear evidence in the record as to how P had clearly followed a standard procedures, and how the errors in said procedure were only discovered as a result of a freak incident, would clearly compel a reasonable person to find that P did not know, or should have known, that a special watchbill was required at the time.

    - Instead, the Board substituted their own apparent expertise in naval procedure for that of more than a decade of Navy professionals and held that P should have known that a special watchbill was "clearly needed."

- This finding that a special watchbill was "clearly needed" is particularly puzzling given that the NCIS investigation of the incident specifically laid the responsibility for the incident on the fact that the engines on the RHIB failed to start, which caused the RHIB to drift and strike the ship, and that EN1 was wearing too large of a life preserver.

- **The evidentiary record would compel a reasonable mind to find that P had ensured appropriate supervision of the operation**.

  - The expert advice at the XO's CM established that neither XOs nor commanders were required to personally supervise small boat operations on ships.

  - The CO's responsibilities for small boat operations were explicitly limited to granting permission to move forward with the operation, after that the supervisory duties passed exclusively to the SME, the boatswain.

  - The record also clearly established that P had ensured proper supervision of the operation through the use of highly trained and qualified personnel at each of the key positions.

- **The Board's speculation about the evidence that *may* have been before ADM H must be set aside as unsupported by substantial evidence**

  - The substantial evidence standard requires evidence in the record to support a specific conclusion.

  - The AO contained significant speculation as to what may have bene submitted to the NJP proceedings – and the Board then used this AO to make the blanket decision to find that the evidence supported the charges levied – despite completely failing to cite anything within the record to support its findings.

- **The Board's upholding of P's NJP must be set aside, as the record compels a reasonable mind to find that the necessary elements of both specifications of the ART 92 charge levied against P were not established**.

CLAIM 2: The Board's decision must be set aside…as the injustice levied against P by using him as a scapegoat was so great as to require overturning under *Kreis.*

- ADM H, in the shadow of upcoming congressional hearings, deliberately chose to force P to undergo proceedings with a lower standard of proof – more than a year after P had already faced discipline for the incident – and 15 months after the actual incident.

- The Navy's reaction clearly shows the incident was due to problems with the equipment and manning of the SAN ANTONIO class of ships – and this was

reinforced by the NCIS investigation's findings which levied responsibility for the incident on the engine failure of the RHIB and the life vest being too large.

- The Navy sought to hide the records of XO's CM from P when he sought them via FOIA. First, claiming the transcript didn't exist – but P was subsequently informed by someone in the know that a transcript had been made immediately after the court-martial.

- The only difference between P's and XO's life paths is that ADM H denied P the opportunity to reveal the full truth of the incident while the XO was free to fully defend his good name.

CLAIM 3: Should the NJP charges be cleared from P's files, the pass over for promotion to CAPT should also be removed and P should be sent before a Special Selection Board.

- Requested Findings:

    - The Board's finding that P was under a duty to issue a special watchbill was unsupported by substantial evidence;

    - The Board's finding that P had not ensured adequate supervision of the operation was unsupported by substantial evidence;

    - Setting aside the Board's upholding of P's NJP as contrary to law under the APA as the necessary elements under the UCMJ were not established;

    - Remove the PLOR that ensued from this NJP from P's record;

    - Setting aside the Board's finding that there was not sufficient injustice in P's matter as to require correction;

    - P's pass over on review for command should be cleared from his records should his NJP be cleared;

    - P is due a SSB should the NJP be cleared

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

**RECORD CHANGE REQUESTED:**

- Removal of the letter of reprimand;
- Removal of any adverse files arising from the ART 15 hearing concerning the events of 04 FEB 09;
- Removal of all pass-overs for promotion;
- Direction that a Special Selection Board be convened; and
- Any other relief the Board determines is in the interests of justice.

**PETITIONER CONTENTION(S)**:

From additional matters received 16 APR 24:

**The Preponderance of the Evidence demonstrates P was not negligently derelict in his duties about the USS SAN ANTONIO**

- Military case law requires the showing of the following three elements to support a finding of guilty of an ART 92 Dereliction of Duty violation
  - The accused had certain duties;
  - The accused had actual knowledge or reasonably should have known of such duties; and
  - The accused was at least negligently derelict in the performance of such duties.
- **P's conduct does not satisfy the third element because P was not negligently derelict** – His actions were not only not negligent but entirely reasonable, careful, and appropriate…
  - In the PLOR, ADM H alleged P had been negligently derelict in his duties as commander in three distinct yet related respects:
    - Failing to adequately supervise the launch of the RHIB;
    - Failing to issue a special watchbill for the launch of the RHIB;
    - Allowing crew who lacked proper training and qualifications to participate in the launch of the RHIB causing errors by line handlers, signalmen, crane operators, and safety observers.

- P adequately supervised the launch of the RHIB
  - P's preparation was the same procedure applied by the prior CO, had been used for numerous small boat ops in the six weeks prior, and followed Navy standard operating practices
  - P was involved with the lowering of the RHIB throughout the operation
  - P's position on the bridge during the launching was consistent with the CO's duties
    - Based on testimony from the XO's court-martial, the CO and XO being absent from the bridge was also common practice
    - There was no requirement or expectation – in the Navy generally or on the USS SAN ANTONIO – for the CO to be on the bridge but for the bridge watch team to control the launch.
  - Even when he stepped away from the bridge, P was always in a position to respond quickly…

- **No requirement to issue a special watchbill for small boat ops existed at the time. P issued all required watchbills.**
  - P signed the required watchbills – but not a "watchbill fashioned specifically for the passenger transfer" because at the time of the incident, there was no Navy requirement for a special watchbill for small boat operations.
  - See testimony from XO's court-martial
    - Navy expert witness testified at the XO's court-martial that there is no special watchbill requirement for small boat operations
    - Witness at trial unable to cite any requirement to issue a special watchbill
    - Not standard procedure aboard SAN ANTONIO to issue a watchbill for small boat operations
    - Boatswain testified that there is no requirement that a specific person be in charge of small boat ops and no requirement for a special watchbill for small boat ops in the Navy
    - Expert witness on small boat ops testified that a special watchbill is not required for small boat operations
    - Testimony that during service on USS CARTER HILL, there were no signed watchbills for small boat ops

- Trial defense counsel emphasized during his closing argument that the Navy failed to show any requirement to issue a special watchbill for small boat operations

- **The Crew who launched the RHIB had proper qualifications. Any errors by the crew were not attributable to P and did not cause the incident.**

    - As the XO's court-martial demonstrates, the crew had extensive experience launching small boats.

    - Expert testimony at court-martial established that it is not only NOT negligent but IAW common Navy procedure to have a warrant officer Boatswain fleet up to First LT if a gap existed

    - Testimony at the court-martial established that SN H inappropriately handled the lines at the mooring station of the RHIB – then lied to Boatswain about it

        - However, there is no evidence – or any other authority – to suggest that SN H's actions are attributable to any action/inaction by P – or that his actions were the actual or proximate cause of the accident.

    - Testimony by two Navy experts demonstrated that the incident was attributable to systemic failures in Navy protocol, generally, as well as features of the LPD 17 class specifically

    - The crew faced unexpected and serious mechanical failure – this was the first occasion where both engines failed to start – and it was standard procedures to start the engines after the boat was in the water to avoid damaging the impellers

- **P's [Punitive] Letter of Reprimand (PLOR) is an injustice requiring correction**

    - Although not required, given the gravity of the offense with which he was charged (negligence leading to the death of a fellow sailor) P should have been given an opportunity to defend himself at a court-martial

    - The XO – no longer attached to the SAN ANTONIO – was able to demand trial by court-martial

    - Inequitably, P was not given the same opportunity – and was found not guilty from the same nexus of facts and for the same charge

    - P neither breached any duty borne by his position as CO nor did any of his actions or lack thereof actually or proximately cause the death of EN1.

| Service Branch | Rate/Rank | Dates of Service | Characterization of Service | Separation Reason(s) | Reentry Code |
|---|---|---|---|---|---|
| USN | CDR | 29 MAY 91<br>30 SEP 15 | HON | RETIRED<br>SUFFICIENT SERVICE FOR RETIREMENT (RBD) | N/A |

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

| Date | CHRONOLOGY OF RELEVANT EVENTS |
|---|---|
| DEC 08 | P assumes command of USS SAN ANTONIO |
| Six weeks later<br><br>04 FEB 09 | (From Complaint)<br><br>A tragic incident during the launch of a small boat resulted in the death of a sailor. An investigation revealed that the accident was due to significant technical and operational problems with the SAN ANTONIO and its sister ships in its class.<br>P underwent counseling for his role in the incident, and his Commanding Officers (COs) considered this more than sufficient correction.<br>Everyone closest to the incident and the SAN ANTONIO class agreed that responsibility for the death lie first and foremost with the flaws of the class and how the Navy chose to man and operate them.<br><br>0n 04 FEB 09, EN1 was lost at sea despite a ten-hour search and rescue mission<br><br>Examiner's note: as noted by ADM H/CFFC (the one who imposed NJP), he continued to have confidence in P's ability to command and did not request Detachment for Cause |
| 11 MAR 09 | Command Investigation (CI) completed by an O-4 appointed by COMPHIBRON FOUR |
| 15 MAR 09 | CI endorsed by COMPHIBRON FOUR |
| 06 APR 09 | CTF-51 returned the CI to COMPPHIBRON FOUR to appoint an O-6 Investigating Officer and to conduct further investigation |
| 16 APR 09 | Reinvestigation completed by COMPHIBRON FOUR Deputy |
| 17 APR 09 | COMPHIBRON FOUR favorably endorsed the reinvestigation |
| 20 APR 09 | CTF-51 favorably endorsed the reinvestigation |
| 28 APR 09 | P administratively counseled by COMPHIBRON FOUR for not ensuring a special watch bill was in place during the RHIB evolution.<br><br>(From counsel's brief)<br><br>P's immediate superior took administrative action – but not punitive action.<br>Both CAPT G and RADM Q endorsed CAPT S's (P's immediate superior) finding that this administrative action was sufficient and no punitive action was warranted |
| 05 AUG 09 | COMFIFTHFLT favorably endorsed reinvestigation – see Exhibit 21 of P's submission for full document<br><br>• This is the final action into the circumstances surrounding the death of EN1 |

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

| | |
|---|---|
| | • (From Recommendations) The personnel corrective actions…are based on supervisory failures by the CO, XO, and Ship's Boatswain related to small boat operations and the man overboard. Their actions may constitute violations of ART 92 (negligent dereliction of duty).<br><br>• …initial disposition of these recommendations is referred to the Convening Authority, COMPHIBRON FOUR, as the administrative Immediate Superior in Command – and is subject to the concurrence of the administrative chain of command. |
| 30 SEP 09 | (From counsel's brief)<br><br>P's performance from 09 MAY 09 to 30 SEP 09 was evaluated by CAPT G, the same officer who investigated P for the incident – and the CAPT stated P "is one of the best commanding officers I've observed and consistently led with vision, energy, unflagging resolve, and a winning attitude to achieve mission success despite first of ship class challenges."<br><br>P was strongly recommended for promotion to CAPT and selected for Major Command Afloat. |
| 02 DEC 09 | Date of NCIS investigation – see exhibit 17<br><br>• Due to the remote location of the USS SAN ANTONIO during the MISHAP and the lack of apparent criminality, Reporting Agent (RA) was not able to be transported to the ship in a timely manner. Guidance was provided by the RA to the IO via email and phone.<br><br>• RA reviewed the CI to include interviews conducted and statements provided by approx. 26 witnesses. Additionally, RA was provided a limited brief on the results of the Safety Board Investigation.<br><br>• Neither investigation uncovered any information to suggest the mishap was caused by any criminal acts.<br><br>• Contributing factors in the death: engines on the RHIB failed to start prior to entering the water, the inability to maintain the sea painter line caused the RHIB to drift aft and strike the port side accommodation ladder; and the life preserver being worn by EN1 at the time of the mishap appears to have been too large. |
| MAR 10 (date hard to read) | COMNAVSURFLANT to Commander, Fleet Forces Command (CFFC) – Investigation into events onboard USS SAN ANTONIO<br><br>• After a thorough review of this investigation, I have concluded that the administrative action taken by COMPPHIBRON FOUR, who was the immediate Commander and the one most closely familiar with the |

