LT BURBY: Yes, your Honor.

COL WHITSON: Please call your next witness.

LT BURBY: Government calls Chief Warrant Officer Shawn Stacey.

Whereupon,

SHAWN LEE STACEY

was called as a witness and, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY LT BURBY:

Q Will you please state your full name, spelling your last name.

A Shawn Lee Stacey, S-t-a-c-e-y.

Q And what is your rank and rate?

A CWO4.

Q Service?

A U.S. Navy.

Q And what is your current duty station?

A Right now I'm at Naval Beach Group 2.

Q CWOL4 Stacey, where were you stationed in February 2009?

A On board USS San Antonio.

Q And in February 2009 how long had you been on board the San Antonio?

A A little over a year or right at a year.

Q What were your responsibilities on board the San Antonio?

A I was ship's bosun.

Q What -- in what detail?

A And I'm the technical advisor for Deck Department, in charge of ground tackle, boats, mooring the ship, painting the ship, well-deck ops.

Q Was the Deck Department broken down into divisions?

A Yes, sir, first and second division.

Q And how many personnel total were in Deck Department?

A I believe at that time, it may be in the neighborhood of people, maybe a little more, maybe a little less. I don't -- I really don't remember right now.

Q Thank you. Now, do you recall a mishap

in February of 2009 with the 11 meter RHIB?
A Yes, sir.
Q I'd like to ask you some questions about procedures for launching the small boat prior to that mishap.
A Okay.
Q Can you explain the procedures for launching -- for lowering the small boat basically after you get it to the RHIB -- I mean, sorry, to the rail.
A Well, after we get it to the rail, we'll call up to the bridge to get permission to put some personnel in the boat, to place the steadying lines and the sea painter -- get those attached, and just do one final equipment check on the boat to make sure that everything's -- there's no issues, things like that. We'll do a comms check typically once we get it to the rail, and then once all that's hooked up we'll pull the personnel out back out of the boat and then, you know -- or load the rest of the personnel in the boat, depending on the -- what we're doing, if we're

ready to launch the boat at that time, and then we'll call the bridge, let them know that the boat's, you know, manned and ready, we request permission to launch the boat and then go from there.

Q Okay, and once permission is granted what's the next step?

A Well, the POIC will give a signal to -- he'll holler out to stand by, signal the crane operator to slew the boat out, direct the line handlers as necessary once we get the boat out, and then once it's clear of the side of the ship and the curvature of the hull, he'll signal -- you know, give a down signal and we'll start coming down on the boat.

Q Okay. So, just to clarify as to the positions during this detail, you mentioned the POIC. What is their main function?

A Petty officer in charge -- they're the petty officer in charge. They're signalmen for that particular evolution. They'll signal the crane and they direct the line handlers.

Q So, the POIC -- are they directing -- who's actually directing the crane?
A The POIC.
Q Okay. What's the difference between a POIC and a signalman?
A The same -- one and the same for this evolution.
Q Now, what other positions are there involved besides line handlers?
A You'll have a safety observer, you'll have -- besides the line handlers?
Q Right.
A You'll have a safety observer, you'll have a crane operator, you'll have the POIC, and then that's really about it.
Q Okay. So, after you've -- you mentioned the boat -- you slew the boat out and then you began lowering on the wire?
A Yes, sir.
Q What happens next?
A Once -- typically when -- well, when we would get it to usually around the knuckle, we

would stop the boat, stop the crane movement, have the person in the mooring station adjust the sea painter; and then once the sea painter was adjusted we had two marks on there -- one for the 7 meter, one for the 11 meter, and then once that was adjusted and made up, they would put it up that the sea painter was secure and then we would continue lowering the boat.

Q If you explain why there's an adjustment --

A Well, the height of the ship, the curvature of the hull, various reasons -- I mean, it's the way the ship was designed, so you have to -- because the -- where the boat sits at the rail, you have to put out so much slack in order to get the sea painter attached to the boat that you would have to adjust the boat or adjust the sea painter as the boat was, you know -- before you put it in the water, because if you put it in water -- if you hooked it up and placed the boat in the water where it was -- where you hooked it up at, the boat would end up, you know, way out of

position for the launch.
Q So, just making sure I understand correctly, you lower it to the knuckle, you make that adjustment, and then you actually stop the boat --
A Yes, sir.
Q -- adjust it, and then what happens at that point?
A Oh. Once we get the report that the sea painter's secured, it's at the mark and it's secured, then we would continue lowering the boat and put it in the water.
Q And what's your understanding on when the engines are started?
A By the tech manual, it's before the -- you know, before the boat's placed in the water.
Q Now, prior to the mishap, understanding what the tech manual says, what was the procedure on board the San Antonio?
A Well, we were doing it prior to putting the boat in the water, but we had burnt up numerous impellers at that point and I think we

were down to the last impeller on board for the 11 meter, so we -- what we eventually started doing was bringing the boat down and we would get it to a position above the water. We would slow the crane down. The POIC would holler down to the coxswain, "Start your engine." The coxswain would start his engines and get a thumbs up and continue putting the boat in the water.

Q Now, you mentioned permissions that are received from the bridge. Can you explain at what steps you are asking and receiving permission from the bridge?

A Well, we would -- throughout the entire evolution, from the start to finish with the crane, we would -- I would -- we would get permission to -- if the ODCL operator's daily checklist wasn't completed on the crane, you know, 24 hours prior to, we would have to do the ODCL so we'd get permission to do the ODCL. Once that was done, I'd get -- we'd get permission to hook the crane into the boat. Once everything was hooked and the crane was hooked and it was ready to

being transferred that morning?

A Not really. I mean, I -- it -- probably in excess of people. I mean, I know it was -- we had quite a few personnel to transfer. But I couldn't tell you an exact number, sir.

Q Was there a brief for these particular evolutions?

A We -- when -- at the nightly ops brief we did a -- we - round tabled it, we talked about it when, you know, like an unrep brief where we put the PowerPoint up and go through the -- the operations officer I believe talked about the schedule of events and who was going by air, who was going by small boat, and things like that; and then we kind of talked, you know, the boat in evolution portion of it.

Q And was LCDR Kearns present for that meeting?

A Probably. I'm sure he was. If -- he was -- it was during the ops brief.

Q Do you recall anything about safety being discussed during the brief?

see if he could get the engine started or if -- you know, sometimes he would -- they would call up and say hey, you know, we've got the boat started, they've given permission to get away. Sometimes they'd pull away; as they were pulling away the engine would die. They'd just move out off the side of the ship with the other engine and the engineer would troubleshoot it, get that boat -- or get the other engine operating. If they didn't, depending on what we were doing, the call may be made to continue on with the mission with one engine. You know, it's -- if both engines didn't start and it was on the sea painter, we would keep it on the sea painter, give the -- you know, based on the mission, the sea state weathers, we would, you know, make a recommendation to pick the boat up or just, you know, call the bridge and say hey, the boat's not starting; captain recommended picking the boat up, you know?

LT BURBY: Okay. Now, based on the recent history with the engine troubles and the

A Okay. We got permission to launch the boat. We slewed the boat out, started coming down on it. We got the -- sea painter was adjusted. We got the report that the sea painter was secured. We kept coming down on the boat -- or commenced coming down on the boat, and I believe the -- that officer-in-charge hollered down to coxswain to start your engines. I don't remember if there was ever a, you know, thumbs up or, you know, if we got a reply back, but the boat was placed in the water and that it slid alongside the ship -- you know, came into the curvature of the ship, the hull. And I, you know, stepped up to the rail at that point and was watching -- seeing the boat kind of move back and then the bow start horsing around.

My initial thought was that the coxswain was playing around down there and I hollered down at BM2, you know, hey, what the -- are you doing? And that's when he hollered up that the engines won't start. So, we sat there, you know, kind of sat there for a minute, you know, to see if the

engineer was going to be able to get the engine started.

Then I noticed the bow -- she slid back more and then the bow started to haul off the port, and that's when I told the -- you know, hollered out at the POIC to pick the boat up. And as he started to come up on the boat, the bow really swung out, and then at that point that's when the boat started to heel over.

Water was coming over the sponson. I saw Seaman Evans and Petty Officer Ansong fall forward, and Petty Officer Stillinger jumped aft to clear the boat, and then I saw SN Evans come up right by the ACCOM ladder and Petty Officer Ansong came up not -- we wasn't too far from SN Evans. Petty Officer Johnson and Chief Miller were down in the mooring -- or, I'm sorry, the ACCOM ladder room. They threw a line out to get SN Evans. I saw Petty Officer Stillinger floating down the side of the ship along with Petty Officer Ansong, both waving their hands above their head. And then I kind of lost -- once they got back further,

I lost sight of those two, and then that's when the ship started turning.

