and they brought it to our attention in the tech manual. We looked in the tech manual, which was the RHIB equipment specific tech manual, and that was where it said that the RHIB should not be started until it enters -- as it enters the water, so that water is available to immediately flow through that seawater cooling impeller. You know, there's been a lot of debate and a lot of discussion about hierarchy of NSTMs. I'll tell you, as a nuclear propulsion officer and a naval officer for 20 years, there's no debate. The ship -- the equipment-specific tech manual over trumps the general case tech manual every time because the general case tech manual is not intended, nor designed to try to encompass or anticipate all cases that might -- that it might be used for, especially technology that was not even in the fleet at the time that that tech manual was written, and that's why the words in the NSTM 580 clearly state, if there's equipment-specific tech manual which disagrees with this tech manual, defer to the equipment- specific tech manual. It

was not even a question in our mind what the appropriate thing to do at that time -- and when we changed our operating methods, we no longer were burning up any impellers and we had never had any issues with safely launching the boat without adjustment to our methodology.

Q Changing these procedures to be consistent with the 11M tech manual, is this something that Captain Kastner, your CO, approved of?

A Absolutely. This was a discussion that we had, but it really, again, I said, in my mind it was not a discussion. We just simply weren't aware of the wording in the tech manual, you know, as was mentioned earlier, we initially didn't even have the correct tech manuals for these boats. A lot of these we got just as we deployed. The ship was originally outfitted with an outdrive 11M. They got the water jet 11M RHIBs sometime in November of 2007, but they didn't come with any support. There was no co-sale support, no tech mail support, no schools, no nothing, just they

shoot me an email and say, call me. Otherwise, if they had traffic they could pass via SIPR email and they would pass it that way, and I would just take that information as appropriate, update the Captain, or act on it, as the case may be, and otherwise continue to just circulate about the ship.

Q You were at the Officer Brief the night before?

A Absolutely, every night.

Q And were the evolutions discussed in the Officer Brief?

A Yes. I mean, as Commander Cash said, we'd generally start with a Ops Intel. We had a standard format for our Ops Intel brief. I think most ships do. We'd either -- we'd wind down the days events, kind of highlights and lowlights as the case may be, for the days events, and then we'd talk about weather for the following day, intel, both, you know, in theater intel and any key intel that was just of a professional interest that might be happening worldwide. Then we went

through the schedule of events for the following day. And we'd go through those depending on -- we go through those in more detail every night, and then depending on what the event was, there'd be an actual brief. For instance, if there's going to be an underway replenishment or if we were going to be doing a sea and anchor detail or if we were going to be doing amphibious operations that involved multiple departments interacting, there would be a brief with the usual ORN slides and what not.

Since that day, the following day was going to be just moving people via boat and helo, those didn't rise to our bar of -- they were (inaudible) evolutions for us, so they weren't briefed with any ORN slides that night. They were just discussed in general terms of, make sure that we have proper people in that station, safety briefs, and everything like that.

Captain Cash, as did Captain Kastner before him, would always stand up at the end of the Ops brief, ask if anyone had any comments, any

concerns, anything to add, any, you know, points that went to the evolutions the next day, and then he went through, as he described it, his command philosophy -- which I had never heard it worded that way but I actually kind of like it, and he started from the day he came on board -- he calls people, parts, and procedures. It essentially wraps up the same sort of things that as a nuke we call our six pillars, but he wraps them up into his people, parts, and procedures, and he'd always run down through that and talk about, as he mentioned, nothing we're going to do tomorrow is worth people getting hurt. If anyone sees anything unsafe or feels rushed, then please step forward and say something.

Q What had been the issue with the 11M RHIB before?

A The repairs that were done and were, you know, that were completed that day prior to the day of the mishap were to the water jet nozzle, which is actually the directional nozzle that allows you to steer the boat. There's one on

Q Did the -- did Commander Cash -- did you talk to him that morning and tell him what you were going to be doing?

A Yes. We had talked about it the night before, kind of like, where do we feel like we needed to have people. Because, you know, while we weren't doing -- it was somewhat unique. We'd never had an embarked staff during a deployment before, and granted, they were only on board for three or four weeks. We're not a flagship, we're not trained to that, so other department heads were a little antsy about it. I had had some experience with it from when I was on Thomas S. Gates. Granted, I was a (inaudible) but I had seen embarked staff, I had an idea, and obviously just through training that you receive, I understood how to support an embarked staff.

So, it was appropriate for someone of at least my level or the Captain's level, to be the one interacting with the Admiral. So, with the Captain needing to be on the bridge, it was appropriate that I was going to be available to

like EN1's hurt, because his float coat was horizontal. He said, it looks like he's hurt, but it looks like BM1 is going to help him. And when he got there and he lifted that up, we realized he was no longer in the float coat.

The Captain communicated that to the ships in company and made sure that the helos we had in the air knew and the boats we had in the water knew, that took a few minutes to get them moving, and then he went on the 1MC and ordered all hands not on watch or involved in any other evolution, topside, and he specifically ordered them topside around the entire ship, not just the portside, and to scan the waters to see if they could find him.

You know, the rest is essentially as you know it. We were never able to locate EN1 Ensong.

Q Were the SAR helos already in the air at the time?

A There was at least one helo in the air. I mean, I believe there were two. If it wasn't in the air, it was lifting off as this all happened

because there were two on station very quickly. We actually had sent our RHIB to go get BM1 Stillinger, our 7M RHIB was coming from the Vella Gulf. They were coming to get BM1 Stillinger and the helo was there so quickly that they just basically told us to wave off, we'll pick him off, and their swimmer was in the water -- you know, I had never seen a SAR team, you know, in action before and so I was just very impressed with how proficient they were and how quickly they had their swimmer in the water. But they beat our boat to the punch.

Q How long did you stay on station?

A We had originally been tasked to depart the area by 1300 which is why we had started when we did, so we would have plenty of time to complete all the transfers, the personnel material, conduct all the briefings without having to be rushed, and then depart the area. Because we had lost a shipmate and we needed to find him, the Captain went and talked to Admiral McKnight and appealed to him to let us stay on station

longer, but ultimately at about 1600 we were directed to leave the area because we were coming up against this tight speed of advance timeline that I talked about previously.

Vella Gulf was already the on scene leader for the SAR mission, because he was the senior commanding officer present. So, they had taken command of the SAR effort once it was declared as a SAR effort. Initially the helos acted as the SAR leader until we could get coordinated, but it was more -- it was appropriate that Vella Gulf, for the sustained SAR effort, was the SAR leader. They remained on station with the Lewis & Clark and their own helos, and we brought our SAR -- I say "our" because we were a team, but they were Theodore Roosevelt's helos -- we brought them back and we departed the area.

It was very hard, not just because we had lost a shipmate, but it was very hard to walk around and try to explain to the crew why we had to leave -- why we had to leave without looking and exhausting all the efforts we could. But, it

command of the San Antonio, were you aware of him having served his XO tour as a CO of a mine countermeasures vessel?

THE WITNESS: Yes, I was. I knew of his, you know -- I didn't know all the details of his service, but I had read his biography. I knew what ships he'd served on and in what positions he served on. I didn't -- I had never met him previously, but, again, you know, as the XO trying to get a feel for who my new boss is going to be, I had asked people who I knew whether they knew him and he came very highly regarded by everyone I spoke to and I did know about his prior services.

COL WHITSON: Did you have any concerns, as his XO, based on your knowledge of his prior service and experience?

THE WITNESS: No. I had no concerns. He had a very broad experience. He had served on amphibs, cru-des (?) ships, mine sweeps. He had a very broad experience. He also had been in OPNAV. He had been exposed, I would say, to the full extent of the Navy arsenal of ships and as having

already been a served CO, he was, I think, well aware of his expectations whether he had been an XO -- at least certainly of what his expectations of what his XO should do.

COL WHITSON: This is a somewhat related question and perhaps the answer you just gave will be the answer to this as well. But if you can recall upon learning of Commander Cash's background, did you have any concerns specifically relating to his experience base for ultimately providing approval and oversight of some evolutions on the San Antonio, for instance, small boat operations?

THE WITNESS: Well, I knew, certainly -- he certainly wouldn't have had any LPD 17 experience. However, he had experience in boating evolutions. The evolutions that I was more -- especially once he got there and I was able to get a better flavor for, okay, he served on these ships, but what did he do. So, for instance, he was on an amphib, but he was in engineering. So he didn't -- he wasn't directly involved in

amphibious operations other than from the engineering perspective of maybe ballasting or things of that nature -- the sterngate. So I was more sensitive to his lack of experience and ship to shore movement and amphibious operations. However, I was also sensitive to his lack of knowledge or experience on just what we used to refer to, and I think they still do, San Antonio-isms -- just the unique things about that ship that just really are just so different than any ship that most of us had ever served on. As he testified to, in the six weeks from his time of taking command, we conducted extensive boating operations. Essentially our missions from the time he took over until the day of the mishap were boating intensive operations. In the first few days that he was the CO, I was certainly more sensitive to him not understanding and I -- there were -- I can remember us having conversations on, and with Boatswain Stacey and with the First Lieutenant on how we did things with the boats and any number of other evolutions that were unique to

San Antonio. However, by the date of the mishap, we had launched and recovered that boat more times than I would say most COs would do during an entire workup cycle.

COL WHITSON: Did you personally insert any mitigations of any sort on your own relating to what you perceived might be the -- I don't know what the right word is -- the differing experiences that your CO brought to the San Antonio?

THE WITNESS: In some sort of a, you know, analytical deliberate fashion, I guess did I sit down and analyze it and kind of plot it out? No. But, I -- even when I showed up as the XO for Commander and now Captain Kastner and just kind of my own philosophy from XOs who I've seen and admired and felt like they were very effective, it's that you fill in. You know, you kind of -- whether you like it or not, whether it's your strong suit or not, whatever your CO likes to do most and his strong suits are and things he prefers not to do and aren't his strong suits,

because of that, ships were benefiting from our lessons learned were the ones that were new construction. So a lot of the problems we identified were fixed on Mesa Verde or on Green Bay or on New York that still are not fixed on San Antonio because -- in part because of that.

COL WHITSON: From Appellate Exhibit 173, was it your impression that the Commanding Officer was going to be on the bridge for the RIB launches on 4 February 2009?

THE WITNESS: I didn't have an impression that he was going to be there specifically for the RIB launches, but it was, as he stated and I will absolutely corroborate, he was on the bridge almost, in fact, to the point where as an XO, you know, I had concerns at some point -- certainly not that day, but at points, you know -- about his fatigue level, and, you know, trying to manage your CO is a challenge for XOs obviously. But I expect -- my understanding was that he liked to be on the bridge, and because he wanted to be on the bridge that day and we had

conscious thought about it. I heard that, like I said, that sense of urgency I had never heard in Boatswain Stacey's voice, so I just got myself up to the bridge wing. In the few seconds it took me to kind of get my SA and satisfy myself that the bridge team had taken the appropriate actions, which was they had already -- I had already heard the call -- as I was coming up the ladder, I had heard the call away man overboard go out over the 1-M-C. So I knew that had happened -- I wasn't, when I got out there initially, sure whether -- what they had done as far as stopping the engines. But as I stated I was able to confirm that order had already been given. At about that time, I saw the Captain. It wasn't until later that I heard that he had gone to his stateroom to get sunscreen, but my impression at that moment was he had been up there. So I didn't know until later.

COL WHITSON: On a scale of one to ten, how confident were you in the ability of the Commanding Officer to control and supervise special op evolutions on LPD 17 without your

assistance as of February 2009?

THE WITNESS: In the evolutions that we were conducting, I was extremely confident that, by that point in the evolutions we were conducting, we had done them so frequently, granted in the short period of time, but just the amount of them -- flight ops and boat ops being those evolutions -- that I had no concerns about his familiarity with LPD 17 with regard to those evolutions. Now, when we got up to Kuwait and we started into amphibious operations for the first time since he had taken command, I was much more, you know, kind of on his hip, you know, kind of flying wingman if you will or whatever. I was much more following around and explaining to him and available to him, answer questions and make sure he understood, you know, what our procedures were and if he had concerns that I could address those to the crew or the deck department or whatever. I mean as the case had it, he really didn't have concerns, but those were evolutions we had yet to conduct with him as the CO. On 4

February, we had already conducted dozens and dozens of boat evolutions and I don't know how many hundreds of flight hours and what not. In those six weeks, that was what we had been doing straight for six weeks.

COL WHITSON: From Appellate Exhibit 177, did your crew fail to follow any watch standing principles during the small boat mishap?

THE WITNESS: Well, I mean, first of all, there were obviously errors made I would say. I would argue that there are errors made every day on every war ship. You know, in a perfect world, would Seaman Hernandez have done what he did, whatever that was in the mooring station? No. I don't know firsthand the truth of any of the testimony regarding UIs not being properly supervised or not. Certainly, if that was the case, that was inappropriate. I did not have firsthand knowledge of that. I would have acted on it had I seen firsthand that that was occurring. So I would say, yes, there were, based on testimony or conjecture anyway, it does appear

there were some fundamentals of watch standing errors that occurred that day. But other than what occurred in the mooring station, from what I have been able to glean from all the investigations that have happened and all the recreations, all the actions done by the boat crew and the crane operator and whatnot were all -- and the bridge team -- were all correct and that the mishap occurred strictly due to the sea paner for whatever reason either not being made up right or being slacked. Again, I don't know exactly what happened. But that appears, in my mind, to be the only mistake or failure that occurred combined with the failure of the engines to start that actually caused the mishap.

COL WHITSON: From Appellate Exhibit 178, were you aware that the watch station -- and I believe you may have just answered this -- but were you aware the watch station of crane operator was manned by a UI and not a qualified watch stander on the day of the mishap?