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

| | |
|---|---|
| | circumstances, with respect to the CO, was appropriate. |
| 13 MAY 10 (15 months after incident) | NJP:<br><br>Violation of ART 92 (negligent dereliction of duty)<br><br>• P, who knew of his duties as CO…, was derelict in the performance of those duties in that he negligently failed to ensure the effective supervision of boating operations and to ensure a Special Evolutions watchbill was in place to support small boat ops as it was his duty to do so, and as a result, improper actions and the participation of unqualified personnel during the launching of the 11-meter RHIB contributed to a mishap in which a Sailor under P's command was lost at sea.<br><br>Awarded a Punitive Letter of Reprimand (PLOR) |
| 13 MAY 10 | Punitive Letter of Reprimand (PLOR) issued – see TAB documents<br><br>• The RHIB launching evolution was deficient in a number of respects:<br><br>o It occurred without adequate supervision and oversight – neither you nor the XO had eyes on the event despite knowing the 1stLt billet was gapped and that there were other evolutions ongoing that created an overall situation warranting continuous command leadership involvement.<br><br>o No special evolution watchbill was promulgated and some of the crew participating in the launch did not have appropriate training and qualifications.<br><br>o Errors were made by the line handlers, signalemen, crane operators, and safety observers – resulting in the small boat tipping and its crewmembers entering the water<br><br>• The authority with which you were entrusted as the CO carried with it the absolute responsibility for the welfare of your ship and crew. You were ultimately responsibility for the safe conduct and supervision of small boat ops. The investigation report and your subsequent acceptance of responsibility at Mast clearly demonstrate that your performance fell short of that expected of a CO. |
| 21 MAY 10 | P appealed the NJP on the basis the punishment was unjust<br><br>NJP appeal<br><br>• My Immediate Superior took sufficient action – on 28 APR 09, I was held accountable for not ensuring a special watchbill was in place – and determined |

**Docket No.: 2735-24**

| | |
|---|---|
| | no further action or punishment was necessary. The Operational chain of command reviewed and concluded my ISIC was in the best position to know and understand the details of the boat accident…<br><br>• Significant design, technical documentation, and procedural issues known and not corrected or unforeseen by cognizant DoN officials had significant impact on the boating accident that a special watchbill alone could not mitigate. (see full discussion in NJP appeal)<br><br>• Manning and training issues, in addition to, ship design and procedural problems were either contributing or causal factors in the boat accident. |
| 03 JUN 10 | Commander, US Fleet Forces Command to VCNO – 1st endorsement on NJP appeal – see TAB documents<br><br>• Although the current COMPHIBRON and COMNAVSURFLANT believe counseling was sufficient, I do not. Accordingly, I exercised my independent judgment as a Command in USS SAN ANTONIO's administrative chain of command to address P's documented failure to promulgate a Special Evolution Watchbill, as well as his negligent failure to ensure effective supervision of the small boat ops.<br><br>• An understanding of the case's procedural history will help put the 14-month delay into context.<br><br>• P was afforded an opportunity to provide a written statement and any other material to be considered at Mast but declined to do so. He also declined to request any witnesses.<br>• P did not raise any of the technical issues he now asserts on appeal – nor were they addressed in the evidence before me at Mast.<br><br>• Even after considering the new issues raised, my decision to impose NJP was correct.<br><br>• The measures P implemented immediately after the incident are measures he should have had in place prior to the incident, independent of the technical matters he now raises.<br><br>• In short, P has a duty to understand the capabilities and limitations of his ship and crew and make adjustments as necessary to ensure ship evolutions are conducted as safely as possible.<br><br>• The punishment awarded in this case was within my authority and does not violate any existing regulations.<br><br>• Recommend the appeal be denied. |

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

| | |
|---|---|
| 21 JUN 10 | VCNO denied P's NJP appeal<br><br>• The imposition of NJP complied with the requirements…<br><br>• You were afforded all of your procedural rights.<br><br>• I find CFFC had a basis in law and fact for his action.<br><br>• The punishment awarded was appropriate considering the nature of the offense and was neither unjust nor disproportionate to the offense committed.<br><br>• The PLOR you received is accurate and relevant to the offense committed and the punishment imposed. |
| 28 JUL 10 | (From counsel's brief)<br><br>The incident generated considerable publicity…<br>Congress held a hearing on the Navy's fleet readiness, focusing on the LPD-17 class in particular.<br>ADM H was one of the officers called to testify at the hearing. |
| 02 AUG 10 | Commander, US Fleet Forces Command to CNPC (PERS 83) – Report of NJP -- see case file/P's submission – Exhibit 19<br><br>• NJP imposed for violation of ART 92 (negligent dereliction of duty)<br><br>• I considered the report of investigation (examiner's note: the command investigation convened by PHIBRON) into the circumstances surrounding the death of EN1 together with the oral statement made by P at the NJP proceeding.<br><br>• I did not recommend P for Detachment for Cause – and he has since had a change of command<br><br>• I recommend P not be required to show cause for retention |
| 01 SEP 10 | P to CNPC (PERS 83) – 1st endorsement on Report of NJP – see case file/P's submission – Exhibit 19 |
| 22 SEP10 | Commander, US Fleet Forces Command to CNCP (PERS 83) – 2nd endorsement on Report of NJP -- see case file/P's submission – Exhibit 19<br><br>• The matters raised by P in the first endorsement reiterate those that were submitted in his appeal on 21 MAY 10. |

THIS DOCUMENT IS AN ADMINISTRATIVE RECORD OF THE BOARD FOR CORRECTION OF NAVAL RECORDS AND MAY CONTAIN INFORMATION PROTECTED BY THE PRIVACY ACT. DO NOT RELEASE WITHOUT APPROPRIATE AUTHORIZATION.

**Docket No.: 2735-24**

| | |
|---|---|
| | • VCNO considered these assertions and denied that appeal on 21 JUN 10<br>• Many of the matters raised were also included in the record and the report of investigation which I considered when awarding NJP.<br>• The fact that intermediate commanders in the chain of command declined to take punitive action based on the results of the investigation does not limit in any way my right as a superior commander to take action.<br>• None of the assertions made in the first endorsement affect my conclusion that P was negligently derelict in the performance of his duties as CO. |
| NOV 10 | Court-Martial of XO – see Exhibit 12 for the Court-Martial transcript |
| 11 JAN 12 | FY13 CAPT Line Promotion Selection Board (PSB) convened<br><br>P considered In Zone – failed to select |
| | (From PERS-8 AO of 11 DEC 17)<br><br>P failed to select Above Zone on the FY14 through FY16 CAPT Line PSBs. |
| 30 SEP 15 | P retired |
| 24 FEB 17 | P applied to the Board for relief |
| 05 AUG 18 | Board considered P's application and declined to grant any relief.<br><br>See TAB documents for Decision Document<br><br>"In reaching its conclusion, the Board acknowledged that subsequent to the death of the Sailor, recommended actions to bring the class of ships within U.S. Navy manning, training, and equipping standards have been addressed. However, the Board significantly concurred with the AO and concluded that there is insufficient evidence and basis for the BC R to exercise its broad powers to correct your record as requested. The Board noted that it appears from the Cl Report that you did not properly plan or anticipate problems. Despite your contention that you did not have an implicit or explicit duty to ensure a special evolutions watchbill was in place to suppo11 small boating operations, the Board determined that the evidence in the CI Report revealed that a special watchbill was clearly needed and it was your responsibility as the CO to ensure proper safeguards were in place. With regard to your contention that your XO was allowed a court-martial, rather than NJP, the Board noted that the imposition of N J P complied with the requirements set forth in the Manual for Courts-Martial, Part V and Article 15 of the UCMJ, and you were afforded all of your procedural rights. Your appeal of the NJP was reviewed and it was determined that |

| | |
|---|---|
| | the evidence supported the charge, and punishment awarded was just, authorized and proportionate to the offense. The Board did not find that such actions were arbitrary or fundamentally unfair." |
| 13 JAN 22 | P filed suit in the US District Court for the District of Columbia |
| 11 MAR 24 | Court ordered P's application be remanded to the Board |

**SUMMARY OF CASE/AUTHORITIES**:

10 U.S. Code 628 – Special Selection Boards

SECNAVINST 1402.1 – Special Selection Boards, Supplemental All-Fully-Qualified-Officers Lists, and Special Boards – 29 APR 19

ASN (M&RA) Memo – Delegation of Authority to the BCNR to Direct the Convening of a SSB… -- 28 NOV 17

- "…the BCNR shall not convene a SSB…for any person who, by maintaining reasonably careful records, may have discovered and taken steps to correct the error or omission on which the original promotion selection board…based its decision against promotion.

**ADVISORY OPINION (AO)**:

Code 20 AO -- UNFAV -- 02 AUG 24 -- see case file for complete AO

- The Vessel exception applied to P on 13 MAY 10. ADM H was within his discretionary authority to impose NJP on P, without offering P the opportunity to demand trial.

- The imposition of NJP met the preponderance of the evidence.

    - The evidence available to ADM H when he served P's NJP – two command investigation reports identifying P's supervisory failures as a causal factor in the incident and P's own statements at NJP accepting responsibility – reasonably met the preponderance of the evidence standard that "more likely than not," P's actions amounted to a negligent dereliction of duty.

    - The record and ADM H's statements in P's appeal from NJP demonstrate that ADM H reached his conclusions regarding P's culpability through review of the CI reports, P's statements at NJP, and his own experience as Commander, Fleet Forces Command.

    - A rational review of the record supports ADM H's findings that, more likely than not, P's acts and omissions met the elements of dereliction of duty.

    - The CI shows lack of proper supervisory controls that contributed to the incident – including the crane operator, signalman, lack of a formal watch bill, boat engineer not

assigned, P not on the bridge. The CI specifically states that creation of a Special Evolution Watch Bill would have ensured that the qualified personnel were filling all positions and resulted in the installation of qualified safety observers with no other duties but ensuring safety at all locations involved in the boat launching process.

  - A person is derelict in the performance of duties when that person "willfully or negligently" fails to perform those duties or exhibits "culpable inefficiency" (an inefficient behavior "for which there is no reasonable or just excuse")

- ADM H was authorized to take separate action to address the issues and there is sufficient evidence for him to assess an allegation of violation of ART 92, Dereliction of Duty.

---

REBUTTAL – 29 AUG 24 – see case file for complete rebuttal

- The AO argues that ADM H's determination that P was negligently derelict in his duties is supported for two distinct reasons: 1) prior to the accident…P did not establish a special watch bill for small boat operations and 2) P failed to ensure adequate supervision of small boat ops during the accident.

- The AO appears to suggest that because much of the evidence provided by P to this Board may not have been available to ADM H at the time he made the decision, ADM H's decision should remain undisturbed.

  - But the AO cites no legal authority in support of this argument

  - And this argument is at odds with this Board's statutory obligation to consider all evidence in the record, not just the evidence which may be unfavorable to the applicant's position.

  - The Board is required to consider all the evidence provided by P when assessing ADM H's decision to issue NJP and a PLOR – not just the evidence ADM H had at the time and not just the evidence favorable to ADM H's determination.