I was talking with the XO at that point or, you know, before that, but the captain -- and then, you know, the ship turned. I saw Petty Officer Stillinger off the port quarter, and I saw what at the time I thought was PO Ansong not -- he was a distance away from PO Stillinger but not, you know, not too far.

The XO was asking me where everybody was at. I told him that Stillinger and Ansong were back off the port quarter and SN Evans was on board, that the BMC and BM1 had pulled him in. Then the XO -- about that time I believe the helo was over -- or, I'm sorry, SN - Petty Officer Stillinger swam over to Petty Officer Ansong's life jacket and picked it up and, you know, that's when I was told that, you know, hey, Ansong's not in his life jacket. And then I directed the personnel that were standing in the boat deck to shift over to the starboard side and start looking to see if anybody could see him. Had some more

people come out to the port side boat deck to, you know, kind of more eyes out looking to see if we could find -- you know, see Petty Officer Ansong. We had a lot of debris in the water, so, you know, we were looking in the debris fields and, you know, helo came over, picked up Petty Officer Stillinger, brought him back aboard, and, you know, the -- I believe the two RHIBs were called back to come over and start looking around, you know, the debris fields. But we never recovered him.

Q During this evolution, do you recall how many people were sent to the port side mooring station for the launch of the meter?

A Sir?

Q Do you recall how many people were sent down to work the mooring station on the port side?

A I don't know how many was down there. I know BMC, BM1, and there was a couple, probably two or three other seaman down there with them. I couldn't tell you off hand how many people were down there.

Navy gets, standard PQS that everybody in Deck Departments are going to get, and then you have based off the watch team replacement plan, based on the individuals, their performance, their level of knowledge, things like that. Then we'll -- boat coxswain, crane operators, some of the other qualifications -- just, you know. But we use the watch team replacement plan to track how many personnel we have qualified, when they're rotating, how -- you know, when -- as we need to start getting people qualified and things like that.

Q Do you know if that morning you went to personally brief the captain on the status of the boat operations?

A Well, I talked to the captain about it and, you know, told him that -- I believe I talked to him about it and told him that the boat was - Petty Officer Ansong had op tested and, you know, they were -- it was running normal, things like that, so --

Q Was that on the bridge, that

them, so that was an issue, and then the Small Boat NSTM tells you to start the boat in -- you know, prior to being put in the water, but these -- the 11 meter tech manual tells you to start the engine as it's being put in the water. Now, so, I mean got to -- how you read it, I guess.

Q How did you resolve that in the procedure?

A Well, that's because we had -- when I've -- when we first started, we were doing it a per the NSTM, starting the boat prior to putting it in the water, that we started going through impellers. So, and there was an issue there. We -- I believe I talked to the captain -- First Lieutenant and I talked to the captain and chief engineer. You know, we kind of bounced it around between us, and we talked about starting the boat just as we were, you know, as we were lowering it into the water. Again, the 11 meter -- and we've never had a problem with -- you know, one engine always started. We -- and, you know, again, as long as that sea painter is made up, I was

A Yes, sir.

Q Is it standard procedure to do a safety brief before evolutions like this?

A Yes, sir.

Q Do you think the ship followed standard procedures that day as far as the safety brief?

A To the best of our ability; yes, sir.

Q Okay. Do you remember if there was a conflict between the general NSTM for lowering the boat and the specific NSTM for the 11 meter RHIB for when to start the engines?

A General NSTM -- you were supposed to start the boat before -- supposed to stop before. The davit captain or the signalman gives the coxswain the permission to start the boat. The coxswain gives a thumbs up, and then you splash. For the 11 meter, as the descent into the waters when, you would kind of start the boat because you've got to kind of have water going through it.

Q Okay. When -- were you trained in -- when operating the 11 meter that it should be started in the water for the protection of the

A Yes, sir.
Q And they didn't light off?
A No, sir -- neither one of them.
Q Okay. They had been running on the skid earlier that morning?
A Yes, sir. They were running on the skid when I actually came out to the boat deck.
Q Okay. Had you -- now in the 50 to 60 times you'd splashed the 11-meter as the coxswain, did you ever have an incident where maybe one of the engines didn't start?
A I did. I had, sir.
Q Was this the first time that both hadn't started?
A Yes, it was the first time. Yes, sir.
Q Now, the -- you talked at length with Trial Counsel about the boat drifting aft. When did you first realize something was wrong?
A Probably the minute that we hit the accom ladder for the first time.
Q Okay.
A When we hit, that pretty much signaled

that he didn't know. He would ask. And we would share. And then he would move on. And that was the way he was supposed to be. And that's the way we saw him.

Q Can you describe the challenges you, deck department, faced on the San Antonio?

A As far as what, sir? In what area?

Q As far as dealing with new systems, absence of tech manuals, absence of NECs, absence of Navy-supported training?

A The only issue that I, myself, have dealt with would be -- is the actual ship's design itself. I've never dealt with a hull that's created in that way. I've never had to deal with an accom ladder that's even created that way. So, that was all kind of new to me. You know, learning from those that had been there before myself, that's the knowledge that we went off of -- you know, the way that they had learned, they had taught us the same way. And it was just -- I mean, it was a lot of, you know, headache. But, I mean, we got through it.

handlers associated with steadying lines and things of that nature. But to specifically state two line handlers in a remote location, there's none that I know of.

COL WHITSON: This is from Appellate Exhibit CX. This is similar to a previously asked question but sufficiently different that we'll ask it. Once the sea painter is made fast at the rail, in the correct position, does it have to be adjusted again before it is cast off from the boat or RIB?

THE WITNESS: Again, very similar. All of the other platforms that I have personally observed, the answer is no. Based on the discussion with the First Lieutenant and the Senior Chief Boatswain Mate, I believe for the LPD Class that that answer is yes.

COL WHITSON: Appellate Exhibit CXI asks substantially the same question and this was asked from Appellate Exhibit CIX and therefore won't be repeated or asked now. Appellate Exhibit CXII; is there a requirement to list assigned boat, deck,

and line handling personnel on a watch bill signed by shipboard leadership prior to small boat operations?

THE WITNESS: I believe that -- that every evolution -- you have a boat bill or an operational bill that is in fact validated with qualified watch standers for every specific watch station and it is signed, typically, by the commanding officer depending on what the boat board -- the ship's boat bill dictates. But there should be -- if you have a watch station and or an evolution qualified personnel at each one of those stations.

COL WHITSON: Let me, if I could, focus on -- perhaps on the word requirement. To your knowledge is there a requirement for such a watch bill?

THE WITNESS: I -- I can't recall. No sir, no; not that I can quote or direct attention to.

COL WHITSON: Okay. What is ATG's expectation or requirement for the XO's level of

that, sir?
A I was the commanding officer of USS San Antonio.
Q When did you assume command of that ship?
A I assumed command in December of 2008.
Q What was the ship's employment when you assumed command?
A The ship was deployed.
Q Who was the executive officer when you assumed command?
A The executive officer was Lieutenant Commander Kearns.
Q And you took over from now Captain Castner?
A That is correct.
Q What was the ship's tasking while on deployment when you first assumed command?
A When I first assumed command, it was the day prior to arriving in port, so, we went into port.
Q Do you have any at-sea turnover with

Q How was that transfer going to be accomplished that day?
A It was directed to be accomplished by use -- utilizing our small boats.
Q Was there going to be an aviation component involved, as well?
A There was an aviation component.
Q What was that?
A Using helicopters.
Q What was the division between who or what was to be moved by the small boats and who or what was to be moved by the helicopters?
A I can't remember the specifics of that.
Q You said it was directed to be done in a certain way.
Did you have any objections to the way that it was directed to be done?
A I asked a question to the operations officer basically of why don't we just use the helicopters and just pretty much told because the admiral wanted to use the -- the RHIBs.
Q What was the plan that day? Who was

being transferred where?
A We had the flag staff that was being transferred to the Vella Gulf. We had some people coming from Vella Gulf to visit San Antonio so they could get some turnover on the -- on the piracy operations. We also had some medical staff, personnel that would be transferred. US -- USNS Lewis and Clark was also in the vicinity.
Q How many total people, sir, could you estimate were being transferred to or from that day?
A I can't give you an exact figure, but it was I'd say greater than 50 people probably that day.
Q How many small boats were supposed to be used to do that, sir?
A Well, there was no specified number of boats that were supposed to be used.
Q There wasn't a plan in advance as to how many boats would be used?
A There was no specific, you know, there

was that a vertical replenishment that was to be conducted?

A We were transferring personnel, and there was probably some cargo was also involved.

Q What boat did you use that day, sir?

A We had the seven-meter, the rescue life boat we were using.

Q Was there another boat that you ultimately ended up attempting to use, sir?

A Yes.

Q And which one was that?

A The 11-meter RHIB, which is our primary mission boat.

Q Was this evolution discussed the evening prior to the event?

A Yes.

Q And in what fashion?