THE WITNESS: No. It was my

looking down. I'm not going to -- again, I wasn't up there. I'm not going to be in a position to second guess. I've heard various things that people were out there. They went to get a radio. I don't know. I heard that there was a brief period that the -- unless the person was there by themselves. Again, I don't know. I am aware there was at least one person out there looking down, which I would consider the minimum appropriate number of people is one person, and then there could be more.

COL WHITSON: Was the person on the bridge wing -- I take it that would be someone, based on your testimony, who would be there to observe but not supervise this operation. Is that accurate?

THE WITNESS: My understanding of the person that was there looking, you know, that was there in the position to see the boat evolution and report that the boat had tipped was the aft lookout, who was in his position where he would normally be for flight operations, because there

too much with what he had.

COL WHITSON: Appellate Exhibit 183 is substantially the same question as has been answered from Appellate Exhibit 170 and therefore will not be asked now as asked and answered. Appellate Exhibit 184, did you feel that there was a great deal from fleet and force commanders to deploy the ship in 2008?

THE WITNESS: There is no question that there was pressure. I mean it's just fact. That class of ship was in trouble. It almost failed in construction of San Antonio that, as I know now, that program had literally been so close to being canceled that they actually had to sell the ships gun mounts back to the ship yard to free up production money to keep the program alive while they went before Congress to ask for money. And then to have all the subsequent problems with the swan and the delays and the missing of the deployment that the Navy needed a win and we certainly were cognizant of that pressure and I will then say that, as I said earlier, Commander

Kastner at the time -- now Captain Kastner and I sat down and in the weeks before we deployed, based on the mitigations that we had done with the training and the upgrades to the swan and the tech rep and other things and the parts and other factors that had been done to mitigate our concerns, we felt we could safely take that ship on deployment. I have subsequently had conversations that had we known what we know now then about lube oil and engines and steering gear and all the host of other problems that have kept San Antonio basically in a maintenance availability for two years and perhaps she probably won't get underway until sometime next April or May. If we'd known then what we know now, no, but, you know, we just didn't know what we didn't know.

COL WHITSON: The Court is of the opinion that Lieutenant Commander Kearns' answer has subsumed that which would be in response to the second question on Appellate Exhibit 184. Therefore that second question will not be asked.



 

COL WHITSON: Very well. Anything further before we call the members at 0900?

LCDR TANG: No, sir.

LT CARMICHAEL: No, sir.

COL WHITSON: The Court is in recess.

BALIFF: All rise.

COL WHITSON: Everyone, please carry on.

(Recess)

BALIFF: All rise.

COL WHITSON: The Court will come to order. Everyone, you may be seated. Members are again present. All parties present when the Court recessed are again present. Accused and counsel are present. Defense Counsel, are you ready to proceed?

LCDR CZAPLAK: Yes, sir.

COL WHITSON: You may call your next witness.

LCDR CZAPLAK: Defense calls Commander Larry Legree.

Whereupon,

LAWRENCE F. LEGREE

was called as a witness and, having been first duly sworn, was examined and testified as follows:

COL WHITSON: Can you please state your full name, spelling your last name?

THE WITNESS: Lawrence F. Legree, L-E-G-R-E-E.

COL WHITSON: And what is your current rank?

THE WITNESS: Commander.

COL WHITSON: Service?

THE WITNESS: Navy.

COL WHITSON: And where is your present duty station?

THE WITNESS: I just transferred from CO USS Mesa Verde en route to Chief Engineer USS Enterprise.

COL WHITSON: Thank you, sir.

DIRECT EXAMINATION

BY LCDR CZAPLAK:

Q Good morning, sir. Can you tell us how you began your career in the Navy?

A Out of high school straight to the Naval

mishap?

A I believe so.

LCDR CZAPLAK: Sir, at this time, the Defense moves to have Commander Legree recognized as an expert in LPD-17 class operations.

COL WHITSON: Any objection?

LT BURBY: No, Your Honor.

COL WHITSON: Very well. The Court will recognize Commander Larry Legree as an expert in LPD-17 class operations.

BY LCDR CZAPLAK:

Q Sir, you had both crew des and amphib experience. Can you discuss the role of the XO generally and specifically with amphibious ships?

A Counterparts or crew des?

Q Yes. Compare and contrast.

A Yeah. Okay. Well, there's several differences, a lot is the same. You know, the XO is still the XO. I'd say one significant difference is simply the size of the organization that the XO has to run on amphibious ship is different. You know, on an average day on this

part-time is, you know, the San Antonio had a long road to hoe to get on that deployment with a lot of the undone work. The final contractor has all the hurdles a ship needed to, to get ready to -- and just fortuitously, Commander Kastner in his -- in his office had a big cabinet where he threw all the old briefs for everything, whether it was, you know, an issue with the steering system, whether it was a file contractor report, whatever it happened to be.

And so basically during my -- that three weeks I described I rode San Antonio, pulled all that stuff out his -- and just shoved it down in the -- in the cabin I was stashed in and just started reading from the top. And I was able to go and look at, you know -- look and touch the piece of gear, or the issue, or talk to the sailors about how it affected them. And that was kind of what armed me with things I wanted to understand from not so ship respective, more programatic, or a policy, or a funding issue once I went back to NAVSEA after that and stashed

myself up there.

So it -- it was everything from specific material concerns about a widget or say the -- power supply. I was able to read up on all the history of it and see how it actually operated at sea, and then take it up from there. It was a counterpoint right to D.C. and ask the, what we call the pro -- pro from Dover, the ISEA, the In-Service Engineering Agent. I was able to ask him, get his perspective on what were some of the design considerations that went into, you know, the widget, the system, whatever it happened to be. But I spent -- you know, I spent three weeks crawling up and down that ship doing this, so a variety of issues that I discovered.

Q With respect to the procedures in place, both before you took command and while you were in command, what problems had you identified with that?

A In general, a good way to characterize the procedures, and I can -- I can give lots of specifics as well, but just immature. Like, for

example, down at the engineering plant what we saw is a lot of the procedures were kind of cut and paste from the LSD-48 class which is a Colt peel-stick engine, but there's some different functions and absolutely different control features. So, you know, the diesel itself looks the same, but the -- the control features, some of the casualty controls, the nomenclatures are just different.

And so we basically identified that, whereas you go into a mature ship, no one has been around for a while. There has been years worth of feedback mechanisms, finding problems that, you know -- that come back and fix the procedures. That was a very immature fledgeling process on a ship like Mesa Verde and San Antonio.

Q With respect to immature procedures, how would you characterize the role of developing a Navy training system plan with respect to maturing procedures?

A That's all part of it, absolutely, because that's going to be the -- an NCSB is what

sets the framework and the structure for basically maturing the training process and just, you know, getting us collectively smart on, you know, the systems themselves.

So, in other words, that way you have a much more higher expectation that this is a mature process that the -- the sailor who shows up on the deck plate has had the fundamental level of training; that he knows how to use the tech manual. That the tech manual is thick enough, deep enough, and vetted enough that it allows troubleshooting, allows the level of knowledge we want our technicians to have.

Q Do you think that, that process arms a crew with the ability to more readily anticipate challenges?

A Well, it makes you smarter about your ship. So I don't know if that's quite answering the question, but, you know, there's always OJT in our job, of course there is, no matter what kind of -- no matter the quality of the schoolhouse training. But having schoolhouse training to

begin with is kind of a foundation, absolutely.

Q What kind of impact would it have on a ship if they didn't have that foundation?

A Well, I can speak firsthand from that with certain systems is you have to rely on stopgap measures, or you have to find ways to get smart. For example, some of the stuff we did was -- it was the interim training process that we developed or that we really expanded on.

Q And what -- what did you expand your interim training process from?

A Well, I was, you know, able to spend a lot of time talking to Commander Kastner about what the -- what he needed to do to get his ship ready to go into deployment, and kept coming back over and over again to the interim training they set up, which was originally for some of the big systems, main propulsive diesel engines, electrical, the engineering control system, ship's control system, helm control system.

And it was five or six subjects where they basically had, once again, what we call the

pro from Dover came down because there wasn't a Navy training system set up yet for that particular system, came down and gave some focused training. And it was -- I remember some of -- you know, talking to some of the guys down in the engine room, for example. It was just eye opening what they learned about their plant doing that.

So looking at that and looking at what else we didn't know about on the ship, part of my strategy for when I got my ship ready to go on deployment for her first one was to expand that -- that training set because I hadn't realized the deficits at that point in what, you know -- what tools weren't in the kit for some of my sailors.

So from the original, it might have been five -- I think it was six maybe training subjects that San Antonio had requested, and this is really good training. This is from the Navy's expert on this particular system, hands-on, on the ship or in a classroom close to the ship. We expanded it from my deployment to maybe 12, 10, 11, 12, something like that subjects. That's when we

started covering some of the crane operations because we have some unique one-off type crane systems, more on the engineering stuff, expanded it. We have 11-meter jet drive RIBs that we didn't know how to do maintenance on. And now -- and since then, this is one of the recent things we were just working on right before I left the ship is Mesa Verde is going to be double pumping on deployment and -- and leaving again soon. And so we got a commitment from NAVSEA to once again fund a level of effort with interim training that still doesn't exist in a schoolhouse and expanded that list to -- I can't remember the exact number -- but probably 20-

Systems, things like that as well.

Q Without that kind of training, is it fair to say the crew doesn't know what it doesn't know?

A Well, that's exactly what I would say. It was, you know, well intentioned smart folks who -- sailors are great at, you know, give them a tech manual. They'll figure it out, but if you

don't have a quality tech manual and you didn't have a foundation or, you know, you didn't come work on a similar piece of gear, it's eye opening when you get training on it. I see that pretty routinely.

Q After the 4, February 2009, mishap on San Antonio, did you -- did you have an opportunity to extensively review that mishap?

A I did. Uh-huh. Absolutely.

Q And how did that impact your -- did you incorporate those lessons learned into your ship?

A Most of them. There are only two sides, but there was the material side of it, in other words, the gear, and there was the people's side of it.

The -- the gear side of it, realized right off the bat there were really two critical changes that were made really fast. As far as the process of ship changes, it was extremely rapid, and it was in the first couple months of my command tour. Put the -- better -- basically repositioned the bits for -- for the lines for the

earned their SWO pins on deployment or toward the tail end of the deployment with quite a bit of sea time. One of my guys joked about the ship for deployment. He spent, you know, 86 percent of his Naval career has been deployed.

So it sounds funny, but I got a pretty salty group of ensigns, but I have 15 of them. So it's a large training responsibility. That's why I can't go with an 18- concept and just -- just put, you know, the ringers on for the -- for the special events. And as a result, things that some ships would consider special evolutions, I don't. That -- that kind of goes back to your earlier question about the difference between crew des operating profiles and Gator operating profiles. I don't consider an anchoring a special evolution. We operate close to land all the time. Every one of my bridge teams is proficient at anchoring, things like that.

Q Along those veins, sir, do -- do you require a special evolutions watch bill for boat operations?

A For boat operations, no. I don't consider boat operations a special evolution.

Q Why is that, sir?

A Well, it's routine on Gators. Every one of my bridge teams is proficient or trained. They wouldn't be qualified in the positions they were at unless -- if I had concerns about their ability to do that. Same thing with flight operations and amphibious operations. In my case it was mostly land craft -- aircrafts, LCACs.

Q Have you ever conducted boat operations when neither you nor the XO was on the bridge?

A Mm-hmm. Yes.

Q And how would you -- is that a rare thing, or did it happen more frequent?

A I can't give you a percentage, but it would happen enough. I mean, it wasn't -- even give the -- you know, the overhead of the San Antonio incident, factors that would matter for me if I or the first lieutenant was going to be on the bridge, would have to do with environmental conditions, you know, the degree of difficulty of

These are all general subjects in the SORN. It's not going to tell me how to run a 3M program. It's going to tell me I need to have one and here are the elements of it.

So as the commanding officers, certainly the SORN is a document that we use as a reference for setting up programs of our own, but I would say -- the best way to describe the use of the SORN is let's say, hey, we're going to review the heavy weather bill, or let's say we're going to review the -- an internal kind of policy, like our division in the spotlight program. You go to the SORN because it's going to tell you here's the elements that make up a program that should be in there, and then you tailor it to your ship; and that's what I sign off.

BY LCDR CZAPLAK:

Q Sir. Are you aware of any requirement in the SORN that requires a special evolutions watch bill for boating?

A I'm not.

Q Have you recently reviewed the SORN for

such a requirement?

A I have.

Q And did you find one?

A No. That was a painful read by the way. I haven't looked at the SORN like that in a while but --

Q Yes, sir. So with respect to how your ship procedurally lowers the 11-meter RIB, how does your -- how your current procedure track with current class advisories or current NSTN?

A Well, this really goes right to the heart of -- of a broader class issue, which is, you know, our procedures are often immature, and we're kind of developing as we go. So right now there's no -- there's no overall class guidance for lowering the 11-meter RIB. There was a class advisory that came out that actually had a mistake or two in it really with, you know, coordination with the accommodation letter, things like that, and it's -- these things gets fixed by process -- or by feedback from the fleet.

So as these procedures are getting

than haphazard or list of general military topics, you actually have -- have it aligned to objectives and goals, organizational things, tied to recurring events.

So always -- always a little bit of a struggle for my nuclear world where people understand that training is part of your job into the conventional world where it often feel like training is something to distract you. You really have to force that down so -- so training is a focus.

So in general we have -- I review every month, monthly training schedules. The training subjects are approved ahead of time. They're tied to required training, and they're tied to specific training. And that's -- that's part of it. Now the other thing, and once again NUCs understand this, is the difference between initial training and proficiency training, and we have to do a lot of proficiency training as well; and that's not necessarily a prepared lesson plan. That's -- that's more one of those making sure that people

are -- have done an evolution in a frequent enough occurrence that it's still fresh. They're still remembering the little things that made it successful the last time.