- The AO spends some time discussing "culpable inefficiency" being used to sustain a dereliction of duty charge. Such discussion is interesting – but ultimately irrelevant – because ADM H found P had committed dereliction of duty because he determined P was negligent – not because he determined P was culpably inefficient.

- When all the evidence provided by P is considered…two points become clear

  - There was no Navy requirement for a special watchbill for special boat operations on 04 FEB 09.

    - The Navy has had over 15 years to find a regulation or policy which required p to issue a special watchbill – it can't – because there was no regulation or policy

    - In fact, in the AO dated 02 FEB 18, Office of Legal Counsel conceded that P "had signed all of the watch bills that he was required to sign."

**Docket No.: 2735-24**

- P provided voluminous evidence that there was no Navy requirement…from the XO's court-martial.

- None of the evidence marshalled by P is rebutted – or even discussed in passing – by the AO. Nor does the AO argue that a regulation/policy existed which required P to issue a special watchbill.

- Instead, the AO relies exclusively on ADM H's own determination that P's decision not to issue a special watchbill constituted negligent dereliction of duty – but ADM H did not cite any legal or regulatory authority which required P to issue a special watchbill.

- There are two fatal problems with the AO's argument that ADM H's determination…was supported by the CI report:

  - First, the AO never explains why there is a causal relationship between the accident on 04 FEB 09 and the lack of a special watchbill. Although the AO argues that a special watchbill "would have ensured that qualified personnel were in the appropriate positions…" all this argument is moot if there were qualified personnel in the appropriate positions and adequate safety observation in place on 04 FEB 09.

  - Second, because there was no Navy requirement for P to issue a special watchbill…any condemnation of P's failure to do so is a substitution of hindsight for foresight. When assessing whether a servicemember's negligent conduct constitutes dereliction, military law does not permit second-guessing with knowledge that can only be gleaned with the benefit of hindsight. No special watchbill was required by Navy regulation. Thus, under the circumstances prevailing at the time, P's decision not to issue a special watchbill was not negligent.

o P adequately supervised the launch of the 11-meter RHIB on 04 FEB 09.

- The evidence is overwhelming that P adequately supervised the RHIB launch from beginning to end.

  - Not only was P's level of involvement with the operation not negligent (see rebuttal for full discussion of P's involvement), it was more extensive than Navy standards as established by the testimony of two Navy experts.

  - The AO does not make even a token effort to explain how P's extremely brief absence either caused or exacerbated the accident.

- See discussion of the crane operator and signalman.

- At the XO's trial, trial counsel attempted to attribute the accident…at least partially to the inappropriate action of SN MH, a linehandler…However no evidence was presented at trial suggesting the SN's actions were attributable to

**Docket No.: 2735-24**

any action/inaction by P.

- See discussion of systemic failures and features of the LPD 17 class.
- The crew faced unexpected and serious mechanical failure – it was the first time both engines of a RHIB failed to start.
  - NCIS investigation identified the failure of the RHIB's engines and a malfunctioning sea painter line as mechanical failures which directly caused the accident. An inherent deficiency in the life preserver was also identified.
  - The AO asks this Board to discount the testimony of two Navy experts, numerous members of the crew, an NCIS investigation, and evidence from CIs and other Navy authorities – and believe that the accident was caused by P's dereliction of duty not by mechanical failure. Yet the AO's own cited evidence undermines this conclusion.

- The AO argues P himself accepted responsibility for the accident – this is flatly contradicted by the record. In his NJP appeal, he states "I am not guilty of the alleged offense [negligent dereliction of duty]…I have been consistent with my assertion of being accountable as CO afloat…My affirmation of accountability does not equate to being guilty."

COUNSEL: Y CONGRESSIONAL: N/A

| Board Date |
| --- |
| 26 SEP 24 |

Examiner Initials (JMP)

Engineering watch bills (EN1 Ansong was the boat engineer for the 11-meter RHIB).[87] Additionally, Petitioner was not on the bridge at the time of the incident, despite the multiple complex operations occurring at the time of the RHIB launch. While the record does demonstrate that Petitioner authorized and participated in the appropriate safety and intelligence briefings leading up to the 11-meter RHIB launch, the conclusions of the command investigation reports directly named "supervisory failure," as a causal factor.[88] LCDR Faught's CI report specifically states that the creation of a Special Evolution Watch Bill would have 1) "ensured" that the "qualified personnel [were] filling all positions," and 2) resulted in the installation of "qualified safety observers, with no other duties but ensuring safety, at all locations involved in the boat launching process."[89] CAPT Grippin cited the lack of sufficient supervisory controls and risk mitigation from Petitioner as a contributing factor in the incident.[90] ADM Harvey reviewed and cited these findings in coming to his conclusions. A rational review of the record supports his findings that, more likely than not, Petitioner's acts and omissions on 4 February meet the elements of dereliction of duty.

5. Finally, though Petitioner's immediate superiors at COMPHIBRON and COMSURFLANT counseled the Petitioner, ADM Harvey was authorized to take separate action to address the issues and there is sufficient evidence for ADM Harvey to assess an allegation of violation of Article 92, dereliction of duty.[91] It is my opinion that the actions of ADM Harvey and the appeal authorities in this case met applicable standards in accordance with the Manual for Courts-Martial, governing case law, and statutory authority.

6. My point of contact for this matter is LT Jacob T. Hayes, JAGC, USN. He can be reached at (202) 685-7683 or at jacob.t.hayes9.mil@us.navy.mil.

C. C. TEMPLE

---

[87] Enclosure (1) of reference (a) at 458. Information regarding the watch bill was included in LCDR Faught's notes during his investigation of the scene on 6 February 2009; Command Investigation Report dated 11 Mar 09, at 6-9 (enclosure (1) of reference (a) at 114-117).
[88] Command Investigation Report dated 15 Mar 09, at 13 (enclosure (1) of reference (a) at 121).
[89] *Id.* .
[90] Command Investigation Report dated 5 Aug 09, at 12-13 (enclosure (1) of reference (a) p. 85-86).
[91] Enclosure (1) of reference (a), at 38.

Law Offices of
**David P. Sheldon, PLLC**

★★★★★ David P. Sheldon, Admitted in DC, MD & MT | Melissa Diaz, Esq., Admitted in DC & FL
Dylan Thayer, Esq., Admitted in NY & DC

April 10, 2024

Board for the Correction of Naval Records
701 S. Courthouse Road
Building 12, Suite 1001
Arlington, VA 22204-2490

**RE: CDR Cash's Application for Correction of Records, Memorandum in Support of Application for Correction of Records, and Accompanying Exhibits.**

**SENT BY E MAIL TO: BCNRApplication@us.navy.mil,**

Dear Sir/Ma'am:

My office represents CDR Eric C. Cash, United States Navy. Attached, please find CDR Cash's Form DD 149 and his Memorandum in Support of his Application, along with accompanying exhibits.

CDR Cash previously applied to the Board on February 24, 2017. On August 5, 2018, the Board considered CDR Cash's application and declined to grant any relief. On January 13, 2022, CDR Cash filed suit in the United States District Court for the District of Columbia, arguing that the Board's denial of his application was arbitrary and capricious, in violation of 5 U.S.C. § 706 (2)(A) and (2)(E). On March 11, 2024, the Court ordered that CDR Cash's application be remanded to the Board, so that the Board could consider CDR Cash's application and the exhibits submitted in support of his application.

Please let me know if you have any additional questions and please direct all future correspondence to me. I can be reached at (202) 546-9575 or by email at lawofficesofdavidpsheldon@militarydefense.com.

Thank you.

Sincerely,

David Sheldon

David P. Sheldon

## II. STATEMENT OF THE FACTS

### A. CDR Cash's Naval Career

On June 3, 1986, at the age of eighteen, CDR Cash enrolled in the Naval Academy Preparatory School and enlisted in the Navy Reserves.[1] After serving in the Naval Academy Prep School for 39 weeks, CDR Cash was honorably discharged to enter the U.S. Naval Academy in May of 1987.[2] After successfully completing his education at the U.S. Naval Academy, CDR Cash graduated and was commissioned an Ensign in the Navy on May 29, 1991.[3]

On April 6, 1992, CDR Cash was assigned to the USS Tarawa. CDR Cash spearheaded several challenging preparations for the ship's demanding Combat Systems Ship Overhaul Inspection.[4] He also successfully developed effective training scenarios for the Combat Systems Training Team, and "excelled as the Command Managed Equal Opportunity Program Manager, significantly improving the program's effectiveness."[5] In recognition of his achievements on USS Tarawa and his exemplary leadership, CDR Cash was awarded the Navy and Marine Corps Achievement Medal, and the Bronze Star.[6]

In September of 1995, CDR Cash transferred to the USS Vincennes, where he remained until May of 1997.[7] Because of his outstanding accomplishments and service, CDR Cash was awarded a Navy and Marine Corps Commendation Medal.[8] From June 1997 to October 1998, CDR Cash served as Surface Junior Officer Initial Accession Detailer at Millington, Tennessee.[9]

---

[1] *See* Exhibit 1 ("Record of Military Processing").
[2] *See* Exhibit 2 ("DD 214").
[3] *See* Exhibit 3 ("Officer Appointment Acceptance and Oath of Office").
[4] *See* Exhibit 4 ("Navy and Marine Corps Achievement Medal I").
[5] *Id.*
[6] *See* Exhibit 5 ("Southwest Asia Campaign Medal with Bronze Star").
[7] Exhibit 6 ("Navy and Marine Corps Achievement Medal II").
[8] *Id.*
[9] Exhibit 7, ("Navy and Marine Corps Achievement Medal III")

and Boatswain Stacey.[89]

Following the report, in April 2009, Captain Brian Smith, CDR Cash's immediate superior, took administrative action, but not punitive action, against CDR Cash.[90] Both Captain Griffin, who conducted the investigation, as well as Rear Admiral K. M. Quinn, endorsed CAPT Smith's finding that this administrative action was sufficient and no punitive action was warranted against CDR Cash.[91]

When evaluating CDR Cash's performance from May 9, 2009, to September 30, 2009, CAPT Grippin, the same officer who investigated CDR Cash for the incident aboard the USS San Antonio, stated that CDR Cash "is one of the best commanding officers I've observed and consistently led with vision, energy, unflagging resolve and a winning attitude to achieve mission success despite first of ship class challenges."[92] CAPT Grippin strongly recommended CDR Cash for promotion to captain and selection for Major Command Afloat.[93]

**D. Article 15 Proceedings.**

The incident on the USS San Antonio generated considerable publicity, both inside and outside the Navy.[94] In response, Congress held a hearing on the Navy's fleet readiness, focusing on the LPD-17 class in particular, on July 28, 2010.[95] Admiral J. C. Harvey was one of the officers called to testify at the hearing.[96] Shortly prior to the hearing, on May 13, 2010, 15 months after the incident aboard the USS San Antonio, ADM Harvey brought CDR Cash to mast

---

89 Exhibit 21.
90 Exhibit 22, "Letter of Rear Admiral K. M. Quinn".
91 Exhibit 22.
92 Exhibit 30, "
93
94 Exhibit 12, pages 210, 215, 221-222, 237.
95 Exhibit 18.
96 Exhibit 18, ("Joint Hearing Before the Subcommittee on Readiness Meeting Jointly with the Subcommittee on Seapower and Expeditionary Forces of the Committee on Armed Services, House of Representatives, One Hundred and Eleventh Congress, Second Session, July 28, 2010.")

under Article 15, UCMJ, for an Article 92, UCMJ, violation.[97] ADM Harvey did so despite RADM Quinn, CAPT Grippin, and CAPT Smith all agreeing that the administrative actions previously imposed on CDR Cash were sufficient.[98]

Undeterred, and perhaps attempting to mollify Congress, ADM Harvey issued CDR Cash a punitive letter of reprimand under Article 15.[99] In the letter, ADM Harvey alleged, as the basis for his finding that CDR Cash had committed a violation of Article 92, UCMJ, that CDR Cash had been negligently derelict in his duties as commander of the USS San Antonio in three distinct yet related respects: 1) failing to adequately supervise the launch of the RHIB; 2) failing to issue a special watchbill for the launch of the RHIB; and; 3) allowing crew who lacked proper "training and qualifications" to participate in the launch of the RHIB causing "errors…by line handlers, signalmen, crane operators, and safety observers".[100]

Because CDR Cash was still attached to the USS San Antonio, he was not given the option to demand trial by court martial in lieu of his non-judicial punishment.[101] However, LCDR Kearns was no longer attached to the ship. When charged with an Article 92 violation arising from the same nexus of facts, LCDR Kearns refused non-judicial punishment and demanded a court martial.[102]At his court martial, following only a few hours of deliberation by the members, LCDR Kearns was found not guilty.[103]

**E. Aftermath.**

Despite his non-judicial punishment, CDR Cash continued to flourish as a leader and as a

[97] Exhibit 19, "Record of CDR Cash's Non Judicial Punishment, Including Appeal and Punitive Letter of Reprimand".
[98] Exhibit 21.
[99] Exhibit 19.
[100] Exhibit 19.
[101] Exhibit 20, ("USN OLC Advisory Opinion").
[102] Exhibit 20.
[103] Exhibit 12, pages 1547-1552.