A We normally had an operations intel brief where we would discuss not only the next day's events, but events out for several days, and the details of the event were discussed that evening.

Q And in what level of detail was the event discussed, sir?

A We talked about the general order of movement of the utilization of the RHIBs, the inclusion of the flight operations.

Q Who was present at that evening brief, sir?

A We had a lot of people present, so, it was a packed house. I can't give you the names because standing room only.

Q Who was the intended audience of that brief?

A Well, the intended audience is certainly all of the supervisors that were participating in the event, but I never excluded anybody from attending that because I wanted as many people as possible to be aware of the operations that were going on when we're out on deployment; that's why it was always standing room only.

Q To accomplish the passenger transfers, which of the accommodations letters was to be used?

A Well, we were using the one on the port side.

Q And had that been briefed at the night of the ops brief?

A Yes.

Q Did that night the ops brief include a formal ORM matrix, as is often done?

A There is no requirement to do so, so, no.

Q Was there a watch bill for the evolution?

A I signed a watch bill for -- for the events.

Q For what event, sir?

A To ensure that we had qualified supervisors, so, the watch bill included the deck rotations, included the people that are on watch in CIC, included also the people that are on watch at engineering.

Q Was that your ordinary condition (inaudible) watch bill?

A I signed the watch bills that I'm

required to sign. So, yes, I -- I signed the requirement.

Q Was there a watch bill fashioned specifically for the passenger transfer of February 4?

A No.

Q With regard to the transfer of the admiral staff from one ship to another, was there a hard and fast deadline by which that had to be done?

A We had to finish it that day, and I can't remember if there was a -- a time cutoff.

Q At this time in your command in the ship's employment cycle, was there any instruction or ship's bill that listed at least by position which watch stations were to be involved in lowering the 11-meter RHIB?

A There is the NSTM that talks about when you do small boat operations, that you're required to have certain positions.

Q Was there anything developed within the ship maybe not by name, but by position, to

delineate who needed to be where?

A As far as -- I mean, if you can ask your question a different way?

Q A watch bill for boating operations, was there one of those, sir?

A No, there's no requirement, so, there was no specific watch bill.

Q That morning, what was going to be the general order of events?

A For that morning, we had the helicopters that we were going to launch. Then we had the 7-meter RHIB that we were going to launch, and then we were going to launch the 11-meter RHIB. And then, after that, it was just going to be the flow of personnel and people and parts and equipment between the three ships.

Q Why starting with that seven-meter RHIB that day?

A For that RHIB, that was the one that I decided that -- that we would launch.

Q Were there any problems with the 11-meter RHIB prior to that day, sir?

water. You can't drive the RHIB around in the boat deck. But they tested operational and satisfactory prior to that.

Q What time do you think that you started to lower the seven-meter RHIB, sir?

A I can't give you an exact time.

Q Relative to morning, afternoon, evening?

A It was in the morning.

Q Where were you when that RHIB was being lowered?

A I was on the bridge.

Q Were was the XO when that RHIB was being lowered?

A He could have been on the bridge. I wasn't looking specifically for the XO. Again, no requirement for him to be there.

Q When you started this evolution and you did get the seven-meter RHIB launched safely, at that point, how many other boats were in the water from the other ships?

A I can't remember at that point.

Q Do you think there was at least one or

essentially put into a condition where we were locked into doing standard bills.

Q Were you able to maintain control of the main engines on the bridge?

A Yes.

Q How soon after the 7-meter RHIB was away do you believe the order was given to launch the 11-meter RHIB?

A I can't --

Q Were you on the bridge when you gave permission to lower the 11-meter RHIB?

A I was on the bridge when we started the evolution for a 7-meter RHIB, and I was on the bridge when the deck folks were making the preparations to remove the 11-meter RHIB out of the -- out of the boat valley.

Q What permissions are required from you and also from the OD in order to be able to launch that boat?

A We had started the boating operations for that day, and -- and for launching of the boats. I give permission to -- to launch the

risk management concerns for that boat that day, given the problems that it had had?

A As far as?

Q Given the problems that it had had the days prior.

A We had successfully op tested -- op tested the engines.

Q How are the engines op tested in this case? How does that compare to when they're running in the water?

A I would just -- starting them and really putting in the water is testing the -- the thrusters and making sure that we were able to -- to use the RHIB.

Q So, were you on the bridge that day when the 11-meter was beginning to be launched?

A I was on the bridge when personnel were repositioning to launch the 11-meter RHIB.

Q And do you remember how soon was that after the permission was given to launch the 11-meter RHIB?

A I don't understand the question.

A Ten minutes or so.
Q What did you leave the bridge to go do, sir?
A I had to get sunscreen.
Q Where did you go?
A I went one deck below.
Q How long did it take for you to get there?
A It didn't take very long, one deck below.
Q How soon after you left the bridge did you hear the man overboard be called away?
A I don't have an exact time.
Q Was the executive offer on the bridge when you left the bridge?
A No.
Q Can you talk about the division of labor on your bridge watch team?
A Sure. You have the normal bridge watch standards. You have an officer of the deck, and then also a CON. They already had an addition two people that were supporting the watch.

Essentially an officer of the deck UI or JOW that were there. Normally, you like to have four people there so they could provide backup. Normally, you'd have the qualified OD, and if I had enough people, I would have a second qualified OD in that -- in the watch sections.

Q What did you have on deck that morning, sir?

A That morning, I had one qualified OD. Then I had one person that was very close to having her OD qualification, and then I had two (inaudible) junior officers.

Q What were the ranks of those officers, sir?

A They were (inaudible).

Q What's going to be the division of labor between the OD, the CON, and then what are the names of those other two people that are there, sir?

A Sure, you have a JOW, and then sometimes you call an ODUI, and the -- obviously, you have the OD, that is the overall supervisor. You have

A They should know the status as far as whether, you know, started, the gun, and if there are control points, they should know that status.
Q And how are they to know that, sir?
A The deck boatswain would communicate that to them.
Q Do you expect anybody of those four people on the bridge watch team to be looking at the boat as it's being launched?
A There was no requirement.
Q Did you have an expectation, even in your own mind, as to what would be prudent?
A I had not communicated expectations of that.
Q Do you think it would be prudent?
A For -- I think it's something that could be done, yes.
Q Do you think it should be done?
A I think the most prudent is to have the qualified supervisor, which is the boatswain, running the evolution.
Q So, there's no requirement, you said no

LCDR CZAPLAK: Objection. Sir, that's not a correct commentary of that. "None of the bridge watchstanders." She should clarify none of the officers rather than "bridge watchstanders."

COL WHITSON: I understand the base of your objection.

Counsel, could you please rephrase that question? The objection is sustained.

LT BURBY: Yes, sir.

BY LT BURBY:

Q Are you satisfied with the situation in which the senior service worker officer was not on the bridge, the second senior service worker officer also not on the bridge, the officer of the deck, the CON-ing officer, the junior officer of the deck, and the junior officer of the watch all had no eyes on the small boat evolution, sir?

A I was satisfied with the condition that the supervisor that was running the evolution had eyes on the -- on the evolution. And -- and that's what I would expect.

Q Was there ever a first lieutenant

Q Sir, do you remember how long it was after you left the bridge that the man overboard was called away?

A No, it still doesn't have a specific time that -- that was there in that statement that -- that I have there. I put just after, but, you know, in the sequence of events, I -- I wasn't looking at a watch or a stopwatch, and, you know, felt like I had, you know, just walked down. Could have been there for five minutes, four minutes, three minutes. But I'd only gone from the bridge wing to my state room.

Q Do you think you were gone from about 10 to 15 minutes, sir?

A The deck logs show that I was not gone 10 to 15 minutes.

LT BURBY: No further questions, sir.

COL WHITSON: Very well. Defense, cross examination.

CROSS-EXAMINATION

BY LCDR CZAPLAK:

Q Sir, do you have one rover per engine

of a mine hunter, and then was CO of San Antonio.
Q So, you had a command before --
A That's correct.
Q Before San Antonio. What was that command?
A It was an MHC, MHC 52.
Q So, have you gone to PCO school twice then?
A That is correct.
Q Now, before going to the San Antonio, did you read any of the reports or hear anything about the issues with material relevance, material with the material condition of the --
A I saw some of the press releases and -- and press articles.
Q And when you got to the ship, the actual material condition of equipment and all, how did that compare with what you had read?
A I would say that it was worse than I thought, only from the standpoint with the significant number of discrepancies and things that were talked about in the papers, I would not

have expected that ship would have been deployed.

Q What was your assessment of the crew when you got there?

A The crew was exceptional. Again, based on the reports and things that you see, I expected that heads would be down, people would not be -- be upbeat, but that was just not the case. The crew was, you know, I thought fantastic. They were trying to really make do with -- with what they had. Which was also unfortunate in some ways for the new sailors that had never served on other ships and didn't have good data points for what things should be like vice what they were essentially given to operate with.