Q Yes, sir. When you rode San Antonio for three weeks, did they have a similar program in place?

A Well, it was -- it was evident that Commander Kearns was a NUC. The XO certainly is the guy who is responsible for the organization and the execution of the ship's training plan as far as like a day-to-day program that runs. So I knew Commander Kearns was a NUC from just the way the training programs -- in other words, the ship had a training program, I believe so, frankly, probably better than my ship did because they had to -- they had to do more of to get that ship ready for deployment than I had to.

Q Yes, sir. Based on the -- everything you've learned about the mishap with San Antonio and your preparations for taking command, what would you characterize as the root cause of that?

A Of the -- of the boat incident?

Q Yes, sir.

A You know, NUCs always go after root causes, whether it's the, you know -- the contributing factors sometimes get confused. But really I would say the NUC -- the root cause of this is simply we didn't know what we didn't know with -- that there was some -- more inherent danger in that evolution than we thought.

Q And can you elaborate on why we didn't know what we didn't know?

A Well, for one, the Venturi effect alongside that ship is just -- it's bizarre, and I've been on lots of ships. You know, the Venturi effect occurs. We had a lower pressure next to the side of the ship, and it's a squared function. It's not a linear function based on ship's speed. So as the -- you know, the water has to fit underneath the volume so that the pressure decreases when it's right alongside, and -- and it has a significant effect on maneuvering small boats alongside the ship. And it's -- I think,

you know, having done destroyers, having done another Gator with a similar -- LSDs are a smaller ship, but, you know, it's still a big ship.

I was just surprised how much this impact had on the San Antonio class, and as we really thought about this and looked at it again, we realized it has a lot to do with the hull form of the ship. It's -- it's a beautiful hull form out of the water. I mean, a ship driver can look at this hull and just say that is going to be a fast, fuel- efficient ship because the bow is swept down, and then it just -- it rises up about halfway back as it tapers back.

So it's built for speed. But what that means is you have not only the nuzzling effect from the Venturi along the side of the ship, but the same water flow underneath the ship, as the massive water is moving underneath, it speeds up right underneath the ship when it fills what effectively would be the hull of the metal that just moved in front of it where it sweeps. I don't know if I'm really explaining that well.

But the effect of that though is you have a significant amount of water movement about midships when the ships are steaming along, and it creates -- once again, it's a squared function not a linear function. And that means the -- the -- the way boats get sucked into the side of that ship, it's like nothing I've ever seen.

So we certainly realize that, whereas on a -- like on a destroyer, for example, you know, you could -- you could safely put the boat in the water from a much lower freeboard. Ideally you'd love to do it slow, but sometimes you can do it 6, 7, 8 knots if you needed to.

With a ship of this size with that kind of weird Venturi flow characteristics alongside of the ship, you really had to be doing about 3 or 4 knots max, and that is the procedure we instituted. We would never do it with less than 4 knots the speed over ground and preferably 2 or 3 knots.

Q And this is something that was only identified post-mishap?

A Absolutely. As a matter of fact, it just -- it's a bunch of us just kind of sitting around scratching our heads on why it was like that. I don't think there was, certainly the awareness of the added degree of difficulty with that.

Q Was the San Antonio deployment the first significant sea time for any ship in the class?

A It was. Yeah.

Q And how significant is that with respect to identifying issues?

A Well, it kind of goes back to the we didn't know what we didn't know. It's -- the San Antonio class of ships is a tremendously complex system of systems. The Navy was doing a lot of new technological advances, new -- new gear, really some new paradigms even to watch standing, things like that. And so the San Antonio was the --

You know, there's the kind of proof of concept you get from the builders trials where you're going out for a couple days and people are

looking at a checklist, but that's a different type of learning experience for the class than when you spend significant time at sea and just -- and just learn about the ship.

And that was absolutely -- we -- we were -- we were sucking up every lesson learned we could get from the San Antonio's deployment, not just incidents but how they operated their engineering plan. What worked; what didn't, that kind of thing.

Q I see. Sir, with respect to your 3 weeks that you spent riding the San Antonio, what were your overall impressions?

A Very favorable. I'm a big fan of Commander Kastner. I think he's one of the best leaders I've ever had the pleasure of working with. A well run ship. I was -- I was particularly impressed with the -- I guess the path of deployment she had made because she had some pretty significant material issues to overcome to get on deployment. The crew was very motivated.

A Yeah.

Q And with respect to the mishap, identified the -- what you feel is the root cause of we don't know what we don't know, but are you familiar with the actions taken on that ship, both leading up to the mishap and -- and after?

A I mean, on the event that day?

Q Yes, sir.

LT BURBY: Objection.

COL WHITSON: Sustained.

LCDR CZAPLAK: I'll rephrase, Your Honor.

BY LCDR CZAPLAK:

Q Had you faced the same sort of challenges as San Antonio? Could this accident have happened to you?

A Absolutely. I'll tell you. I mean, even given what I knew about the, you know, the hydrodynamics alongside the -- the extra challenges of a single point lift for a RIB from that height, and, you know, the controls we had put in place to make sure we were as favorable

environment conditions as we could, I mean, I had a near miss where we judged the -- we had a wind driven sea I remember one day. It was off North Carolina and a slow ocean current that we didn't see. It was in the early morning hours, and even given what I knew about that incident, I almost swamped a boat once. It was a big, ah, shit, you know. I couldn't believe it happened. It happened like that. So it almost did happen, and it certainly could happen to me.

Q Were you satisfied with the actions of the XO on 4, February, 2009, based on what you know?

LT BURBY: Objection, Your Honor.

LCDR CZAPLAK: Yes, sir.

COL WHITSON: Sustained.

BY LCDR CZAPLAK:

Q That's all I have now, sir. Thank you very much.

COL WHITSON: Government, cross-examination.

LT BURBY: Thank you.

A I'm sorry?
Q You mentioned before that the crew doesn't know what they need to know sometimes.
A No. I -- what I mentioned was we didn't know what we didn't know. There were a lot of unknowns about that ship class.
Q Does the CO and XO have responsibility to figure out the areas that the crew doesn't know?
A Absolutely. And it's a constant process.
Q And you use your experience to identify these areas where you have a training deficiency?
A Experience, operational experience you gain as you figure things out as you -- as you postmortem something, as you do a critique at the end of an incident or --
Q Yes, sir.
A -- every evolution at the end of it will have a debrief to find out ways to get better. Absolutely.
Q So do you use your experience as someone

COL WHITSON: Okay.

LT CARMICHAEL: Thanks.

COL WHITSON: Objection sustained, I suppose.

LCDR TANG: The complacency extended not from small evolutions on that ship but to big ship-wide evolution. Things such as a passenger transfer of a number of (inaudible) staff to another ship. A day that involved steaming and formation with other ships within a mile. You have knowledge of the things that you've done on your ships. One mile, it's not that much. It's probably within your CPA point for which you require a call even in the middle of the night. Not one, but two ships within a mile. LT (inaudible) Meyers said that there were already seven-meter RHIBs in the water, one from the Vella Gulf, one from the Lewis and Clark, and then the USS San Antonio had lowered their starboard side seven- meter RHIB that day. And when they lowered that RHIB, the XO and the CO were both on the bridge.

but it's about one or a little more than one boat length, right behind where that RHIB is. And everyone when asked said that that only magnifies again the importance of that sea painter, making those errors and the failure to train, supervise, and mitigate the risks of the other deliberate decisions that were made all the more glaring and all the more negligent.

Something that Commander Cash said when he was testifying and he was talking about why he thought he needed to lower the 11-meter RHIB for an OP test while all those evolutions were going on, while there was no one on the bridge, and with the engineering casualty, and he said I'm not going to give up my redundancy. That's not how I was brought up in the Navy. Well, that's what -- that's what the ship used to justify doing that evolution oat an ill-fated time when it was not deconflicted but then they have deliberately given up the redundancy on the engines, the sea painter, and then taking away any room for error by having the accommodations letter out.

recess for 20 minutes. If we can be in recess until 1500.

SPEAKER: That's acceptable.

COL WHITSON: Very well. Thank you, sir. Court is in recess.

BAILIFF: All rise.

COL WHITSON: Please carry on, everyone.

(Recess)

BAILIFF: All rise.

COL WHITSON: Court will come to order. You may take your seats, everyone.

Members, I'd like to correct something that I believe was a mistake on my part in instructing you. There is no requirement that you report unanimity or lack thereof with respect to your verdict. If it is otherwise in accordance with the instructions that's all that is necessary. I will give you a written copy of all of the instructions and you will see that where that portion was given to you previously that's been lined out.

SPEAKER: Just for clarity. If it is

unanimous, we don't have to say that.

COL WHITSON: That is correct, sir. A report with respect to unanimity is neither desired nor required.

SPEAKER: Understand.

COL WHITSON: Mr. Bailiff, would you please hand to the President what we've marked as Appellate Exhibit 203? These are the Members' Instructions on Findings.

BAILIFF: Yes, sir.

COL WHITSON: Members of the Court, you may now withdraw to the deliberation room.

BAILIFF: All rise.

COL WHITSON: Court is closed for deliberations. Everyone, you may carry on. Counsel, if you leave the courtroom as you are free to do during deliberations, please make sure that the bailiff --

(Recess)

COL WHITSON: Court will come to order. Everyone, you may take your seats.

Sir, I hate to interrupt you in the

middle of your deliberations. I was just mindful of the hour and thought I would ask your opinion as to what you and the rest of the members might like to do for evening chow. If you sense that you're nearing resolution of your current task we could just go back and resume. If you'd like a brief recess, I believe there's still some, you know, places where you could get food and either take a very short recess and bring it back and continue deliberations. Just wanted to see what your thoughts might be.

SPEAKER: We've already caucused on this. What I don't know is how does our decision influence your and the other members in the presence of this Court's ability to get chow? I don't know how our being in there deliberating impacts your ability to depart.

COL WHITSON: Well, if you're in there deliberating and we're hungry, I'm sure we'll find an opportunity to run out and get something for a few minutes. If you were to say you were ready to return there might be a few minutes delay while we

assemble everyone else back together. But the rest of us can adjust to that situation.

SPEAKER: Okay. So long as our presence here in continued deliberation doesn't impact your ability for the quality of life issue at hand, we would like to go back into deliberations and you can do as you choose.

COL WHITSON: All right. Would you like a brief recess for a comfort break or anything or just press on?

SPEAKER: Not required.

COL WHITSON: Very well. With that said, you may continue your deliberations.

BAILIFF: All rise.

COL WHITSON: Members have departed the Court and the Court will just note that LN3 Moses is our court reporter now for the current session. She has been previously sworn. Everyone, please, you may carry on. The Court is closed for further deliberations.

And just by way of 802, I meant it. If anyone wants to run out for chow just --

(Recess)

COL WHITSON: -- closed for deliberations are again present. The Members are absent. Mr. Bailiff, have the Members notified you that they desire to return to the courtroom?

BAILIFF: Yes, sir.

COL WHITSON: Would you please ask the Members to do so?

BAILIFF: Yes, sir. All rise.

COL WHITSON: Court will come to order. Everyone may be seated. All present. The Members are present.

Mr. President, has the Court reached findings in the case?

SPEAKER: Yes, Your Honor, we have.

COL WHITSON: Are those findings reflected on the Findings Worksheet?

SPEAKER: They are, sir.

COL WHITSON: And have you signed it at the bottom, sir?

SPEAKER: It's actually the top of page two but yes, I have signed it.

COL WHITSON: Very well.

SPEAKER: Would you please hand the folder to the bailiff? Mr. Bailiff, may I see the Findings Worksheet, please?

The bailiff has handed me what we have previously marked as Appellate Exhibit 2002, the Findings Worksheet. It appears to be in the proper form.

Mr. Bailiff, would you please return this to the President?

BAILIFF: Yes, sir.

COL WHITSON: Accused and Counsel, please rise.

Mr. President, would you please announce the findings of the Court?

SPEAKER: Yes, Your Honor. In the United States v. Sean D. Kearns, Lieutenant Commander Sean D. Kearns, USN, this Special Court Martial finds you of the charge and specification, Not Guilty.

COL WHITSON: You may be seated. Members of the Court, you have now completed your

Johnson, Matthew S. E...
Support the F136 engine - F136.com - Why abandon 15 years of research and development?
Josey Wales
maile.baca
« Back to Inbox Archive Report spam Delete Move to Labels More actions
Invite a friend
Give Gmail to:
Send Invite 50 left
Preview Invite

**FW: I miss you...** Inbox X

**Cash, Eric CDR CO** to Renee, me

show detail

Found the email. Read below.

CDR Eric C. Cash
Commanding Officer
USS SAN ANTONIO (LPD 17)
FPO AE 09587-1700
Inport: (757) 445 - 6260 DSN 565
POTS: (757) 443 - 8653
Cell: (361) 739 - 0387
SIPR: co@lpd17.navy.smil.mil

**From:** Commanding Officer
**Sent:** Monday, September 22, 2008 12:06 AM
**To:** 'Ange Kastner'
**Subject:** I miss you...

Hey hon. Good morning.
It was nice to hear your voice first thing this morning – it is always such a nice way to wake up.

We have a busy day to day with a refuel at sea and other stuff. I am very frustrated with the wardroom right r
urgency amongst most of the officers and no one seems to understand that where we are going can be a dai
unprepared and it scares the crap out of me. I see many hours (more hours) spent on the bridge. My new Ol
cannot seem to find his ass with both hands – he does not know what delegation means and I don't think he
his job is. XO has talked to him and I will very soon. I'm not sure he is going to make it and that is a very pivo

My other department heads are having trouble getting focused. Maybe it is me – maybe I am not clear in my
stressed about it (on top of everything else).