Op. Att'y Gen. 94 (1952); *see also* 41 Op. Att'y Gen. 251 (1955); 40 Op. Att'y Gen. 504 (1947). Indeed, numerous cases acknowledge correction boards' power to grant broad equitable relief. *See, e.g., Bard v. Seamans,* 507 F.2d 765, 769 (1974) ("The Powers of the Board have been liberally construed"); *Kimmel v. United States,* 196 Ct. Cl. 579 (1971) (noting compelling "equitable principles" guiding boards of correction).

Thus, the Board has power to grant relief based on two conceptually distinct bases. The Board can assess a case based on evidence of error regarding particular legal and procedural issues. But the Board's broad authority also permits assessment of a case based on other considerations such as extreme prejudice suffered by an agency action.

## IV. TIMELINESS AND EXHAUSTION

10 U.S.C. § 1552 provides for the correction of errors in the record of a member of the military. Corrections shall be applied for within three years of the discovery of the error or injustice making the correction necessary. 10 U.S.C. § 1552(b).

CDR Cash retired in October of 2015 and previously applied to the Board on February 24, 2017. CDR Cash's application was denied on August 5, 2018. CDR Cash filed suit on January 13, 2022, and the Court ordered a remand to this Board on March 11, 2024.

CDR Cash's application is timely.

## V. REQUESTED RELIEF

Commander Cash respectfully requests the following relief from the Board: 1) the removal of the letter of reprimand from his personnel file; 2) the removal of any adverse files arising from an Article 15 hearing concerning the events of February 4, 2009, from his personnel file; 3) direct removal of all pass-overs for promotion, as well as direction that a Special Selection Board be convened for CDR Cash; and 4) any other relief that the Board determines is in the interests of justice.

# RECORD OF MILITARY PROCESSING - ARMED FORCES OF THE UNITED STATES

*Before completing this form, read Privacy Act Statement, Warning, and Instructions on reverse.*

Form Approved
OMB No. 0704-0173
Exp. Date: Jun. 30, 1988

| A. SERVICE PROCESSING FOR | B. STATUS (X one) | C. SELECTIVE SERVICE CLASSIFICATION | D. SELECTIVE SERVICE REGISTRATION NO. |
|---|---|---|---|
| USNAM | X NPS / PS | N/A | N/A |

## SECTION I - PERSONAL DATA

| 1. SOCIAL SECURITY NUMBER | 2. NAME (Last, First, Middle Name (& Maiden, if any), Jr., Sr., etc.) | 3. ALIASES |
|---|---|---|
| [redacted] | CASH ERIC CRAWFORD | NONE |

**4. CURRENT ADDRESS** (Street, City, County, State, ZIP Code): 16 HOPEWELL DR STONY BROOK, SUFFOLK NY 11790

**5. HOME OF RECORD ADDRESS** (Street, City, County, State, ZIP Code): SAME AS #4

**6. CITIZENSHIP** (X one)
- X a. U.S. AT BIRTH (If this box is marked, also X (1) or (2))
  - (1) NATIVE BORN
  - X (2) BORN ABROAD OF U.S. PARENT(S)
- b. U.S. NATURALIZED
- c. U.S. DERIVED THROUGH NATURALIZATION OF PARENT(S)
- d. U.S. NON-CITIZEN NATIONAL
- e. IMMIGRANT ALIEN (Specify)
- f. NON-IMMIGRANT FOREIGN NATIONAL (Specify)

**7. SEX**
- X a. MALE
- b. FEMALE

**8. POPULATION GROUP**
- a. WHITE
- X b. BLACK
- c. ASIAN
- d. AMERICAN INDIAN
- e. OTHER (Specify)

**9. ETHNIC GROUP** (Specify): ~~BLACK~~ NONE

**10. MARITAL STATUS** (Specify): SINGLE

**11. NUMBER OF DEPENDENTS**: NONE (0)

| 12. DATE OF BIRTH (YYMMDD) | 13. RELIGIOUS PREFERENCE (Optional) | 14. EDUCATION (Highest Grade Completed) | 15. PROFICIENT IN FOREIGN LANGUAGE (Yes or No) (If yes, specify language) |
|---|---|---|---|
| [redacted] | BAPTIST CHURCHES, OTHER | 15 | (No) NONE |

| 16. VALID DRIVER'S LICENSE (Yes or No) (If yes, list state, number, and expiration date) | 17. PLACE OF BIRTH (City, State and Country) |
|---|---|
| NONE | ANGELES CITY, PAMPANGA, PHILIPPINES |

## SECTION II - EXAMINATION AND ENTRANCE DATA PROCESSING CODES

FOR OFFICE USE ONLY - DO NOT WRITE IN THIS SECTION - GO ON TO PAGE 2, QUESTION 23

**18. APTITUDE TEST RESULTS**

a. TEST ID | b. TEST SCORES

| GS | AR | WK | PC | NO | CS | AS | MK | MC | EI | VE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

c. AFQT PERCENTILE

| GI | NO | AD | WK | AR | SP | MK | EI | MC | GS | SI | AI |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

**19. DEP ENLISTMENT DATA**

| a. DATE OF DEP ENLISTMENT (YYMMDD) | b. PROJ ACTIVE DUTY DATE (YYMMDD) | c. ES | d. RECRUITER IDENTIFICATION | e. PROGRAM ENLISTED FOR | f. T-E MOS/AFS |
|---|---|---|---|---|---|
| 860603 | 860801 | 3 | [redacted] | DNAPS | SR |

**20. ACCESSION DATA**

| a. ENLISTMENT DATE (YYMMDD) | b. ACTIVE DUTY SERVICE DATE (YYMMDD) | c. PAY ENTRY DATE (YYMMDD) | d. TOE | e. WAIVER | f. PAY GRADE | g. DATE OF GRADE (YYMMDD) | h. ES | i. HIGHEST ED GR COMPL |
|---|---|---|---|---|---|---|---|---|
| 860603 | 860801 | 860603 | 8 | YYY | E01 | 860801 | 2 | 122 |

| j. RECRUITER IDENTIFICATION | k. PROGRAM ENLISTED FOR | l. T-E MOS/AFS | m. PMOS/AFS | n. YOUTH | o. OA | p. TRANSFER TO |
|---|---|---|---|---|---|---|
| [redacted] | ANAPS | SR | | YY9 | YY | N31176 |

**21. SERVICE REQUIRED CODES**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 1 | 1 | 0 | 2 | 0 | 3 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | 0 |

| 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9 | 9 | 1 | 8 | 3 | 2 | 8 | Z | Z | 9 | 5 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 | 50 | 51 | 52 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | Y | Y | Y | Y | Y | Y | 0 | X | 3 | 6 | 8 | 6 | 0 | 8 | 0 | 1 | 0 |

| 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | | | | | | | | | | | | | | | | |

DD FORM 1966/1, AUG 85 Previous editions are obsolete. ORIGINAL REVERSE

IDENTIFICATION PURPOSES SAFEGUARD IT AREAS REQUIRE FORM VOID

DD FORM 214 1 JUL 79 — PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE — CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY

| | |
|---|---|
| 1. NAME (Last, first, middle) | CASH, ERIC CRAWFORD |
| 2. DEPARTMENT, COMPONENT AND BRANCH | NAVY, USN |
| 3. SOCIAL SECURITY NO | [redacted] |
| 4a. GRADE, RATE OR RANK | SA |
| 4b. PAY GRADE | E-2 |
| 5. DATE OF BIRTH | [redacted] |
| 6. PLACE OF ENTRY INTO ACTIVE DUTY | BROOKLYN, NY |
| 7. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | NAPS, NETC, NEWPORT, RI |
| 8. STATION WHERE SEPARATED | U.S. NAVAL ACADEMY, ANNAPOLIS, MARYLAND |
| 9. COMMAND TO WHICH TRANSFERRED | NA |
| 10. SGLI COVERAGE | AMOUNT $ 50, 000 NONE |
| 11. PRIMARY SPECIALTY NUMBER, TITLE AND YEARS AND MONTHS IN SPECIALTY (Additional specialty numbers and titles involving periods of one or more years) | 0000/0000 |

| 12. RECORD OF SERVICE | YEAR(S) | MON(S) | DAY(S) |
|---|---|---|---|
| a. Date Entered AD This Period | [illegible] | [illegible] | [illegible] |
| b. Separation Date This Period | [illegible] | [illegible] | [illegible] |
| c. Net Active Service This Period | [illegible] | [illegible] | [illegible] |
| d. Total Prior Active Service | [illegible] | [illegible] | [illegible] |
| e. Total Prior Inactive Service | [illegible] | 01 | [illegible] |
| f. Foreign Service | [illegible] | [illegible] | [illegible] |
| g. Sea Service | [illegible] | [illegible] | [illegible] |
| h. Effective Date of Pay Grade | [illegible] | [illegible] | [illegible] |
| i. Reserve Oblig. Term. Date | [illegible] | [illegible] | [illegible] |

13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service): NONE

14. MILITARY EDUCATION (Course Title, number weeks, and month and year completed): NAVAL ACADEMY PREPARATORY SCHOOL, 39 WKS, MAY 97.

15. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM: YES [ ] NO [X]

16. HIGH SCHOOL GRADUATE OR EQUIVALENT: YES [X] NO [ ]

17. DAYS ACCRUED LEAVE PAID: NONE

18. REMARKS: NO DISCHARGE CERTIFICATE ISSUED.
MAINTAINED IN DUAL STATUS IAW MILPERSMAN 3640410.

X X X X X X X X X

19. MAILING ADDRESS AFTER SEPARATION: 1? [illegible] DRIVE STONYBROOK, NY 11790

20. MEMBER REQUESTS COPY 6 BE SENT TO DIR. OF VET AFFAIRS: YES [ ] NO [X]

21. SIGNATURE OF MEMBER BEING SEPARATED: [signature] ERIC CASH

22. TYPED NAME, GRADE, TITLE AND SIGNATURE OF OFFICIAL AUTHORIZED TO SIGN: [signature] S. G. RIDEN, LT, USN, MILPERSOFF

SPECIAL ADDITIONAL INFORMATION (For use by authorized agencies only)

| | |
|---|---|
| 23. TYPE OF SEPARATION | RELEASED FROM ACTIVE DUTY. |
| 24. CHARACTER OF SERVICE (Includes upgrades) | HONORABLE |
| 25. SEPARATION AUTHORITY | MILPERSMAN-3620100 |
| 26. SEPARATION CODE | KGU |
| 27. REENLISTMENT CODE | RE-2 |
| 28. NARRATIVE REASON FOR SEPARATION | ENTER U.S. NAVAL ACADEMY. |
| 29. DATES OF TIME LOST DURING THIS PERIOD | NONE |
| 30. MEMBER REQUESTS COPY 4 | INITIALS |

S/N 0102-LF 000 2140

SERVICE - 2

BUPERS USE ONLY

BUPERS USE ONLY

# OFFICER APPOINTMENT ACCEPTANCE AND OATH OF OFFICE

| 1. NAME (LAST, FIRST, MIDDLE) | 2. STATUS BEFORE APPT | 3. PC |
|---|---|---|
| CASH, ERIC CRAWFORD | MIDN, USN | |

ADDRESS
SUPERINTENDENT
U.S. NAVAL ACADEMY
ANNAPOLIS, MD 21402-5000

| 4. SSN | 5. FILE NO. | 6. DESIG. | 7. S | 8. ENL SERVICE NO. | 9. CSC | 10. CSC | 11. BC |
|---|---|---|---|---|---|---|---|
| [redacted] | X | 1160 | M | | 010 | 010 | N |

| 12. DATE OF BIRTH | 13. PERM. GRADE | 14. PERM. GRADE DATE | 15. PRES. GRADE | 16. PRES. GRADE DATE | 17. NULL & VOID DATE |
|---|---|---|---|---|---|
| [redacted] | ENS | 91MAY29 | ENS | 91MAY29 | |

TYPE OF DUTY: [X] 18. ACTIVE [ ] 19. INACTIVE
TYPE OF APPOINTMENT: [ ] 20. TEMPORARY [X] 21. PERMANENT
STATUS: [X] 22. CONFIRMED [ ] 23. AD INTERIM [X] 24. USN [ ] 25. USNR

| 26. AUTHORITY | 27. PLSD | 28. | 29. BUPERS USE ONLY |
|---|---|---|---|
| 10 USC 531 | EN | | 91MAY29 |

THE PRESIDENT OF THE UNITED STATES HAS APPOINTED YOU AS AN OFFICER IN THE U.S. NAVY UNDER THE CONDITIONS INDICATED IN THIS DOCUMENT. IF APPOINTMENT IS ACCEPTED YOU MUST COMPLETE OATH OF OFFICE, IF IT IS NOT ACCEPTED SIGN AND DATE DECLINATION/INDICATE REASONS FOR NON-ACCEPTANCE.

AUTHENTICATED: CHERYL R. JACKSON CODE 427 91MAY29

## OATH OF OFFICE

From: ERIC CRAWFORD CASH

To: Secretary of the Navy

NOTED FOR REPORT CODE 13
NAVCRUITCOM

25 JUL 1991

I ERIC CRAWFORD CASH

HAVING BEEN APPOINTED ENS (P)

IN THE U.S. NAVY UNDER THE CONDITIONS INDICATED IN THIS DOCUMENT, DO ACCEPT SUCH APPOINTMENT AND DO SOLEMNLY SWEAR (OR AFFIRM) THAT I WILL SUPPORT AND DEFEND THE CONSTITUTION OF THE UNITED STATES AGAINST ALL ENEMIES, FOREIGN AND DOMESTIC, THAT I WILL BEAR TRUE FAITH AND ALLEGIANCE TO THE SAME; THAT I TAKE THIS OBLIGATION FREELY, WITHOUT ANY MENTAL RESERVATION OR PURPOSE OF EVASION; AND THAT I WILL WELL AND FAITHFULLY DISCHARGE THE DUTIES OF THE OFFICE ON WHICH I AM ABOUT TO ENTER, SO HELP ME GOD.

Copy to:

E. C. Cash
(SIGNATURE OF APPOINTEE)

SUBSCRIBED AND SWORN TO BEFORE ME THIS 29th DAY OF May 19 91

(SIGNATURE AND GRADE OF WITNESSING OFFICER)

## DECLINATION OR DISQUALIFICATION

[ ] NOT OFFERED

[ ] NOT ACCEPTED

(APPOINTEE/COMMANDING OFFICER SIGNATURE) (DATE)

REASON

**COMMANDER**
**AMPHIBIOUS GROUP THREE**

**The Secretary of the Navy takes pleasure in presenting the NAVY and MARINE CORPS ACHIEVEMENT MEDAL to**

**LIEUTENANT**
**ERIC CRAWFORD CASH**
**UNITED STATES NAVY**

**for service as set forth in the following**

**CITATION:**

"For professional achievement in the superior performance of his duties while serving as Assistant Combat Systems Officer, USS TARAWA (LHA 1) from June 1994 to May 1995. Lieutenant Cash consistently performed his demanding duties in an exemplary and highly professional manner. A dynamic leader and achiever, he spearheaded challenging preparations for the ship's demanding Combat Systems Ship Overhaul Inspection Trials and was directly responsible for superb evaluation results following a 14-month overhaul. He developed superb training scenarios for the Combat Systems Training Team, enabling TARAWA to successfully complete two Total Ship Training Availabilities. A resourceful manager, he was directly responsible for the successful recertification of TARAWA's magazine sprinkler systems and the receipt of top marks on the exacting Shipboard Explosive Safety Inspection. Additionally, he excelled as the Command Managed Equal Opportunity Program Manager, significantly improving program effectiveness. Lieutenant Cash's leadership, personal initiative, and unswerving devotion to duty reflected great credit upon himself and were in keeping with the highest traditions of the United States Naval Service."

For the Secretary,

CHARLES R. SAFFELL
Rear Admiral, United States Navy

**ADMINISTRATIVE REMARKS**
NAVPERS 1070/613 (REV. 10-81)
S/N 0106-LF-010-6991

E-32

SHIP OR STATION USS TARAWA (LHA 1) FPO AP 96622-1600

17 SEP 1992: THE SECRETARY OF DEFENSE AUTHORIZES THE WEARING OF THE SOUTHWEST ASIA CAMPAIGN MEDAL W/BRONZE STAR IN ACCORDANCE WITH ALNAV 065/91 071936Z JUN 91.

W. A. MCCARTY, YNCS, USN
ADMIN OFFICER, BYDIRCO

A. M. CAR
ADMIN OF

NAME (Last, First, Middle) CASH, ERIC CRAWFORD | SSN [redacted] | BRANCH AND CLASS USN

13



[redacted]

# DEPARTMENT OF THE NAVY

THIS IS TO CERTIFY THAT
THE SECRETARY OF THE NAVY HAS AWARDED THE

## NAVY AND MARINE CORPS ACHIEVEMENT MEDAL

(GOLD STAR IN LIEU OF SECOND AWARD)

TO

LIEUTENANT ERIC C. CASH
UNITED STATES NAVY

FOR

PROFESSIONAL ACHIEVEMENT IN THE SUPERIOR PERFORMANCE OF HIS DUTIES WHILE SERVING AS FIRE CONTROL OFFICER IN USS VINCENNES (CG 49) FROM SEPTEMBER 1995 TO MAY 1997. LIEUTENANT CASH PERFORMED HIS DUTIES IN AN EXEMPLARY AND HIGHLY PROFESSIONAL MANNER. DISPLAYING EXCEPTIONAL SKILL AND RESOURCEFULNESS, HE LED HIS DIVISION THROUGH AN ARDUOUS TRAINING CYCLE AND DEPLOYMENT, SUCCESSFULLY MAINTAINING A LEVEL OF MATERIAL AND OPERATIONAL READINESS. HE DIRECTED AND SUPERVISED A DIVISIONAL SELF-EFFICIENCY EFFORT AND ELEVATED THE MATERIAL CONDITION OF THE AEGIS SUITE TO UNPRECEDENTED HEIGHTS, SAVING THE NAVY MORE THAN $200,000 IN REPAIR COSTS. ADDITIONALLY, HE PLAYED A KEY ROLE IN THE EARLY COMPLETION OF A LIGHT-OFF FOLLOWING A NINE WEEK SELECTED RESTRICTED AVAILABILITY. LIEUTENANT CASH'S INITIATIVE, PERSEVERANCE, AND LOYAL DEVOTION TO DUTY REFLECTED CREDIT UPON HIMSELF AND WERE IN KEEPING WITH THE HIGHEST TRADITIONS OF THE UNITED STATES NAVAL SERVICE.

GIVEN THIS 1ST DAY OF MAY 19 97

DEPARTMENT OF THE NAVY • UNITED STATES OF AMERICA

FOR THE SECRETARY OF THE NAVY
A. J. KREKICH
VICE ADMIRAL, USN
COMMANDER, NAVAL SURFACE FORCE, U.S. PACIFIC FLEET

NAVSO 1650/42 (11-95)
SN 0104-LF-019 2900

[redacted]



# DEPARTMENT OF THE NAVY

THIS IS TO CERTIFY THAT

THE SECRETARY OF THE NAVY HAS AWARDED THE

## NAVY AND MARINE CORPS COMMENDATION MEDAL

TO

*LIEUTENANT ERIC C. CASH, UNITED STATES NAVY*

FOR

MERITORIOUS SERVICE WHILE SERVING AS SURFACE JUNIOR OFFICER INITIAL ACCESSION DETAILER, NAVY PERSONNEL COMMAND, MILLINGTON, TENNESSEE FROM JUNE 1997 TO OCTOBER 1998. LIEUTENANT CASH DISTINGUISHED HIMSELF AS AN EXTRAORDINARY ASSIGNMENT OFFICER BY EXPERTLY BALANCING BOTH THE PROFESSIONAL AND PERSONAL DESIRES OF 2,000 CONSTITUENTS. AS PRIMARY PERSONNEL ANALYST FOR THE JUNIOR OFFICER ASSIGNMENT BRANCH, LIEUTENANT CASH DEVELOPED AN OFFICER TRACKING DATABASE WHICH COMPILES AND CORRELATES OFFICER SELECTION, RESIGNATION AND QUALIFICATION TRENDS. HIS INITIATIVE PROVIDED THE BRANCH WITH ACCURATE INFORMATION WHILE AVOIDING THE EXTENSIVE MANPOWER REQUIREMENT REQUIRED IN THE PAST TO GATHER THIS DATA. HIS EFFORTS WERE CRITICAL IN THE DEVELOPMENT OF A CD ROM INFORMATION DISK THAT HIGHLIGHTS THE ROLE AND FUNCTIONS OF SURFACE WARFARE OFFICERS AT SEA IN THE PAST, PRESENT, AND FUTURE. LIEUTENANT CASH'S DISTINCTIVE ACCOMPLISHMENTS, UNRELENTING PERSEVERANCE, AND STEADFAST DEVOTION TO DUTY REFLECTED CREDIT UPON HIMSELF AND WERE IN KEEPING WITH THE HIGHEST TRADITIONS OF THE UNITED STATES NAVAL SERVICE.

GIVEN THIS *25th* DAY OF *November* 19*98*

DEPARTMENT OF THE NAVY • UNITED STATES OF AMERICA

W. R. Schmidt

*for the* SECRETARY OF THE NAVY

*W. R. SCHMIDT*
*Rear Admiral, U.S. Navy*
*Commander, Navy Personnel Command*

NAVSO 1650/11 (1-95)
S/N 0104-LF-019-2800

E2

**ADMINISTRATIVE REMARKS**
NAVPERS 1070/613 (REV.10-81)
S/N 0106-LF-6991

**SHIP OR STATION**
COMMANDING OFFICER, USS LAKE ERIE (CG 70) FPO AP 96671-1190

99SEP28: Received. Sea Duty Counter started.

J. E. BANFEILD
By direction of the Commanding Officer

---

99OCT08: Successfully completed qualification as Officer of the Deck Underway.