Q When were you on as the PCO or the Perspective Commanding Officer? When were you on San Antonio?

A Never.

Q Did you have a time period where you actually weren't CO where you're doing your turnover?

A There was a period of time when I was

intel specific to the events that we were doing. We also had a weather portion. They also talked about the next day's events, sequence of operations, and then we talked about the sequence of operations for events that would occur beyond the next day.

I always closed -- well, and for events if we were doing something like an unrep, where you had the requirement to do a formal ORM brief or wet well operations, we would normally do all of those briefs during the -- during that time period, and for every brief, I always closed with what I call the three Ps, people, parts, and procedures, and making sure that we were looking at ORM and safety along those lines, making sure that, you know, we had the right people at the right place at the right time. We had -- we knew the status of the equipment and as well as -- as procedures. So, and that was always.

Q Before on an amphib (inaudible) for small boat evolutions or well deck evolutions, do you actually create a watch bill for every spot as

far as all the deck personnel that are going to be doing that?

A No, there's no requirement to -- to do that. Multi mission, the deck department personnel could flex from wet well operations to boat deck operations. So, that was managed by the department head much in the same manner that for flight operations, the air boss is managing that with his flight crew personnel.

Q About how long hour-wise before this event did you go to the bridge? Were you on there an hour or two, do you --

A I was on there for an hour and 15 minutes, hour and 20 minutes.

Q And what were you doing during that time?

A Up there, I saw the, you know, the launch of the seven-meter RHIB, I was taking a variety of reports. I had talked to the admiral while I was up there, I talked to the XO, I talked to my command master chief, I talked to the department heads that were up there. I believe

the operations officer off of Vella Gulf, when he came onboard, he came up, and I talked to him. So, that was sort of my -- or it had been really kind of my office because I was out on the bridge wing all the time during the anti-piracy operations, and -- and then I was up there during that time period. So, people just came up to the bridge.

Q Do you remember Boatswain Stacey briefing you about the 11-meter RHIB that morning on the bridge?

A I know he was up on the bridge. I don't remember him specifically briefing me on the 11-meter RHIB. I do remember the division officer briefing me on the status of the RHIB and ensuring me that the RHIB had op-tested satisfactorily.

Q Would the CO ever go down and op-test the engines himself or is it normal to take the word of the division officer that the engines have been op-tested?

A If I'm op-testing the -- the engines in -- in the RHIB, there's a serious problem because

of prior to launching that RHIB.

COL WHITSON: And, sir, you mentioned that you discussed using the 11-meter RHIB so long as there were satisfactory operational tests.

Would you say it was your decision to use the 11-meter RHIB or was that directed from some other source?

THE WITNESS: As the CO, it was ultimately my decision. The guidance was just use RHIBs.

COL WHITSON: At the time of the mishap, and this is similar to a prior question, and, therefore, if you believe you've already answered it, that would be fine, but at the time of the mishap, was there a commanding officer standing order that delineated required permissions during small boat ops?

THE WITNESS: No, I'm not aware that there was -- I can't recall a specific checklist for small boat operations as -- as the instruction.

COL WHITSON: Okay, very well. That was

will ask the following questions, this from Appellate Exhibit 133. CDR Bodvake, I'll ask you the question, but if you could please direct your answer to the Members I'd be grateful. Can you cite the governing instruction if there is one requiring a watch bill for small boat operations?

THE WITNESS: I would have to look. I don't know that I would cite it properly. I believe that it is the SORN.

COL WHITSON: I'm sorry, sir. Could you tell me what that is?

THE WITNESS: Standard Operation Regulations of the Navy.

COL WHITSON: SORN?

THE WITNESS: Correct.

COL WHITSON: From Appellate Exhibit 134, was the ORM lecture provided to LCDR Kearns derived from doctrine or instruction or was it based solely on best practice, specifically, the ORM case study relating to small boat ops?

THE WITNESS: It was derived from doctrine and I don't know specifically where the

PRESENT:

MJ COL Mark a. Whitson

DC LT Andrew Carmichael

ADC LCDR Chris Czaplak

TC LCDR Angela Tang

ATC LT Jonathan Burby

ACC LCDR Sean Kearns

* * * * *

C O N T E N T S


| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Richard Salo | 5 | 13 | 31 | 32 |
| | | | 36 | |
| Shawn Stacey | 44 | 95 | 111 | 115 |
| | | | 133 | |
| Luis A. Rodriguez | 140 | 156 | 165 | |
| Sean D. Kearns | 176 | 265 | 285 | |

LT BURBY: Briefly, sir. Thank you.
REDIRECT EXAMINATION
BY LT BURBY:
Q Sir, can you please explain the difference between reliability and safety concerns?
A Well, there -- you know, they both are separate subjects. I mean, treated as separate subjects. But they're -- they do relate, obviously.
Q When you say reliability concerns, what do you mean?
A Equipment malfunctions, I go to start my power unit and it does not start, is a reliability problem. You know, whereas, you know, safety, of course, we emphasize if a person can get hurt or equipment can get severely damaged would come under the safety category.
Q And is safety a priority in your position?
A Yes.
Q And in regards to portside boat

operations, how many express safety concerns are you aware of from the USS San Antonio prior to February 4, 2009?

LT CZAPLAK: Objection, leading.

COL WHITSON: Overruled.

THE WITNESS: None.

LT BURBY: Thank you, sir.

COL WHITSON: Re-cross?

LT CZAPLAK: Thank you, sir.

RECROSS EXAMINATION

BY LT CZAPLAK:

Q Sir, of the reliability issues that you had from USS San Antonio, how many of those are still ongoing?

A We are working -- ship control -- ship change document, no. We used to call them SHIPALTS related to the hinged ramps. I still have one going on with filtration, I think, on the hydraulic fluid on the stern gate. That's what comes to mind.

Not working any specific -- oh, on the starboard side we're still finishing some of the

changes identified to the design on the rescue boat davit.

Q The -- are you aware of SHIPALTS adding cleats on the portside UNREP station?

LT BURBY: Your Honor, this is outside the scope of redirect.

LT CZAPLAK: This is -- I want to know if this is one of the reliability concerns that was raised early on in the class, sir.

COL WHITSON: Overruled.

BY LT CZAPLAK:

Q Were you aware of the addition of cleats to the port UNREP station?

A Yes.

Q Can you describe in detail what those cleats were and what they're used for?

A The cleats that were there previously were for -- are there for our UREP system for receiving -- we have a cargo receive station in that area and also a fueling receive station. And then after the -- and there was conversation and a work item issued to put two more Tbit-type cleats

right up against the bulkhead in the port area for the steadying lines. It's a more convenient location for the steadying lines for boat handling.

Q Do you recall when the initial request for additional cleats came into NAVC?

A They were discussed in -- at the summit.

Q In 2009?

A Mmm-hmm.

Q Do you know if they were discussed at a previous summit in 1998?

A Not specifically. If they had been in 1998, they should have been there.

Q Thank you, sir.

COL WHITSON: Questions from the members? Mr. Salo, the members are allowed to ask you questions now. But unlike the attorneys, they write theirs down. So we're just circulating the paperwork.

THE WITNESS: Thank you.

COL WHITSON: You're welcome. The court has received appellate exhibits 139 and 140,

Exhibit (inaudible).

COL WHITSON: Very well.

BY LT CARMICHAEL:

Q (Inaudible.)

A This would be a TORIS TFOM card for small boat operations.

Q And what is that?

A It's basically what we use to grade a small boat operation evolution.

Q Is that what ATG use to grade the small boat operations on the --

A Yes, sir. This is one of -- this would be one of the documents that would be used.

Q Is there anything on that card or were you ever trained that the XO should be supervising the small boat operations?

A No, sir. There's nothing on here that says who's in charge of it, anything like that.

Q Anything about grading a special evolution watch bill for launching the boat?

A No, sir.

LT CARMICHAEL: I am now retrieving --

to specifically lower the 11 meter rig with the knuckleboom crane?

A Not to my knowledge, nothing that specifically said, you know, you're going to have these people here. You're going to have -- you know, you're going to do all this. Nothing, you know, that specifically spelled out everything.

Q Okay. So is that a procedure that the crew had to come up with themselves?

A Well, we had the small boat bill, which kind of gives you a broad -- you know, a general process for the whole evolution. But we were, you know -- that was kind of a vague, as well as a lot of the documents that were on board the ship. So we were kind of in the process of fine- tuning and re-writing a lot of the procedures and things that we did.

Q How was the conflict -- when you speak to how the conflict in the 2 NSTMs was resolved -- the 583 and then the 11 meter RHIB?

A Well, to my knowledge it was resolved after the -- after the incident with the class

advisory that said that we would stop the boat approximately 10 feet above the water line, start the engine, and then continue lowering the boat once we had a verbal or a positive indications that the engines were started, then we could continue putting the boat in the water.