Sorry to dump all this on you but I have no one else to talk to about this. I really need my best friend (you) rig
am feeling like we (the ship) is on the verge of a major incident or failure and it is very uncomfortable. Just g

-----Original Message-----
From: Dawson, Phillip E CAPT NAVSEA PEO SHIPS, SHIPS-F
Sent: Thursday, October 21, 2010 9:24
To: Graham, Michael R CAPT NAVSEA, SEA21/PMS470; Samimi, Sam CIV SHIPS; Russell, Robin CAPT NAVSEA, Deputy SEA21A; Stefany, Frederick J CIV PEO SHIPS
Cc: Boozer, William CIV NAVSEA PEO SHIPS, SHIPS-F; Riedy, John R CIV SHIPS; Schneider, Kelly T CIV NAVSEA PEO SHIPS, PMS317; Vandroff, Mark CAPT PEO SHIPS, 317; Melsom, Stephen J CIV NAVSEA HQ, SEA 21; Conlon, Thomas M CIV NAVSEA PEO SHIPS, SHIPS-F; Van Durick, Michael G CAPT SHIPS, F
Subject: FW: TOP TRAINING QUICK WINS - TF INPUT

For your back pocket when asked "What can we do now to make LPD better?" Additionally, we have some concerns with the training plan info paper in the attached e-mail, that we are attempting to address with the sponsor.

=========================================

1. The most critical training shortfalls for the LPD17 Class fall into two specific areas: INTERIM TRAINING and FEA-TRPMM/NTSP DEVELOPMENT

The following information provides an executive overview of what is currently needed to address these training deficiencies:

TF WHOLENESS TOP TRAINING QUICK WINS

INTERIM TRAINING
The current structured INTERIM TRAINING program covers only the 6 main LPD17 Class systems to include:
a. MPDE
b. SSDG
c. SCS
d. ECS/ICAS
e. 60hz Electrical System
f. SWAN
NOTE: MK46 GWS interim training is now conducted at NTC Dam Neck.

This INTERIM TRAINING package only addresses minimum training for these systems and represent only a fraction of the INTERIM TRAINING required for the Class. Additional INTERIM TRAINING is required until a formal training solution in implemented (NTSP). As noted by JAGMAN, INSURV, ATG, TF WHOLENESS and routinely requested by the ship Commanding Officers, many critical systems currently have no defined Initial/Interim or Life Cycle training plan.

RECOMMENDATION (QUICK WIN 1)

a. Provide funding (FY11) for a Full and robust Interim Training program development effort and delivery (5 per year) costs that addresses LPD17 systems with no current training plan.
(1) MSCS
(2) 23TV

(3) 27TV
(4) CPS
(5) SES
(6) CONCILIUM
(7) FLOODING CAUSULTY CONTROL
(8) SPS-73(V)13
(9) WPCS
(10) FIBER OPTICS/FUSION SPLICING
(11) 11M RHIB (COXSWAIN/OPS/MAINT)
(12) AFSS
(13) WATERMIST
(14) NDDS
(15) AEMS LADDER

DELIVERY COSTS PER EVENT: $250K (est.). Training Development costs (TBD).

FEA-TRPMM/NTSP DEVELOPMENT
Early FEA-TRPMM and system NTSP development is critical due to the development time necessary to go from FEA-TRPMM development start to NTSP Approval and "Ready For Training". This process can represent a period of 2-4 years thus requiring the INTERIM TRIANING solution to fulfill the training needs for longer periods of time. Currently, only a small percentage of long term training requirements are being addressed via the FEA-TRPMM and NTSP process.

RECOMMENDATION (QUICK WIN 2)

b. TRPMM/NTSP Development (2 parts)

PART I: Provide full funding to achieve RFT for the following systems currently in TRPMM/NTSP development:
(1) MPDE
(2) ECS/ICAS
(3) SPCS
(4) 60HZ ELECTRICAL SYSTEMS
(5) SSDG (OEM Training in Peoria IL - Caterpillar)

PART II: Provide full funding for the development of FEA and NTSP for the following systems

(1) Deck Mission Systems
Rescue Boat System (Caley)
Boat and Cargo Crane
Cargo Weapons Elevator
Hangar Bridge Crane
Boat Stowage
Accommodation Ladder
Well Deck Bridge Crane
Flight Deck Ramp Door
Sideport Cargo Crane
Sliding Padeye
Hinged Ramp

Aviation Maintenance Boom Crane
Ammo Lift Platform
Stern Gate
Anchor System

(2) Watermist
(3) MSCS
(4) 23TV
(5) NDDS
(6) AEMS Ladder
(7) AFSSS

Investments in these two "quick wins" will immediately result in establishing programs and training focus areas that will result in significant LPD17 Class readiness levels and mission success.

These are the TWO most critical "quick win" solutions that would significantly fill the training gaps in the fleet.

CAPT Phil Dawson
TEAM SHIPS
SEA 21
470R- Mine, Amphibious, Auxiliary & Command Ships Division Director

202-781-3046 W
202-422-4304

FOR OFFICIAL USE ONLY -- PRIVACY ACT NOTICE: This email communication may contain information subject to provisions of Privacy Act (P.L. 93-579), and any misuse or unauthorized disclosure can result in both civil and criminal penalties. This personal data is intended only for the use of the individual(s) addressed above and is to be treated in a confidential manner. If you have received this email in error, please immediately notify sender by return email and delete this message from your system. Thank you.

NAVSEA
WARFARE CENTERS
Carderock Division

# Main Propulsion Diesel Engines/ Pitch Cutback

## Brief History

931 involved in trials and inspections of lead ship. Trial support continues for follow-on ships. However, INSURV support has not been requested since the initial LPD17 INSURV. Numerous issues have been identified, including engine control programming, build deficiencies, training and logistics. 931 continues to provide in-service support through TYCOM-funded Diesel Readiness System initiatives.

## Current Known Issues / Risks

MPDE Control Programming – shaft imbalance and pitch cutback when operating in Program Mode. Proper operation depends on the calibration of several sensitive components, many of which are rarely in cal. Documented in all 931 reports.

Build Deficiencies – pneumatic tubing not installed per engine installation drawing. Tubing restrictions at the pneumatic junction block lead to engine start failures. Documented in all 931 reports.

Training – no formal training established to date. Lack of S/F understanding of engine and controls contributed to LPD17 underway issue.

Logistics – TM, PMS and EOSS are technically incorrect. S/F cannot rely on these documents for proper operation, maintenance and troubleshooting.

## Solutions / Risk Mitigation

MPDE Control Programming – SSES recommends program changes to engine load/pitch relationship to eliminate dependence on calibration of multiple components. NSWC working with PMS317 and RRNM to develop solution.

Build Deficiencies – 931 recommends removing restrictions and installing tubing per engine installation drawings.

Training – CNE working, training plan update req'd. 931 recommends combination classroom and shipboard (Hot Plant preferred) and should be involved in training development. LEEC training scheduled for LPDs 17 and 19 week of 18 Feb. OEM needs to develop LEEC View Only for ship's use.

Logistics – 931 needs to review and revise TM, PMS and EOSS.

## Unfunded – Funded Requirements

| PMS 470 $ | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| Transition | 175.0 | 0.0 | 0.0 | 175.0 |
| Sustainment | 0.0 | 58.5 | 58.5 | 117.0 |
| **Total:** | **175.0** | **58.5** | **58.5** | **292.0** |

PMS317 is partially funding solution development.

Unfunded tasks include: Logistics, LEEC View Only, pipeline training development, follow-on LEEC user training, and correction of build deficiencies.

NAVSEA WARFARE CENTERS Carderock Division

# Logistics and Additional Information

## Logistics

- Existing ILS based on LSD41/49 platform, much of which needed correction. A significant amount of the ILS doesn't apply to this engine due to fundamental differences (STC, electronic controls, etc). The TM needs a complete rewrite, PMS and EOSS need scrubs.

## Additional Information

- Diesel Readiness System is being introduced on this platform. The TYCOM-funded initiative addresses fluid quality, maintenance and performance monitoring initiatives. Overhaul maintenance standards are being developed under DRS.

NAVSEA
WARFARE CENTERS
Carderock Division

# Boat Handling & Stowage Systems

## Brief History

Boat Handling Systems consist of:
- Rescue Boat Davit (Caley Ocean Systems Ltd.)
- Boat & Cargo Crane (Appleton).

Both systems are modified COTS and utilize pendulation control derrick heads (unique to LPD-17) to lift and maneuver boats.

The rescue boat davit has had several operational problems with the tow boom (cylinder damage, disconnect from coupling) and sea painter (line fouling) . In addition, the supporting ILS documentation does not fully reflect the system as installed.

## Current Known Issues / Risks

Rescue Boat Davit
- System technical manual has inaccuracies/defiencies that hinder troubleshooting and repair efforts.
- APL and PMS deficient for proper lubrication of davit luff cylinders.
- Lack of shipboard identification of hydraulic valves results in operator confusion (for both system normal and emergency operation).

Boat Stowage (Boat & Cargo Crane)
- Concern about adequacy of boat stowage design (OEM tasked to review)

## Solutions / Risk Mitigation

Rescue Boat Davit
- Modification of laundry vent has eliminated damage to tow boom drive mechanism.
- Modification to sea painter line has eliminated fouling with tow boom.
- Validate system technical manual to reflect accurate shipboard configurations for all ships.
- Develop and install label plates for system valves and hoses.
- Revise ILS to reflect accurate shipboard configurations and to correct PMS deficiency for luff cylinder lubrication.

Boat Stowage
- Review OEM findings/recommendations and implement solutions as required.

## Unfunded – Funded Requirements

- OEM shipboard verification of rescue boat davit configuration funded by PMS 317. Completed Jan 08.
- Results of validation visit forth coming from OEM. Estimate needs to be developed to accomplish necessary ILS changes.

| PMS 470 $K | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| | 109.8 | 108.9 | 101.5 | 320.2 |

NAVSEA
WARFARE CENTERS
Carderock Division

# EOSS

| Brief History | Current Known Issues / Risks |
| --- | --- |
| Several AIT installs/configuration changes have been completed without the proper ILS Certification. EOSS is not being properly updated as a result with red-line changes be made by contractors vice proper authority/ISEA approval. | Contractors making EOSS changes without the proper authorization and ISEA approval. Contractors are having Ship's Force forward EOSS documents to the CO for temporary approval. This is permitted but the CO is now signing that he has authorized and is responsible for these changes.<br><br>Official EOSS documentation becomes out-dated and obsolute since these changes aren't being incorporated officially.<br><br>Use of EOSS ensures proper operation and minimizes damage to equipment or injury to personnel, by defining responsibility for system development, review, distribution, training, installation, use, monitoring, and updating. |

| Solutions / Risk Mitigation | Unfunded – Funded Requirements |
| --- | --- |
| Recommend an EOSS Team conduct a shipcheck to address EOSS that has not been properly updated as a result of AIT installations/configuration changes.<br><br>EOSS Team will provide updated EOSS to LPD-17 at completion of shipcheck. Therefore, all EOSS will be then be current and up to date as required.<br><br>EOSS Team will provide training to crew on proper method to submit EOSS changes and resolve any other EOSS related issues. | EOSS Validation cost is $60K to conduct shipboard validation, correct existing EOSS issues, provide updated EOSS documents at completion of shipcheck, provide final laminated EOSS. |

NAVSEA
WARFARE CENTERS
Carderock Division

# EOSS Expansion

## Brief History

Ship's force currently has a working local procedures for:

- Central Hydraulics (Side Port Door, Aviation Crane, Overhead Crane, Shell Doors)

- Alignment, start, operation, and securing of Shore LP Air.

Ship's force currently does not have any procedures for:

- Collective Protection System

- Secondary drainage systems.

Ship's Force requests an Engineering Operational Sequencing System (EOSS) Engineering Operational Procedure (EOP) and associated Diagrams to properly support theses systems.

## Current Known Issues / Risks

Ineffective use of available personnel and equipment and non-standardization of EOSS EOP practices.

Use of EOSS ensures proper operation and minimizes damage to equipment or injury to personnel, by defining responsibility for system development, review, distribution, training, installation, use, monitoring, and updating.

## Solutions / Risk Mitigation

Develop EOSS EOP and associated Diagrams for:

- Collective Protection System

-Central Hydraulics System

-Shore LP Air System

-Secondary Drainage System

## Unfunded – Funded Requirements

EOSS coverage for these systems is currently not funded by PMS-317 and is considered outside the scope. Ship's Force has requested EOSS coverage for these systems. EOSS development cost is as follows:

- Collective Protection System - $40K per ship

-Central Hydraulics System - $30K per ship

-Shore LP Air System - $20K per ship

-Secondary Drainage System - $10K per ship

NAVSEA
WARFARE CENTERS
Carderock Division

# LPD-17 TM Issues

## Brief History

The TMs were developed and approved for the systems and equipment as they were delivered and accepted by the Navy. Many of the systems and equipments have had upgrades post delivery which are not supported in the current approved TMs. These TMs are now deficient and will need to be corrected.

## Current Known Issues / Risks

It is estimated that there are at least 35 TMs that are deficient due to post delivery hardware changes that are not supported in the TMs. For the safety of the Fleet and to ensure mission readiness, it is necessary to have TMs that are accurate and adequate, which is currently not the case. The risk is that, without correct TMs, ships will not be able to properly and safely maintain, operate, and troubleshoot the equ pment and systems.

## Solutions / Risk Mitigation

Provide complete accurate TMs that will support the current configuration of the equipments and systems

## Unfunded – Funded Requirements

| PMS 470 $ | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| Transition | 0.0 | 100.0 | 100.0 | 200.0 |
| Sustainment | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total:** | **0.0** | **100.0** | **100.0** | **200.0** |

Currently, it is unknown if a dedicated funding line exists from PMS 317 to support the required TM modifications.