J. E. BANFIELD
By direction of the Commanding Officer

---

99OCT08: Successfully completed qualification as Tactical Action Officer (Interim)

J. E. BANFIELD
By direction of the Commanding Officer

---

99NOV17: AUTHORIZED TO WEAR THE ARMED FORCES EXPEDITIONARY MEDAL FOR OPERATION SOUTHERN WATCH WHILE ASSIGNED TO USS LAKE ERIE (CG 70) FOR THE PERIOD 28 SEPTEMBER 1999 TO 8 NOVEMBER 1999.

J. E. BANFIELD, YN1, USN
SHIP'S SECRETARY
BY DIRECTION OF THE COMMANDING OFFICER

---

00MAR07: SNO AUTHORIZED TO WEAR THE BATTLE "E" RIBBON FRO COMPETITIVE PERIOD 1 JANUARY 1999 TO DECEMBER 1999 WHIEL ONBOARD USS LAKE ERIE (CG 70). AUTHORITY: COMNAVSURFPAC SAN DIEGO MSG 011856ZMAR00.

L. D. NORDENSTROM, YN2, USN
By direction of the Commanding Officer

| *NAME (Last, First, Middle)* | *SSN* | *Brach and Class* |
| --- | --- | --- |
| CASH, Eric C | [redacted] | USN |

13

E-32

**ADMINISTRATIVE REMARKS**
NAVPERS 1070/613 (REV.10-81)
S/N 0106-LF-6991

SHIP OR STATION
COMMANDING OFFICER, USS LAKE ERIE (CG 70) FPO AP 96671-1190

99SEP28: SNO RECEIVED. START SEA DUTY COUNTER

J. E. BANFIELD, YNC(SW), USN
By direction of the Commanding Officer

02APR26: SNO AWARDED THE NATIONAL DEFENSE MEDAL (SECOND AWARD).

J. E. BANFIELD, YNC(SW), USN
By direction of the Commanding Officer

02JUL19: SNO AWARDED THE NAVY AND MARINE CORPS COMMENDATION MEDAL FOR SERVICE AS COMBAT SYSTEMS OFFICER, USS LAKE ERIE (CG 70) FROM SEPTEMBER 1999 TO JULY 2002.

J. E. BANFIELD, YNC(SW), USN
By direction of the Commanding Officer

02JUL19: SNO TRANSFERRED. STOP SEA DUTY COUNTER.

J. E. BANFIELD, YNC(SW), USN
By direction of the Commanding Officer

| *NAME (Last, First, Middle)* | *SSN* | *Brach and Class* |
|---|---|---|
| CASH, ERIC CRAWFORD | [redacted] | USN |

13

PRESENT:

MJ CAPT Moira Modzelewski

DC LT Andrew Carmichael

ADC LCDR Chris Czaplak

TC LCDR Angela Tang

ACC LCDR Sean Kearns

* * * * *

it gets to trial next week, you know, in the court room he controls the orderly presentation of evidence. You know what is going on in front of those members. And now, all of a sudden, instead we're -- to use the Trial Counsel's word that she uses in the motion a lot -- trotting. I don't know -- the verb, to trot.

All these members and everybody else, down to the piers and on board the ship and, potentially significantly confusing the record of trial and exposing the members to all sorts of extraneous evidence in a court-martial. I mean, that's why the rules are so strongly weighted to presentation of evidence in a court room.

LT CARMICHAEL: Ma'am, to limit that potential contaminating, I would suggest that we -- the Judge, actually -- order the members not to discuss anything while they're on the ship and then we agree with the preapproved script that our guide just says when we get to each spot -- we have a route that we go maybe three spots and nobody talks until we get to spot 1, somebody

you tell us what that --

CDR KYLER: I did, sir. I have not seen anything official investigation-wise, but I have heard on the waterfront some stories, and I've also seen (inaudible) source.

COL WHITSON: Okay. In the press, would that be Virginian Pilot articles?

CDR KYLER: Virginian Pilot, Navy Times.

COL WHITSON: Navy Times, all right. Based on some information in your background, it appears that you -- perhaps you had served previously aboard the USS Ronald Reagan?

CDR KYLER: Yes, sir.

COL WHITSON: Is that correct?

CDR KYLER: Yes, sir.

COL WHITSON: Were you ever aboard it when there was a mishap relating to the reactor?

CDR KYLER: Not related to the reactor, sir, but I was reactor officer when we lost a sailor to electrocution.

COL WHITSON: I see. Was there an investigation?

that I would take him as an expert within his assigned deal.

COL WHITSON: All right. I believe you indicated, as well, that -- you answered yes I think to the question as to whether someone might have mentioned anything to you about this case or whether you've read anything about the case.

CDR MOYER: Yes, sir.

COL WHITSON: Can you tell us what the basis of that is?

CDR MOYER: Yes, sir. I wasn't aware of the exact date, but I recall sometime around the incident, I heard an initial report, and I'm not sure if it was the Today Show or something of that nature, but it was in the morning hours, and I recall hearing an initial report that there had been an accident aboard the USS San Antonio. And then I recall a Navy Times article in the recent past mentioning an incident aboard the San Antonio.

COL WHITSON: Beyond those things that you just described, do you have any information

expertise, I would be more inclined to believe him.

COL WHITSON: In other words, that's what I'm getting at, is there anything about your prior work with him that is going to influence your ability to listen to what he has to say in this court-martial and evaluate it based on all of the factors you would ordinarily use to evaluate testimony, just like any other witness that you don't know?

CDR PIECZYNSKI: No, sir.

COL WHITSON: I believe you also might have indicated when we asked the panel if anyone had heard anything or read anything about the case, I believe you said --

CDR PIECZYNSKI: Yes, sir.

COL WHITSON: Could you tell us what the basis of that is?

CDR PIECZYNSKI: Just whatever the news reporting was at the time, what had happened.

COL WHITSON: Can you remember how long ago it was you might have read something about the

case?

CDR PIECZYNSKI: I know it was right around the time that it happened.

COL WHITSON: As a result of anything you've read or heard outside of this courtroom, have you formed any opinions as to how the accident happened or who's responsible for it or anything like that?

CDR PIECZYNSKI: No, sir.

COL WHITSON: Do you think you've formed any opinions that could impact your ability to sit as a fair and impartial member of the panel?

CDR PIECZYNSKI: No, sir.

COL WHITSON: Do you think you can be open to all of the evidence that's received and follow the instructions of the Court?

CDR PIECZYNSKI: Yes, sir.

COL WHITSON: Very well, thank you, Commander Pieczynski, those are the questions we wanted to -- oh, I'm sorry, one more. I did forget something here. I believe your court-marital questionnaire might indicate that

articles, have you formed any particular opinion about the facts or circumstances of the case?

CAPT WHEELER: No, Your Honor, I have not.

COL WHITSON: Have you formed any opinion about responsibility for the incident?

CAPT WHEELER: I have not.

COL WHITSON: Now, besides articles that might have appeared in the Navy Times or the Virginian Pilot, is there any other basis for that response that you might have heard something about the case outside of court?

CAPT WHEELER: No, there's not.

COL WHITSON: Now, I've been given to understand from your questionnaire that your current job is with OP NAV N3N5, is that correct?

CAPT WHEELER: Actually it's Navy Warfare Development Command N3N5.

COL WHITSON: Okay. What is your billet with that command and what are your duties, generally speaking?

CAPT WHEELER: I'm currently the

You're going to learn a lot about USS San Antonio, but I think I can sum it up in an April 2007 (inaudible) message. The USS San Antonio remains an unfinished ship. She was incomplete. And the Navy wanted Lieutenant Commander Kearns and the crew of the USS San Antonio to deploy with an incomplete ship. Now the Government is going to ask you to convict him of a crime in this case.

Trial Counsel alluded to Lieutenant Commander Kearns checking his e-mail at the time of the incident. Well, what you will hear is that in between cycling through multiple stations, including the boat deck, including the starboard side, including flight quarters, including the bridge, he was checking the SIPRNet traffic because he had to coordinate the transits, the pack transfers, the tasking, and also the debarking of Admiral McKnight and his staff.

You will also hear that after he had held quarters behind the bridge that morning, Lieutenant Commander Kearns had an extensive

conversation with his XO, or I'm sorry, his CO, Commander Cash. And you will hear and the evidence will show that what Lieutenant Commander Kearns was doing on the morning of 4 February 2009, is exactly what his CO wanted him to do.

You'll hear about a variety of challenges the crew faced on the USS San Antonio. To name a few, 6,000 faulty wells, loose bolts that caused all four main engines to misalign. But perhaps the most telling, you will learn that USS San Antonio was operational without a single training assistance plan or a single ship specific entity, that she was deployed with as little as 60 percent of the tech manuals she needed, and that Lieutenant Commander Kearns, along with his CO that preceded Commander Cash, had to beg the Navy for over half a million dollars to get the crew essential training they needed, 3,000 hours in the months of June and July before they deployed.

You will hear that when Lieutenant Commander Kearns checked onboard the USS San Antonio, he stepped up that ship's administration

water.

So once the RIB gets to the water, we start the engines, thumbs up from the boat coxswain and the crane head is removed, the steadying lines come off, sea painter is the last to come off and the boat launches.

It's done typically at 3 to 5 knots while the ship is in an underway condition. Unless conditions are perfect, we could do it at anchor or do it at all stop, but it's better, in my opinion, to do that evolution underway.

I can create a nice falsity (sic) on the port side of that ship by driving ship and that's very basically how that boat is launched.

If we were going to put a crew into that to go to a visit or a search-seizure or an approach op, we have two options, actually three options for picking up that crew.

You could take the 11-meter RIB around to the stern gate. Again, this would be something we would do at anchor, where we could load the crew over the stern gate. We could load the crew

focusing first on the control from the bridge?

A Well, you want to make sure that everybody's qualified. You want to make sure that checklists are being followed, if there's a checklist involved.

I'm not sure what you're asking me.

Q When you were lowering boats as the commanding officer of that ship, where would you, where would you station yourself?

A I would station myself in the pilothouse or on the bridge way.

Q What would your expectations be of the bridge watch team with regard to the boat operations? What do you expect your bridge watch team to be doing?

A The bridge watch team, if I'm out on the bridge way watching small boat operations, my expectation is that the bridge watch team is paying attention to safe navigation of the ship and safe contact management, so they're driving the ship. I'll go out on the bridge way and watch the actual boat evolution.

of actually seeing that evolution.

The starboard side, the Caley davit, when that thing swings out over the side, you've got a boat crew in it. That's a long haul down to the waterline, so we had talked on multiple occasions that yes, it was an inherently dangerous operation, but there were things in place that mitigated that danger, and that's why we decided to, to continue doing what we were doing.

Q Okay.

LCDR TANG: No further questions, sir.

COL WHITSON: Defense, cross-examination?

LT CARMICHAEL: Yes, sir.

CROSS-EXAMINATION

BY LT CARMICHAEL:

Q Good morning, Captain Kastner.

A Good morning.

Q Sir, I know that we talked about you taking command of San Antonio in your current billet at ATG.

Can you tell us, can you give us sort of

a thumbnail sketch of your background in the Navy?

A Yes. I'm a, I have 22 years in now, spring stick amphib sailor. I've done multiple tours on LSD class ships, both in engineering and the operations world. I've done tours in ambiguous squadron. I was the flag lieutenant for the amphibious ship admiral, so I've got a lot of Gator (sic) experience.

Q Thank you, sir. Now, you took command in July of 2007; is that right?

A That's correct.

Q And there had been a pre-INSURV that April; is that correct?

A There had been a final contract trial in April, yes.

Q And so when you took command shortly after that, they had identified about 108 deficiencies; is that right?

A That, that number rings a bell.

Q There was -- 53 of those had no clear path to correction?