Q Before that, was there any guidance as far as which one should take precedence or the fact that there was -- you had this new jet, this new 11 meter RHIB. Was that ever addressed?

A No, sir. Because we never had that problem up until we left on deployment. So, I mean it wasn't -- it was never an issue whenever we put the boat in the water. Like I said before, we always had one or the other engine start. We'd burn up some impellers on deployment, and that's when we started looking -- you know, we knew what the NSTM said, we pulled up the ship -- the boat information book to -- the 11 meter tech manual to see what -- if there was any steps we were missing or something that we were not getting. And that's, you know, as the boat is going into the

water. So, we discussed, you know -- we're burning up impellers. So start, you know, as we're lowering the boat into the water, start the engines.

Q What's the life cycles of those impellers?

A Well, I found out at the boat summit that there was an approximately 20 seconds is what we were told for the 11 meter RHIB that you could run the engine without water going through the impeller. And, you know, that 20 seconds was kind of vague. We asked, is it 20 seconds continuous time? Is it 20 seconds over the life of the impeller? And that, nobody could really answer that question, either. So, to my knowledge it's still not resolved.

Q That knuckleboom crane. Can it take a side load or does it have to just -- does the load have to come just straight down?

A Well with any crane, you don't want a side load. You have to -- I mean, if you go by the tech manuals, the manufacturers, everything,

the bridge. Once you're hooked up to the boat and starting to move the boat, we get permission from the bridge just -- you know, if nothing else, so the OD's got assay that, hey, we've got a boat in the air and they, you know, kind of don't want them start doing any radical maneuvering of the ship. And then once we're at the rail, we would inform the bridge that the boat's at the rail and then get permission to put somebody in the boat to hook up all the steadying lines and, again, so the OD knows that they've got somebody outboard the lifelines not attached to the ship. They'd be wearing a PPE, but they wouldn't have a safety line or anything like that on them.

And then once the boat's loaded and ready to go, we would get permission to launch the boat, and then lower away. And then once the boat's in the water, let the bridge know that the boat's in the water. And then once the boat was away, we would call the bridge and let them know that the small boat's away.

Q Okay. Except for those last ones you

were talking about where obviously the boat is away, were all those steps followed on 4 February 2009?

A Yes, sir.

Q Seaman Hernandez was line handler POIC qual. Can you explain what that is?

A He's a petty officer in charge of a line handling detail. So on the foc's'le, he would -- he would be the person in charge of, we'll say, mooring line number 1. He was responsible for getting the line over to the pier, making sure that it was placed on the bits or the bollards or the cleats properly. And then once permission was given from the foc's'le POIC to heave around, he would make sure that that was done safely and properly. Ensure that the stoppers were passed correctly on the mooring line. He's responsible for the safety of the personnel that are on his line, and then doubling up.

Q So on a mooring station he's actually in charge of other line handlers?

A Yes, sir.

THE WITNESS: I asked SN Hernandez if he had adjusted the line or done anything with the line and he told me that he had not. And then found out later that he had, in fact, adjusted the line -- taken the line off.

BY LT CARMICHAEL:

Q Did you attend an LPD 17 class boat handling summit in June of 2009?

A Yes, sir, I did.

Q What was the purpose of that?

A Well, from my understanding the purpose was to discuss problems and issues with LPD 17 and lessons learned that we had gotten from the deployment, as well as issues and lessons learned that we had from the boat accident.

LT CARMICHAEL: Your Honor, may I approach the witness?

COL WHITSON: Yes, you may.

LT CARMICHAEL: I'm handing the witness what has been previously marked as Defense Exhibit B (inaudible).

BY LT CARMICHAEL:

Q CWO4 Stacey, do you recognize that document?
A Yes, sir. It's the minutes from the boat handling summit in 2009.
Q How was that document created?
A How is that what, sir?
Q How was it created? How did the group come up with that?
A I believe it was items that we had addressed to them, some of the things that we had talked to them about. Plus, I believe it was things that were from --
LT BURBY: I would request the document be retrieved prior to asking him about the contents of the document.
COL WHITSON: You want to offer it?
LT CARMICHAEL: Yes, sir. I'm laying the foundation for (inaudible)
COL WHITSON: All right. Well, let's move on with the foundation, then, before we start eliciting testimony about the contents of the document.

LT CARMICHAEL: Yes, sir.
COL WHITSON: Thanks. The objection is sustained.
BY LT CARMICHAEL:
Q At that boat handling summit, did you come up with several line items to -- as to what were issues with the LPD 17 class boat handling?
A Yes, sir.
Q Okay. And, were those issues discussed at this boat handling summit and recorded in a document?
A Yes, sir, they were.
Q And the status of each of those issues was also recorded in a document?
A Yes, sir.
Q And that was created in an Excel spreadsheet that was sent out to all of the people that were at that boat summit?
A Yes, sir. I believe so.
Q Okay. Is this that spreadsheet that was created based off of that boat handling summit and sent out to everyone?

issue workshop report dated 15 July 1998. Was that something that was eventually provided to you?

A Yes, sir. We eventually got it. I believe at the boat summit is the first time that the first lieutenant and I had seen it.

Q Okay. Were there recommendations in 1998 that were actually made concerning boat safety on the LPD 17 class?

A Yes, sir. A lot -- I think -- I believe a lot of the issues that we brought up in 2009 were still -- were brought up in 1998.

Q And was that boat summit, that workshop issue report, was that ever provided to you prior to the deployment?

LT BURBY: Your Honor, again, if the document could be retrieved from the witness. He's continually viewing it as he testifies.

COL WHITSON: He's being asked about the document, the objection is overruled.

BY LT CARMICHAEL:

Q Now, is that something that was -- the

15 July 1998 workshop. Was that something that was provided to the ship prior to the deployment?

A To my knowledge, no. If it was provided to the ship I had never seen it, and I don't believe anybody else in the chain of command had seen it.

Q So, several safety concerns were addressed in 1998 and the ship was actually never told about them?

A Yes -- to my knowledge, yes, sir.

Q Do you know if one of those concerns was the -- was a lack of a constant tension mode in the crane?

COL WHITSON: I'm sorry, but if I could just interrupt you for a moment. Do you have further questions about the minutes?

LT CARMICHAEL: Yes, sir. I'm going to go for certain line items. I could retrieve it before I do that, sir. But I --

COL WHITSON: All right. Well, so long as you still have questions about that exhibit, then please proceed. Sorry to interrupt.

BY LT CARMICHAEL:

Q Was one of those issues a lack of constant tension mode in the crane?

A Yes, sir. There was -- one of the concerns was there was no type of constant tension device in the knuckleboom crane.

Q Was -- do you remember if one of the recommendations was putting a tow boom on the port side?

LT BURBY: Objection, Your Honor. The witness has stated he has no firsthand knowledge of the boat report or workshop conducted in 1998.

LT CARMICHAEL: But, the boats -- it was all discussed in this particular boat summit.

COL WHITSON: The objection to the question is overruled. You may ask that question, if he recalls.

BY LT CARMICHAEL:

Q Were -- was one of the safety concerns mentioned in 1998 the sea painter?

A Yes, sir. I believe so.

Q Was it recommended in 1998 that the LPD

17 class have an outboard engine instead of an inboard jet engine?

A Yes, sir. That was one of the recommendations was that the water jet drive not be placed on LPD 17. And initially, when we were outfitted with our 11 meter RHIBs we had the 11 meter with the outdrives on it. And shortly before I reported to the ship, they were swapped out and we were given the water jet drive 11 meters.

Q Was one of the recommendations back in 1998 to have cleats for the line handlers for the fore and aft setting lines?

A Yes, sir. There was another issue about inadequate line handling fixtures up there.

Q And those were just installed on the San Antonio this year?

A To my knowledge they were installed but they're still not -- they're still waiting weight test and final testing on those.

Q What -- when you took over as the boatswain on the San Antonio, would it have been

helpful to know about these recommendations that were made back in 1998?

A Sure it would have been helpful. I mean, you know, at least I would have known that somebody besides myself and people that were already on San Antonio knew about all these issues. Yeah.

Q All right. I want to continue on with the boat summit notes. What is item 6?

A Verify portable T-bit availability status and associated logistics.

Q Are those the bits that were recommended back in 1998?

A Yes, sir.

Q What was line item 12?

A Line item -- which one, sir?

Q 12.

A 12? Valuates current 7 meter and 11 meter RHIB engine starting procedures during launching operations, establish a uniform instruction that clearly identifies when the RHIB engine should be started. Include RHIB engine

Q An evolution where SN Hernandez was filling a critical billet for that particular evolution?

A Yes, sir.

Q Okay. And at this time you were a chief warrant officer 3?

A 3. Yes, sir.

Q And he was a seaman.