NAVSEA
WARFARE CENTERS
Carderock Division

# LPD-17 TM Feedbacks (TMDERs)

## Brief History

Ship's Force is encouraged to submit questions and recommended changes to Technical Manuals through TM Technical Manual Deficiency Reports (TMDERs). TMDERs are processed in accordance with applicable NAVSEA Instructions that require the In-Service Engineering Activity (ISEA) provide a response to TMDERs for the equipment/system. It is estimated that LPD-17 will Generate 12+ TMDERs in FY08. Funds requested by this proposal are to enable completion of the projected workload.

## Current Known Issues / Risks

**FY08 LPD-17 TMDER Metrics**

1 TMDERS received since 1 October 2007

0 TMDERs completed in FY08 through 8 Feb

9 TMDERs currently onboard and in process (FY08)

**FY07 and prior Metrics**

30 FY07 LPD-17 TMDERs completed

16 FY06 LPD-17 TMDERs completed

8 Open (carried into FY08)

## Solutions / Risk Mitigation

Provide revised and new TMs, as required

All TMDER resolutions result in a response to the originator

NSWCCD documents TM changes in TDMIS

## Unfunded – Funded Requirements

| PMS 470 $ | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| Transition | 0.0 | 0.0 | 0.0 | 0.0 |
| Sustainment | 35.0 | 60.0 | 60.0 | 155.0 |
| **Total:** | **35.0** | **60.0** | **60.0** | **155.0** |

Based upon TMDER Metrics above and historic trends we can expect to receive at least 25 TMDERs per year for the next few years as TMs are used to perform maintenance on equipment.

NAVSEA
WARFARE CENTERS
Carderock Division

# LPD-17 Training Issues

## Brief History

LPD-17 Navy Training Systems Plans and correlating Life-cycle training solutions for various engineering systems where not developed or procured during the acquisition process in accordance with OPNAV 1500.76A.

Systems currently identified with training deficiencies:

1. ECS
2. Diesels MPDE/SSDG
3. Electrical Plant
4. Water Mist
5. PLC controlled Elevators

## Current Known Issues / Risks

It is known that at least 5 HM&E systems under SSES Philadelphia management have not had NTSP's or life-cycle training solutions procured. Risks associated with non-procurement are:

1. Impact to Fleet Readiness/Reduced Operational Capability
2. Increased risk of CASREP
3. Improper manpower allocations
4. Inability of the Navy Training Community to POM for lifecycle training funds and therefore…
5. Inability of the program office to transfer training responsibility (physical and fiscal) to the applicable Training Agent (TA) in accordance with OPNAV 1500.76A

CAVEAT – Additional Review of HM&E systems is underway – more systems may be identified as having training requirements

## Solutions / Risk Mitigation

▪Develop complete and accurate NTSP's with lifecycle training plans identified and vetted to all stakeholders through TRRPM process.

▪Develop NTSP identied and agreed training solutions

▪Deliver training solution to the Navy Training community in accordance with Integrated Learning Environment (ILE) policy and guidance provided at https://ile-help.nko.navy.mil/ile/content/policy.aspx

## Unfunded – Funded Requirements

| PMS 470 $ In K | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| NTSP Development | 858.0 | 0.0 | 0.0 | 858.0 |
| NTSP Annual Reviews | 0.0 | 69.0 | 69.0 | 138.0 |
| Training Development | 1200.0 | 2000.0 | 700.0 | 3900.0 |
| **Total:** | **2058.0** | **2069.0** | **769.0** | **4896.0** |

Unknown Funding Status

CAVEAT – Funding requirements associated with development costs of lifecycle solutions are estimatec and will require identified solutions of approved NTSPs to firmly quote.

# LPD 17 Class Wholeness Task Force Survey Results Analysis 17 September 2010



TEAM SHIPS

# Bottom Line Up Front

- **Purpose:** The LPD 17 Class Wholeness Task Force Survey was administered to collect Voice of the Customer from the Fleet about current state issues with Readiness and use the results to formulate deep dive questions for Assessment Team site visits
- **Analysis:**

**Issue Identification**

**Survey Validated Issues**
- Correct NECs not onboard
- Low inventory Levels
- Corrosion, Etc.

**New Topics**
- Health and Wellness Risks *
- Sailors are often pulled away from maintenance to perform other mission tasks by C.O.C. *
- Crew Safety, Etc. *

**Perceived Root Causes**

**Root Causes**
- Insufficient Manning
- Lack of Training
- Lack of Funding for Ship
- Poor Quality of Construction

**Deep Dive Questions**

**Development of Questions**
- Leverage Past Knowledge and Survey Reponses to provide insight for Deep Dive
- Ensure Issues Captured from Fleet interviews are relayed effectively to IWGs

- **Next Steps:** Further develop Deep Dive questions from Survey Reponses to ensure issues captured during site visits

* Notice: Based on comments from sailors during survey

Business Sensitive: Do not distribute without concurrence from SEA 21 PMS 470R.

# *Survey Approach*



- Leveraged SME knowledge from IWGs to develop survey questions
- Organized survey into the following 8 Key Categories:
  - a) Manning & Resources
  - b) Training
  - c) Shore Support
  - d) Technical Documentation
  - e) Information Management
  - f) Integrated Logistics Support
  - g) Maintenance
  - h) New Construction




- Developed 1 Integrated Survey for Sailors consisting of 130 Questions
- Administered survey to Sailors from 14 Aug thru 3 Sep
- Used Six Sigma Methodologies to Bucket & Analyze Survey Results



**Single Integrated Sailor Survey**

* Notice: Based on comments from sailors during survey

TEAM SHIPS

# Analysis of Survey Comments

- Perceived Root Causes
  - A. Insufficient Manning
  - B. Lack of Training
  - C. Lack of Funding for Ship
  - D. Poor Quality of Construction
  - – Each Key Category has corresponding Perceived Root Causes

| Key Categories \ Root Causes | Insufficient Manning | Lack of Training | Lack of Funding for Ship | Poor Quality of Construction |
|---|---|---|---|---|
| 1. Manning | ● | | ● | |
| 2. Training | ● | ● | ● | |
| 3. Maintenance | ● | ● | ● | ● |
| 4. Technical Documentation | | ● | ● | |
| 5. Shore Support | ● | ● | ● | ● |
| 6. ILS Support | ● | ● | ● | ● |
| 7. Information Management | ● | ● | | |
| 8. New Construction | | ● | | ● |

* Notice: Based on comments from sailors during survey

TEAM SHIPS

# Overall Survey Results: Known Issues

| Survey Validated Issues |
|---|
| Insufficient manning |
| Low inventory levels |
| Lack of training |
| CBT is ineffective |
| Corrosion |
| Correct NECs not onboard the ship |
| Inadequate welding, piping, wiring |
| Inadequate accessibility of tech manuals / missing NSNs |
| Not enough time to do PMS due to poor construction (e.g. oil spills, inadequate shipboard systems) |
| Not enough funding for ship support |
| Sailors don't have proper tooling to preform maintenance |

- Survey Validated Issues
  - Represent the known issues that the Task Force's Assessment Team was aware of through:
    - Review of historical studies
    - Information provided by existing LPD 17 Class Working Groups and various Fleet supporting organizations
  - These known issues were reaffirmed within the survey results
  - Encompasses the majority of total issues identified

* Notice: Based on comments from sailors during survey

Business Sensitive: Do not distribute without concurrence from SEA 21 PMS 470R.

TEAM SHIPS

# Symptoms of the Perceived Root Causes

## Insufficient Manning

- Overworked Personnel
- Overwhelmed Shore Support
- Reduced Work Effectiveness
- Inefficiencies in Staffing
- Safety Risks
- Decreased Morale
- Poor Maintenance

Link to specific Insufficient Manning comments in backup slides

## Lack of Training

- Absences of Appropriate NECs
- Increased Work Hours
- Ineffective CBT
- Inadequate Training
- Reliance on Shore Based Support
- Safety Risks
- Poor Maintenance

Link to specific Lack of Manning comments in backup slides

## Perceived Root Causes and Symptoms

## Lack of Funding for Ship

- Obsolete and Unreliable Equipment
- Lack of Inventory
- Inadequate Tooling
- Absent or Out of Date Tech Manuals
- Safety Risks
- Deferred Maintenance

Link to specific Lack of Funding for Ship comments in backup slides

## Poor Quality of Construction

- Nonfunctioning Platform Components
- Equipment Inadequate for Shipboard Use
- Not enough time to do PMS due to poor construction (e.g. oil spills, inadequate shipboard systems)

Link to specific Poor Quality of Construction comments in backup slides

* Notice: Based on comments from sailors during survey

Business Sensitive: Do not distribute without concurrence from SEA 21 PMS 470R.

# Overall Survey Results: New Topics

| New Issues from Survey |
| --- |
| Many systems are not designed for shipboard use (i.e. systems will short out when wet) |
| Personnel with multiple NECs required to do multiple peoples jobs |
| Sailors are often pulled away from maintenance to perform other mission tasks by C.O.C. |
| Internal C.O.C. does not address issues onboard the ship |
| Too much paperwork to do with maintenance |
| Medical personnel are used for flight, well deck, small boat, live fire exercises, sea and anchor evolutions / operations so cannot accomplish their tasking or maintain their spaces |
| Health risks from skipping lunch, shortening their sleep hours to 3-4 hours/day, and not exercising due to the lack of manning |

- New Topics
  - Represent new topics to the LPD 17 Wholeness Task Force that have surfaced as a result of the Survey
  - Were not identified as existing issues in past LPD 17 Class studies / reports provided to the Assessment Team
  - Will be further investigated during Assessment Team deep dives / site visits
  - Ensures the Task Force team is holistically capturing issues

* Notice: Based on comments from sailors during survey

# Next Steps




- Assessment Team interviews in Norfolk:
  - Deep Dive Questions
  - Daily correspondence and feedback with IWGs

* Notice: Based on comments from sailors during survey

# Backup

* Notice: Based on comments from sailors during survey



Business Sensitive: Do not distribute without concurrence from SEA 21 PMS 470R.

TEAM SHIPS

# Supporting Comments (Lack of Manning)

## Comments from Survey

for the whole readiness of the 17 class ....need more people ... the ship is undermanned ... is this where the "NEW NAVY" is going?... for example **the USS Independence is so undermanned they don't even help on pier watches and pier sweepers so we have to carry the load which is very unfair for us because some of us are being DOUBLED UP on watch.**

**High maintenance volume as topside weapons system (dirt, corrosion, some reliability issues)**

When you **don't have enough people to do all the PMS and then something breaks then you don't have time trouble shoot the system and when you don't have people to do PMS and clean and trouble shoot** then every thing starts to take a toll

**Supply Manning is minimal; they do not have the personnel to support their mission properly** and therefore the **ship suffers due to the long lag time to get supplies, work depot level repairable issues, etc.**

The ship was poorly constructed and the ships force spends huge amounts of time wiping up fuel and oil leaks, with only 2-5 personnel assigned to each mainspace, and some of those personnel assigned to DCPO or FSA duties, and some of them being tasked with administrative duties for at least part of the day, little or no time can be devoted to proper maintenance. This disparity becomes even more of a problem as work ups and training cycles approach. **With current LPD 17 manning, its a question of when, not if catastrophic equipment failure and serious personnel injury will occur.**

**98% paperwork, 2% maintenance. We bought off on a failed system and spend more time worrying about if something's was circled correctly than if the maintenance was really done**. What a **WASTE of man-hours!!!** Keep serving the Kool-Aid, we are forced to drink it. **XO's and 3MC's everywhere are worried about a score, but I almost NEVER hear about the equipment**. Is this messed up????

No one **has the time to actually sit down and learn from the CBT's it always turns into a liberty item**, so its just get t done as fast as possible. a lot of the **information on the current LPD-18 Class ICW was incorrect or out dated**. There just **isn't enough hours in the day to accomplish everything, but we have to anyway, so it all gets done, just not "right"**

**Maintenance completion: lack of support from the supply department in regards to parts makes it difficult to complete maintenance in a timely manner**. A large portion of this problem occurs because of lack of funding for the required parts. -

Manning: **During the deployment several departments were incredibly undermanned to the point that many individuals were unable to complete tasks assigned to them and stand their assigned watches. Many of these individuals sacrificed their health and wellness by skipping lunch, shorting their sleep hours to 3-4 hours/day, and not exercising. This continued lack of sleep was a concern due to their inability to stand a watch with the full alertness level required.** The department that was most apparent in their lack of manning was Deck.

'ey

Business Sensitive: Do not distribute without concurrence from SEA 21 PMS 470R.

TEAM SHIPS

# *Supporting Comments (Lack of Training)*

## Comments from Survey

**Fix training on current "modern" systems before creating more modernization**. Take all trouble calls and casualties reported to ISEA and develop valid training for the platform. This is not just to train current Sailors, but every Sailor for the lifespan of the platform.

**Lack of adequate training for all three. VMS has antiquated computers and no formal training** (although we have great support from ISEA), **we do not have any DMR technicians**, however the equipment has **constant failures of Power amplifiers and receivers.** HYDRA is a money pit with obsolete parts and no money identified for replacing or upgrading to the new APL supported radios.

Bring back the SIMA's. so the **sailors can learn to fix rather than calling on contractors to fix due to inadequate training.**

More **training needs to be held on how to use distance support** so that all crew members are able to effectively use the program.

Bring back the SIMA's. **We need to bring back the sailor to the job. Ships are missing the qualified sailor** that returns to the fleet after working with the fleet on equipment issues. Civilian contractors have no interest in providing the fleet with the type of job satisfaction found in sailor maintenance personnel who have ownership of the damaged equipment.