A That's, from the April INSURV that,

yeah, that all sounds familiar.
Q Okay. There's six fleet maintenance issues; is that correct?
A Yes.
Q Okay. And there are, there are a number of materiel problems that you had to cope with when you took command, such as 124 of 269 watertight closures were not watertight; does that sound about right, sir?
A Yes.
Q And what, can you tell us what an ETC is in the context of INSURV, a card of some sort?
A It's a -- I can't remember whether it's -- it's some sort of trial card.
Q There are over 1,200 ETCs from acceptance trial still open?
A That's correct.
Q 355 work items were transferred from the ship's CSMP?
A Right.
Q And after that, after the April '07 trial, there were 3,868 new ETCs identified; does

that sound right?
A It sure -- that sounds, that sounds right.
Q Sir, would you characterize, at the time you took command, would you characterize the San Antonio as an unfinished ship?
A I would characterize it as a ship that still had some, some issues, you know. Obviously, we could get underway, but I'm not sure we had everything that we needed to get underway.
Unfinished is, is a big term, and you can look at it as unfinished materially, which I think it was when I took command in July. I think we still had somewhere in the neighborhood of 50 to 60 spaces that had not been completely turned over to the ship yet, and that's of the 939 spaces that we have in the ship.
So if you're talking July of '07, when the ship was commissioned in December of 2005, that's not a real good track record.
The bigger concern to me when I took command was the lack of logistics support in terms

of training, in terms of parts support, in terms of technical manuals, in terms of NECs for the ship and training for the sailors who were coming to the ship. That was a huge concern as I geared up to get ready to take command in July.

Q Sir, you talked about identifying some essential systems that you needed to get extra training on before your 2008-2009 deployment.

Can you tell me or tell the members why the SWAN was a system of concern for you?

A The SWAN, or Ship-Wide Area Network, in San Antonio is basically the backbone of the entire ship. The engineering control system rides on the SWAN. The ship control system, which encompasses both navigation and combat systems, rides on the SWAN, and the SWAN is an interesting engineering feat, for lack of a better term.

My personal opinion is that it's over-designed. It's got a lot of things in it that sailors don't necessarily understand and a lot of things that I'm not sure are conducive to a maritime environment so much so that in addition

to the training that was set up by PMS470 for Navy sailors to go through, when that ship deployed in August of 2008, we took a Raytheon tech with us, a SWAN expert, who made the entire deployment in the event that we had an issue.

Q Now, you had to send -- you said that PMS470 had to pay for some training. Did you send sailors actually to Raytheon to get training because there was no Navy school for them?

A That's correct. The sailors went to the Raytheon SWAN course, which I think was out in San Diego, somewhere out in California.

Q Now, where -- you mentioned tech manuals and pubs. When you deployed, is it fair to say you only had about 60 percent of the manuals and publications that you needed?

A I think by deployment time, it might have been closer to 75 or 80 percent, but we still did not have a complete tech manual system, and the tech manuals that we had didn't necessarily give us all the tools that we needed to conduct troubleshooting, so much so that it was one of the

things that were noted again at the INSURV that I conducted, the special materiel inspection, in November.

Q Now, with that inspection, was that leading up to the December 2007 INSURV?

A The, the INSURV was conducted in November. I think the message came out in December.

Q In that message, or, I should say, in that INSURV, had they identified over 3,600 trial cards during final contract trials and of that, 1,100 remained open?

A The 3,600 trial cards were identified back in that April final contract trial, and the whole reason for doing the materiel inspection in November was the ship failed to sail in April, so the underway portion and the operations portion in the final contract trials could not be completed.

The ship couldn't meet minimum equipment and steering gear. The ship couldn't meet interim equipment for reverse osmosis, which is our water-making capability, so the ship by, you know, the

way we used to do the in-serves, by 2000 on day 2, if you, if you don't clear minimum equipment to go to sea, you don't go to sea on day 3, and that's what happened in the April INSURV.

So it was about 3,600, give or take, trial cards that were done on static systems during that INSURV.

By the time we got to the November INSURV, that was down to the, I think it was to 1,095.

So -- (inaudible) and improve shipbuilding.

Q Sir, I think we're having some issues again. (Pause.) Sir, can you hear me?

A I can. Can you hear me?

Q Yes, sir. I think we've got you back.

COL WHITSON: Let me just jump in for a moment.

Captain Kastner, this is the judge. We have a little technical glitch here. I believe from my own recollection I lost you right after you described for us that by the time of the

second INSURV, you were down to, I believe you said, approximately 1,095 trial cards, and then we lost you for a few seconds at that point. If you could pick up from there, thank you.

THE WITNESS: Yes, sir. So by the time we got to the special materiel inspection, which was conducted late November, we were down to, you know, 1,095 trial cards.

Most of those trial cards that had gone away were fixed by maintenance, multiple maintenance availabilities and shipyard work.

BY LT CARMICHAEL:

Q Were you able to -- was it, would you say it was through the efforts of ship's force and support on the waterfront that you were able to clear this and get the ship ready to deploy?

A Ships force, the waterfront, PMS470, the maintenance team, my instant Commodore Piker, who had PHIBRON 4 at the time, just overwhelming support to get that ship prepared to take it on deployment.

Q Sir. Sir, you mentioned you had

concerns about integrative logistics support.
Was there -- can you, can you tell us what a Navy training system plan is?
A Navy training system plan is, is, it's developed -- (inaudible) to identify --
Q Sir, I think we're having another glitch.
A Yeah. I'm losing the video. Are you back?
Q We can hear you. We got the audio. I think we've got the video now, sir.
A Okay. So a Navy training systems plan is developed, they look at Navy systems on a ship, specific Navy systems on a ship, and then they develop the training that each crew member at various levels will have to receive in order to go and operate that system.
It's a long process. I think the, the process falls under what's called the TRPM, Training Readiness Manpower process, and it takes I guess between 18 and 24 months to develop training for specific Navy systems.

I got a brief on it before I went to command, but I don't remember all the specifics.

Q How many MTSPs (sic) did San Antonio have when you took command?

A I want to say two, but they were incomplete. The way that San Antonio, the vision for San Antonio training was that the ship would have this on-board electronic classroom and San Antonio sailors would be trained via computer-based training through the electronic classroom.

The electronic classroom in LPD-17 San Antonio never came to fruition. I don't know the details of it, but the bottom line is, the funding was cut.

The electronic classroom space existed. It's right across from the helo magner (sic), in fact, on the 03-04 level, nice space, large space, lots of ventilation in there.

We took advantage of it and turned it into a cardio gym, so that electronic classroom never got picked up. There was a small ship's

library that had computers in it. We took the computer-based training that we were given, which was all developed in the 2003-2004 time frame. It was developed on an as-designed mission versus as-built condition, so a lot of that computer-based training that was provided to the ship was inaccurate with respect to what was actually in the ship, that it was very -- (inaudible) -- specific ship --

Q Sir, I think we had another hiccup. Can you just repeat that last part, sir?

Sir, I think we have you back.

A Can you hear me now?

Q Yes, sir. Sir, you were talking about the computer-based training was as-designed rather than as-built?

A That's correct. So a lot of the computer-based training that was developed was developed before the ship was even in commission, and, and the large majority of it was inaccurate with respect to what was actually in San Antonio.

Q I want to hit one thing real quick

before I move on to another topic.

Did you ever receive any end-to-end line diagrams to troubleshoot SWAN?

A No, not during my tenure. There was one that was supposedly under development, and there was a interactive or electronic tech manual that the tech rep for Raytheon who rode the ship brought out with him, and that had some end-to-end line diagrams, but every time we brought up the end-to-end line diagrams discussion, the community sent us back to -- SEASOS (sic) book number 4 was supposed to be the magic book that had everything that we were looking for.

Well, most of the line diagrams were pin-to-pin engineering level diagrams that we had gotten in that SEASOS book and were not usable to the techs when trying to troubleshoot why one of the remote switches in -- (inaudible). That's what we needed, tech level support for the SWAN.

Q Now, you mentioned that the engineering control system, ship's control system, gun weapons system were among some of the critical systems you

felt needed to get funded with the half million dollars from PMS470.

You said that the crane fell through. I'd like to talk a little about what you did to mitigate that.

What kind of procedures for lowering the 11-meter boat, 11-meter RIB, came about under your command?

A Essentially, the procedure that I, that I talked to earlier.

Q Uh-huh.

A Most of that was in place before I took command because of the way they had to launch even the outdrive 11-meter RIB.

The only procedure, procedural change was when we got the 11-meter RIB, it started burning up impellers starting that RIB out of the water. We went to the RIB tech manual and that said to not start the engines out of the water.

So I guess if there was a procedural change, it was that the engines were started once that RIB was in the water, but that was due to the

crane to launch that boat.

Q And --

A That line is necessary to control the movement, the pivotal movement of that RIB.

Q And a sea painter is used on other ships, as well?

A Absolutely. Yes.

Q And it has the same role on other ships as it does on the USS San Antonio class?

A Yes.

Q Other than the crane being different and the curvature of the hull, once that boat begins to lower, that's a boat handling evolution that you, did you feel comfortable that your deck boson and your first lieutenant could apply the common concepts of other ship classes to that boat handing evolution on San Antonio?

A The only other exception was the RIB, the 11-meter RIB is a water jet RIB with a different propulsion train, so starting that RIB above the water before the RIB hits the water is not recommended by that RIB's specific tech manual

and not recommended by the tech reps that we talked to as we continued to burn through impellers with that boat.

So all that being said, I still had every faith in the world in that deck department from the time they hooked the derrick's head up when the boat was in the skids to the lift over the bulkhead all the way to the waterline.

Q You testified on direct that you put that boat in the water safely about 50 to 75 times while on deployment?

A We, we did a lot of boat operations working up to deployment and then on deployment, everything from the pro chops (sic) and the Horn of Africa to doing security operations up around the oil fields with the Kuwait and the Bahraini Navy, so we did a lot of boat operations.

That 50 to 75 was a swag (sic) on my part.

Q Okay.

LCDR TANG: No further questions, sir.

LT CARMICHAEL: Defense recross,

don't recall whether we did small boat operations or not.

COL WHITSON: For the record, as the balance of the question was a conditional in the event that Captain Kastner answered in the affirmative, the balance of that question won't be asked. Are there qualification cards -- And we've lost the witness.

(Pause.)

COL WHITSON: Captain Kastner, are there qualification cards for all personnel involved in small boat handling, including the person handling the sea painter line?

THE WITNESS: I don't know if I'm familiar with qualification cards. We use the standard PQS assignments, and the individual on the sea painter was POIC qualified under the Personal Qualifications System, PQS -- or Personal Qualifications Standards, PQS. He was qualified under that system.

COL WHITSON: Are those personnel assigned duties on an approved watch bill?

THE WITNESS: There is not a watch bill per se -- (inaudible) -- with any time.

COL WHITSON: I'm sorry, sir. You were cut off in the middle of answering that question. And you were cut off on mine.

Trial counsel, do you know the phone number for this room, if we gave that?

I'm not anticipating a lot more questions, but still I want to expedite a little bit.

(Pause.)

COL WHITSON: Sir, you were cut off as you were answering the question whether personnel involved in small boat handling were assigned duties on an approved watch bill.

THE WITNESS: Yes, sir. It wouldn't be covered under the standard, you know, like a three-section second watch bill, but boat team and boat deck assignments would be covered on a watch porter's station's bill or certainly a watch team replacement plan so that you could track those qualifications.

COL WHITSON: Was the sea painter marked

ship in between the waves and the boat.

Q What permissions as OOD did you have to receive prior to launching the small boat?

A Basically, when we were ready to put the boat in the water, I would give the captain a brief, telling him we're on a steady course; we're at a safe speed; these are the conditions we're at; request permission to put the boat in the water. And you would proceed from there.