A Yes, sir.

Q And later, he told you the truth, correct?

A I'm sorry, sir?

Q He told you that he had touched the line later. Is that correct?

A He didn't specifically tell me. No, sir.

Q Okay. It's your understanding that he told someone that?

A Yes, sir.

Q Okay. Based on that information, do you believe he acted inappropriately in that mooring station?

A Well, yes, sir. I mean --
Q You believe he didn't follow his training that morning?
A Yes, sir.
Q However, he continued to handle lines after that, correct?
A Well, yeah. I mean, he left sometime after that. But, yes, sir. He was still a --
Q Okay. Did you pull his quals after that?
A Not to my knowledge.
Q Okay. Did you provide additional training to him, specifically, about line handling?
A When we were on the fo'c'sal, we had -- you know, we'd go over things and conduct training.
Q Okay. You had an individual who you believe touched a line inappropriately in violation of his training. You didn't take him aside and provide additional instruction?
A Yes, sir. On the fo'c'sle, when we'd do

direct you to stray from boat handling NSTM guidance in starting the RHIB as it was entering the water?

THE WITNESS: No, sir. No, sir.

COL WHITSON: That was from Appellate Exhibit 143, the second portion of that is a conditional that wasn't met so it will not be asked.

From Appellate Exhibit 144. Was it an established practice to assign only one person to Mooring Station 2 during launch of the 11 meter RHIB?

THE WITNESS: Yes, sir. I mean, we -- both sides we have one person, unless we had somebody down there UI. Typically that's how it was manned up.

COL WHITSON: From Appellate Exhibit 145. On 4 February 2009, was there any visual indication that the sea painter might not have been tended properly as the 11 meter boat was entering the water?

THE WITNESS: Not initially as it was --

passenger transfer on the morning of 4 February 2009?

THE WITNESS: Well, we knew that -- we discussed that the night before that after the 11 meter was put in the water for the op test. And as long as everything tested out satisfactorily with the op test, after that we would bring the 11 meter into the packs transfer.

COL WHITSON: And, who informed you of that decision? Which is to say, to use the 11 meter RHIB for passenger transport?

THE WITNESS: Well, I believe I talked to the captain about that the night before.

COL WHITSON: From Appellate Exhibit 151. Did you get specific explicit permission from the commanding officer to launch the 11 meter RHIB as a separate permission from a launching of the 7 meter RHIB on the morning of 4 February 2009?

THE WITNESS: Well, I talked to the captain prior to launching the 7 meter. And then once the 7 meter was away, as we were making preps

is out there, because we have to ask permission, that way we don't have to track him down, because he has to provide us permission to put a person in the boat. Every time someone goes over the side of the ship, we have to ask permission from him. So, he's normally up there, but the main guy for us is the first lieutenant. I'm on the station controlling the evolution from the station. The first lieutenant's on the bridge waiting to assist the OD and the captain and to basically talk to the captain and ask permission right there, or the XO if the XO is there.

Q And in your experience, is it common for the XO to supervise boat operations?

A No.

Q Is it common for the XO to be on the boat deck for boating evolutions?

A Never.

Q Have you launched the small boats without your XO and CO on the bridge before?

A Yes.

Q Have you seen the standard boatbill

that's derived from the Navy SORM?

A Yes, I have.

Q And what is your understanding of the role of the XO in that boatbill?

A The boatbill really doesn't specify the XO's role for lowering boats underway, it mainly talks about running liberty boats and being in charge of that, but as far as, we put a boat on the water, the XO has to be on the bridge way, it doesn't say that, but he is in charge of the scheduling and how we're going to run the liberty boats, which it refers to the ship being at anchor.

Q And do you know who takes over that role if the -- if the XO is not there to do it?

A The person supposed to do that is the OOD. The OOD has been trained, has been boarded, is a trustee of the captain, the captain can go to sleep at night knowing that that person is not going to hit anything in the water. That is the guy that's in charge of the entire evolution.

Q I'm sorry, I meant as far as -- as far

as the boatbill like in anchor.
A If he's not there, it's just whoever's got the duty, the CDO.
Q The CDO. Earlier, obviously you stated you studied this evolution extensively to come up with your procedures. Have you formed an opinion of what the cause of this accident was?
A Yes, I have.
Q And what is that?
A And I've seen this happen before. This is not the first time it's happened, but the sea painter ran away from the line handler and the boat weighs 17,000 pounds. You know, you take into account the speed of the ship going through the water, he probably didn't have enough turns on the bits and maybe it was not secured properly, but once that boat touched the water, it was basically being left behind as the ship was moving. He couldn't control it, it ran away from him. Again, I've seen it happen before on other platforms.
Q Do you think this could have happened to

anyone?

A Yes.

Q If you were in Boatswains Stacey's position on 4 February 2009, could that have happened to you?

A Yes. I'll say yes because a lot of the things that I have in place currently to avoid that are because we are -- because of what happened to 17. Normally we have someone that's qualified, we trust them, and now we have put steps in place to basically verify and re-verify that that sea painter is going to be secured, that the ship is going through the water at the right speed, that we have a lee. Every time we put a boat in the water that is in the back of our heads what happened to 17, so we're a little bit more cautious because of that, but if I was in Boatswain Stacey's shoes that day, I would not have been able to prevent it, not me being on the boat deck, and the sea painter being in a separate compartment unsupervised without me being right there supervising the sea painter, which on most

the captain for that specific evolution, we are not allowed to deviate from the watch bill unless we take it back up to make the changes. If there's an evolution that is -- let's say we're in the middle of the day and they say, put a boat in the water, you cannot always execute that same specific watch bill because you either have a watch team on watch up on the bridge or doing something else that prevents some members from filling those positions. That is the reason why we have to have more folks qualify, for instance, crane operators, you know, may have a name listed on the watch bill for a specific evolution. If it was briefed and I need to make a change, I need to let the captain know. For normal day and day evolutions, if we just jump into the evolution, I've just got to make sure that I have a qualified person out of the ones that we have that can fill that spot.

COL WHITSON: Do you -- was there a requirement for a watch bill detailing watch stations during special evolutions, including

small boat operations, prior to 4 February 2009?

THE WITNESS: Actually, we -- all ships in the Navy get inspected with the watch bill replacement plan. We have ATG come on board, we have FIBRU come on board, we get drilled on the same thing and we have to provide these watch bills with being backed by PQS qualifications, page twos, RADM. Those watch bills, we have to have them. We have them. But all this watch bill tells you is that if I needed to operate something I have someone that's qualified, it just has a specific name. I may have more than one person qualified to do the job, but just to fill those spots, there's a specific name put into the watch bill.

COL WHITSON: From Exhibit CLXV. How long does it take to adjust the sea painter during launch?

THE WITNESS: Just a couple of seconds, not even a minute.

COL WHITSON: And from Appellate Exhibit CLXVI did you develop your 11M RHIB procedures

looking at it in a drawing, to eventually going to be coming out as law, this is how we're going to do business once everyone looks at it.

I am conducting business that way because it's been approved by my CO, and we have more than the standard procedures in place, the standard safety procedures in place. We have gone beyond with duel comms, with putting procedures in place that verify the sea painter, it said to verify that the things are happening the way we want it to happen. And every single time we hold training and we just did a boot camp for all the amphibious ships on this -- on both bases, Little Creek, and we even have folks from the West Coast come over and NAVSEA was on board my ship doing an amphibious boot camp, and I did it specifically by what I wrote, by the numbers.

COL WHITSON: Defense wrote a question in light of those from other members.

LT CARMICHAEL: Chief Warrant Office 4 Rodriguez, has the watch bill that you were referring to that gets inspected by the ATG, is

that referred to as a watch quarter and station bill?

THE WITNESS: We have a watch quarter station bill and we have a watch bill replacement plan.

LT CARMICHAEL: So, those -- the watch quarter and station bill and watch team replacement plan, they're inspected to make sure you have qualified people that can -- that would be able to do every possible position on the ship? Is that what that is?

THE WITNESS: It's basically to -- that's basically what it is is we're going to do this evolution, do you have folks that are qualified to do it?

LT CARMICHAEL: And then the watch team replacement plan, that is your plan for the future in case those people leave?

THE WITNESS: Correct.

LT CARMICHAEL: But that doesn't count for an individual one day thing like, you know, Tuesday, this day, if other people are on watch --

is that just the overall thing of the ship?

THE WITNESS: It doesn't account for that in the fact that you normally don't have a watch bill on station. When I tell my guys, man the bill dabit (?) or man the crane, let's put a boat in the water, I'm not walking out there with a written watch bill and telling them, you go here, you go there.

If we have a safety brief, I already know my folks, I know who's qualified to do what, so I tell them, you get on the crane, you get on the sea painter, you get on the tag line, and that's how we do it because I already know who is capable of doing what and who's qualified on paper.