Our computer **class room doesn't work and it's there is no formal training on these programs**. You really hope your First Class has this wired. The **Maintenance University is really good for Sked and NG but you can't get a seat**. It took **over 7 month before I got the class**. The **class was very well done! Should be required in route and not half way thru your tour**.

DO **AWAY WITH COMPUTER BASED TRAINING AND REVERT IT BACK TO STAND UP INSTRUCTION** WITH INSTRUCTORS THAT ARE FAMILIAR WITH THE **EQUIPMENT THAT THE SAILOR IS SUPPOSED TO BE LEARNINGTHAT THEY CANNOT LEARN BY CLICKING THROUGH A COMPUTER BASED TRAINING COURSE**.

All of it is garbage[CBT]. Two examples. **LPD-17 Class MK46 30MM GWS ICW/NKO courseware doesn't load. LPD-17 Class 23TV System ICW/NKO courseware is near impossible to pass due to lack of instructions and functionality** on the test portion.

**I am the training Chief on the ship. The ATG TRAINO course in no way prepared me for the responsibilities that were placed upon me when I got to the command.** This course needs to be a more comprehensive and in-depth explanation of the SFTM/FLTMPS/TORIS/RADM relationship, and the expectations of ATG that are now placed on the ship.

ey



Business Sensitive: Do not distribute without concurrence from SEA 21 PMS 470R.

TEAM SHIPS

# *Statistical Significance of Survey Results*

- **Population:** 1500 Sailors (Assumed)
- **Percentage of Picking Choice:** 0.33
- **Confidence Interval:** 0.06
- **Survey Respondents:** 151
- **Confidence Interval:** 90%
- **Sample Size Formula:**

$$ss = \frac{Z^2 * (p) * (1-p)}{c^2}$$

Where:

Z = Z value (e.g. 1.96 for 95% confidence level)
p = percentage picking a choice, expressed as decimal (.5 used for sample size needed)
c = confidence interval, expressed as decimal (e.g., .04 = ±4)

$$\text{new ss} = \frac{ss}{1 + \frac{ss-1}{pop}}$$

Where: pop = population

- **Required Sample Size (per formula):** 112 < **Survey Respondents:** 151
- **What it means:** It can be concluded at a 90% confidence level that the LPD 17 Wholeness Task Force Survey Results are accurate with a +/- 6% margin of error

TEAM SHIPS

# Supporting Comments (Lack of Funding for Ship)

## Comments from Survey

I feel that it is almost too modernized as it is so that when systems **do fail it is rare that we are able to repair the equipment due to lack of material because of the cost**. The biggest system that could use something done would be the electrical distribution system and the problems with our generator circuit breakers.

Lack of adequate training for all three. VMS has antiquated computers and no formal training (although we have great support from ISEA), we do not have any DMR technicians, however the equipment has **constant failures of Power amplifiers and receivers. HYDRA is a money pit with obsolete parts and no money identified for replacing or upgrading to the new APL supported radios.**

THE SHIP EXPERIENCED A **MAJOR ENGINE CASUALTY BACK IN JUNE OF THIS YEAR. WHILE TRYING TO REPAIR THE ENGINE, SHIPS FORCE DIDN'T HAVE THE PROPER TOOLS AND TIME SPENT ACCUIRING THE TOOLS OR WAITNG FOR TOOLS TO ARRIVE CAUSED TIME CONSTRAINTS ON REPAIRING** THE ENGINE. ALSO THE TOOLS THAT WERE MISSING WERE PUT ON ORDER BACK IN 2007 AND SHIPS FORCE HAS TO RESUBMIT THE JOB AGAIN TO REORDER THE TOOLS REQUIRED.

Some **parts are too expensive for Supply to stock**. Other times **Supply cancels jobs without telling you because they don't have money for parts, and don't want to have unfilled orders on their list** (and therefore look bad). The **ship has no tool control program whatsoever.**

LPD 17 Class ILS is driving the number of CASREPS sent. Lack of **repair parts onboard coupled with budgetary concerns forces Ship's Force to CASREP many systems for PARTS**. Technical support is usually available and adequate to correct casualties; however, the SWAN and all integrated systems have proven to be difficult to get the correct level of support unless sending the CASREP at CAT 3 vice a CAT 2.

Disagree on questions 17, 18, & 19 because we **went out in town and purchased our own tools.**

Maintenance completion: lack of support from the supply department in regards to parts makes it difficult to complete maintenance in a timely manner. **A large portion of this problem occurs because of lack of funding for the required parts.**

-Manning: During the deployment several departments were incredibly undermanned to the point that many individuals were unable to complete tasks assigned to them and stand their assigned watches. Many of these individuals sacrificed their health and wellness by skipping lunch, shorting their sleep hours to 3-4 hours/day, and not exercising. This continued lack of sleep was a concern due to their inability to stand a watch with the full alertness level required. The department that was most apparent in their lack of manning was Deck.

ey



Business Sensitive: Do not distribute without concurrence from SEA 21 PMS 470R.

# Supporting Comments (Poor Quality of Construction)

## Comments from Survey

The ship as a whole has serious construction flaws, **from bad welding, equipment placement and poorly designed or substandard materials. Leaks on system welds, F/M, SWS are commonly discovered and require shipboard repairs**. In hot weather **the ship sweats so badly that the decks need constant attention due to water puddles. CPS fan rooms flood out in hours due to condensation and must be left open to combat the problem, resulting in a useless CPS system.** I fear the ship will rust out in ten years causing huge expenses to repair. Maintaining the ships Stern Gate is a man hour burden due to faulty design/fabrication. The electrical system is unreliable/unstable and has required civilian contractors to deploy with us during the last two deployments.

**Ship Service Diesel Generator piping, there is no reason why we should spring on an average between 5-15 leaks per generator based on welds**. Gaskets going out is one thing but when the piping welds are causing leaks, something is definitely wrong.

**Not designed for ship board use [EQUIPMENT], vibrations and hard water causing many faults**

The **ship was poorly constructed and the ships force spends huge amounts of time wiping up fuel and oil leaks, with only 2-5 personnel assigned to each mainspace, and some of those personnel assigned to DCPO or FSA duties, and some of them being tasked with administrative duties for at least part of the day, little or no time can be devoted to proper maintenance**. This disparity becomes even more of a problem as work ups and training cycles approach. With current LPD 17 manning, its a question of when, not if catastrophic equipment failure and serious personnel injury will occur.

This ship The electrical system is ridiculous and class have been plagued with problems. For **this ship the final year was rushed to 2 months, leaving entire levels unfinished with no decks on the metal or lagging on the bulkheads. , literally twice as many wires as needed** (wiring was laid and never connected, then re-laid, leaving many dead wires everywhere). This **makes it impossible to troubleshoot systems that are further than 20-30 feet apart**. Also almost half of the remaining working wiring is not labeled, and never has been. **There are switches in power panels that lead to nothing, or are mislabeled, and due to the overwhelming majority of errors ship's crew is still running into this. Right now out of the 8 spaces that my WC owns 5 have jobs that have been in longer than a year, 2 spaces have jobs that have been in since before commissioning**. Almost **every space has either a dead end power connection or lights that do not light or IVCS phones that connect to nothing. The brand new decks had to be replaced before the end of the initial return to homeport**. Not one system in combat systems has worked properly since inception, and every FC system has permanent errors, things we cannot fix and tech assists cannot either. We have **had a CASREP in on an FC system in every single port** this prior deployment. Add that to the critical under manning and it really is a surprise that we passed any of our certs.

ey

TEAM SHIPS

# Supporting Comments (Safety & Misc.)

**Comments from Survey**

All **engineering systems are degraded in some way shape or form**. During LPD 18 sail around from Avondale to San Diego, a **catastrophic failure of both steering pumps lead to a three week hold up in Pensacola**. On several occasions during WestPac, **fuel pumps cracked causing fuel spray that luckily never caused a fire**. The electrical system has been inherently dangerous at best, with the crew taking the ship with hundreds of dead end cables hanging in the passage ways. The **cables were unknown if they had current or not**. I am surprised no one was electrocuted. I will still not dust in the cable ways to this day for fear of becoming a casualty. Load **center 31-41 circuit breaker opens for no reason at least once a week on board LPD 18, as does the Generator Breaker for NR 4 SSDG, making the STBD buss unreliable, and if too much of the load transfers to port bus, that bus will overload, causing a Dead in Water condition**. I would not want to have to depend on any system onboard in a battle condition, **I am happy to transfer in September, as I have been here since Pre commissioning and this platform does not seem to be improving as it should, or as many seem to think it is**. Give me an LSD any day over the gimmicks and trickery built into these "smart ships"

The ship was poorly constructed and the ships force spends huge amounts of time wiping up fuel and oil leaks, with only 2-5 personnel assigned to each mainspace, and some of those personnel assigned to DCPO or FSA duties, and some of them being tasked with administrative duties for at least part of the day, little or no time can be devoted to proper maintenance. This disparity becomes even more of a problem as work ups and training cycles approach. **With current LPD 17 manning, its a question of when, not if catastrophic equipment failure and serious personnel injury will occur.**

**Issues that are brought up the COC are, at best, swept under the rug**. Asking for assistance COC replies of course you will receive help, and NEVER provides any. **The ship as a whole is critically undermanned, the CO believes that longer working hours is a good way to address morale related issues (such as poor performance during pre-certification evolutions), with absolutely no understanding of the work load we are struggling under and the operational stress.** In general, the entire COC would be hard pressed to care less about junior personnel, about rectifying issues brought through COC or CMEO, and are only interested in how they appear at the moment to outside entities.

Due to **additional tasking for medical department (medical coverage for flight, well deck, small boat, live fire exercises, sea and anchor evolutions / operations) many of the personnel are not able to accomplish their assigned tasks in time**. Medical is a dynamic environment and customer service orientated (sick call, appointments and emergencies) this provides additional barriers that other departments do not have to take into consideration when assigning maintenance to people in their department. This is **an additional strain on a LPD 17 class minimal manned ship when there are not enough corpsman to cover sick-call, evolutions and maintenance.**

ey

-----Original Message-----
From: Dawson, Phillip E CAPT NAVSEA PEO SHIPS, SHIPS-F
Sent: Thursday, October 21, 2010 9:24
To: Graham, Michael R CAPT NAVSEA, SEA21/PMS470; Samimi, Sam CIV SHIPS; Russell, Robin CAPT NAVSEA, Deputy SEA21A; Stefany, Frederick J CIV PEO SHIPS
Cc: Boozer, William CIV NAVSEA PEO SHIPS, SHIPS-F; Riedy, John R CIV SHIPS; Schneider, Kelly T CIV NAVSEA PEO SHIPS, PMS317; Vandroff, Mark CAPT PEO SHIPS, 317; Melsom, Stephen J CIV NAVSEA HQ, SEA 21; Conlon, Thomas M CIV NAVSEA PEO SHIPS, SHIPS-F; Van Durick, Michael G CAPT SHIPS, F
Subject: FW: TOP TRAINING QUICK WINS - TF INPUT

For your back pocket when asked "What can we do now to make LPD better?" Additionally, we have some concerns with the training plan info paper in the attached e-mail, that we are attempting to address with the sponsor.

==========================================

1. The most critical training shortfalls for the LPD17 Class fall into two specific areas: INTERIM TRAINING and FEA-TRPMM/NTSP DEVELOPMENT

The following information provides an executive overview of what is currently needed to address these training deficiencies:

---

TF WHOLENESS TOP TRAINING QUICK WINS

INTERIM TRAINING
The current structured INTERIM TRAINING program covers only the 6 main LPD17 Class systems to include:
a. MPDE
b. SSDG
c. SCS
d. ECS/ICAS
e. 60hz Electrical System
f. SWAN
NOTE: MK46 GWS interim training is now conducted at NTC Dam Neck.

This INTERIM TRAINING package only addresses minimum training for these systems and represent only a fraction of the INTERIM TRAINING required for the Class. Additional INTERIM TRAINING is required until a formal training solution in implemented (NTSP). As noted by JAGMAN, INSURV, ATG, TF WHOLENESS and routinely requested by the ship Commanding Officers, many critical systems currently have no defined Initial/Interim or Life Cycle training plan.

RECOMMENDATION (QUICK WIN 1)

a. Provide funding (FY11) for a Full and robust Interim Training program development effort and delivery (5 per year) costs that addresses LPD17 systems with no current training plan.
(1) MSCS
(2) 23TV

(3) 27TV
(4) CPS
(5) SES
(6) CONCILIUM
(7) FLOODING CAUSULTY CONTROL
(8) SPS-73(V)13
(9) WPCS
(10) FIBER OPTICS/FUSION SPLICING
(11) 11M RHIB (COXSWAIN/OPS/MAINT)
(12) AFSS
(13) WATERMIST
(14) NDDS
(15) AEMS LADDER

DELIVERY COSTS PER EVENT: $250K (est.). Training Development costs (TBD).

FEA-TRPMM/NTSP DEVELOPMENT
Early FEA-TRPMM and system NTSP development is critical due to the development time necessary to go from FEA-TRPMM development start to NTSP Approval and "Ready For Training". This process can represent a period of 2-4 years thus requiring the INTERIM TRIANING solution to fulfill the training needs for longer periods of time. Currently, only a small percentage of long term training requirements are being addressed via the FEA-TRPMM and NTSP process.