Q And at this point, have you already been communicating with the boat deck?

A Absolutely, yes.

Q Okay. The point that you call the commanding officer, where's the boat situated?

A Still in the --

Q Cradle?

A Cradle.

Q Okay, so you called the commanding Officer prior to the boat being pulled out of the cradle.

A Yes.

Q Okay. What roles do the members of the

about?

A I mean, the --

Q To clarify, did you --

A I mean, the CONN ordered all stop.

Q The CONN ordered -- okay, thank you. Sorry. Do you recall who was present on the bridge when -- besides the bridge team, when this boat was being lowered?

A The captain had just stepped off the bridge. He needed to go get some sunscreen. It was going to be a long day of boat ops and flight ops, so he was probably going to sit out on his port bridge wing chair and observe.

Q Okay.

A So.

Q Was the XO present?

A Yes. To my knowledge, yes.

Q And why do you think that?

A Because he was always up there for every -- you know, every other time we did boat ops he was up there. He was very energetic, so he was often in and out. But I can't say for certain he

A From the --
Q From the station.
A Boat deck. From the boat deck, yes.
Q Okay. Was he also the acting First Lieutenant?
A I would imagine so, yes.
Q Do you have any knowledge of his experience in boat operations?
A I know he's been in the Navy longer than I've been alive, so probably a lot.
Q Is it fair to say that you felt pretty comfortable with him in charge of this -- of the operations on the boat deck?
A Oh, absolutely. Absolutely.
Q Now, when you did your initial brief on putting the RHIB in the water, do you remember if the captain was actually up there and that was an in-person brief?
A He was up there for that. I do remember giving him a face-to-face brief.
Q And then at that point, you -- do you have a checklist there on the bridge? What's the

--

A We have a OOD binder full of checklists, and so any time we do any sort of special evolutions, you just "all right, we're doing an unrep." You get the unrep checklist out and start running it. "All right we're doing small --" you know, so, it was -- the checklist, I believe, was already out. The previous watch had set it out and said all right. It was part of a turnover item.

Q Okay, and as each step of the boat launching procedure is being accomplished, do you sign off or initial on the checklist?

A Just check it off and make sure it's good.

Q And was that done -- was that a normal procedure done that day?

A Yes. Yes.

Q Now, you said you had two ships alongside you. What was kind of the orientation of that?

A The Vella Gulf was off our port side,

that, you know -- see what's going on, so.

Q How about the free board? What's the comparison of the free board from where you're lowering ships -- or lowering small boats?

A Well, say, the free board for the San Antonio is 60 feet and on a frigate the height of eye in the pilothouse is, like, 32 feet, so.

Q Okay. In your position on the USS San Antonio, did you have a chance to interact with the XO, LCDR Kearns?

A Yes.

Q How so, or how often?

A As the ATRAINO, I was often in the XO's office working out paperwork issues, and just any time the XO needed something chased down, it generally was, "Hey, ATRAINO, can you chase this down for me?" So, I saw him a lot and worked with him a lot, especially in that last year.

Q Would you say a daily basis?

A Yes.

Q Even more frequently than daily?

A More probably like an hour a week,

because --

Q With that contact and being able to observe LCDR Kearns, were you able to get an -- observe his leadership abilities?

A Yes.

Q His attention to detail?

A Yes.

Q His commitment to training?

A Yes.

Q His commitment to the troops?

A Yes.

Q And can you give your opinion of his military character based off of those observations?

A I believe he's an excellent officer, somebody who --

LT BURBY: Objection, your Honor. It's limited to her opinion as to his military character, not for a full explanation of why she feels that way.

COL WHITSON: Overruled. You can complete your answer to the question.

THE WITNESS: I just thought he was a great officer, somebody I wanted to emulate then and still want to emulate now. He was very, very knowledgeable, and he was somebody I genuinely looked up to.

BY LT CARMICHAEL:

Q All right.

A That's saying a lot considering I was ADMINO.

LT CARMICHAEL: Okay, I have no further questions.

COL WHITSON: Government. Redirect.

LT BURBY: Yes, sir. Thank you.

COL WHITSON: Redirect.

LT BURBY: Just a few follow-up questions.

THE WITNESS: Um-hmm.

REDIRECT EXAMINATION

BY LT BURBY:

Q Now, this lookout, who I guess you believe was on the port bridge wing --

A Um-hmm.

Q Was that an aft lookout? P13 -- is that the term?
A Yes, that's -- I cannot say his name, so I -- P13. I'm not -- I can't remember exactly what his position was. I do know he was -- at the time, he saw it happen and he came to the port bridge wing door and notified the pilothouse.
Q Now, his location -- the fact that he was on the 04 deck, was that because of flight ops?
A Assuming he was the aft lookout, yes. But I'm -- I don't remember what his exact position was that day.
Q What are the other lookouts up there?
A The -- we each have also a port -- you have a port and starboard lookout, and then you have an aft lookout.
Q Okay. So, this individual you're not sure which position they're filling came into the pilothouse.
A No.
Q Yelled into the pilothouse?

A Yes.
Q And they told you, based on your previous testimony, that the boat was already flipped over and people were in the water.
A Yes.
Q And it's your understanding that that person came from the position 20 feet away on the port bridge wing?
A Yes. I -- I'm assuming that's where he was. I don't know anything other than when he appeared in the port bridge wing door and said that the boat flipped. All -- any -- it's conjecture on my part as to where he was.
Q Okay, but that location's 20 feet away; correct?
A Yes.
Q Now, with the aft lookout, I understand you don't know what positions this person was filling -- would they be stationed further aft overlooking the crane and the boat deck?
A No, they would generally be by the aft mast on that -- the 04 level as well, so.

Q Okay. Now, would that change if you were doing flight operations?

A That is where he would be if --

Q For flight operations.

A For flight operations. If not, he would be on the flight deck.

Q So, this is a position much further aft, though, than the port bridge wing.

A Yes.

Q Okay, thank you. What is the individual who notified the bridge team? What's -- what was their rank and rate?

A I believe he's a seaman. A deck seaman. I believe.

Q Is this an individual who is knowledgeable on the operation crane?

A No, sir.

Q Is this someone who --

A Well, as a deck guy, depending on what his training was or whether he wanted to be a crane operator. I don't -- I couldn't tell you how -- if he had gotten any training on that.

Q Has he had the -- has he ever been placed in the position to supervise crane operations?

A No.

Q Supervise any sort of launching or recovery of small boats?

A No.

Q Okay. Now, the brief the night before where the timeline was discussed -- and, again, you testified that that's the timeline you were following?

A Yes.

Q Was the XO present for that brief?

A Yes.

Q Okay.

LT BURBY: No more questions, sir. Thank you.

COL WHITSON: Defense, recross.

RECROSS EXAMINATION

BY LT CARMICHAEL:

Q We've already covered, but you're OOD qualified, right?

A Yes.
Q Have you ever been in the position to supervise the lowering of boats, of small boats?
A You mean on the boat deck?
Q On the boat deck.
A No.
Q Have any of the officers that stand OOD been in that position?
A No. Maybe one of the deck DVOS.
Q If it was an officer out there on the port lookout, do you think they would have been able to run faster than you're the petty officer to notify you quicker?
A No.
Q Okay.
LT CARMICHAEL: No further questions.
COL WHITSON: At this point in the courts-martial, the members are allowed to ask questions if they choose, and the way they do that is by writing them down.
Members, are there any questions for LTJG Meyer?

SPEAKER: Yes, there are, your Honor.

COL WHITSON: Okay, thank you. Thank you, Mr. Bailiff. The Court's been handed questions from the members. It appears that there are seven marked as the next Appellate exhibits in order.

(Pause)

And the Bailiff is delivering the questions as marked, counsel, for review and possible objection. Thank you, Mr. Bailiff.

(Pause)

(Appellate Exhibit Nos. AE-XLIX, AE-L, AE-LI, AE-LII, AE-LIII, AE-LIV, and AE-LV were marked for identification.)

COL WHITSON: Okay, and we have received what we've marked as Appellate Exhibits XLIX through LV, questions from the members, with no objections from counsel.

LTJG Meyer, I'll ask you the questions, but if you could please direct your answer to the members.

THE WITNESS: Yes, sir.

COL WHITSON: First question. Do you recall the ordered speed of the ship at the time of the mishap?

THE WITNESS: Five knots.

COL WHITSON: How much time elapsed following the mishap before the CO returned to the bridge?

THE WITNESS: Almost no time at all. He was right back up there pretty quickly.

COL WHITSON: Appellate Exhibit 51 is the -- slightly rephrased, but it's the same question as Appellate Exhibit XLIX, and so will not be asked.

On 4 February 2009, why was the 11 meter RHIB being launched? What was its intended use once deployed?

THE WITNESS: Honestly, I don't remember why we were putting it in the water. I believe it was going to be a safety boat, but I can't say with certainty. I just don't remember. I apologize.

COL WHITSON: You stated that rudder amidship was ordered once the immediate actions were started. Do you recall if the rudder had been to port to maintain the lee and, if so, how much port rudder?

THE WITNESS: I don't remember.

COL WHITSON: When the all stop was ordered, once the lookout reported man overboard, was the all stop modified with a 333/999/888, and before answering I'll ask if you recognize what those numbers indicate.

THE WITNESS: I have no idea.

COL WHITSON: All right, let me rephrase it, because I think there's a helpful hint here for us on Appellate Exhibit XLIV. When the all stop was ordered once the lookout reported man overboard, was the all stop modified with any particular throttling rates, to your recall?

THE WITNESS: When you -- like, was another engine order given? Is that what you're asking, or -- I don't understand the question, I guess.

COL WHITSON: Very well. Were the three ships - San Antonio, the Bella Gulf, the Lewis and Clark -- steaming in a romeo circle with one ship assigned as ZULU ZULU?

THE WITNESS: I don't recall.

COL WHITSON: Can you recall what were the minimum assigned distances, if there were minimum assigned distances, between those three vessels?

THE WITNESS: I don't recall. I don't recall.

COL WHITSON: Trial counsel, any further questions in light of those from the members?

LT BURBY: No, your Honor.

COL WHITSON: Defense counsel?

LT CARMICHAEL: Yes, sir.

COL WHITSON: Please. You may proceed.

LT CARMICHAEL: I think I can, hopefully, clarify that a little bit.

FURTHER REDIRECT EXAMINATION

BY LT CARMICHAEL:

Q When you were on -- when you were

traveling, how were you creating the lee? Were you doing it with a dynamic turning lee with your rudder to port, or were you doing it on a steady course?

A A steady course.

Q And is your ship's engines -- are they steam or are they diesel?

A They're diesel.

Q Okay, thanks.

LT CARMICHAEL: I have no further questions.

COL WHITSON: Any further questions from the members?

SPEAKER: No, your Honor.

COL WHITSON: It's a negative response from the members. Does either party desire that LTJG Meyer be subject to warning or recall. Government?

LT BURBY: No, your Honor.

COL WHITSON: Defense?

LT CARMICHAEL: No, your Honor.

COL WHITSON: LTJG Meyer, the Court

thanks you for your testimony here today. You are excused.

THE WITNESS: Thank you, sir.

COL WHITSON: Government, I assume you have another witness to call:

LT BURBY: Yes, your Honor.

COL WHITSON: Okay. Before doing so, Mr. President, if you would agree, I believe it might be an appropriate time for us to take a noon, midday chow break. Would that be satisfactory?

SPEAKER: That would be satisfactory.

COL WHITSON: Very well. The court will stand in recess for midday chow. Let's return, be ready at 1315 by that clock there. It's a little less than an hour --

(Recess)

BAILIFF: Everyone please take a seat. Court is in session.

COL WHITSON: Court is assembled. The members have returned. Accused and counsel are present. Government, are you prepared to proceed?