LT CARMICHAEL: Okay, thank you.

COL WHITSON: Government, questions in light of those from the members?

LT BURBY: No, Your Honor.

COL WHITSON: Any further questions from the members?

SPEAKER: No, Your Honor.

program at Massachusetts Institute of Technology. It was actually the engineering duty officer program. I was filling a kind of empty seat there. I did the ED officer curriculum, achieved the P code as well as two master's degrees, one in naval architecture and marine engineering and the other in mechanical engineering.

From there I proceeded to a department head school at SWOS with then follow on orders to the U.S.S. Carter Hall LSD 50 where I was the First Lieutenant. Got there just as the ship was leaving the yards. Did a complete work up cycle to deployment, an eight and a half month deployment, in support of the second Iraqi war and then operations off Liberia.

From there to U.S.S. George Washington where I was their Reactor Electrical Assistant for two years, deployed on board George Washington to the Gulf area as well. Leaving George Washington I went to work for Admiral Donald's staff up at Naval Reactors Headquarters in the "Line Locker" where I was in charge of carrier policy, training,

A I did. I commenced the PCO course in late March and graduated from the course of instruction on June 25th of this year.

Q And this was post mishap?

A Yes.

Q At PCO school, was there an actual case study on this mishap?

A Yes, there was. We had one afternoon -- we had our ORM lectures, operation risk management lectures, followed up by an afternoon of various case studies.

Q Going back to when you became XO of the U.S.S. San Antonio, had you been reading any reports about the ship before you got there?

A I had seen -- I was aware of the ship design being built, it was just being kind of concept level discussed when I was in the engineering duty officer course at MIT, so I was aware they were trying to conceive of this new class of ship and then I -- certainly I read things that were in the media. The one article that I remember most distinctly was a fairly

extensive article that was run in the Navy Times which, after getting to the ship, I more jokingly referred to as kind of like a car ad. It was like the ship -- all the great things the ship was going to do and they had a full pull out of a 3- D cutaway view of what the ship was going to look like and all the great things it was going to have on board, and all the technology it was going to bring, and how that was going to make it so much -- you know, such a more capable platform.

Q And when did you check on board as XO?

A On March 17th of 2008.

Q What were your initial impressions when checking on board the ship?

A Well, my very first impression of the ship, I boarded the ship via LCAC and I came on board while the ship was probably about two thirds of the way through its operational evaluation that it was doing as the first ship in the class to demonstrate the capabilities of the class or to demonstrate whether they were able to perform the capabilities of the class as it was intended. So,

other challenges that are present is the joy of working with, you know, the sailors and the other officers and what not, so, I would get out and about, wouldn't have necessarily any particular place in mind some days unless we were doing something specific, but I'd just run around, you know, the crew said it was the XO ambush, but I would just duck my head in, you know. They were doing training, oh, what are you training on? You know? I'd sit in for a few minutes. If they were doing their evolution or go into combat or up on the bridge and just get a feel for the battle rhythm of the watch, you know, were things being done in a form of fashion, was -- did things seem to be, you know, calm or was there a little bit of chaos, you know, did some people seem to be doing duties that others should be, in other words, were some people not picking up their slack. Just look for little -- little indications of where things might be out of the ordinary and if I saw them, you know, sometimes if it's something you need to correct on the spot like you walk by someone who

is, you know, standing up on a ladder without someone holding the ladder, you know, you correct that on the spot certainly, but if it was something where maybe I saw someone doing something on watch, maybe he was a little informal in his communications, I didn't feel as the XO that I would jump in on all those situations but I'd file it away. Okay, that watch team, I saw that, and if I continued to see it to the point where I thought it was a trend, then I would speak to the senior supervisor for that watch, whether it was the TAO or the CIC watch officer, the (inaudible), just mention it to him.

Q What were the challenges that the crew faced materially with LPD 17?

A Well, during my first months on board, I definitely, in all that -- you know, I guess -- time leading up to reporting to San Antonio, I just had no appreciation for what a truly different platform it is. I had never been on a ship with anything like the Ship Wide Area Network, where the -- where everything, where the

communications, conda (?) systems, engineering control, ship controls, everything rides on that Ship Wide Area Network, that fiber optic backbone, and the various nodes and not being a computer guy or a very IT savvy guy, I was grossly unprepared to really appreciate -- I had heard of the SWAN and I heard the SWAN was trouble, but that didn't mean anything to me. I'm like, okay, so they can't check their email or -- because that's as much computer capability as I had ever had on any previous ship. I'm like, all right, well, so, big deal, they can't -- to me that was almost an improvement back to my days of my -- when I was a junior officer when we didn't have email.

When I got to the ship and I realized -- you know, it wasn't an instant realization because there's so much about that ship, I mean, the ship is 700 feet long, you know, it's 26,000 tons. It's so much bigger than any ship I'd been on other than an aircraft carrier and I was there in a specialized role there, but as a SWO, the biggest ship I'd been on was the South Carolina,

11,000 tons, and this ship is almost three times that size and had technology that I just had never had a ship with this similar technology.

So, slowly as I wrapped my arms and my brain around some of the systems, I, you know, it became clear why the SWAN was so much in the press. I still, to this day, am not IT savvy enough to really explain all the problems that we had with our SWAN network, but suffice it to say that things like data packet collisions and, you know, various network cards becoming overloaded and things like that would cause the system to crash or we'd lose functionality, and there would be no warning, there was no, like, way to -- where we could see that things were about to happen or we would know whether we were about to have something happen. And just by way of example, and this was not an uncommon thing, we were heading into anchor at Onslow Bay, heading in towards shore, we were about 500 yards from our anchorage when the SWAN system did what we call a d-sink and we lost everything, we lost everything. We lost

propulsion, we lost indication, we lost all controls, we were basically a hulk drifting in towards shore and the deck department ran out and did an emergency anchorage just, you know, manually, with no power, they just anchored and stopped the ship and kept us from drifting onto the shoals. I couldn't believe that that could happen, but that was what -- I would call the love affair with technology with the San Antonio class, which on paper seems so wonderful, they were going to leverage off this technology to reduce manning. A ship of that size you would never imagine would only have a crew of 360, but because of the technology they envisioned for it, they were going to reduce the manning with automation and technology. The unintended consequence is, what happens if the technology doesn't work? You don't want to all of the sudden have more manning and you don't all of the sudden have extra training manning, you have what you have. And hen you have to start putting people in the loop and you might not, you know -- let's just say that that was an

unintended consequence of failed technology.

If the ship had worked and the technology had all worked as designed, those wouldn't have been an issue.

Getting back to your question, those were the things that were happening when I first got to the ship, things that have subsequently happened like with all the wells and stuff, we had no indication -- those hadn't started to happen yet.

Our chief concerns were primarily related to the SWAN and the systems that rode on the SWAN, as I said, the engineering control system and the engine throttle control system, (inaudible) control system, our entire combat systems suite, our ability to display radar data, I mean, all depended on the SWAN, as did, of course, just the normal mundane stuff like computers and, you know, day-to-day workstations for email and internet and things. And then we had some other systems like the Mark 46 gun, which we were the first ship to ever have that gun

weapon system so it was very new and nobody knew much about it. You know, the resources you have to help you with stuff, now what's called (inaudible) was formally called (inaudible), well, they're dependent on their own subject matter experts. When you're evolutionaring a ship with new systems, we would call for help and (inaudible) experts would first come on and say, what's that thing called again? You know, they wouldn't know anything about it because we were the first on the waterfront and as has been testified to repeatedly, there were no shore side training, I had no LPD 17 school that I went to to teach me about all this new technology and nor was there any schools for any of the enlisted personnel, brick and mortar school that people coming to the ship would go and learn about these systems.

So, everything had to be taught on board and we had no NAVSEA approved and correct -- I would say correct and approved and effective training resources, so we just did on- the-job

training leveraging off the skill and knowledge of the precommissioning crew, those that were left. When I got to the ship there was about 50 people from the original crew, because the ship had been delayed and delayed for so long and missed deployments and had to go through multiple in serves. You know, the ship, when we deployed, was almost four years in commission at that point, three and a half years in commission, so I was the third XO and the most of the precommissioning crew who had had the training at Norfolk -- at the Norfolk (inaudible) Shipyard as part of the precom, they were gone. And without the training materials and the advanced electronic classroom that was supposed to have been part of the ship and the so-called Total Ships Training System that was cut for funding reasons, there was no way to bridge that gap, which we were sensitive to and Captain -- now Captain Kastner had to fight very hard to get the interim training that was talked about that we had in the couple months prior to deployment on what we call our key systems, one of

them, and the one that was most concerning to us, was SWAN. And then of course -- and I don't recall the full list, but as was testified to, SWAN, engineering control systems, ships control system, the gun weapons system, those were the ones that were on our mind at the time because they were the ones that were causing us the troubles at the time.