RECOMMENDATION (QUICK WIN 2)

b. TRPMM/NTSP Development (2 parts)

PART I: Provide full funding to achieve RFT for the following systems currently in TRPMM/NTSP development:
(1) MPDE
(2) ECS/ICAS
(3) SPCS
(4) 60HZ ELECTRICAL SYSTEMS
(5) SSDG (OEM Training in Peoria IL - Caterpillar)

PART II: Provide full funding for the development of FEA and NTSP for the following systems

(1) Deck Mission Systems
Rescue Boat System (Caley)
Boat and Cargo Crane
Cargo Weapons Elevator
Hangar Bridge Crane
Boat Stowage
Accommodation Ladder
Well Deck Bridge Crane
Flight Deck Ramp Door
Sideport Cargo Crane
Sliding Padeye
Hinged Ramp

Aviation Maintenance Boom Crane
Ammo Lift Platform
Stern Gate
Anchor System

(2) Watermist
(3) MSCS
(4) 23TV
(5) NDDS
(6) AEMS Ladder
(7) AFSSS

Investments in these two "quick wins" will immediately result in establishing programs and training focus areas that will result in significant LPD17 Class readiness levels and mission success.

These are the TWO most critical "quick win" solutions that would significantly fill the training gaps in the fleet.

CAPT Phil Dawson
TEAM SHIPS
SEA 21
470R- Mine, Amphibious, Auxiliary & Command Ships Division Director

202-781-3046 W
202-422-4304

FOR OFFICIAL USE ONLY -- PRIVACY ACT NOTICE: This email communication may contain information subject to provisions of Privacy Act (P.L. 93-579), and any misuse or unauthorized disclosure can result in both civil and criminal penalties. This personal data is intended only for the use of the individual(s) addressed above and is to be treated in a confidential manner. If you have received this email in error, please immediately notify sender by return email and delete this message from your system. Thank you.

NAVSEA
WARFARE CENTERS
Carderock Division

# Main Propulsion Diesel Engines/ Pitch Cutback

## Brief History

931 involved in trials and inspections of lead ship. Trial support continues for follow-on ships. However, INSURV support has not been requested since the initial LPD17 INSURV. Numerous issues have been identified, including engine control programming, build deficiencies, training and logistics. 931 continues to provide in-service support through TYCOM-funded Diesel Readiness System initiatives.

## Current Known Issues / Risks

MPDE Control Programming – shaft imbalance and pitch cutback when operating in Program Mode. Proper operation depends on the calibration of several sensitive components, many of which are rarely in cal. Documented in all 931 reports.

Build Deficiencies – pneumatic tubing not installed per engine installation drawing. Tubing restrictions at the pneumatic junction block lead to engine start failures. Documented in all 931 reports.

Training – no formal training established to date. Lack of S/F understanding of engine and controls contributed to LPD17 underway issue.

Logistics – TM, PMS and EOSS are technically incorrect. S/F cannot rely on these documents for proper operation, maintenance and troubleshooting.

## Solutions / Risk Mitigation

MPDE Control Programming – SSES recommends program changes to engine load/pitch relationship to eliminate dependence on calibration of multiple components. NSWC working with PMS317 and RRNM to develop solution.

Build Deficiencies – 931 recommends removing restrictions and installing tubing per engine installation drawings.

Training – CNE working, training plan update req'd. 931 recommends combination classroom and shipboard (Hot Plant preferred) and should be involved in training development. LEEC training scheduled for LPDs 17 and 19 week of 18 Feb. OEM needs to develop LEEC View Only for ship's use.

Logistics – 931 needs to review and revise TM, PMS and EOSS.

## Unfunded – Funded Requirements

| PMS 470 $ | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| Transition | 175.0 | 0.0 | 0.0 | 175.0 |
| Sustainment | 0.0 | 58.5 | 58.5 | 117.0 |
| **Total:** | **175.0** | **58.5** | **58.5** | **292.0** |

PMS317 is partially funding solution development.

Unfunded tasks include: Logistics, LEEC View Only, pipeline training development, follow-on LEEC user training, and correction of build deficiencies.

NAVSEA
WARFARE CENTERS
Carderock Division

# Logistics and Additional Information

## Logistics

- Existing ILS based on LSD41/49 platform, much of which needed correction. A significant amount of the ILS doesn't apply to this engine due to fundamental differences (STC, electronic controls, etc). The TM needs a complete rewrite, PMS and EOSS need scrubs.

## Additional Information

- Diesel Readiness System is being introduced on this platform. The TYCOM-funded initiative addresses fluid quality, maintenance and performance monitoring initiatives. Overhaul maintenance standards are being developed under DRS.

NAVSEA
WARFARE CENTERS
Carderock Division

# Boat Handling & Stowage Systems

## Brief History

Boat Handling Systems consist of:
- Rescue Boat Davit (Caley Ocean Systems Ltd.)
- Boat & Cargo Crane (Appleton).

Both systems are modified COTS and utilize pendulation control derrick heads (unique to LPD-17) to lift and maneuver boats.

The rescue boat davit has had several operational problems with the tow boom (cylinder damage, disconnect from coupling) and sea painter (line fouling) . In addition, the supporting ILS documentation does not fully reflect the system as installed.

## Current Known Issues / Risks

Rescue Boat Davit
- System technical manual has inaccuracies/defiencies that hinder troubleshooting and repair efforts.
- APL and PMS deficient for proper lubrication of davit luff cylinders.
- Lack of shipboard identification of hydraulic valves results in operator confusion (for both system normal and emergency operation).

Boat Stowage (Boat & Cargo Crane)
- Concern about adequacy of boat stowage design (OEM tasked to review)

## Solutions / Risk Mitigation

Rescue Boat Davit
- Modification of laundry vent has eliminated damage to tow boom drive mechanism.
- Modification to sea painter line has eliminated fouling with tow boom.
- Validate system technical manual to reflect accurate shipboard configurations for all ships.
- Develop and install label plates for system valves and hoses.
- Revise ILS to reflect accurate shipboard configurations and to correct PMS deficiency for luff cylinder lubrication.

Boat Stowage
- Review OEM findings/recommendations and implement solutions as required.

## Unfunded – Funded Requirements

- OEM shipboard verification of rescue boat davit configuration funded by PMS 317. Completed Jan 08.
- Results of validation visit forth coming from OEM. Estimate needs to be developed to accomplish necessary ILS changes.

| PMS 470 $K | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| | 109.8 | 108.9 | 101.5 | 320.2 |

NAVSEA
WARFARE CENTERS
Carderock Division

# EOSS

## Brief History

Several AIT installs/configuration changes have been completed without the proper ILS Certification. EOSS is not being properly updated as a result with red-line changes be made by contractors vice proper authority/ISEA approval.

## Current Known Issues / Risks

Contractors making EOSS changes without the proper authorization and ISEA approval. Contractors are having Ship's Force forward EOSS documents to the CO for temporary approval. This is permitted but the CO is now signing that he has authorized and is responsible for these changes.

Official EOSS documentation becomes out-dated and obsolute since these changes aren't being incorporated officially.

Use of EOSS ensures proper operation and minimizes damage to equipment or injury to personnel, by defining responsibility for system development, review, distribution, training, installation, use, monitoring, and updating.

## Solutions / Risk Mitigation

Recommend an EOSS Team conduct a shipcheck to address EOSS that has not been properly updated as a result of AIT installations/configuration changes.

EOSS Team will provide updated EOSS to LPD-17 at completion of shipcheck. Therefore, all EOSS will be then be current and up to date as required.

EOSS Team will provide training to crew on proper method to submit EOSS changes and resolve any other EOSS related issues.

## Unfunded – Funded Requirements

EOSS Validation cost is $60K to conduct shipboard validation, correct existing EOSS issues, provide updated EOSS documents at completion of shipcheck, provide final laminated EOSS.

NAVSEA
WARFARE CENTERS
Carderock Division

# EOSS Expansion

## Brief History

Ship's force currently has a working local procedures for:

- Central Hydraulics (Side Port Door, Aviation Crane, Overhead Crane, Shell Doors)

- Alignment, start, operation, and securing of Shore LP Air.

Ship's force currently does not have any procedures for:

- Collective Protection System

- Secondary drainage systems.

Ship's Force requests an Engineering Operational Sequencing System (EOSS) Engineering Operational Procedure (EOP) and associated Diagrams to properly support theses systems.

## Current Known Issues / Risks

Ineffective use of available personnel and equipment and non-standardization of EOSS EOP practices.

Use of EOSS ensures proper operation and minimizes damage to equipment or injury to personnel, by defining responsibility for system development, review, distribution, training, installation, use, monitoring, and updating.

## Solutions / Risk Mitigation

Develop EOSS EOP and associated Diagrams for:

- Collective Protection System

-Central Hydraulics System

-Shore LP Air System

-Secondary Drainage System

## Unfunded – Funded Requirements

EOSS coverage for these systems is currently not funded by PMS-317 and is considered outside the scope. Ship's Force has requested EOSS coverage for these systems. EOSS development cost is as follows:

- Collective Protection System - $40K per ship

-Central Hydraulics System - $30K per ship

-Shore LP Air System - $20K per ship

-Secondary Drainage System - $10K per ship

NAVSEA
WARFARE CENTERS
Carderock Division

# LPD-17 TM Issues

## Brief History

The TMs were developed and approved for the systems and equipment as they were delivered and accepted by the Navy. Many of the systems and equipments have had upgrades post delivery which are not supported in the current approved TMs. These TMs are now deficient and will need to be corrected.

## Current Known Issues / Risks

It is estimated that there are at least 35 TMs that are deficient due to post delivery hardware changes that are not supported in the TMs. For the safety of the Fleet and to ensure mission readiness, it is necessary to have TMs that are accurate and adequate, which is currently not the case. The risk is that, without correct TMs, ships will not be able to properly and safely maintain, operate, and troubleshoot the equipment and systems.

## Solutions / Risk Mitigation

Provide complete accurate TMs that will support the current configuration of the equipments and systems

## Unfunded – Funded Requirements

| PMS 470 $ | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| Transition | 0.0 | 100.0 | 100.0 | 200.0 |
| Sustainment | 0.0 | 0.0 | 0.0 | 0.0 |
| **Total:** | **0.0** | **100.0** | **100.0** | **200.0** |

Currently, it is unknown if a dedicated funding line exists from PMS 317 to support the required TM modifications.

NAVSEA
WARFARE CENTERS
Carderock Division

# LPD-17 TM Feedbacks (TMDERs)

## Brief History

Ship's Force is encouraged to submit questions and recommended changes to Technical Manuals through TM Technical Manual Deficiency Reports (TMDERs). TMDERs are processed in accordance with applicable NAVSEA Instructions that require the In-Service Engineering Activity (ISEA) provide a response to TMDERs for the equipment/system. It is estimated that LPD-17 will Generate 12+ TMDERs in FY08. Funds requested by this proposal are to enable completion of the projected workload.

## Current Known Issues / Risks

**FY08 LPD-17 TMDER Metrics**

1 TMDERS received since 1 October 2007

0 TMDERs completed in FY08 through 8 Feb

9 TMDERs currently onboard and in process (FY08)

**FY07 and prior Metrics**

30 FY07 LPD-17 TMDERs completed

16 FY06 LPD-17 TMDERs completed

8 Open (carried into FY08)

## Solutions / Risk Mitigation

Provide revised and new TMs, as required

All TMDER resolutions result in a response to the originator

NSWCCD documents TM changes in TDMIS

## Unfunded – Funded Requirements

| PMS 470 $ | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| Transition | 0.0 | 0.0 | 0.0 | 0.0 |
| Sustainment | 35.0 | 60.0 | 60.0 | 155.0 |
| **Total:** | **35.0** | **60.0** | **60.0** | **155.0** |

Based upon TMDER Metrics above and historic trends we can expect to receive at least 25 TMDERs per year for the next few years as TMs are used to perform maintenance on equipment.

NAVSEA
WARFARE CENTERS
Carderock Division

# LPD-17 Training Issues

## Brief History

LPD-17 Navy Training Systems Plans and correlating Life-cycle training solutions for various engineering systems where not developed or procured during the acquisition process in accordance with OPNAV 1500.76A.

Systems currently identified with training deficiencies:

1. ECS
2. Diesels MPDE/SSDG
3. Electrical Plant
4. Water Mist
5. PLC controlled Elevators

## Current Known Issues / Risks

It is known that at least 5 HM&E systems under SSES Philadelphia management have not had NTSP's or life-cycle training solutions procured. Risks associated with non-procurement are:

1. Impact to Fleet Readiness/Reduced Operational Capability
2. Increased risk of CASREP
3. Improper manpower allocations
4. Inability of the Navy Training Community to POM for lifecycle training funds and therefore…
5. Inability of the program office to transfer training responsibility (physical and fiscal) to the applicable Training Agent (TA) in accordance with OPNAV 1500.76A

CAVEAT – Additional Review of HM&E systems is underway – more systems may be identified as having training requirements

## Solutions / Risk Mitigation

▪Develop complete and accurate NTSP's with lifecycle training plans identified and vetted to all stakeholders through TRRPM process.

▪Develop NTSP identied and agreed training solutions

▪Deliver training solution to the Navy Training community in accordance with Integrated Learning Environment (ILE) policy and guidance provided at https://ile-help.nko.navy.mil/ile/content/policy.aspx

## Unfunded – Funded Requirements

| PMS 470 $ in K | FY08 | FY09 | FY10 | FY08-10 Total |
|---|---|---|---|---|
| NTSP Development | 858.0 | 0.0 | 0.0 | 858.0 |
| NTSP Annual Reviews | 0.0 | 69.0 | 69.0 | 138.0 |
| Training Development | 1200.0 | 2000.0 | 700.0 | 3900.0 |
| **Total:** | **2058.0** | **2069.0** | **769.0** | **4896.0** |

Unknown Funding Status

CAVEAT – Funding requirements associated with development costs of lifecycle solutions are estimatec and will require identified solutions of approved NTSPs to firmly quote.