So, with the limited money and limited time that we had, the focus of the training was on that. Some of the other mitigations that we did for the SWAN prior to deployment was, as has been mentioned, we had -- Rathion was contracted to have a technician, a very senior and knowledge tech rep on the SWAN system was on the ship for the entire deployment. I can tell you that we kept him busy every day, all day, and he had parts -- basically a bin of spare parts that had been brought on board the ship, hundreds and hundreds of cards and components for the network that were brought on outside of the normal logistics chain. They weren't in the co-sell or anything, they were

just brought on as kind of a -- what they called a Rathion Parts Kid, I think is what it was referred to, and between that, those spare parts, the knowledgeable tech rep, they also did a health groom on the system prior to deployment. They got the system working to the point where it was reliable enough to operate the ship safely.

Q Were these extra -- the extra training, did you get all that you requested?

A No, we had to -- you know, I think Captain Kastner talked to you -- and we identified a lot of areas that we didn't have training for. The list was, you know, long, many greater than 30 items, and then based on those items and given the cost -- it was a combination of factors. Was there any training available for the system? Was there any conceivable training that PMS 170 could put on on short notice that would be worthwhile? Did they have someone who had their own, like, commercial course where they had a subject matter expert who had some sort of a curriculum they could come and teach us? Did anything like that

exist? If it did, how much would it cost? Were they available on short notice to be scheduled to come? Were the crew that we wanted to train going to be able to get the training based on, you know, we wanted these people to get this training and that training? They could get one, but they wouldn't have time to get both. So, that was how the list was racked and stacked. In a series of discussions between the ship and our FIBRON and the water front maintenance community with MARMIC, NOWNISA (?) and PMS 470, PMS 317, we came down to a list of about five or six key training events or key training systems that we weren't given training on but by no means was that comprehensive. There was a long, long list of other training that we would liked to have had. There just simply wasn't -- the training didn't exist and there was no time or money to get it.

Q Despite these challenges, was the ship still safe to deploy?

A Well, I will say that when we -- the day we deployed and then the week prior to the

deployment, Captain Kastner and I sat down over a cup of coffee and kind of looked at each other and said, you know, what do you think? And we both agreed that if you'd asked us three months ago we would have said, no, we wouldn't have felt comfortable, and it was primarily related to the Ship Wide Area Network and all the issues coming out of that and the unreliability and just what we called the ghost in the machine, because you just never knew -- there was never any indication, everything would be fine and then something would go, and it wouldn't necessarily be, like I told in the anecdote I gave previously, it wasn't necessarily a complete (inaudible), you might lose (inaudible), or you might lose all indication of steering, or you might lose your radar displays, or you might lose the radar display and that would cascade or everything would go at once, so those concerns were troubling as we were going through our integrative phase workups, but the PMS 470 funded a fairly expensive and lengthy what they called SWAN health refresh, where they went

through -- the Rathion techs came through and basically -- they basically groomed the system, replacing multiple network cards, rang out fiber optic lines, optimized the system, basically brought it up almost like an overhaul of it, for lack of a better word, so that any aging cards or what not were identified before they had a chance to fail, things of that nature. And then they put the tech rep on board for the deployment, because normally when we'd have a problem he wasn't there, we'd have to wait for him to become available or we'd have to wait until we could contact him by phone, ashore, which was very inefficient, systems would be down for a long period of time.

With him on board, we were generally able to recover in a fairly short period of time, not to mention the fact that with the health refresh the frequency of occurrence of problems dropped off significantly.

What I was saying in looking back on it is that while heading into deployment, SWAN was our chief concern. At the end of the deployment,

SWAN had ended up not being anywhere near as much of a concern as other things that we hadn't seen coming like faulty welds and other issues that developed during the course of the deployment.

Q How did you find out about the faulty welds?

A The first indication that we had of this problem was a major lube oil rupture while we were transiting the Strait of Hormuz on our way into the Arabian Gulf. It essentially spewed engine lube oil over the entire lower level of the engine room. When I went down there after the initial fire fighting efforts were over with and the space had been gas freed, I was literally amazed that we hadn't had a mass conflagration. There was oil splattered and spewed everywhere. What had happened was a lube oil sampling line, a one-inch line, had just sheered and it had nothing on it except the valve. The only weight that was on it was the valve to isolate that sampling line and it had just sheered, and you had a one-inch line coming off a six or eight inch, I think, main lube

oil header, just spraying lube oil all over the lower engine room.

In the triage of that casualty we started to identify other -- we identified that that weld was a faulty weld. That raised, of course, the concern of others -- if there's one faulty weld, you better see if there are other faulty welds.

Within the space of two weeks we had a handful of lube oil leaks or ruptures. That was the worst, the first one, but we had others where we had what they call saddle welds or butt welds where the weld bead would start to seep, others where it was a little bit worse than just plain seepage, but the first one was the worst, but as we started to pull lagging and look at these welds, none of the welds were visible for us to see just walking around, but as we had these problems, we were in communications back with the waterfront here in Norfolk. They said, pull and then start doing a spot check of weld inspections.

We had a couple of very experienced HT1

welders who were -- one of whom was actually not only a level one welder, but was also a level one weld inspector, and just through his quick spot checking of the welds he identified numerous welds that were either un-sat or heat affected or others. You know, this was a lube oil system which kind of unfamiliar to me, they elected to use stainless steel for the lube oil system. I'm used to copper nickel in every other ship that I've been on and most recently they've been the aircraft carrier and George Washington, and so as I know now, a combination of using an alloy, stainless steel, and also the piping they used was a schedule that was fairly thin, easily head affected, and the weld -- and that there was also just some sloppy welding.

So, the combination of all those factors led to a number of bad welds just within the lube oil system to where the ship was not safe to operate. Once that was identified, we finished up the tasking we were currently involved with and then pulled into Bahrain as Captain Kastner

testified, for 37 days of emergent voyage repairs when they flew out 30 or 40 welders for the Norfolk Naval Shipyard, including the chief engineer for the Norfolk Naval Shipyard. He came out and basically -- so that he could respond to any changes in the plans of how they were going to fix the system beyond station to make the repair as quickly and as properly as possible. But due to the system problems that they identified when they got there, it was even worse than we thought, so they realized they weren't going to be able to do a permanent repair, they could only just basically cobble it together to get us through deployment.

What I will say is they did do a good job and that we had no -- we had one more lube oil leak after the repair that we were able to repair ourselves, and they had no more lube oil leaks, although we did have, as a result of all the work that was done, was debris in the lube oil system that caused subsequent main engine damage. So, it was almost like we just couldn't get a break with

quarter, station bill?

A The ship wide watch, quarter, station bill often are referred to as the battle bill. In addition, all the departments had their own watch, quarter, and station bill, and/or watch team replacement plan, that allowed them to track QUALS so that they would be ensured that they had not only sufficient people qualified to conduct evolutions now, but they were planning to maintain that level of QUALS for future.

Q Now, obviously the question has come up several times of the ambiguity in the tech manuals, the NSTM 583 for the generic lower of a boat and the 11M RHIB. How was that ambiguity resolved?

A I was not initially aware of the wording in the 11M tech manual. When I first got to the ship we were launching the -- all the RHIBs, we were launching them, in the way that I was familiar with from my prior naval service of stopping the boat at some point above the water, starting the engines, and lowering them in the

water. But what transpired over the course of our operations is that we were having chronic overheating problems with the 11M RHIBs such to the point that it was basically becoming mission incapable, that the previous example of when we actually had to recover the 11M RHIB because it had died -- it was an overheating issue and it burned up -- it's sea water cooling impellers had burned up and the ship was unable to -- the boat was unable to be run, and we had to actually bring the ship alongside, attach the sea painter to it, get back underway at a safe speed, take it under tow, lower the hook down and recover the RHIB, because it was dead in the water.

Based on these problems and the fact that we had limited spare parts, again, first in class ship, first of the class to deploy, no other ship in the Navy other than the LPDs have the 11M RHIB. No other -- or the water jet RHIB. No other water jet RHIBs were in theater. In fact, we were having parts problems. We went to the security boat folks in Bahrain thinking we would

easily get parts for them and they said, we don't operate anything but outdrives here.

We were down to our last impellers and we were very concerned we were going to lose the capability of that ship, these were long lead parts. We had no co-sell support for them, and we were having to order them direct from the manufacturer with long leads. So, combination of the -- Captain Kastner was constantly communicating with PMS 470 and this is something we had discussed with them prior to deploying. They wanted to make sure, as you would expect as would be appropriate for them, that they wanted to capture all lessons learned -- first in class ship, first in class deployer, so he was constantly feeding them back, hey, take it for what it's worth, here are the things we're seeing, and if they felt it was something they would want to act on, they would, but he -- rather than decide what they would think was important, he told them all the things that were happening.

We were having these impeller issues,