# EXHIBIT 17

# FOR OFFICIAL USE ONLY
## NAVAL CRIMINAL INVESTIGATIVE SERVICES
## RECORDS MANAGEMENT DIVISION
## LAW ENFORCEMENT RECORDS

Package ID #: 0011831-000215

**Name:** ANSONG THEOPHILUS KWAKU

**AKA:**

**Social Security Number:** [redacted] **Context:** Victim

**Date of Birth:** [redacted] **State of Birth:** **Country of Birth:** GH - Ghana

**Case Number:** 06FEB09NFNF0071 **Dossier:**

| DCII INDEX CODE: | RECORD SERIES #: | Date Closed: |
|---|---|---|
| K = 50 years | 5580/4a(1)(b) | 12/02/2009 |

**RECORD SERIES (FILE PLAN)**

ty Svcs - Law Enforcement - NCIS Criminal Investigative - Controlled Death, Sex Investigations, & Case Files (Created on or after 1 January 1988)

**Criminal Investigative Reports**

MAILED 12/16/09 VIA REGISTERED
MAIL #RB 656 066 675 US
TO NCISHQ ATTN T. WILLETT

**Comments:**

| | |
|---|---|
| No | Polygraph Examination Conducted |
| No | Finger Prints Submitted to Code 24B3 |
| No | Sexual Offender Registry Completed |
| No | Final Disposition Report to FBI |

CIS - ____________ / ____________

☐ Closed Status ☐ Dup Title ☐ Dup CCN

Disclosure/Accountability Statement: If this investigation is disseminated outside NCIS, complete NCIS Form 000/10-80, and ensure it is retained in the case file.

RUR000RLIT

**09/211489**

I MARIO PALOMINO certify that this document has been reviewed and is complete.

Typed Name of SSA

15 DEC 09

DATE

SIGNATURE

Unclassified when separated from attachment unless otherwise indicated

**FOR OFFICIAL USE ONLY**

0 6 DEC 2010

Privacy Act Statement

Privacy Sensitive · Any misuse or unauthorized disclosure may result in both civil or criminal penalties

PREVIEW OF 93361401PJ.DOC IN:SSD #17094 OUT:TEMPLATE #562

//23/NF//

# U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

REPORT OF INVESTIGATION (CLOSED) 02DEC09

DEATH (II) CONTROL: 06FEB09-NFNF-0071-7HNA/C

V/ANSONG, THEOPHILUS KWAKU/EN1 USN
M/B/NEE6/N/[redacted]/[redacted]/GHANA, WEST AFRICA

COMMAND/USS SAN ANTONIO (LPD 17)/07207

MADE AT/NFNF/NORFOLK VA/BRAD S. DUCKWORTH, SPECIAL AGENT

REFERENCES

(A) NCISFO NORFOLK VA ROI (INTERIM)/20FEB09 (Contains Exhibit 1)
(B) NCISFO NORFOLK VA ROI (INTERIM)/16MAR09 (Contains Exhibit 2)
(C) NCISFO NORFOLK VA ROI (INTERIM)/13APR09
(D) NCISFO NORFOLK VA ROI (INTERIM)/13MAY09 (Contains Exhibits 3 & 4)
(E) NCISFO NORFOLK VA ROI (INTERIM)/15JUN09
(F) NCISFO NORFOLK VA ROI (INTERIM)/15JUL09
(G) NCISFO NORFOLK VA ROI (INTERIM)/17AUG09
(H) NCISFO NORFOLK VA ROI (INTERIM)/24AUG09 (Contains Exhibits 5 & 6)
(I) NCISFO NORFOLK VA ROI (INTERIM)/29SEP09 (Contains Exhibits 7 & 8)

EXECUTIVE SUMMARY

1. On 04Feb09, an 11 meter Rigid-Hulled Inflatable Boat (RHIB) assigned to the USS SAN ANTONIO (LPD 17) (SAN) was involved in a mishap while being lowered into the water via the onboard crane system in support of operational testing of the RHIB's engines. The mishap resulted in three sailors having to abandon the RHIB wherein two sailors were rescued and the third sailor, EN1 Theophilus Kwaku ANSONG, USN (V/ANSONG), was never located during the ensuing search and rescue mission. Due to the remote location of the SAN during the mishap and the lack of apparent criminality, Reporting Agent (RA) was not able to be transported to the SAN in a timely manner. Guidance was provided by Reporting Agent (RA) to the appointed Command's Investigating Officer (IO) via e-mail and phone. Subsequently, a Safety Board Investigation (SBI) team was established to conduct a safety investigation into the mishap.

2. RA reviewed the Command Investigation (CI) to include interviews conducted and statements provided by approximately 26 witnesses. Additionally, RA was provided a limited brief on the results of the SBI. Neither investigation uncovered any information to suggest the mishap was caused by any criminal acts. Contributing factors in the death of V/ANSONG were identified as follows; the engines on the RHIB failed to start prior to entering the water, the inability to maintain the sea painter line caused the RHIB to drift aft and strike the port side accommodation ladder, and the MK-1 Life Preserver being worn by V/ANSONG at the time of the mishap appears to have been too large. Final endorsement from NAVCENT and final DD Form 1300 has been received. A NCISFO Norfolk Death Review Panel (DRP) was convened and voted unanimously to close this investigation.

NARRATIVE

**FOR OFFICIAL USE ONLY**

*Page 1*

**WARNING**

THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

06FEB09-NFNF-0071-7HNA/C

SUBJ: V/ANSONG, THEOPHILUS KWAKU/EN1 USN

## U.S. NAVAL CRIMINAL INVESTIGATIVE SERVICE

1. This investigation was initiated to document the facts and circumstances surrounding the mishap occurring onboard the SAN during RHIB operational testing which resulted in the apparent death of V/ANSONG.

2. References (A) through (H) document investigative activity to date. Subsequent to the submission of Reference (H), RA briefed the status of this investigation to the DRP on 21Oct09 which voted unanimously to close this investigation.

DISTRIBUTION
NCISHQ: 0023B
INFO: NFNF

**FOR OFFICIAL USE ONLY**



**WARNING**
THIS DOCUMENT IS THE PROPERTY OF THE NAVAL CRIMINAL INVESTIGATIVE SERVICE
CONTENTS MAY BE DISCLOSED ONLY TO PERSONS WHOSE OFFICIAL DUTIES REQUIRE ACCESS HERETO. CONTENTS MAY NOT BE DISCLOSED TO THE PARTY(S) CONCERNED WITHOUT SPECIFIC AUTHORIZATION FROM THE NAVAL CRIMINAL INVESTIGATIVE SERVICE.

[House Hearing, 111 Congress]
[From the U.S. Government Publishing Office]

[H.A.S.C. No. 111-174]

# FLEET READINESS

JOINT HEARING

BEFORE THE

SUBCOMMITTEE ON READINESS

MEETING JOINTLY WITH

SUBCOMMITTEE ON SEAPOWER AND EXPEDITIONARY FORCES

OF THE

COMMITTEE ON ARMED SERVICES

HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

HEARING HELD

JULY 28, 2010

U.S. GOVERNMENT PRINTING OFFICE
61-771 WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office,
http://bookstore.gpo.gov. For more information, contact the GPO Customer
Contact Center, U.S. Government Printing Office. Phone 202-512-1800, or
866-512-1800 (toll-free). E-mail, gpo@custhelp.com.

SUBCOMMITTEE ON READINESS

SOLOMON P. ORTIZ, Texas, Chairman

| | |
|---|---|
| GENE TAYLOR, Mississippi | J. RANDY FORBES, Virginia |
| SILVESTRE REYES, Texas | ROB BISHOP, Utah |
| JIM MARSHALL, Georgia | MIKE ROGERS, Alabama |
| MADELEINE Z. BORDALLO, Guam | TRENT FRANKS, Arizona |
| CAROL SHEA-PORTER, New Hampshire | K. MICHAEL CONAWAY, Texas |
| JOE COURTNEY, Connecticut | DOUG LAMBORN, Colorado |
| DAVID LOEBSACK, Iowa | ROB WITTMAN, Virginia |
| GABRIELLE GIFFORDS, Arizona | MARY FALLIN, Oklahoma |
| GLENN NYE, Virginia | JOHN C. FLEMING, Louisiana |
| LARRY KISSELL, North Carolina | FRANK A. LoBIONDO, New Jersey |
| MARTIN HEINRICH, New Mexico | MICHAEL TURNER, Ohio |
| FRANK M. KRATOVIL, Jr., Maryland | CHARLES K. DJOU, Hawaii |
| BOBBY BRIGHT, Alabama | |
| JOHN GARAMENDI, California | |
| DAN BOREN, Oklahoma | |
| HANK JOHNSON, Georgia | |

Vickie Plunkett, Professional Staff Member
Lynn Williams, Professional Staff Member
Katy Bloomberg, Staff Assistant

------

SUBCOMMITTEE ON SEAPOWER AND EXPEDITIONARY FORCES

GENE TAYLOR, Mississippi, Chairman

| | |
|---|---|
| SOLOMON P. ORTIZ, Texas | W. TODD AKIN, Missouri |
| JAMES R. LANGEVIN, Rhode Island | ROB WITTMAN, Virginia |
| RICK LARSEN, Washington | ROSCOE G. BARTLETT, Maryland |
| BRAD ELLSWORTH, Indiana | J. RANDY FORBES, Virginia |
| JOE COURTNEY, Connecticut | DUNCAN HUNTER, California |
| JOE SESTAK, Pennsylvania | MIKE COFFMAN, Colorado |
| GLENN NYE, Virginia | THOMAS J. ROONEY, Florida |
| CHELLIE PINGREE, Maine | |
| MARK S. CRITZ, Pennsylvania | |

Will Ebbs, Professional Staff Member
Jenness Simler, Professional Staff Member

C O N T E N T S

----------

CHRONOLOGICAL LIST OF HEARINGS
2010

Page

Hearing:

Wednesday, July 28, 2010, Fleet Readiness........................ 1

Appendix:

Wednesday, July 28, 2010.......................................... 33

----------

WEDNESDAY, JULY 28, 2010
FLEET READINESS
STATEMENTS PRESENTED BY MEMBERS OF CONGRESS

Forbes, Hon. J. Randy, a Representative from Virginia, Ranking Member, Subcommittee on Readiness.............................. 2
Ortiz, Hon. Solomon P., a Representative from Texas, Chairman, Subcommittee on Readiness.................................... 1
Taylor, Hon. Gene, a Representative from Mississippi, Chairman, Subcommittee on Seapower and Expeditionary Forces............. 4
Wittman, Hon. Rob, a Representative from Virginia, Subcommittee on Seapower and Expeditionary Forces.......................... 4

WITNESSES

Harvey, Adm. J.C., Jr., USN, Commander, U.S. Fleet Forces Command; accompanied by Vice Adm. William Burke, USN, Deputy Chief of Naval Operations for Fleet Readiness and Logistics, and Vice Adm. Kevin McCoy, USN, Commander, Naval Sea Systems Command........................................................ 5

APPENDIX

Prepared Statements:

Akin, Hon. W. Todd, a Representative from Missouri, Ranking Member, Subcommittee on Seapower and Expeditionary Forces.. 43
Forbes, Hon. J. Randy...................................... 41
Harvey, Adm. J.C., Jr., joint with Vice Adm. William Burke and Vice Adm. Kevin McCoy................................. 46
Ortiz, Hon. Solomon P...................................... 37
Taylor, Hon. Gene.......................................... 40

Documents Submitted for the Record:

[There were no Documents submitted.]

Witness Responses to Questions Asked During the Hearing:

Mr. Coffman................................................ 53

Questions Submitted by Members Post Hearing:

Mr. Ortiz.................................................. 57

FLEET READINESS

----------

House of Representatives, Committee on Armed Services, Subcommittee on Readiness, meeting jointly with Subcommittee on Seapower and Expeditionary Forces, Washington, DC, Wednesday, July 28, 2010.

The subcommittee met, pursuant to call, at 10:02 a.m., in room 2118, Rayburn House Office Building, Hon. Solomon P. Ortiz (chairman of the subcommittee) presiding.

OPENING STATEMENT OF HON. SOLOMON P. ORTIZ, A REPRESENTATIVE FROM TEXAS, CHAIRMAN, SUBCOMMITTEE ON READINESS

Mr. Ortiz. The subcommittee will come to order. Today, the Readiness and Seapower and Expeditionary Forces Subcommittees meet to hear testimony on issues affecting the readiness of the non-nuclear fleet.

I want to thank our distinguished witnesses from the Department of the Navy for appearing before the subcommittee today.

Admiral Harvey, as you note in your prepared statement, you and your colleagues are here today because the Surface Force's overall readiness trends remain in the wrong direction. When the Navy Board of Inspection and Survey in April of 2008 deemed the USS Chosin and the USS Stout unfit for combat operations because of their material readiness condition, it confirmed the subcommittees' concern regarding the readiness of the Surface Force.

The Readiness Subcommittee in March, 2009, examined issues the Navy faces in sustaining its Surface Force ships for their expected service life and beyond. The Navy reported at that hearing that it had begun taking steps to address gaps in ship maintenance funding and to address material conditions through a pilot program of technical inspections.

Since last spring, however, other reports and incidents have come to the subcommittees' attention that once again raise the issue of whether the Navy can achieve, let alone extend, the design service life of its Surface Force ships. These reports and incidents call into question the ability of the surface fleet to accomplish assigned missions. Concerns range from quality assurance issues affecting the USS San Antonio, the lead ship in the new LPD [Landing Platform Dock] class of amphibious transport docking ships, to the conclusion of a Fleet Review Panel that Surface Force readiness has degraded to a point that it is well below acceptable levels to support reliable, sustained operations at sea.

The subcommittees today will examine the factors that appear to have contributed to these concerns. These factors are