wide-ranging in nature and comprehensive in impact, from manpower and manning to funding, training, equipping, command, and control culture.

We also will address what steps the Navy has taken to move from a period of degraded readiness where, as you noted, Admiral Harvey, commanders were allowed to operate and maintain their ships below established standards, back to a Navy that fulfills our sailors' expectations regarding their deployment readiness--where effectiveness is more important than efficiency.

Our witnesses today are Admiral John Harvey, Commander, Fleet Forces Command; Vice Admiral William Burke, United States Navy, Deputy Chief of Naval Operations, Fleet Readiness and Logistics; and Vice Admiral Kevin McCoy, Commander, Naval Sea Systems Command.

[The prepared statement of Mr. Ortiz can be found in the Appendix on page 37.]

Mr. Ortiz. The chair now recognizes the distinguished gentleman from Virginia, Mr. Forbes, the ranking member of the Readiness Subcommittee, for any remarks that he would like to make.

Mr. Forbes.

STATEMENT OF HON. J. RANDY FORBES, A REPRESENTATIVE FROM VIRGINIA, RANKING MEMBER, SUBCOMMITTEE ON READINESS

Mr. Forbes. Thank you, Mr. Chairman, and thank all you gentlemen for your service to our country and for being here today. We are having this hearing today because it has become wholly evident that decisions driven by near-term budget pressures have resulted in long-term impacts to the fleet.

This committee has consistently warned of the risk associated with Navy's resourcing decisions over the last several years. Despite those warnings and efforts to get the Department of Defense [DOD] to consider long-term requirements, the trend of declining readiness is undeniable. Some may think we ask for things like the 30-year shipbuilding plan, the annual report on China, and the Quadrennial Defense Review [QDR] because we just need a few more reports to read each night. In fact, we legislated the specific requirements to these plans and reports because we consistently see the Department taking a rather myopic view when it comes to resourcing decisions. We live in a world where fiscal restraint is a national security imperative. The problem is that the DOD has taken a view that fiscal restraint means they take actions that are contrary to their own best interest.

Admiral Harvey, I appreciate you coming before the committee today. And I am looking forward to your oral testimony and the rest of today's discussion. But for the sake of those that don't have a copy of your written testimony before them, I would like to take just a second to highlight some of the things you provided in your written submission to the committee.

You note that risk to the Navy is ``moderate, trending to significant,'' and that your investigation into the related readiness issues found that ``the cumulative impacts of cost-cutting decisions made over the last two decades had begun to degrade Surface Force readiness.'' You go on to note that ``these trends were 20 years in the making and will take constant pressure over time to resolve.''

Admiral, this is exactly why we ask for plans that contain a 20- to 30-year outlook. Instead, oftentimes the reports we get are somewhat narrowly focused and they fail to identify the long-term consequences of the decisions that are being made. The problems we are talking about today are problems which

result from a QDR that fails to look out 20 years and, instead, focuses on the here and now.

The Navy chose to substantially short-change sustainment and manpower accounts in order to extract savings to pay for procurement and modernization efforts. The culmination of several resourcing decisions over time has reduced the skills of our sailors and significantly reduced the surface life of the ships we were counting on for decades to come. This is the equivalent of saving up to buy a nice, fancy new car, knowing all the while that you won't be able to afford to change the oil or rotate the tires.

The budgeters in the Department seem to just push those expenses outside the 5-year budget cycle and hope that someone else will come along and fix the problem. The problem with that approach is that there is no magical cash cow outside the FYDP [Future Years Defense Plan]. Year 6, year 7, year 8, even year 20, are likely to be just as constrained as year 2. But no one inside the DOD seems to be willing to admit that, and no matter how hard we try, we can't seem to get them to acknowledge the obvious, much less put a plan in place to deal with it.

So we now find ourselves with several bills to pay--bills to cover corrosion and ship repairs because preventive maintenance actions were not done or were deferred; bills to cover end-strength requirements to reestablish the cadre of experienced enlisted sailors and instructors; and bills to cover critical parts shortages and tools that were at one time deemed to be ``excess requirements.''

I don't know what that bill is. I haven't seen it. But I can guarantee my colleagues it is going to cost the taxpayers a lot more than it would have if we would have just resourced those readiness needs in the first place.

Mr. Chairman, I don't know what it is going to take for all of us to realize that we have got to develop a reasonable long-term approach that balances sustainment with the need for modernization and recapitalization.

Gentlemen, I know you are good men. You have served your country well. And we want to come together and try to find a partnership of how we can just make sure that we are moving our Navy forward in the direction that is going to guarantee the safety and defense of our country.

Thanks for taking time to be with us today.

Mr. Chairman, I yield back the balance of my time.

[The prepared statement of Mr. Forbes can be found in the Appendix on page 41.]

Mr. Ortiz. The chair recognizes my good friend, the chairman of the Seapower Subcommittee, Mr. Taylor, for his remarks.

## STATEMENT OF HON. GENE TAYLOR, A REPRESENTATIVE FROM MISSISSIPPI, CHAIRMAN, SUBCOMMITTEE ON SEAPOWER AND EXPEDITIONARY FORCES

Mr. Taylor. Thank you, Mr. Chairman. With your permission, I am going to submit a statement for the record.

Mr. Ortiz. No objection. So ordered.

Mr. Taylor. Mr. Chairman, I want to thank you so much for having this hearing. I think everyone here shares the same goal, and that is a 313-ship Navy that is fully capable of defending our Nation for years to come. The Navy has been given the additional mission of providing our Nation's national missile defense. So it is particularly troubling when there are headlines in the Navy Times about the Aegis radar systems being inoperable or at less than optimum use. There are a lot of things that are causing this.

The two sailors who were apprehended in Afghanistan this

week are a painful reminder of the demands being made on the Navy for things that are not normally their mission and the need for individual augmentees to go help the Army and the Marines in their missions in Afghanistan, often taking people away from what we train them to do, which really causes two problems. It puts them in a position where they are not fully trained for the mission in Afghanistan; but it also takes someone who is trained to be manning a radar, someone who is trained to be a hull technician, and takes them away from the ship where they need to be, with the result of less-than-operable ships.

If we are going to get to 313 ships, we have to have ships that last for 30 years. And, with optimal manning, we have seen crew sizes reduced to a point where maintenance is not getting done, electronics are not being repaired in a timely manner. And the other shortsighted cost-saving attempt was buying spares, which means that they weren't there when the ships needed them to replace the parts that are worn out.

So I hope we will get some answers today from our panel in front of us. We, obviously, have some challenges. But I think we all share the same goal of a 313-ship Navy--a Navy that continues to be the world's greatest for decades to come.

I yield back.

[The prepared statement of Mr. Taylor can be found in the Appendix on page 40.]

Mr. Ortiz. The Chair recognizes the distinguished gentleman from Virginia, Mr. Wittman, for any remarks that he would like to make.

STATEMENT OF HON. ROB WITTMAN, A REPRESENTATIVE FROM VIRGINIA, SUBCOMMITTEE ON SEAPOWER AND EXPEDITIONARY FORCES

Mr. Wittman. Thank you, Mr. Chairman. I will begin by asking for unanimous consent to entering Ranking Member Akin's remarks into the record.

[The prepared statement of Mr. Akin can be found in the Appendix on page 43.]

Mr. Ortiz. So ordered. And now we are going to proceed with your statement, Admiral Harvey.

Mr. Wittman. Just for a moment. I wanted to thank the admirals for joining us today. We appreciate your dedication and your service to our Nation. As you know, I think all of us here believe that there are some significant challenges out there ahead for the Navy; that operational capability concerns us all. As you know, the term ``Ao'' [Operational Availability] means a lot to a lot of people up and down the line. And that operational capability, as we see today, is something that is critical and something that we absolutely have to address, just as Chairman Taylor said.

As we look at the number of ships we have, those ships that are in service, the needs that those ships have as far as needing maintenance is of considerable concern to us, especially as we look at the challenges that we face around the world. And if you look at our Naval force structure, I think all of us believe that there are many areas where the demand far exceeds the capability to meet that demand. And that is becoming more and more of an issue, more and more of a concern for us.

As you know, there are only a certain number of dollars to go so far; and that is where we need to really be focusing this discussion, is to say within that context, let's get back to the basic element of what is strategically needed for this Nation.

And I realize, ultimately, budgets do drive things, but they ought to drive things in a reverse order. This body ought

to have before it the full need of what the Navy has before it, whether it is maintenance of the ships it has, the ships we need to be constructing in the future, and then make sure that we put those in context of the decisions that need to be made. And that is, I think, more critical than ever these days: to make sure that strategy decides our decision-making, not having budgets drive our decision-making.

I realize budgets are a reality, but I think if we look at the challenges around the world that the Navy faces in its needs, ``We have got a lot to do, and a short time to get there,'' as the old saying goes.

So I appreciate your commitment. I look forward to your testimony today and look forward to your insights as to how we can make sure that the readiness of our non-nuclear surface fleet is where it needs to be. And that, I think, is critical as we go forward.

So, Mr. Chairman I thank you, and I yield back.

Mr. Ortiz. Thank you. Like I have always stated, we belong to the same team. And in order for this subcommittee or for the full committee to be able to help you, not that you haven't been candid in the past, but we need you to be candid with us and tell us exactly how we can help you; what is wrong, what can we do, how can we help?

STATEMENT OF ADM. J.C. HARVEY, JR., USN, COMMANDER, U.S. FLEET FORCES COMMAND; ACCOMPANIED BY VICE ADM. WILLIAM BURKE, USN, DEPUTY CHIEF OF NAVAL OPERATIONS FOR FLEET READINESS AND LOGISTICS, AND VICE ADM. KEVIN MCCOY, USN, COMMANDER, NAVAL SEA SYSTEMS COMMAND

Mr. Ortiz. Admiral, whenever you are ready, sir.

Admiral Harvey. Thank you, sir.

Chairman Ortiz, Chairman Taylor, Representative Forbes, Representative Wittman, members of the Readiness Subcommittee and the Seapower and Expeditionary Forces Subcommittee, I do appreciate this opportunity to discuss the number one issue I face every day, which is the readiness of our fleet, and in particular the readiness of our surface fleet. And I would ask that my previously delivered written statement be entered into the record, sir.

Mr. Ortiz. No objection. So ordered.

Admiral Harvey. Thank you, sir. To your comment about being on the same team, there has never been a doubt in my mind. And that was proven last night with the vote taken here that will move the funding to where we need it desperately in this year to keep going on many of the corrective measures we have put in place to deal with the issues that all of you have just remarked upon in your opening statements. So I do thank you on behalf of the sailors and Fleet Forces Command for the actions last night in approving that funding bill.

Readiness is my top issue every day. And, in my view, there are four components of a ready force: sufficient numbers of high-quality people; well-maintained and ready equipment; units that are properly supplied; and effective training programs.

I believe the first component is the most important. Readiness begins and ends with high-quality sailors. And we risk our ability to retain high-quality sailors if we do not provide them with the tools, the training, and the time required to deploy, confident in their ability to accomplish their assigned missions.

Our Navy, our deployed surface force, is ready today. Our response to Haiti, while continuing all the other missions we are currently executing around the globe, is not the hallmark of an unready force.

But some key readiness trends are certainly in the wrong

direction, as highlighted by unsatisfactory and degraded Board of Inspection Survey results over the last few years. These trends, as you have commented upon, sir, were 20 years in the making and will not go away overnight. But if not turned around through a determined and steady process, they will impact our ability to sustain today's high operational tempo into the future and ensure today's fleet can reach its expected service life; which is precisely why Admiral Willard, then the Commander of the Pacific Fleet, and I established the Fleet Review Panel, to determine the facts and identify the root causes behind the trends we were experiencing with our Surface Force.

We chose Vice Admiral (Retired) Phil Balisle to lead this panel because of his extensive operational and command experience at sea, as well as service to shore in positions of significant responsibility with respect to the sustainment and maintenance of the fleet. He had the background necessary to determine the facts and the determination to follow the facts wherever they led. In our view, he had the credibility, independence, and experience to take a long, deep look at the problem across the entire manned, trained, and equipped spectrum.

Admiral Balisle gave us a good sight picture of what had happened over time. We let the effort to generate execution-year savings, year after year, overtake our culture of operational effectiveness, and he confirmed much of what we needed--Admiral Willard and I, now Admiral Walsh and I--what we needed to go and do, which we have gone and are doing.

A constant undercurrent within the negative trend lines of our Surface Force readiness was the unreliable performance of USS San Antonio. The LPD-17 class represents Navy's strong and enduring commitment--strong and enduring commitment--to expeditionary operations, power projection, and strategic engagement. This ship is extremely important to the future of the Navy and Marine Corps team. We had to find the facts behind recurring problems with her propulsion plant and put a corrective plan in effect as soon as practicable. We have done so. The plan is in execution, and our lessons learned are being applied to the other ships of this class. With the completion of the Fleet Review Panel report and the San Antonio investigation, we now have a clear sight picture of the root causes behind the negative readiness trends we have observed in our Surface Force.

With regard to the Littoral Combat Ship, the LCS, I believe it is critical that we, Navy, adapt to the LCS, and we do not force the LCS and her crews to adapt to an institutional fleet model. We must be more forceful to ensure we do not expect this ship to be a destroyer. It was designed, built, and manned to specific littoral missions, and is not meant to run with a carrier strike group in blue water over an extensive period of time. We deployed her essentially 2 years early to greatly accelerate our learning curve with this ship, which was built with research and development funds. It was a brilliant move by our CNO [Chief of Naval Operations].

I see tremendous opportunities for this ship if we truly take the time to learn and then act deliberately on the facts we determine. Quickly transitioning LCS to the fleet and getting our ships to expected service life are critical to growing our fleet, as you have stated. We have to learn to man our fleet with about 324,000 sailors, which I believe, based on my 2\1/2\ years as the Chief of Naval Personnel, is about the right number for the fleet size we are attempting to achieve.

But I also know we still need to work the distribution of our people to ensure we get the ``train and maintain'' piece correct; in particular, properly manning our optimally manned

ships and creating the billets ashore to reestablish a seashore flow between ship and intermediate-level maintenance organizations to develop the skilled, experienced petty officers and chief petty officers we must have.

So we will arrest the negative trends. We will redistribute manpower. We will target resources at root causes to get maximum impact. And we will sustain our efforts over time to get our ships to service life. We will stay on it.

And I would certainly be happy to respond to any questions you may have, sir.

Thank you.

Mr. Ortiz. Thank you.

[The joint prepared statement of Admiral Harvey, Admiral Burke, and Admiral McCoy, can be found in the Appendix on page 46.]

Mr. Ortiz. I have some questions that I would like to begin with. My first question will be, Why didn't the Navy understand the overall--the big, big-picture impact of the incremental changes that were made over the past two decades in the name of efficiency and cost-cutting? And does the Navy have enough people to correct Surface Force ship manning and reverse degraded readiness?

Is there any truth to a recent Navy Times report that the Navy could cut as many as 25,000 sailors and officers from its ranks over the next few years?

And I know I am asking too many questions at the same time, but you take time to respond. What budgetary changes have been made and what programmatic changes are being considered to address the man-train-equip issue cited in the report?

Admiral Harvey. Yes, sir, you did ask a few questions there, but I will get at them the best I can. First, and to the most important one because of the potential impact it has on our sailors today.

I know of no plan, I know of no planning in place to cut an additional 25,000 sailors from today's fleet. I have just testified to the fact that I think around 324,000 sailors is the right number for 313 ships. I would react strongly to any plan that would take us an additional 25,000 sailors below that. I find that a statement that, wherever it was attributed to, to be wildly off the mark.

To your second question in terms of manning. Again, I think it is based on a distribution issue, sir. We have taken steps today, in the recent past, to improve our manning on the LPD-17 class with the lessons we learned from the JAGMAN [Judge Advocate General Manual] investigation that I ordered. We have redistributed manning today onto our LSDs and our LHAs in the engineering department. We have done that today. We have a plan to continue this redistribution through fiscal year 2011, and a larger plan for redistribution in 2012 and out, which is under discussions now as part of the building of the POM [Program Objective Memorandum] 2012.

So we are taking steps, sir, to effect that redistribution that you just talked about. I think that we can execute those steps, not based on wishful thinking, but based on what I learned during my time as Chief of Naval Personnel and things that are within the Navy's power to do. So I think we can move forward in that, and we are moving forward right now, to achieve those goals.

As to the larger question you asked, Well, how did it all happen? I certainly have been part of this for the last--I have been a flag officer for 10 years. I was promoted in December of 2000. Very intimate with many of the details that we are talking about here. And I see my own experience as kind of indicative of what may have happened in the larger sense.

I think in the surface fleet in particular, we got very

focused on what can we do this year to save money, and we were not focused on what do we get out of the long haul from all this. In my experience in Fleet Forces Command, I have seen a much stronger governance model in our submarine force and in our aviation force. I think it is particularly because the results of failure are so much higher. A plane will come out of the sky, a submarine will not surface if we don't get it exactly right. And so that intensity that grows from those kind of results was missing in our review, I suspect, of surface fleet changes that were made over time.

We also were very, very focused on meeting operational demand, as Representative Wittman has discussed, and I think that focus on meeting the Ao, getting out there and answering every combatant commander demand for the surface ship, today we have 60 percent of your fleet is underway; 43 percent of your fleet is forward deployed. Those figures are unprecedented in my experience. And we have sustained that 60 percent or above figure for over a month. Routinely, we have been deploying over 50 percent of the fleet underway every day. So we have really been focused on the Ao and not focused enough on the implications of what meeting that Ao, that operational demand from the combatant commanders, needed day after day, month after month, year after year.

The trends we see now in our INSURV [Board of Inspection and Survey] reports, that started the ball rolling. We now have a really good sight picture of what we have to do. And I feel that with the sustained funding that we saw in fiscal year 2010, that we have submitted fiscal year 2011, and will be part of the 2012 POM bill, I think if we maintain that funding, continue the redistribution plans that we have recommended, I think we can go a long way towards arresting those trends and, just as importantly, ensuring the fleet gets to its expected service life and make that 313 number a reality.

Mr. Ortiz. You mentioned that what we need to do is to be sure that we have sufficient personnel to man those ships. If we are going to extend the life of these ships, we cannot, in my opinion, cut corners. We need to be able to maintain it and, like I say, to supply it.

In the past, we have had testimony that we don't think we have enough personnel on the ships. I don't know whether through your experience and learning from past experiences if you were able to come up with the same conclusion that we need more personnel so that we can, in an efficient way, do what we need to do to extend the life of the ships.

Admiral Harvey. Yes, sir. We are putting more people onto these ships. We will put more into the fire controlmen on our destroyers and cruisers, our enginemen on LSDs and LPDs, and machinist mates on our LHDs and LHAs. But it is a redistribution of those sailors that we already have within the larger 324,000.

Also, one of the important things that I think was lost along the way is, as all these initiatives were going down their own tracks, each of these initiatives, whether it was in the manning world, in the maintenance world, or the resourcing world, all of them were based upon certain assumptions coming true. And when the assumptions didn't fully come true, the plan didn't change. We continued. And so I see that as really at the heart of the matter. Optimal manning depends upon a vigorous shore support capacity. We were down this road before.

I was in the commissioning crew of USS McInerney, FFG-8, back in 1978 and 1979. A minimally manned ship. Not an optimally manned ship. A minimally manned ship. We showed up in Mayport, Florida, and I took the work package over to the shore intermediate maintenance activity, as it was supposed to be

done. I was laughed out of town and told, ``Hey, that's your problem, Harvey. Get on it.''

We did not fulfill the assumption that a minimally manned ship needed significant additional help to do the fundamental maintenance. We didn't get it right then. And I don't think we got it right now on the shore support piece. That is why we are so focused on the LCS. We can't afford to get that wrong.

Mr. Ortiz. Now, we also wondered, you know, about--we are seeing now more Navy boots on the ground in Afghanistan and Iraq. I don't know how many numbers are there, but this has taken away from doing the job, like Chairman Taylor stated a few moments ago. Do you have any idea how many boots on the ground we have in Iraq or Afghanistan?

Admiral Harvey. As of today, we have about 6,500 sailors on an individual augmentee [IA] assignment in Afghanistan and about 2,300 left in Iraq.

Mr. Ortiz. Could this be one of the reasons why you need more people to be able to operate and maintain the ships?

Admiral Harvey. Certainly those are sailors who, if they weren't in Afghanistan or Iraq, would be doing something, not all of them on ships. Many of them are in skill sets that come out of the shore establishment.

Admiral McCoy has a significant number of engineering duty officers that are performing important jobs there. We have senior supply corps officers doing important jobs in contracting to maintain control of all those funds that are going over there.

So I can say it is not a reason. If someone says that is bringing us down, I would disagree with that. I know the impact. I know where those IAs come from, which ships we bring them from. We have increasingly, over time, put safeguards in place to ensure we don't take them from certain ships that are already in a manning-constrained environment.

So, yes. Does it make the daily job tougher for some ships, for some sailors, for some squadrons? Absolutely. But it is an important mission for the war. And some of those are missions that only our sailors can do. And so when faced with the greater good, I think the Navy has made exactly the right choice. And I stand up in front of our sailors every day and I tell them as long as those conflicts are going, we are going to have IAs over there. We are where we are. They are doing a vital mission and they are a large part of the progress we have made. I am proud of what they have done. I expect it to continue. But I don't see that as the reason that I would say is bringing any unit to its knees in terms of sustaining that IA effort, sir.

Mr. Ortiz. And I am just going to have the last question, short. Going back and looking as to what maybe went wrong, did you find that the people who were building these vessels supplied the best material? Did you find any material used to build the ship was inferior?

Admiral Harvey. I think I will defer to Admiral McCoy on that question, sir. He has a far better picture of that aspect of the LPD-17 issue than I do right now.

Mr. Ortiz. Admiral.

Admiral McCoy. Thank you very much, Mr. Chairman. To address your question.

Mr. Ortiz. My question was, going back and looking at some of the experiences in the back, a few years back, and why they are deteriorating. Were there any facts that maybe the material used to construct these ships were inferior; were not the top-quality material that should be used?

Admiral McCoy. Mr. Chairman, no, sir. In terms of the basic materials and components, we did not find that they were a contributor. What we did find was the fundamental construction

processes used by the shipbuilder, for example, on the LPD-17 class, the fundamental government oversight at the supervisor shipbuilding, and then some sub-optimized system designs were responsible for the failures, principally on the LPD-17 class main engines and on the piping systems.

Mr. Ortiz. I am going to yield to my good friend, Mr. Forbes.

Mr. Forbes. Thank you, Mr. Chairman.

As the chairman mentioned, we appreciate so much you being here. We view this as a team. But, Admiral Harvey, I will tell you, oftentimes my frustration is I think we are viewed as a team when it comes to appropriating money to spend, but we are not always viewed as a team when it comes to sitting down and looking at the choices we have for the long-term consequences of where those dollars are--effects they are going to have down the road.

We appreciate the three of you. You are the guys we have got at the table today, so we are not pointing fingers at any particular person. But we don't have the luxury of going over to the Pentagon, walking down halls and stopping in people's offices and saying, ``What assumptions are you basing this on?''

One of the things that is so frustrating to us is, Admiral, as you mentioned, you said, ``The projections are based on assumptions. And when assumptions do not come true, the outcome is not obtained.'' Over and over again, we are trying to get at those assumptions. And we just feel like we just get stonewalled in trying to find out what are the assumptions so we can look at those long-term impacts.

Admiral Burke, last week we were talking about the modeling and simulation capability that we have. You told us at that time that the models were fully accredited and enabled the Navy to project resourcing requirements based on a desired level of readiness.

Can you tell us how those models will be used to improve the forecasting and long-range resource management for the Navy and how we can get at being able to understand those models better so we can do just what Admiral Harvey was suggesting--look at the assumptions to see if the assumptions have some common sense to them and will work?

Admiral Burke. Sir, let me try. Mostly, we are talking about ship maintenance, oh let me start with that. The ship maintenance model is a set of spreadsheets and databases, and it is designed to program and budget for depot and intermediate maintenance for our ships and submarines. It has a variety of inputs. Those inputs are the force structure, the class maintenance plan, fleet depot maintenance schedule, material and labor costs, and workload standards. So those inputs are critical. And what you get out is determined by what you put in. And what we put in in the past is a class maintenance plan that has not had a view for long-term maintenance to get at expected service life.

So that is what Admiral McCoy's guys have been working on for the DDG-51 class and the LSD-4149 in preparation for the 2012 budget. They have revised that class maintenance plan. So that will now be--and I will let him talk about this some more--but that is now designed to get at long-term expected service life of these ships--long-term maintenance to get to the expected service life. The output of this model is a workload by location; the cost; and a backlog, if you don't put enough money into it.

The other thing that Admiral McCoy's guys are working on is the class maintenance plan is a notional class maintenance plan. So it tells you what the DDG-51--what is needed in the 51 to get it to expected service life, that long-term maintenance

that we had to some degree lost our way on, to what Admiral Harvey was talking about, where we are trying to make sure the ships are able to get underway. The focus was on getting underway. We needed somebody to focus on what it takes to get the ships to expected service life. That is what NAVSEA [Naval Sea Systems Command] is doing. And that is what they have done with this review of the class maintenance plan.

The other piece of this is how do you know what the specifics are on that ship--on DDG-55, for instance--that are different from the notional. That is another piece of what Admiral McCoy's folks are working on. And there is a plan to get through all the classes over the next couple of years to develop that improved class maintenance plan as well as to identify the differentials for the specific ships from the notional.

So back to the model again. If we improve the input, which we will do, that class maintenance plan will change the database that is designed as one of the inputs, down to the level of what does it take to repair this specific pump and how frequently should it be repaired; what parts, how many people, what level of capability is required. When that gets adjusted, that will adjust what comes out of the maintenance model, sir.

Mr. Forbes. Good.

Let me just ask one more question and any of you can respond to this. Again, we appreciate so much your expertise. We understand a lot of these issues are incredibly complex. And it is always great to look at them on Monday morning and look with hindsight. But some of it is not so complex and some of it comes down to some commonsense things.

One of the things that we have seen, recently the Navy submitted a 30-year shipbuilding plan that contained a profile that shows a funding increase of $2 billion per year in constant dollars in the middle of the plan. Now these are the years, incidentally, that coincide with the procurement of the Ohio class submarine, the platform the Navy has decided to fund from within the SCN [ship-procurement] account rather than request increased funding, with the Secretary of Defense requesting the Navy to find $28 billion in efficiencies over the next 5 years; with your own $523 million shortfall in fiscal year 2011 alone; with $3 billion in shipyard infrastructure shortfall; with what at least a couple of us believe is a very ill-conceived billion-dollar carrier move to Mayport; is there some way you can explain how the Navy will be able to increase the shipbuilding budget in those years?

Admiral Harvey. I think when you look at the totality of the budget within the Department of Defense and how we have to fund ship construction throughout a FYDP [Future Years Defense Plan] and submit a 30-year shipbuilding plan to you that makes an extraordinary number of assumptions--we know that those assumptions, the longer you go out in that shipbuilding plan, the less likely some of those assumptions are to hold for 10, 20 years--I find it not unreasonable to expect, here is a 30-year plan. Here is what we think we need to have over the next quarter or more of a century in order to sustain the fleet into the third part of this century.

So I don't find it unreasonable to put in there, Hey, this is what it is. This is what it would take to sustain this fleet. On the SSBN-X, in particular, we know the goal has to the got to be to deliver the minimum essential military requirement that that submarine needs at the most affordable cost. And I would say that the search for that answer is not over yet.

So there is considerable more work to be done in terms of that particular issue that may make that burden in the outyears far less onerous on the overall SCN account.

Those are my thoughts from Norfolk. I am pretty far away from the day-to-day thrust and parry of how you put together the shipbuilding plan and the 30-year shipbuilding plan. But I don't find what has been submitted, sir, unreasonable. Those assumptions are certainly true, that we are going to have to increase the SCN account. And what our Navy will look like in 5 and 10 years, in terms of the action the Secretary of Defense has directed us to go and take, may make indeed those assumptions very true for us.

So I hear you, sir. I don't see the hopelessness of it. I see something where we have a lot of work to do and a lot of time to do it.

Mr. Forbes. Admiral, I am not suggesting the hopelessness nature of it. What I am simply saying is that one of the statutory requirements of that shipbuilding plan is that the Secretary of Defense give a certification that the budget is sufficient to accomplish that shipbuilding plan. And it is just when you look at these numbers, it makes us scratch our head and say, how do you get from here to there with the numbers that we have been given. Laying out the needs is one thing, which I don't disagree with that; but I think if you look at some of these dollar figures, it is hard for us from a commonsense point of view to see how you get there. I think that is a question we need to be asking now instead of just 10 years down the road.

With that, Mr. Chairman, I yield back.

Mr. Ortiz. The chair recognizes Chairman Taylor.

Mr. Taylor. Mr. Chairman, thank you again for having this very important hearing.

Gentlemen, I am going to quote to you a paragraph in the Fleet Review Panel's report. It points out four things in particular that I find very alarming. What I am going to ask of you at the end of this is, I want to know who is responsible for fixing these four things; whether or not those four things have been fixed; and, if not, when they are going to be fixed.

The review of cruiser and destroyer reviews of the SPY radar health area of concern and a prior review of the SPY radar led the panel to state:

One, the technicians can't get the money to buy spare parts.

Two, they haven't been trained to the requirement.

Three, they can't go to their supervisor because, in the case of the DDGs, they likely are the supervisor.

Four, they can't repair the radar, through no fault of their own. But over time, the non-responsiveness of the Navy system, the acceptance of SPY degradation by the Navy system, and the senior officers and chiefs alike, will breed--if not already--a culture that tolerates poor system performance.

The fact that the requests for technical assistance are Navy-wide suggests there is a diminished self-sufficiency in the surface fleet. The sailors perhaps are losing their sense of ownership of the equipment and are more apt to want others to fix it.

Admiral Harvey, you correctly pointed out that we are not counting on the LCS to be the backbone of the fleet. We are counting on cruisers and destroyers--and particularly the destroyers--to be the backbone of the fleet.

I was an early convert to Admiral Roughead's decision to abandon the DD-1000 and go back to building 51s. I continue with that decision today. I am also an early supporter of his decision to put our Nation's missile defense on our Aegis destroyers, which makes this particular report all the more damning, since that is now the mainstay of our fleet.

If the radar of the mainstay of our fleet are not working because of lack of spare parts, because people aren't trained,

because it has now become accepted for them not to work, four questions: Who is responsible? Who is going to fix it? And when does it get fixed?

Admiral Harvey. Sir, the answer to that one is pretty easy. I am responsible. It is my job to ensure the readiness of the surface fleet. If I can't do it, I get moved out and they bring in somebody who can. I consider that my responsibility in terms of the training, in terms of providing the maintenance funding so that we buy the parts we need to do the fixes we need to sustain the Aegis system and all its supporting subsystems fit to fight. That is my responsibility.

In terms of the overall picture of the fleet, I believe I am on track to reverse these trends in the next 2 years if we stay on track with the investments we know we need to make in terms of our training, in terms of sustaining our maintenance availabilities, in terms of making sure our repair parts lockers are filled up appropriately. And we will drive to that via the BMD [Ballistic Missile Defense] mission that we have been given. That is a big driving factor for us, again, for which I am responsible for the readiness of the Navy to execute that mission.

So that is what I consider the answer to be, sir.

Mr. Taylor. So your timeline is 2 years?

Admiral Harvey. My timeline is to turn the trends in 2 years. I testified that we had negative trends. I believe that if we sustain the funding in 2010, if we get funding we need in 2011, and we redistribute our manpower as I have recommended, if we can do these things, we can turn those trends around in that amount of time, sir.

Mr. Taylor. Admiral, one of the observations from a retired officer whose opinion I respect is that in the effort to rush sailors to the fleet, that the training times have been reduced substantially, not only for the enlisted people but for the officers, and that too much emphasis has been put on training through computer modeling; too little emphasis has been put on actually having the sailor tear a compressor apart, tear an engine apart, rebuild a panel on an electrical system.

I agree with that observation. I am curious what, if anything, is being done to turn that around.

Admiral Harvey. Well, I agree with that observation, too. So I am glad you respect that retired officer's opinion, because I think he got it right.

Let me give you two examples of what we are doing right now, sir:

Number one is in junior officer training. A few years ago, we took a look at the training that was being provided at the Surface Warfare Officer School for the basic course in Newport, Rhode Island. It was a 6-month course. There was a widespread opinion that that was a course in which we crammed 6 weeks of work into 6 months. We didn't like the course. We didn't like the output of the course. It was inefficient. And we felt also that the ensigns and JGs [junior grade officers] attending that course didn't think much of it either.

So we were pretty fired up about computer-based training. And there was an idea that, hey, maybe we can save money. Take that course, digitize it, give it to the officers to do on their own, and be guided in that by their commanding officers. That experiment was a flat-out failure. Admiral Curtis recognized that early on in his tour, and we have brought back the Surface Warfare Officer introduction course in San Diego, Mayport, and Norfolk.

So we have got back to getting these junior officers some incredibly important training before they get to the ship, so they are not lost and confused and swimming in a big ocean by themselves when they get there, and not throw the entire burden

on a CO [commanding officer] who has already got a few other things to worry about. So that is being done right now, sir, and I suspect we will expand that course over time to do right by our junior officers and get them off to a strong first start.

The second piece, incredibly important, fire controlman training. Again, we saw in what was called the ``revolution in training'' the benefits that could accrue to us in terms of how we transmit this knowledge and how it is retained through the most modern computer-based training available. We found also that we met a standard, but that standard of training was too low. So lots was blamed on computer-based training when in fact there are indeed great advantages to it.

But you have got to set the standard right and you have got to augment it, you have got to balance it with a version of on-the-job training, which you probably grew up with in the Navy for the last 235 years. And so we have done that.

I was just in Dahlgren last week looking at the changes we have made at our A school and our C school curriculums, the fundamental package by which we send a trained fire controlman to the fleet. We have made changes so that in our C school it is much more of an instructor-led environment. The classes I observed were one instructor, three students, who were through the basic course and now getting that intense training in big maintenance--the big maintenance issues. Not the easy stuff. The hard stuff. And so they get ready to get to their ship and be an impact player on arrival.

So we are making those changes, sir, in real time. We have got more to do, particularly in the enginemen rate, again, for these ships that have these complex diesel main propulsion engines. We are working on that at the engineman A and the follow-on schools. So I think we are going down the right track now. And I continue to push very, very hard to keep going down that track, sir.

Mr. Taylor. Admiral, lastly, I would think Mr. Bartlett and I would have a slightly different view of the LCS program than the rosy one you gave the subcommittee. I hope it is getting turned around. I hope that they will come in at a decent price. But thus far it is late, it is costly, and it is subject to protest, as opposed to Littoral Combat Ship. About the only other thing that could go wrong is if it didn't stay in the fleet as long as it should have.

What is the projected life of those vessels, and whose job is it to see to it that we get those years out of those ships?

Admiral Harvey. I think the view I presented, I would not characterize it as a rosy one, sir. I thought it was a realistic one from a fleet-user perspective. You were referring, I think maybe, to some issues on the acquisition side of the house. I was referring to what we are doing right now with the ships we have got that are out there sailing with the fleet as I speak.

I believe the service life for going forward for those ships is 25 years. Again, it is on me to ensure that, working with Admiral McCoy and his organizations, that we have a realistic maintenance plan in effect that we actually execute, that will do that maintenance, the deep maintenance over the long haul that will get those ships to their service life.

So I think it is up to me and Admiral McCoy to get that piece of it right, sir, and to get them to that service life.

Mr. Taylor. Admiral, let me commend you for your willingness to step forward and say, ``That's my job.'' That I like to hear. I hope you will instill it in the junior officers below you so that 5, 10, 15 years from now that now-lieutenant who is going to be a commander or captain is taking the same ownership responsibility for those vessels.

Admiral McCoy. Mr. Chairman, can I comment on part of your question and augment Admiral Harvey's statement?

I will tell you that I am responsible for the engineering and maintenance piece of our ships, both on the BMD side, which you talked about, as well as the LCS. And I will tell you that over the last 2 years, if you looked at NAVSEA, the area that we have refocused the most is on this piece--surface maintenance and getting it right; getting the fundamental engineering right; the underpinnings, the technical rigor behind the maintenance plans. In fact, every 60 days I meet with Admiral Harvey on the plan ahead and what we are doing to arrest the issues that we are talking about here. And I just spent an hour with the CNO [Chief of Naval Operations].

This year, we decommissioned USS Philadelphia and USS Los Angeles at 33 years, their designed ship life. We never doubted that we would get those ships to that point. In fact, those crews will tell you those ships went out more capable than the day they entered the Navy. And that is because we have an established process that gets to the technical rigor--when you do tanks, when you do pumps, when you do valves, when you do deep maintenance--and we don't depart from that. And we have the maintenance infrastructure both at the major shipyards as well as the intermediate level to in fact do that maintenance. And for the past 2 years we have been working on just that, and putting that in place for the surface wars. Because budgets are no good and budget problems tend to impact those who have the least data the most.

And so, in fact, because we have not had the technical underpinning of what should be a selected restricted availability on a DDG-51, what work should be done to get the ship to its full design life? When budget times got hard, because we didn't have the underpinning, we cut it. And there was no impact to that because we didn't have the fidelity. We are putting that in place.

We stood up the SSLCMA, the Surface Ship Life Cycle Management Activity, in 2009, to do exactly what the submarine force and the carrier community do. We have those plans. In fact, we increased surface maintenance $150 million this year because of the quick-look efforts that we did a year ago for the DDG-51 class that said we were way off the mark on the surface maintenance that we need.

In addition, we are working right now, and expect next year to get for the first time, program-related engineering and logistics budget line to the tune of about $47 million to do the ISEA [In-Service Engineering Agent] support, to do the things that you are talking about. So why didn't the ISEAs provide more support for the Aegis BMD, more training on the deck plate for our sailors? We will now be able to do that. In fact, I am working with a three-star panel that includes both fleet deputy commanders and director of the Navy staff to get the maintenance and sustainment and assessment piece right well into the future.

And so that is where we are headed. We are not reinventing anything. We are doing exactly what we have done on our submarine force and aircraft carriers that has proven successful.

Thank you, sir.

Mr. Ortiz. The chair recognizes Mr. Wittman.

Mr. Wittman. Thank you, Mr. Chairman.

Admiral Harvey, I want to go back, and I appreciate your comments about Ao and operational availability. I think that increased operational availability is critical. It still seems like to me, though, there are situations where demand still exceeds availability.

Let me point to a comment by Ranking Member Akin, where he

had said that the deployment of the 13th MEU [Marine Expeditionary Unit] may be delayed due to the material readiness condition of the USS Green Bay LPD-20. I just want to get you to confirm whether that is or is not the case.

Second, within that context, have other deployments of surface combatants or amphib vessels been delayed over the past 6 to 12 months due to the readiness of the fleet? And are you planning for more delayed deployments next year, based on operational availability? And what are the operational and personal impacts of those delays, if any?

I realize operational tempos have a lot to do with that too, and demand, but I want to get your perspective on that, and where we are, and that is a real-world situation that appears to be developing. I just want to get your comments on that.

Admiral Harvey. No, sir. Admiral McCoy will talk to the Green Bay specifically because he has the best knowledge on that. But in terms of making the deployment schedule for the MEUs, we are going to make the deployment schedule we have to make for our Marine Expeditionary Units and our Amphibious Ready Groups [ARG], and we will do what it takes to get there. Those are critically important in every theater, as we saw when we started the Haiti operation. And we diverted the Nassau ARG with the embark MEU down south to see if we were going to need them for the assistance; pushed them on into CENTCOM [United States Central Command].

But we certainly have had issues as we saw with the LPDs. I was very concerned whether we would deliver the LPDs on time and fix the ones that we have to get fixed. I am very confident now that we are going to be able to make all the deployments I see in the near future, on the right schedule for our ARG/MEUs, and make them with the full ARG set of ships. So I don't see future delays.

Now, certainly to be complete, we have reracked within those ARG/MEUs some of the ships that went. The Ponce is going over. We pulled her out for one more deployment because of the problems with San Antonio. But we made the deployment, we made the requirement, and we will continue to do that. Pretty much whatever it takes.

Now, does that have an impact on sailors if you move them from one schedule to the next? Absolutely. Today in Norfolk, the USS Dwight D. Eisenhower is arriving after a 7-month deployment. She had a 6-month break from her last one, okay? That is a huge impact on those sailors and their families, to the point of your question. We recognize that. But we also recognize the demands of the war we are in and we have to meet those demands. Our sailors recognize that and they are staying with us. So we are okay in terms of meeting our deployment schedules.

We are okay in terms of now I think we have got to understand what is going on with San Antonio. We will have that ship when I need it, and the rest of her class when we need them.

And I will get Admiral McCoy on the Green Bay in particular, sir.

Admiral McCoy. Yes, sir.

Congressman, earlier this spring, Green Bay entered a post-shakedown availability following new construction trials. During that time frame, we elected to install system modifications that we determined coming out of the San Antonio investigation, and other issues with main propulsion diesel engines on LPD-17 class. We changed the filtering systems. We also did some piping changes between the final strainer and the engine to eliminate socket welds and install butt welds so that we didn't have, possibly, contaminants and hideout places for

contaminants in the system. We also did a number of piping inspections and piping repairs due to inadequate fillet welds during the new construction process. Towards the end of that PSA, post-shakedown availability, we determined significant foreign material in the steering system that had fouled the rams and caused galling of the steering ram. And we had to go cut the deck and replace the ram, which made that PSA go long, which pushed the downstream schedule.

That has been repaired. The ship has been back out and completed final contract trials last week. And we expect the ship to take its place in the regular fleet rotation from thereon, sir.

Mr. Wittman. Very good. Thank you, Admiral McCoy.

Admiral Harvey, I want to go back to a more general scope question and ask you what measures are you putting in place to ensure that the Navy is going to stay committed to improving the readiness of the surface force over the long haul?

As you know, the Navy has already been directed to find $28.3 billion in efficiencies over the next 5 years. And that I think creates some significant challenges. We have seen too many examples, unfortunately, within those cost-cutting realms trying to front-load those savings but then being concerned about what are the long-term implications of that. And as Ranking Member Forbes had pointed out, if you look at the 30-year shipbuilding plan, there are some concerns about how the loading of the cost structure is there with the construction of ships and those costs.

Let me ask this. Under those challenges, how can you assure this committee that the Navy is truly committed to making the investments that it needs into the future within context of all those cost requirements and training, manning, maintenance, testing and quality assurance, to ensure that we are able to sustain operations? And I think that is the key, not knowing quite what the challenge is going to be in the future. The concern is, How are we going to balance all of those things in the face of those requirements to save, but also in the face of what we all know, too, are many, many needs and demands going forward.

Admiral Harvey. It is a two-part question, sir. I will take one at a time.

The first part. We have to simply make the commitment to treat our surface ships in their training phases, in their maintenance phases, and in their deployment phases like we treat our submarines and like we treat our aircraft carriers. We have a firm maintenance plan for aircraft carriers and submarines that we do not deviate from. We simply won't. And until we have that attitude thoroughly inculcated in the fleet, in the force, in the maintenance activities, and in the budget tiers, we will have problems in the surface fleet.

We have to treat those ships right for the long haul. That means during that reset phase, when we commit to training, we have got to do the training. When we commit to a captain that he has got a 20-week maintenance period, then by God we give him a 20-week maintenance period that is well thought-out and well-configured and paid for, and delivers real maintenance that keeps that ship going not just for the next deployment but for the deployments to come.

So it is a level of commitment across the organization that we will go back and treat these ships right for the long haul, just like we do the rest of the fleet. That is number one.

Number two, sir, you keyed on it in your opening statement and you have come back to it here. There is an unconstrained demand on the part of every combatant commander for what these ships bring. I understand that. I know what these ships and their crews bring. It is incredibly valuable not just to the

wars going on now, but to all of our strategic engagements around the globe.

Look what is happening up there off Korea right now, today. Incredibly important deployment of our fleet and sustaining that deployment over the long haul. But we are going to have to meter that demand, just like we meter it today for our nuclear attack submarines, just like we meter it today for our aircraft carriers, just like we meter it today for amphibious ships.

Through the global force management process that is run by Joint Forces Command in conjunction with the Joint Staff, we receive all of the demands and we come back and say, here is what we can meet while we sustain this fleet for the long haul.

So it is an idea that you not only meet the critical needs today, but you do it in a way that sustains yourself over the long haul. So I have got to work that. We are working that hard in the Navy. I need to work that with the Joint Force who uses the incredible capabilities we bring. That is the answer, sir. We have to get there.

Mr. Wittman. Thank you. I appreciate your candor there.

I want to extend a little bit further, too, on the ability to sustain in the long haul. Obviously we have capital needs, but also on the operational side we have those human needs. And one of the concerns there is making sure that you can meet all of those demands in a pretty challenging environment.

One of the aspects of that obviously is training. And you spoke a little bit to that; about how we make sure that we get timely training that assures that people at every level have the skills and capabilities that they need. And I wanted to ask how you are integrating the innovative use of technology, like serious gaming, into the training regime to try to make sure we are getting the most out of the time that our men and women in the Navy have to obtain that training. And just like you said, we want to make sure that things are effective the deployment side increases, as you know, return time and making sure they have training becomes even more important.

So I just want to get your thoughts about how you are using those innovative technologies in meeting those training needs into the future.

Admiral Harvey. Well, I will tell you one--I have been in command for almost exactly a year and it has been a real learning process for me in so many different areas. And you keyed on one of them. I came in and found a significant investment that was planned, an increase and significant use of what we call ``fleet synthetic training,'' is how you train a strike group commander to be ready to go to the Arabian Gulf and deal with whatever they may find over there, but without having to get the entire strike group underway, spend all the money on fuel, take them out of home, fly the air wing, fly those hours off those aircraft just to train the staff of the striking commander.

I was a skeptic. I was old school. I said, ``by God, you get underway, that is where you learn, that is how you learn.'' Okay? That is why we did it for the last 30-some years. But I have really become a believer in the fleet synthetic training and what I have seen develop over the last 5 years. It is very sophisticated, it is very complete, and it really puts the onus on the people, the targeted audiences, for the training at the staff level, at the fleet commander level. I think we really put them through a wringer with that and we get a very good result for it.

I think that is what you are talking about, sir. And I see that as something I am going to continue to push very hard on because you get a really big bang for not so many bucks.

Mr. Wittman. Thank you, Admiral. Thank you, members of the panel. We really appreciate your time today.

And, Mr. Chairman, with that I yield back.

Mr. Ortiz. The chair recognizes Mr. Courtney.

Mr. Courtney. Thank you, Mr. Chairman. And thank you to the panel. This has been a terrific hearing. And thank you for your great work.

I have worked with Admiral McCoy over the last year or so on a couple of issues, and I am just so impressed with the quality and seriousness which you brought to your job.

Admiral Harvey, you have been pressed a few times today about whether or not there is really a light at the end of the tunnel in terms of the challenges the Navy faces in terms of the 30-year plan and the need to find efficiencies. I just wanted to at least support your positive outlook.

This Saturday, we are commissioning the Missouri, which was built in 65 months. The first submarine in its class took 87 months to build. The next block, again partly because of Admiral McCoy's great team, is going to be probably 55 months in the making. So the fact is there are ways to find efficiencies, to find savings, without sacrificing capability. Those newer boats are going to be, in fact, more capable than the first ones that came through the system.

So I share your belief that when you set targets and you really hold people's feet to the fire, that you actually can see real results.

And obviously you mentioned the submarine fleet a couple of times in terms of it being an example for the surface fleet.

I guess the one question I wanted to ask today is you mentioned, Admiral, the exercises going on in Korea right now. It all is happening because of a surface ship that was sunk. Obviously, it was a South Korean vessel, but there clearly was a pretty scary shortcoming that that ship had, which is that it couldn't detect through its sonar technology the minisub that basically, in my opinion, committed homicide in that incident.

Obviously, you are dealing with maintenance issues and keeping ships sort of maintained. But, obviously, there are challenges out there that you also have to kind of respond to or see out there. And, obviously, this minisub threat, and particularly in shallow settings, creates a real challenge in terms of sonar.

Again, we talked about radar issues which has been analyzed. But where are we in terms of the surface ships' capability--our surface ships' capability in terms of being able to deal with a threat like that?

Admiral Harvey. Sir, I think of no warfare area that presents our Navy a greater challenge than anti-submarine warfare [ASW]. I mean, the physics are against us. And as long as you can build a diesel electric submarine, they are going to be in certain environments, in certain bodies of water and under certain conditions, they are going to be very, very tough to detect on the best of days. But the good news is we have got the best equipment in the world, our sonar seats, our Navy towed array system, and the sailors that we have to put that all together and work that piece real hard, bringing the PA [patrol aircraft] Poseidon into the fight now, as we are, as a replacement for the P-3.

One of the reasons Chairman Taylor mentioned about the truncation of the DDG-1000 was to keep the focus and the great capabilities that our DDG-51 class Flight II and hopefully the Flight III have in the blue water, the deep ASW fight. Tremendous challenge.

But we have the best equipment in the world. We have to make sure that our training matches the capabilities of the equipment. And I think if there is any area where I have seen the deficiencies, it has been in our focused training on ASW. I think our helicopter squadrons have been solid over the years.

Our P-3 deployments were entirely focused for the last 8 years on supporting the fight on the ground in Iraq and Afghanistan with some of their unique surveillance systems they had.

We brought them back to blue water. We are focusing and we have set the standard: You are the ASW platform, and ASW is a mission that only, only the United States Navy does in our Joint Force.

So the key, sir, to getting at this very tough challenge is the training of our sailors across the board--aviation, submarine, and in the surface fleet--that makes our equipment truly capable of what we know it is capable of. It is that package you have to bring together and then work it together with the helicopter, with the towed array, with the submarine, working it all together in real time.

So it is individual training, it is collective training, and it is staying on that equipment and keeping it up to design specs. If we do all that, we will be good to go in either the Western Pacific, in the Persian Gulf, or anywhere else we may have to operate and sustain ourselves for an extended period of time.

Mr. Courtney. There has been, obviously, a lot of back and forth today about the training challenges that are out there and whether or not the computer-based training really is adequate.

Again, is the sonar area one of these places that you are focused as far as upgrading?

Admiral Harvey. Absolutely sir. It is a critical warfare area--a warfare area of growth that we really have to get after, ASW and ballistic missile defense. In both those areas, the training that is going to be required from an individual basis, from a team basis, that you would see in the CICU [rugged chassis] of a destroyer or on a theater basis, because these are big-picture issues. So it is a theater issue as well.

All of that is a blended solution of training. You can't get it all from a CD. You can't just do it all passed down from the older petty officers to the younger petty officers. You have to stay up. So it is a blended solution that matches the capabilities of the sailors we are trying to train.

So that is what we have to stay after, in a ruthlessly disciplined process to get at, in order to be equal to the challenges we are going to face.

Mr. Ortiz. The chair recognizes Mr. Coffman.

Mr. Coffman. Thank you, Mr. Chairman.

And Admiral Harvey, Burke, and McCoy, thank you so much for your service to this country. All three of you have had distinguished careers.

Let me just say that, Admiral Harvey, you have mentioned a couple of things. Number one, I think your commitment to, or the Navy's commitment to expeditionary forces and the commitment to extending the fleet through its service life.

First of all, to the expeditionary forces. I think the United States Marine Corps has a requirement to deploy two Marine expeditionary brigades at any one period of time. That is 17 ships per Marine expeditionary brigade. So that is 34 ships in total. And then you probably need an additional four for maintenance purposes in terms of rotation.

Right now the United States Navy is down to 31 amphibs and now the United States Navy would like to retire 2 prior to their service life. I believe the USS Peleliu and the USS Saipan. And that raises a concern to me that not only does the United States Marine Corps not have the requisite number of ships to fulfill its mission, but that the United States Navy would like to save operating dollars in cutting back two ships prior to the end of their service life.

You mentioned the USS San Antonio and the maintenance

problems there. But you did not mention in your presentation those two ships which the Navy wants to retire prematurely. I wonder if you can address those issues.

Admiral Harvey. Absolutely. I was just recommending to the Chief of Naval Operations yesterday that, based on all that I have learned in the last year, and particularly in the last 4 months, and what I believe will be the way ahead for our LPD-17 class, that I am a strong supporter of going ahead and decommissioning in fiscal year 2013 Peleliu and Denver, and still being able to meet the deployment requirements for the ARG/MEUs that we just talked about in a recent discussion.

So I do support decommissioning those ships. Tough call. Clearly, a very tough call. But if we don't, and if you look at the maintenance costs of those ships, they are not steady each year. As you approach the age of those ships, those maintenance costs, just to keep them going from day to day, are on a geometric road, not an arithmetic road. So it is taking more and more of a finite budget to keep fewer ships going. And that is a very difficult choice to make.

I talked a lot earlier today about the redistribution of those 324,000 sailors. We have urgent needs in our Special Operations Forces, what we have learned in the last 10 years about the needs for that incredibly skilled and incredibly important force. Our cyber forces, we are in the news every day about more and more cyber threats to this country and to the Armed Forces. So we are counting on redistributing those sailors off those ships into these very vital warfare areas.

So in terms of using the sailors best for the long haul, making sure I get the most out of the maintenance dollars, while still meeting the essential combatant command requirements, I made the recommendation to CNO to move forward with those early decoms [decomissionings]. I support it. And I believe I can look General Rich Natonski and Denny Hejlik in the eye down there in Norfolk where the rubber meets the road and say, I am going to get the Marines where they need to go, when they need to get there, and still decommission those ships.

Mr. Coffman. Admiral, when is the service life of the Denver and the Peleliu, when do they come to the end? What is the schedule for those? I believe it is a 40-year life.

Admiral McCoy. Congressman, they are both around 35 years. They are both within about a 5-year window of their service life.

Mr. Coffman. Let me just say this; that I think that sometimes organizations over time forget their core mission. And the core mission of the United States Navy is projecting seapower. That is the core mission.

And if it is a matter of saving operating dollars, let me just remind you that, in my view, that the United States Navy is top-heavy and could use some reform in terms of reducing its bureaucracy at the top.

But let me leave you with another issue, and that is something to look at. I would commend to you that you certainly have talked about doing all you can to extend the service life of these ships to at least realize their usefulness until they are scheduled to be decommissioned by virtue of their service life; that you adhere to those schedules and that you find the savings in looking at the top-heavy nature of the United States Navy's bureaucracy at the top.

Also, on a separate note, to look at--I believe that all of the services are based on an archaic model of a 20-year career path and the promotion schedules reflect that. And I think that those promotion schedules are too fast and I don't think that sailors, as well as members of other services, gain the kind of technical proficiency they ought to gain with that kind of

career path that I think is too expedited.

If you would like to respond to any of the issues that I have raised, please do so in my remaining time. I believe my time has expired, Mr. Chairman.

Mr. Ortiz. You can go ahead and respond to his questions.

Admiral Harvey. Yes, sir. You covered a lot of territory, but I want to go back to you on one point that I think is just incredibly important, and that is kind of what our focus is here and my responsibilities.

I am sitting here staring at a quote from the U.S. Constitution, Article 1, Section 8, which is a very visible reminder of the Congress' responsibility for the provision and maintenance of the Navy. And I am very, very aware of that.

I am equally aware of the law, its requirements of the Navy. It is Title 10, Section 5062. ``The Navy shall be organized, trained and equipped primarily for prompt and sustained combat incident to operations at sea.''

Sir, I have never forgotten that. That is the law that drives every action at Fleet Forces Command. We have to make tough choices, as do you. And you make them every day and we make them, too. But I am never--I just want to assure you, I understand what the law demands of the United States Navy. I understand deeply the mission of the Navy and the Navy-Marine Corps team, and what we do for the Nation that no other Armed Forces on this planet can do. And I am deeply committed to sustaining that capability through whatever lays ahead: good times, hard times, whatever. That has never, never gone from my mind and governs every action I take every day at Fleet Forces.

Admiral McCoy. Congressman, could I come back on the design life? Peleliu, when the ship was designed, was a 20-year ship. So she is already at the 35-year point. And we expect Denver to be at 44 years, based on a 40-year life, when she goes out.

Mr. Coffman. Mr. Chairman, may I ask one question about the USS Saipan that was not addressed?

Mr. Ortiz. Sure.

Mr. Coffman. You all did mention the USS Saipan, and I understand that that was a part of the proposal to prematurely retire the Peleliu and the Saipan. I don't think that that was mentioned to this committee. And the Denver, quite frankly, was not mentioned. The USS Denver was not mentioned to this committee in prior hearings.

Admiral McCoy. Sir, you may be thinking about the Nassau, which is LHA-4, and the Peleliu, which is LHA-5.

Mr. Coffman. I stand corrected. The USS Nassau. What is the status of the USS Nassau, then?

Admiral McCoy. We expect her to go out next year, sir, in fiscal year 2011.

Mr. Coffman. That is before its scheduled service life?

Admiral McCoy. No, sir. It was designed for 20 years when it was built. Just like Peleliu.

Admiral Harvey. It is way in excess of its service life, sir.

Mr. Coffman. Mr. Chairman, I think if we could get--I would like a report back on that, because I think we have differences in what the scheduled service life is. And I would be stunned that these--I am rather surprised that these ships are only 20 years.

Admiral Harvey. Yes, sir. We will certainly get that to you.

[The information referred to can be found in the Appendix on page 53.]

Mr. Ortiz. Thank you so much. The chair recognizes Mr. Kissell.

Mr. Kissell. I want to thank the panelists for being here today, but I also want to thank the chairman for having this

joint hearing. I am on the Readiness committee, but my other subcommittee is Air and Land. So to get this insight to the issues of the Navy is very interesting to me, and I don't have the intimate knowledge that I would like to have there. So my questions might be more of a general nature and actually reflecting maybe some concerns that have already been expressed.

Admiral Harvey, you talked about trying to reverse downward trends in terms of training and command structure and things along this line. And that obviously would be an issue across any of our branches of service if we had downward trends.

I think one of the keys there--and this was mentioned by my colleague, Mr. Wittman--is not only what are we doing about that, but at some point in time that downward trend started. How confident can you be in telling us that we are willing and have systems in place that maybe perhaps could spot other downward trends before they reach the point that evidently this one has, to cause so much concern?

Admiral Harvey. Yes, sir. I think in one of my earlier responses I talked about the institutional rigor with which our aviation and submarine communities view every aspect of their operations, and that my assessment was that similar type of institutional rigor has not been present in how we monitor the health of the surface fleet. My answer is we have got to ensure we take that rigorous type of approach in the surface fleet in every aspect of this: training, maintenance, operations, and repair parts. Until we do, we won't turn those trends around.

That is why my focus has been on working with the admirals to my right and to my left on getting that type of rigor into how we view our business with the surface fleet; making sure it is not just a passing fad from day to day, but that it becomes deeply entrenched in how we do business from day to day. I think that is the key. If we don't get there, we won't reverse those trends.

But I think we have got the focus, we have got the energy, I have got the resources, and we certainly have the intent to get that kind of rigor in how we do business with our surface fleet and sustain it into the future.

Mr. Kissell. As Mr. Taylor said, we appreciate so much you being willing to take on that responsibility because that is--as Mr. Forbes said, we have a relationship, but that is also what we are dependent upon from you and we appreciate that.

And once again, kind of going into what Mr. Courtney talked about, the mini-submarine. We have talked about in some hearings I have been in before about we know what IEDs [Improvised Explosive Devices] have done in Iraq and Afghanistan and how they take the multibillion dollars that we have available and high-tech gear and they bring it down to a common danger that is very cheap.

The threats that are presented to our Navy along this line where we have the highest technology on our ships, how are we anticipating the equivalent of IEDs being a challenge to our Navy in future years so that we can prepare defenses from that, short of actual experience?

Admiral Harvey. Well, I think what you are talking about there, sir, is, (a)--and General Mattis alluded to it in his confirmation hearing yesterday in front of the Senate Armed Services Committee--our ability to adapt.

These events move at a speed during wartime which is far in advance of what you experience in a normal peacetime environment. And organizations are developed and structured generally during peacetime. What we have to do is ensure that our ability to adapt in this large bureaucratic structure, that we know and love as the United States Navy, we have to ensure that we have that ability to adapt as fast as whatever the

enemy throws at us, wherever that enemy may be, conventional, nonconventional, asymmetric threats--which is kind of what you are alluding to here--and how rapidly we do that. And you do that because you have got the best people on the planet wearing the uniform and working on that piece every day.

So it starts with our people. If we bring in the right people, if we maintain them in our service, if we train them correctly and treat them correctly, they have the imagination, they have the capability, they are absolutely brilliant on the basics, and they will bring us through those kind of threats that you talk about. Because those are failures of imagination, those are failures of adaptation. And I think we are particularly strong if we keep the people where we need them. We will stay current with the threats. We will not lose in the battle of the future. We will be the preeminent naval force on the sea because of the people we have working for us today. That is the key to this whole thing.

Mr. Kissell. And I would even suggest--and I think this is obvious--that the word--and ``adapt'' is a great word--but ``anticipate'' to what could be brought our way so that we don't have to learn from experience, so to speak; that we can anticipate and through that anticipation avert a bad situation.

But I appreciate once again your all's service, and these are important conversations. Once again, Mr. Chairman, I appreciate the opportunity to learn more about seapower.

Mr. Ortiz. Thank you so much. Mr. Critz.

Mr. Critz. Thank you, Mr. Chairman, and to Chairman Ortiz and my chairman, Chairman Taylor, and to you gentlemen for appearing here today.

My question goes to the LCS manning. I understand that the LCS is designed to carry a 78-person crew. And one of the things that is worrisome is that the GAO [Government Accountability Office] report says the Navy faces risks in its ability to identify and assign personnel given the time needed to achieve the extensive training required--484 days.

I am curious if the LCS and really all new ships will require our crew members to do more or our ships to do more with less people. And I would like to hear the details on how you plan to maintain this healthy circle of readiness.

And why I refer to this is that in one of our questions, or some of the information we were given, it was our understanding that ships now have to be augmented with personnel to help them pass INSURV, which raises questions about ship self-sufficiency. So we have a decline in the number of personnel and we are getting information that ships are having to be augmented with personnel to meet this INSURV. I would be curious to hear your answer.

Admiral Harvey. Yes, sir. I think there is a little bit in your questions for all of us here, and I will take a first shot at a couple of things. My first INSURV inspection was when I was Lieutenant Junior Grade Harvey back in 1977 under--Admiral Buckley was the lead inspector on the USS Bainbridge. It was pretty rigorous back then, too. And it took all we had to go through an INSURV, which is operating every piece of equipment on board that ship, in port and underway, in a very short period of time, to its design specifications.

Now, in normal ship operations, even under the most strenuous conditions you can imagine underway, you are never operating every piece of equipment to that level of degree in a very, very short period of time. So the INSURV inspection is a very intense, focused look at an entire ship, stem to stern, every piece of it, in a very finite amount of time.

But the effort it has taken us in the last 3 years to prepare a ship for INSURV, as you alluded to, was precisely one of those incredibly important indicators that showed me we had

our trends in the wrong direction. So it wasn't just the INSURV results, what it took to get those ships that passed to the passing level. The intense maintenance we had to do and the workup to those ships, the extra training we had to do, that was the issue. Not so much we had just a failure rate, but it took a lot more effort to get them ready to go.

So that was part of the thing that we have learned from and it is clearly one of the things we have to correct. And you correct that through the steady application of resources and training throughout the cycle of the ship; not just in 2 weeks before the great exam comes, and you try and do an all-nighter essentially, and cram it up, and then get through it. That is entirely wrong.

And the approach we are taking is that steady strain of increased effort, treating these ships as they need to be treated. So that is the very important thing I think we have learned from the INSURV piece.

To LCS, I think the issue before us, as always on these complex issues, is very simple. We have to have the courage, the institutional courage, to face the facts that we draw from her recent deployment. And we have to put them down. And we say, This is what we designed this ship to do. These are the CONOPS [Concept of Operations] that we put out there for this ship to execute--which they executed, by the way, very successfully in the Caribbean in the anti-narcotics missions. Some real successes down there that were very, very important for us.

But then we have to look at the totality of them. Could they maintain the ship the way we need to maintain that ship? Could they operate that ship to the degree we needed to operate that ship and get those answers in black and white and then deal with the facts as we find them? We may have to make adjustments in manning. We may have to make adjustments in maintenance schedules. We may have to make adjustments in terms of how we prepare those crews to get to that ship and be ready to execute because it is unique in the Navy in terms of what we expect those sailors to do.

I think we just simply have to be sure that we are getting the facts, that we have the courage to face those facts and follow them where they lead us. Because if we do that, we will deliver on this Navy a great ship.

One last story, sir. I alluded to earlier that I was in the commission crew of the FFG-8. That class of ship--and I think Chairman Taylor may remember--was much maligned in its early days of operation. It was designed to do long-range ASW patrols in the North Atlantic. That is why that ship was built. None of those ships have ever executed a long-range ASW patrol in the North Atlantic in the course of their lifetime. But they have gone on to do incredibly valuable things over many years of good service.

I think we are going to see that similar type of growth in LCS. And that is not just happy talk. I don't do happy talk here. I don't do it with sailors. I believe to the marrow of my bones that we are going to be very glad we brought LCS into the fleet. And I think we are going to have the courage to follow those facts and make sure we develop that ship and see what it is capable of and bring that to the fleet, those capabilities that we really need.

In terms of some specifics on the training for the LCS, sir, I think Admiral Burke can give us a couple on that, sir, with your permission.

Admiral Burke. Yes, sir. A couple of things about LCS manning. First of all, we are putting a lot of effort into getting the right people to the ship. So we are taking good quality sailors and putting them on that ship with a

significant amount of training.

The other thing that we are doing that is quite different from what we have done with other ships is we have what we call a 3-2-1 concept for the majority of the LCS fleet. And that is three crews for two ships, one of which is away all the time. So what that does for us is provides greater Ao, to Mr. Wittman's point; but it also gives us ready replacements that we need to keep that ship operating because the training of these sailors is at such a high level and they are so critical to the team because there are so few of them. So each individual person is more valuable than he would be on a 300-person ship, for instance. So that 3-2-1 concept allows that rapid replacement to happen should we have a crew member get sick or hurt, or whatever the case might be.

And then the other thing that we are doing is we have taken a bunch of the logistics functions off the ship. We have done some of this in some of the other classes, but not to the level of LCS. So we have taken off many of the supply functions, many of the ordering parts, people functions, taking care of the crew. So we have this logistics support group that tracks the ship, is ahead of them for husbanding needs, for repair parts, getting the parts there, getting the contract crews there to clean and maintain the ship to keep it at the right level.

So those are a couple of things that we are doing in the LCS. And that is what Admiral Harvey alludes to. We are treating this ship differently, and we have to treat it differently. We have to adapt to the ship, as opposed to have the ship adapt to what we have done.

Additionally, I think Admiral McCoy probably wants to talk about some of the things we have done in the maintenance area on this ship.

Admiral McCoy. Congressman, along those lines of the Navy adapting to LCS or LCS adapting to the embedded Navy structure, there are a number of things we have had to do. For example, we have had to augment the crew with contractor support to do fundamental preventive maintenance, where we have not done that before on previous ships. But when you are down to a 40-person crew, we need to do that. During maintenance availabilities, we augment the crew with contractors to do things like tag-outs, to set system isolation to support the maintenance.

In port we provide contractor support for deep cleaning and painting and corrosion prevention, which we do not do for our other ships, all examples of how we have to adapt to fit the LCS model.

Additionally, the whole mission module concept is a great burden reliever for the crew because the fundamental warfighting package is maintained off the ship and can be, in a turnaround, essentially a fresh one on the shelf provided to the ship.

We send the key data on the propulsion plant and the main auxiliary systems off board every day electronically to ISEA engineers, in-service engineering agents to look at the health and the monitoring of the systems. Additionally, we have these ships in the American Bureau of Shipping inspection cycle to make sure that we are looking at all areas of the ship on an about 8- to 10-year cycle, similar to what we are standing up for the rest of our surface Navy.

Right now as Admiral Harvey talked about, we are looking at what are the early returns, what have we learned from both ships? And two things we have learned. Even though we have done one pass on preventive maintenance, it is still too much. But we need to go back and do another pass, and in fact take some more preventive maintenance off the crew's burdens to either shore support and, in fact, infuse some technology.

So, for example, we are working on laser technology for

doing lube oil and fuel oil samples to take some of that burden off of the crew, other examples of how we are trying to adapt.

The other one is corrosion. We need better choices during the shipbuilding process--of materials--better paints and things like that. We are seeing already corrosion on both ships. So we are factoring that back into the production line, as well as into the maintenance plan.

Mr. Critz. Thank you very much. I have no further questions.

Mr. Ortiz. Thank you so much.

I just have one last question, unless some of the other members and the rankings and Chairman Taylor have a closing statement.

But I know that you all are very responsible, and this morning you have done a great job. But my question is: What plans and metrics has the Navy developed to track and measure progress of the corrective actions that are being implemented? And how would the Navy assure that this does not end up in the same place we did, again, in another 5 to 10 years?

Admiral Harvey. Yes, sir. The direction I have given to my subordinate commanders, both the fleet commander, the second fleet commander and for the type commanders in surface, air and submarine, we gather in a room every 2 weeks and we put the fleet up on the board and we talk about what has to happen to deliver the forces ready for tasking that we have committed to delivery. We look at every aspect of their maintenance, their training, their manning, every piece of what it takes to deliver a ship, a squadron, a submarine, to a combatant commander, ready to operate to the limit of its combat systems capabilities.

We now take a hard, hard look at that. And I ask some pretty tough questions. You can ask tough questions, Mr. Chairman, and so can I. And I like to get the same kind of answers out of my people that you want out of me.

It is the same process. We look at the assumptions that are so important. You heard Admiral McCoy talk about the assumptions that we made for the LCS to operate properly with the manning we have given her. And if you don't bring those assumptions home, this whole thing collapses like a house of cards.

So we focus on what we owe those ships and squadrons and submarines to deliver and what we owe those sailors. And we drill down hard on that. And we are just going to keep at it.

And then I owe the CNO a picture of the fleet. And this is where I come to him and say, ``This is what I have got. This is what we are able to do. This is what I need to sustain ourselves into the future.'' And I have to be honest and forthright in doing that. And I think I will be. That is his expectation of me, and I certainly intend to deliver on it.

But that is the kind of thing, sir--there is no magic formula for this. This is hard work every day, chasing the facts, understanding the facts, and acting on the facts.

Mr. Ortiz. Chairman Taylor, do you have any statement that you would like to make?

Mr. Taylor. No.

Mr. Ortiz. Mr. Forbes. Mr. Wittman.

There is no question that you gentlemen are very, very well informed, very knowledgeable, and you have answered some tough questions this morning. And we just want to assure you that we want to work with you. And anything that happens along the way, let us know, because we would like to help you.

But I think that this hearing this morning has been very, very informative to us and members of the subcommittee. And we just want to say thank you so much for what you do, for your service, and the family support that you get from your family.

Chairman Taylor.

Mr. Taylor. Thank you, Chairman. And again, I don't want to delay this any longer.

Admiral Harvey, for about 4 years running, both then-Chairman Bartlett and I had people come to our office and tell us the LCS program was on line and everything is going fine; and then somewhere around November of 2006, we get a call that this thing has just gone to hell in a hand basket. At no time do I ever remember anyone stepping forward and saying, ``That was my job and I didn't do it right.'' So I do want to commend you for stepping forward today and saying that it is your job, that you are going to get it done. In this town, we don't hear that often enough.

So I want to commend you for what you said. I look forward to working with you on this. And you tell us what you need from us, because it is our job to provide the funds that you need to do yours.

Again, I want to thank all of you for being with us today. And I particularly appreciate what you had to say today.

Thank you, Mr. Chairman.

Mr. Ortiz. Thank you so much. And there being no further questions, this hearing stands adjourned. Thank you.

[Whereupon, at 11:42 a.m., the subcommittees were adjourned.]

=======================================================================

A P P E N D I X

July 28, 2010

=======================================================================

PREPARED STATEMENTS SUBMITTED FOR THE RECORD

July 28, 2010

=======================================================================

=======================================================================

WITNESS RESPONSES TO QUESTIONS ASKED DURING

THE HEARING

July 28, 2010

=======================================================================

RESPONSE TO QUESTION SUBMITTED BY MR. COFFMAN

Admiral Harvey. The Landing Helicopter Assault (LHA 1) Class Amphibious Assault Ship had a designed service life of 20 years as

defined in the Performance Specifications for LHA 1 Class of March 1969. Today, USS NASSAU (LHA 4) is 31 years old.

U.S. Navy uses the Expected Service Life (ESL) of ships for long-range ship planning, budget development, and force structure recapitalization planning. ESL is typically longer than the designed service life objective and is achieved through a technical assessment of the ship's material condition coupled with any necessary modernization. The ESL of the LHA 1 Class was established at 35 years per a 1986 Chief of Naval Operations memorandum and was supported by implementation of the LHA Mid-Life Upgrade Program. The LHA 1 Class technical assessment, conducted by operational and technical personnel (SEA 05, PMS 470 Program Office) as a result of an August 1997 INSURV report on USS NASSAU (LHA 4), validated the ship's degraded status. This one-time technical assessment was conducted across all ships of the class and resulted in development of the mid-life package to address known deficiencies. [See page 25.]

?

=======================================================================

QUESTIONS SUBMITTED BY MEMBERS POST HEARING

July 28, 2010

=======================================================================

QUESTIONS SUBMITTED BY MR. ORTIZ

Mr. Ortiz. Over the past several years, the Navy has concurrently taken several actions that have affected ship crews, including implementing reductions in manning on certain ship types, shifting to more computer-based training, and increasing mission requirements aboard ships. While the Navy's intention was to save costs and improve efficiencies, it appears that collectively these actions have affected ship readiness. However, based on GAO's analysis, the Balisle report, and other studies, it appears the Navy took these actions on a case-by-case basis without sufficient analysis of the potential collective effect.

As the Navy looks to the future, what steps will it take to ensure it considers the holistic effect of making changes to manning, training, and mission requirements on ship crews before implementing any adjustments?

To what degree are the issues raised in the Balisle report being used as ``lessons learned'' as the Navy struggles to manage the strike fighter shortfall? How can we be assured that we will not see such an erosion of readiness in aviation as the Navy works to minimize the resources required to support legacy aircraft squadrons?

Admiral Harvey. Our surface force is ready today. Operation UNIFIED RESPONSE (OUR), the Haitian earthquake relief effort, highlighted the readiness of the Fleet to respond to a significant, no-notice tasking. While OUR was not combat operations, the Fleet's response was also not the hallmark of an unready force. It is our overall readiness trends that are of concern. These trends (Board of Inspection and Survey trends, Casualty Report trends, ship's force maintenance backlogs, etc.) are the result of the cumulative impact of individual decisions made over the last two decades. The decisions made over the last two decades were based on detailed analysis under a specific set of assumptions about a future we can never predict with 100% accuracy. Feedback loops (readiness trends) are critically important to the Navy because they allow us to adjust the course of the Navy program based on reality (versus assumptions) in execution. We are doing this today with the surface force to prevent an unready force in the future, and have

the same formal processes in place for our air and submarine communities.

The feedback mechanisms in place for our aviation community are much more robust than in the surface community, which is why operational and material health trends have not degraded as significantly despite community challenges (e.g., strike fighter shortfalls, aging force). To prevent erosion of readiness that could result in an unready force in the future, Navy commits forces at a sustainable rate in the Global Force Management process; enforces established man, train, equip, and maintain standards; and monitors feedback loops, adjusting course in execution as required should resourcing/program decisions create negative readiness trends.

Mr. Ortiz. For those ships with ballistic missile defense responsibilities, has the Navy included manpower requirements for this mission in its ship manning documents?

Admiral Harvey. For FY10, Fleet accelerated PR-11 funding for 30 Fire Controlmen (FCs) in support of Ballistic Missile Defense (BMD). Fleet also requested an additional 30 billets for ships that will possess a BMD capability in future years. These increases in BMD requirements will ensure the Navy can effectively accomplish the BMD mission aboard designated ships.

Additional training requirements will also be necessary to support this increase in BMD manpower aboard BMD ships. Fleet has requested 54 training instructors for Center for Surface Combat Systems (CSCS) Advanced Warfare Trainer (AWT), Afloat Training Group (ATG), and Tactical Training Group (TACTRAGRU). This BMD manpower addition provides the necessary capacity to execute advanced and integrated training in line with growth in BMD capabilities.

Mr. Ortiz. In a recent report, GAO noted that in-port workloads have been increasing for Navy cruisers and destroyers, but based on a longstanding assumption, the Navy does not measure or evaluate in-port workload when determining the required crew sizes of its ships.

What plans, if any, does the Navy have to adjust its methodology for determining the crewing requirements for it ships, or for verifying its assumptions concerning in-port workloads?

Admiral Harvey. Navy determines shipboard manpower requirements utilizing at-sea wartime scenarios derived from each platform's Required Operational Capabilities/Projected Operating Environments (ROC/POE). In assessing workload as part of the optimal manning initiative, Navy used a long-held assumption that at-sea workload exceeds in-port workload requirements.

In-port workload requirements are not guided by Condition I watchstanding (i.e., Battle Stations), but are impacted by additional requirements when in port, such as training, maintenance, supporting local security requirements and leave of absence.

The Navy is reviewing military personnel manning assumptions and recognizes that the reduced crew size also impacted crew workload capacity both in-port and underway. At the same time the optimal manning initiative was reducing crew size and crew workload capacity, the organic intermediate maintenance support available from the Regional Maintenance Centers was also decreasing due to military billet reductions which shifted workload to the private sector. Consequently, Navy is looking closely at increasing manning levels both shipboard and at the regional maintenance centers to alleviate the maintenance burden when ships are in port.

Mr. Ortiz. How did the consolidation of the ship intermediate maintenance activities into regional maintenance centers affect 1) the material assistance and support available to surface ships, and 2) the professional development opportunities available to shipboard personnel who are on shore duty between tours at sea?

Admiral Harvey. Consolidation of maintenance activities (Intermediate and Depot) within geographic regions was a Navy decision made to gain efficiencies and reduce overhead. The consolidation in Norfolk specifically, diluted focus of the maintenance activity and resulted in a loss of focus on surface ship intermediate maintenance.

Separately, but concurrently, all intermediate maintenance activities were subjected to manning reductions that eliminated shore Sailor billets as these requirements could be performed by DOD civilians or contractors, which resulted in a significant reduction of journeyman training opportunities for Sailors rotating ashore.

Command, U.S. Fleet Forces Command, Commander, Pacific Fleet, and Naval Sea Systems Command implemented initiatives to restore shore billets at the Norfolk Ship Support Activity, South East Regional Maintenance Center, South West Regional Maintenance Center North West Regional Maintenance Center and Hawaii Regional Maintenance Center effective in FY2011. These additional billets will renew our commitment to a training continuum for Sailors to hone their craftsman skills while improving surface ship maintenance responsiveness and effectiveness such that the Fleet produces ships ready for tasking.

Mr. Ortiz. Does the Navy plan to address the loss of both training opportunities and assistance and support available to ships caused by the consolidation of the ship intermediate maintenance activities into regional maintenance centers in 2004?

Admiral Harvey. Yes. Consolidation of the ship intermediate maintenance activities into regional maintenance centers in 2004 was designed to combine three activities with waterfront support missions, Shore Intermediate Maintenance Activities, Fleet Technical Support Centers, and Repair Supervisors of Shipbuilding, into a single regional command that increased administrative efficiency by reducing duplicate overhead functions and provided a single point of contact for ship repair support. The consolidation did not impact waterfront military repair billets, however in 2006 a separate initiative substituted civilian personnel and contractors for 2,214 military billets (2,148 active duty and 66 reserve full time support). At the time, it was thought that use of more capable depot level personnel would increase the overall efficiency of maintenance execution. In 2007, 126 of these military billets were bought back, resulting in an overall net of 2,088 military billets reduced from this initiative.

The Navy is in the process of reassessing those decisions and is developing a plan designed to optimize the responsiveness of waterfront shops and military personnel training opportunities while continuing to utilize the expertise of more capable, but remote depot shops. This review is expected to result in an increase in waterfront military repair billets. A separate initiative is working to revitalize the Navy Afloat Maintenance Training Strategy which is designed to ensure that personnel assigned to shore maintenance activities receive formalized training designed to lead to journeyman certification.

Mr. Ortiz. In a recent report, the GAO recommended that the Navy address its lack of outcome-based performance measures for off-ship training programs by developing metrics to measure the impact of training on job performance, knowledge, skills, and abilities as they relate to occupational and watchstanding proficiency.

What actions, if any, does the Navy plan to take to address this recommendation and develop the types of metrics outlined in the GAO report?

Admiral Harvey. The Department of the Navy increased efforts to measure the impact of off-ship training on individual job performance, knowledge, skills, and abilities as they relate to occupational and watchstanding proficiency across the Surface Force by introducing a Surface Warfare Officer (SWO) qualification Log Book program, increasing the frequency of Level of Knowledge (LOK) exams, and re-emphasizing the necessity to update the Training and Operational Readiness Information Services (TORIS) and the Navy Training Management and Planning System (NTMPS) data bases.

The Surface Navy instituted a SWO Log Book pilot program, modeled after the Aviation Log Book program, to record all professional development evolutions for every officer which can then be used to help evaluate training impact to job performance, skills and abilities. The expectation is to refine and expand the program to include enlisted Sailors, providing data that can be used to measure factors affecting

job performance. Additionally, every Sailor is required to take a LOK exam within the first three months of reporting on board and then again every quarter for the duration of their tour. All scores are maintained in the TORIS database which provides an output-based metric that training commands and the Chain of Command can use to help determine how off-ship and on-ship training affect the knowledge base of Sailors.

Access to every Sailor's goals and progress of Personal Qualification Standards (PQS), warfare qualifications, watchstander qualifications, and off-ship and on-ship education is tracked and reported in NTMPS. In May 2010, Commanders, Naval Surface Force Pacific and Atlantic sent a joint message to the Surface Fleet outlining best practices for training and readiness. The message reinforced the necessity to properly document, in both TORIS and NTMPS, all training conducted because this documentation is necessary to understand how well training is conducted and what adjustments are needed to improve training in the future.

Mr. Ortiz. GAO reported that the Navy instituted a number of changes but didn't have an evaluation strategy with metrics in place to inform itself of whether it was achieving desired results or to elicit info that might enable it to detect any unintended consequences.

How does the Navy intend to evaluate the impact of any planned corrective actions?

Admiral Harvey. Commander, U.S. Fleet Forces Command and Commander, U.S. Pacific Fleet measure and assess Fleet Readiness monthly and provide that assessment to CNO. Further, Navy Fleet Readiness is reflected in the Joint Forces Readiness Review which serves to inform the Department's Quarterly Readiness Report to Congress.

Mr. Ortiz. Based on the findings of the Balisle report, the Navy plans to take a number of actions in many interrelated areas, such as training, maintenance, command and control, manning, etc. What's not clear, however, is who will be responsible for making sure the actions are coordinated and implemented. To avoid the problems of the past where the Navy wasn't looking at things holistically to see whether the changes it was making were compatible and did not have unintended consequences, the Navy will need to make accountability clear and have some kind of integration mechanism across the areas, whether it be one senior-level official who is the focal point supported by an interdisciplinary group or another approach.

How does the Navy intend to proceed from here in taking corrective actions, including establishing leadership and organizational accountability?

Admiral Harvey. To reaffirm my 28 July testimony, I am responsible and accountable for Fleet readiness. It is my responsibility to man ships with sufficient numbers of trained Sailors who are afforded adequate and recurring Fleet training to maintain their war fighting skills and to provide sufficient maintenance such that our ships and systems are fit to fight.

I meet regularly with Commander, Pacific Fleet and our subordinate commanders to review and assess Fleet readiness to ensure Navy can deliver the forces ready for tasking that we have committed to delivering.

With regards to the Fleet Readiness Panel for Surface Force Readiness specific recommendations, I have begun executing a plan of corrective actions to improve Surface Force Readiness. Both Surface Force Type Commanders are responsible and accountable to me for delivering the improvements in readiness that I and the panel identified.

CASH [redacted]

DEPARTMENT OF THE NAVY
COMMANDER
U.S. FLEET FORCES COMMAND
1562 MITSCHER AVENUE SUITE 250
NORFOLK, VA 23551-2487

1611
Ser N00/236
22 Sep 10

SECOND ENDORSEMENT on Commander, U.S. Fleet Forces Command ltr 1611 Ser N00/197 of 2 Aug 10

From: Commander, U.S. Fleet Forces Command
To: Commander, Navy Personnel Command (PERS 83)

Subj: REPORT OF NON-JUDICIAL PUNISHMENT ICO COMMANDER ERIC C. CASH, USN, XXX-XX-[redacted]

1. Forwarded for inclusion in the officer's permanent record.

2. The matters raised by Commander Cash in the first endorsement reiterate those that were submitted in his appeal on 21 May 2010. The Vice Chief of Naval Operations considered these assertions and denied that appeal on 21 June 2010. Many of the matters raised also were included in the record and the report of investigation which I considered when awarding non-judicial punishment. The fact that intermediate Commanders in the chain of command declined to take punitive action based on the results of the investigation does not limit in any way my right as a superior Commander to take such action. None of the assertions made in the first endorsement affect my conclusion that Commander Cash was negligently derelict in the performance of his duties as Commanding Officer.

J. C. HARVEY, JR.

Copy to:
CDR Cash

OCT 0 6 2010

FINISH FILE PERS 834

SEP 29 2010

OFFICIAL RECORD COPY

FOR OFFICIAL USE ONLY - PRIVACY SENSITIVE

CASH [redacted]

1611
01 SEPT 2010

FIRST ENDORSEMENT on Commander, U.S. Fleet Forces Command ltr 1611 Ser N000/197 of 2 Aug 10

From: Commander Eric C. Cash, USN
To: Commander, Navy Personnel Command (Pers-83)
Via: Commander, U.S. Fleet Forces Command

Subj: REPORT OF NON-JUDICIAL PUNISHMENT (NJP) ICO COMMANDER ERIC C. CASH, USN, XXX-XX[redacted]

1. Forwarded.

2. The statements in the following paragraphs were written to accompany a punitive letter of reprimand issued by Admiral John C. Harvey, Jr., Commander U.S. Fleet Forces Command. My statement is written in the most temperate language and manner I could and not intended to be inflammatory or derogatory to my accuser. However, it was written to show my strength of belief that I am not guilty of the alleged offense and concern about statements included in the letters documenting the award of non-judicial punishment that are untrue in entirety or not causal factors. An example of an untrue and easily verifiable false statement is that I was temporarily assigned to the staff of Commander Naval Surface Forces Atlantic following my change of command. In fact, I was on leave between change of permanent duty station awaiting an orders modification that I initiated, initially was denied a change, and requested prior to my change of command.

3. I have been consistent with my assertion of being accountable as a commanding officer afloat, very cooperative during the investigation, honest and exacting in my statements and in presentation of the facts. My affirmation of accountability does not equate to being guilty. Admiral Harvey's opinion of the facts and award of non-judicial punishment are not supported by the preponderance of evidence and final conclusions as evidenced by my chain of command's actions, positive promotion (Captain, USN) and selection for next major career milestone (major command) recommendations through my entire 18 month tour as commanding officer of USS SAN ANTONIO and change of command. The truth of the facts and preponderance of evidence shows that LPD 17 ship class design, technical documentation, materiel deficiencies, and lack of standardized ship class procedures are the root causes of the



2/27A2

OFFICIAL RECORD COPY

CASH [redacted]

OFFICIAL RECORD COPY

**DEPARTMENT OF THE NAVY**
COMMANDER
U.S. FLEET FORCES COMMAND
1562 MITSCHER AVENUE SUITE 250
NORFOLK, VA 23551-2487

1611
Ser N00/197
2 Aug 10

From: Commander, U.S. Fleet Forces Command
To: Commander, Navy Personnel Command (PERS 83)
Via: (1) Commander Eric C. Cash, USN
(2) Commander, U.S. Fleet Forces Command

Subj: REPORT OF NON-JUDICIAL PUNISHMENT (NJP) ICO COMMANDER ERIC C. CASH, USN, XXX-XX-[redacted]

Ref: (a) MILPERSMAN 1611-010
(b) JAGMAN, Chapter 1, Part B
(c) UCMJ, Article 15
(d) Part V, Manual for Courts-Martial, 2008 Ed.

Encl: (1) NAVPERS 1626/7 ICO CDR Eric C. Cash, USN
(2) Investigation Report
(3) Accused's notification and election of rights
(4) Commander, U.S. Fleet Forces Command ltr 5800 Ser N00/129 dtd 13 May 10 (PLOR)
(5) Accused's acknowledgement of appeal rights
(6) CDR Eric C. Cash ltr dtd 21 May 10, NJP Appeal, with USFF endorsement
(7) VCNO ltr 5800 Ser N09D/0U118097 dtd 21 Jun 10, denial of NJP appeal

1. This report is forwarded in accordance with references (a) and (b) for review and action.

2. The charge and specification in this case arose from a small boat mishap that occurred on 4 February 2009, in the Gulf of Aden. On 13 May 2010, in accordance with references (b) through (d), Non-Judicial Punishment (NJP) was imposed on Commander Eric C. Cash, USN, for violation of Article 92 of the Uniform Code of Military Justice (UCMJ), negligent dereliction of duty. As a result, he was awarded a punitive letter of reprimand. Enclosure (1) is the completed Report and Disposition of Offenses from that proceeding. In reaching my decision, I considered the report of investigation into the circumstances surrounding the death of EN1(SW) Theophilus K. Ansong on 4 February 2009, provided as enclosure (2), together with the oral statement made by Commander Cash at the NJP proceeding.

10/27AZ

CASH [redacted]

Subj: REPORT OF NON-JUDICIAL PUNISHMENT ICO COMMANDER ERIC C. CASH, USN, XXX-XX-[redacted]

3. After having been advised of his rights, Commander Cash accepted responsibility for the incident. Based on his admissions during the hearing, as well as the findings of the investigating officer and endorsers, I found that Commander Cash had committed the charged offense and awarded him a punitive letter of reprimand, a copy is attached as enclosure (4). Following mast, Commander Cash was advised of his right to appeal by enclosure (5). On 21 May 2010, Commander Cash submitted an appeal of his punishment on the basis that the punishment was unjust. On 21 June 2010, the Vice Chief of Naval Operations (VCNO) denied Commander Cash's appeal. Accordingly, the NJP is now considered final. Commander Cash did not submit a statement in response to the punitive letter.

4. I did not recommend Commander Cash for detachment for cause from USS SAN ANTONIO (LPD 17), and he has since had a change of command and is temporarily assigned to U.S. Naval Surface Force Atlantic. I recommend that Commander Cash not be required to show cause for retention in the Navy. Commander Cash is not currently on a promotion list.

5. Commander Cash is hereby notified of his right, per reference (a), to submit comments within 15 days of receipt, concerning this report of NJP and the punitive letter of reprimand, both of which will be included as adverse matters in his official record. His comments, if any, will be submitted via endorsement of this report.

J. C. HARVEY, JR.

Copy to:
CDR Cash

OFFICIAL RECORD COPY



11/27A

CASH [redacted]

**DEPARTMENT OF THE NAVY**
COMMANDER
U.S. FLEET FORCES COMMAND
1562 MITSCHER AVENUE, SUITE 250
NORFOLK, VA 23551-2487

5800
Ser N00/129
13 May 10

From: Commander, U.S. Fleet Forces Command
To: Commander Eric C. Cash, USN, XXX-XX-[redacted]/1110

Subj: PUNITIVE LETTER OF REPRIMAND

Ref: (a) Report of investigation into the circumstances surrounding the death of Engineman First Class (Surface Warfare) Theophilus K. Ansong on 4 February 2009 w/endorsements
(b) UCMJ Art. 15
(c) Para. 5 of Part V, MCM, 2008
(d) JAGMAN 0114

1. Reference (a) is the report of a command investigation convened by Commander, Amphibious Squadron FOUR, to inquire into the USS SAN ANTONIO small boat mishap that occurred on 4 February 2009 and resulted in a Sailor under your command being lost at sea. A hearing was conducted pursuant to references (b) and (c) on 13 May 2010.

2. The 11-meter RHIB launching evolution on 4 February 2009 was deficient in a number of respects. First and foremost, it occurred without adequate supervision and oversight. Neither you nor your Executive Officer had eyes on the event, despite knowing that the First Lieutenant billet was gapped and that there were other evolutions ongoing that created an overall situation warranting continuous command leadership involvement. In addition, no special evolution watchbill was promulgated and some of the crew participating in the RHIB launching evolution did not have appropriate training and qualifications. Furthermore, errors were made by line handlers, signalmen, crane operators, and safety observers, resulting in the small boat tipping and its crewmembers entering the water. One of the crewmembers, EN1(SW) Theophilus Ansong, was lost at sea after he struck the accommodation ladder and slipped from his flotation vest, which was too large and improperly fastened.

Enclosure (4)

14/27A2

OFFICIAL RECORD COPY

CASH [redacted]

Subj: PUNITIVE LETTER OF REPRIMAND

3. The authority with which you were entrusted as Commanding Officer carried with it the absolute responsibility for the welfare of your ship and crew. You were ultimately responsible for the safe conduct and supervision of small boat operations. The investigation report and your subsequent acceptance of responsibility at Mast clearly demonstrate that your performance fell short of that expected of a Commanding Officer. Pursuant to references (b) through (d), you are hereby reprimanded for dereliction in the performance of your duties.

4. You may appeal this punitive letter to the next superior authority, the Vice Chief of Naval Operations, under the provisions of Article 15(e) of the Uniform Code of Military Justice, paragraph 7 of Part V, Manual for Courts-Martial, and section 0114g of the Manual of the Judge Advocate General.

5. If you do not desire to appeal this punitive letter, you are directed to so inform the issuing authority in writing within five days after the receipt of this letter.

6. If you do desire to appeal this punitive letter, you are advised that an appeal must be made within a reasonable time and that, in the absence of unusual circumstances, an appeal made more than five days after the receipt of this letter may be considered as not having been made within a reasonable time. If, in your opinion, unusual circumstances make it impracticable or extremely difficult for you to prepare and submit your appeal within the five days, you shall immediately advise the officer issuing this letter of such circumstances and request an appropriate extension of time to submit your appeal. Failure to receive a reply to such request will not, however, constitute a grant of such extension of time to submit your appeal.

7. In all communications concerning an appeal of this punitive letter, you are directed to state the date of your receipt of this letter.

8. Unless withdrawn or set aside by higher authority, a copy of this letter will be placed in your official record at the Bureau of Naval Personnel. You may forward within 15 days after receipt of final denial of your appeal or after the date of your notification of your decision not to appeal, whichever may be applicable, a statement concerning this letter for inclusion in



15/27Az

OFFICIAL RECORD COPY

CASH [redacted]

Subj: PUNITIVE LETTER OF REPRIMAND

your record. If you do not desire to submit a statement, you shall so state in writing within five days. You are advised that any statement submitted must be couched in temperate language and shall be confined to pertinent facts. Opinions shall not be expressed nor the motives of others impugned. Your statements may not contain countercharges. Your reporting senior may note this letter in your next fitness report submitted after this letter becomes final, either by decision of higher authority upon appeal or by your decision not to appeal.

J. C. HARVEY, JR.

OFFICIAL RECORD COPY



16/27Az

CASH [redacted]

21 May 2010

From: CDR Eric C. Cash, XXX-XX-[redacted] USN
To: Vice Chief of Naval Operations

Ref: (a) Commander, U.S. Fleet Forces Command Ltr 5800 Ser N00/129 of 13 May 10
(b) Report of investigation into the circumstances surrounding the death of Engineman First Class (Surface Warfare) Theophilus K. Ansong on 04 February 2009 w/endorsements
(c) LPD 17 Class Advisory NR 13-09 - Small Boat Handling Evolution MSG DTG 281900ZAUG09

SUBJ: NJP APPEAL

1. I respectfully request a review of NJP awarded on 13 May 2010 by Commander, U.S. Fleet Forces Command at Admiral's Mast. My appeal is based on the grounds the punishment was unjust.

2. As commanding officer of USS SAN ANTONIO for the past 17 months, I fully recognize and accept that that I am accountable to my superior for my success or failure in executing my duties and that my performance is measured against established standards. I understand that when my performance deviates from those established standards that I can and should be held responsible. However, for this case, imposing a letter of reprimand as punishment over 14 months after the incident occurred is unjust. I was held accountable.

3. My immediate superior took sufficient action.

a. On 28 April 2009, my Commander, Amphibious Squadron FOUR Captain Brian T. Smith, my immediate superior in my chain of command, held me accountable for not ensuring a special watch bill was in place when SAN ANTONIO's 11-meter Rigid Hull Inflatable Hull Boat (RHIB) accident (hereinafter boat accident) occurred. My immediate commander's relief, who served as investigating officer for the second investigation of the boat accident, determined that no further action or punishment was necessary.

b. Operational chain of command reviews by Commander, U.S. FIFTH Fleet, VADM William E. Gortney dated 05 August 2009, and Commander, Task Force FIVE ONE RADM Michelle J. Howard dated 20 April 2009 concluded that my immediate superior in my chain of

1T/27A2

OFFICIAL RECORD COPY

CASH [redacted]

command was in the best position to know and understand the details of the boat accident and determine my accountability in the boat accident.

c. On 19 March 2010, Commander, Naval Surface Force Atlantic RADM Kevin M. Quinn in response to an inquiry by Commander, U.S. Fleet Forces Command, Admiral John C. Harvey Jr. concurred in the determination and earlier recommendations that sufficient administrative measures had been taken by my immediate superior. Specifically, RADM Quinn stated that he "considers his action with respect to the personnel accountability recommendations 1-3 of this investigation sufficient and complete. The current Commodore (who was the investing officer for this investigation), CAPT Larry Grippin, has elected not to take any further action with respect to recommendations 1-3." He went on to state that "[a]fter a thorough review of this investigation, I have concluded that the administrative action taken by CPR4, who was the immediate Commander and the one most closely familiar with the circumstances of this incident, with respect to the Commanding Officer, USS SAN ANTONIO (LPD 17) was appropriate."

4. Significant design, technical documentation, and procedural issues known and not corrected or unforeseen by cognizant Department of the Navy officials had significant impact on the boating accident that a special evolutions watch bill alone could not mitigate. Known concerns and issues with ship design and equipment outfitting existed since 1998 and had not been corrected or procedures established to mitigate the concerns/issues by cognizant and accountable Department of the Navy authorities until after the boat accident. The Manual of the Judge Advocate General (JAGMAN) investigation and subsequent technical reviews revealed, directed, or resulted in the following:

a. The LPD 17 Boat Issue Workshop report in 1998 recommended using the lower maintenance outdrive propeller option 11M RHIB vice waterjet propulsion boat on SAN ANTONIO.

b. The LPD 17 Boat Issue Workshop report in 1998 recommended implementation of an enhanced safety system (tow boom, positive control device for load control to launch position, hook on boat vice hoist) for knuckle boom and lifeboat single arm davits which was not installed. As described in the report, "THESE PROVIDE FOR SAFER BOAT HANDLING BY REDUCING THE BOAT MOVEMENT DURING LAUNCHING AND RECOVERING AND MAY BE USED WITHOUT LINE HANDLERS. A SAMPLE SYSTEM WOULD ALSO INCLUDE A TOW



18/2742

OFFICIAL RECORD COPY

CASH [redacted]

BOOM FROM THE SIDE OF THE SHIP FOR THE SEA PAINTER. THIS ENABLES THE BOAT TO REMAIN PARALLEL TO THE SHIP DURING LAUNCH AND RECOVERY, WHICH IS PARTICULARLY CRUCIAL CONCERNING THE CURVATURE OF THE SHIP'S HULL."

c. Navy Ships Technical Manual (NSTM) 583 (Boats and Small Craft) at paragraph 583 - 9.4.5. GENERAL OPERATING PROCEDURES FOR CRANE OR BOOM BOAT HANDLING states, "CLEATS, PADEYES AND OTHER FITTINGS SHALL BE PROVIDED FOR USE OF HANDLING AND STEADYING LINES." Cleats, padeyes, and other fittings were not installed on SAN ANTONIO during the initial construction or any period prior to the boat accident for boat operations using the knuckle boom crane.

d. NAVSEA PMS 317 letter 4200 SER 317-226 dated June 18 2009 directed the LPD 17 Class Planning Yard to develop a work specification to modify the port and starboard boat handling fittings. This modification was directed after the boat accident and provides positive proof that design issues created unique problems for boat handling on SAN ANTONIO.

e. Mitigating actions promulgated by Commander, Naval Sea Systems Command for immediate implementation because of the risk to personnel that could have prevented the boating accident were released to the fleet in NAVSEA PMS 317 MSG DTG 281900ZAUG09, LPD 17 CLASS ADVISORY NR 13-09 - SMALL BOAT HANDLING EVOLUTION

(a) Paragraph 2.A. states, "PMS 317, NAVSEA 05Z, AND NSWCCD CODE 97 REVIEWED THE BOAT HANDLING PROCEDURES FOR IN-SERVICE LPD 17 CLASS SHIPS AND DETERMINED THAT STANDARDIZED PROCEDURES FOR BOAT HANDLING EVOLUTIONS ARE REQUIRED."

(b) Paragraph 3.B. provides guidance to preclude adjusting the sea painter as was the standard practice on SAN ANTONIO when she deployed.

(c) Paragraph 3.E. provides an engine start procedure when launching small boats. Specifically:

1. Stop lowering the RHIB approximately ten (10) feet above the water to avoid wave peaks.

2. Start the engines and signal to the OIC that the boat engines have started. If lowering the boat into the water is delayed for more than ten (10) seconds, then stop



19/27Az

OFFICIAL RECORD COPY

CASH [redacted]

the engines to avoid boat engine impeller damage and inform the OIC that the boat is not ready for lowering into the water.

(d) Paragraph 3.F. states, "REF C DIRECTS THE LPD 17 CLASS PLANNING YARD TO DEVELOP A WORK SPECIFICATION TO MODIFY THE PORT AND STARBOARD BOAT HANDLING FITTINGS. THIS CHANGE HAS BEEN COMPLETED ON LPD 19 AND LPD 20 AND WILL BE DONE ON LPD 21 DURING PSA. THE WORK SPECIFICATION (AWI) HAS BEEN REVIEWED AND APPROVED BY THE ISEA AND TECHNICAL WARRANT HOLDER. PMS 317 WILL PROVIDE THE WORK SPECIFICATION TO PMS470 SO THAT A SCD CAN BE DEVELOPED THAT BACKFITS THIS CHANGE ON LPD 17 AND LPD 18."

(e) Because of the restricted visibility to see boats throughout the entire launching process from the Bridge and Boat Deck NAVSEA in paragraph G. states, "SEA05 and NSWCCD SSES CODE 97 will consider additional system modifications to improve visibility during small boat handling operations. "

5. Manning and training issues, in addition to, ship design and procedural problems were either contributing or causal factors in the boat accident. The below information is provided to supplement or clarify significant issues noted in the investigation.

(1) Personnel assignments and Boat Bill (signed 10 May 2006 by the commanding officer my predecessor relieved) for boating operations were consistent with positions manned to train the crew, certify the ship for operations, and as executed on deployment prior to me assuming command. Subsequently, I have updated the Boat Handling Bill to include for the first time a procedure for launching/recovery boats using the knuckle boom crane, a mooring station line handler supervisor, established communications paths (primary, secondary, tertiary) between the bridge, deck launching crew, and boat crew, as well as guidance to ensure the engines for the 11-meter water drive RHIB are started prior to the boat entering the water.

(2) The Mooring Station NR2 Line Hander was qualified for his position and made an improper action by checking the sea painter. A supervisor was not assigned to the mooring station which was consistent with previously required position assignments for boating operations used to train the crew, certify the ship for operations, and on deployment prior to me assuming command. Since the incident a supervisor has been assigned to the mooring station.



20/27Az

OFFICIAL RECORD COPY

(3) The Coxswain was qualified for his position and attempted to start the engines during the evolution at a point that was consistent with training, existing technical requirements, and existing operating procedures. NSTM 583 (Boats and Small Craft) and Boat Information Book 11-Meter 11MRX0504 THRU 11MRX0506 waterjet drive 11-Meter Rigid Inflatable Boats both state, "START THE ENGINES SO THAT THE ENGINES ARE RUNNING AS SOON AS THE RIB IS WATERBORNE." USS SAN ANTONIO has a waterjet drive (serial number 11MRX0506) 11-Meter RHIB. The Boat Information Book for LPD 17 CLASS VARIANT 11-Meter RX outdrive Rigid Inflatable Boats which are not aboard USS SAN ANTONIO (LPD 17) states, " BEFORE THE BOAT COMES IN CONTACT WITH THE WATER, STOP LOWERING AND FULLY LOWER THE OUTDRIVE. START THE ENGINES. ENSURE THE ENGINES ARE RUNNING SMOOTHLY BEFORE CONTINUING THE LOWERING OPERATION."

4. I've exercised my duties as Commanding Officer knowing that I am accountable. I have not acted with negligence and believe the punishment awarded by Commander, U.S. Fleet Forces Command Admiral John C. Harvey, Jr is unjust because I was held accountable by my superior. Ship design, technical documentation, and procedural issues in some cases documented back to 1998 went uncorrected, mitigated, and were not made aware to either me or the crew of USS SAN ANTONIO (LPD 17) until after the boat accident. Ship design issues, initial construction problems, and lack of mitigating actions were not unique to just boating on SAN ANTONIO. There was another significant initial construction deficiency concerning the ability to board pilots on the starboard side of the ship that almost contributed to significant injury or the loss of life. Upon notification of the problem, I engaged NAVSEA PMS 317/470 and an alternative design to mitigate the problem was approved and is being installed during the current availability. During my time as Commanding Officer I have actively sought to uncover and demanded my crew report equipment and procedural deficiencies to improve USS SAN ANTONIO (LPD 17) and the LPD 17 SHIP CLASS.

Eric C. Cash
CDR USN



21/27 Aj

OFFICIAL RECORD COPY

CASH [redacted]

**DEPARTMENT OF THE NAVY**
COMMANDER
U.S. FLEET FORCES COMMAND
1562 MITSCHER AVENUE, SUITE 250
NORFOLK, VA 23551-2487

5812
Ser N00/ 144
3 Jun 10

FIRST ENDORSEMENT on CDR Eric C. Cash, USN, ltr of 21 May 2010

From: Commander, U. S. Fleet Forces Command
To: Vice Chief of Naval Operations

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

Encl: (1) Report of Disposition of Offense (NAVPERS 1626/7) of 13 May 10
(2) Punitive letter of Reprimand of 13 May 10
(3) JAGMAN investigation into RHIB mishap
(4) CHNAVPERS ltr 5800 Ser N1/020 of 2 Feb 10
(5) USFF ltr 5800 Ser N00/035 of 17 Feb 10
(6) COMNAVSURFLANT ltr 5800 Ser N00/031 of 19 Mar 10

1. Readdressed and forwarded, recommending denial.

2. On 13 May 2010, CDR Eric C. Cash appeared before me at Admiral's Mast regarding an allegation of dereliction of duty, in violation of Article 92 of the Uniform Code of Military Justice, while serving as Commanding Officer, USS SAN ANTONIO (LPD 17). At Mast, I ascertained that CDR Cash had been advised of and understood his rights with respect to the charge and specification. After carefully considering the evidence in the case, which consisted of a command investigation, including all subsequent endorsements and supplemental investigation reports, and verbal statements made by CDR Cash at Mast, I found that CDR Cash had committed the alleged violation and awarded him a punitive letter of reprimand. CDR Cash now appeals his punishment on the basis that it was unjust. CDR Cash's appeal was submitted in a timely manner. Enclosures (1) through (6) are relevant to the appeal.

3. The dereliction of duty charge stems from a small boat mishap that occurred on February 4, 2009, in the Gulf of Aden. While launching SAN ANTONIO's 11-meter RHIB, several missteps occurred which led to the RHIB tipping and the boat crew entering the water. Tragically, EN1(SW) Theophilus Ansong was lost at sea. An investigation into the mishap found that the Commanding Officer had failed to ensure an approved Special Evolution Watchbill was in place to support small boat



Enclosure (6)

22/37Az

OFFICIAL RECORD COPY

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

operations and that there was ineffective supervision of boating operations. Some of the personnel involved in the small boat evolution were not qualified for their positions and mistakes were made which resulted in the mishap.

4. CDR Cash begins his appeal by asserting that his former Commodore and Immediate Superior in Command (ISIC), CAPT Brian T. Smith (former Commander, Amphibious Squadron (COMPHIBRON) FOUR), previously held him accountable for his failure to ensure a Special Evolution Watchbill was in place prior to the 4 February 2009 RHIB incident. Significantly, CDR Cash does not dispute his failure, but asserts only that it was previously addressed. Specifically, Commodore Smith counseled CDR Cash but did not take punitive action. Although the current COMPHIBRON FOUR and Commander, Naval Surface Force Atlantic (COMNAVSURFLANT) believe counseling was sufficient, I do not. Accordingly, I exercised my independent judgment as a Commander in USS SAN ANTONIO's administrative chain of command to address CDR Cash's documented failure to promulgate a Special Evolution Watchbill, as well as his negligent failure to ensure effective supervision of the small boat operations.

5. CDR Cash also believes that imposition of punishment more than 14 months after the incident is unjust, especially taking into account the administrative action taken by COMPHIBRON FOUR. An understanding of the case's procedural history will help put the 14-month delay into context.

a. After the 4 February 2009 mishap, COMPHIBRON FOUR appointed an O-4 to conduct the investigation. After it was completed on 11 March 2009, COMPHIBRON FOUR endorsed the investigation on 15 March 2009, recommending disciplinary action against both the Commanding Officer and the Executive Officer.

b. After receiving the investigation from COMPHIBRON FOUR, Commander, Task Force FIVE ONE (CTF-51) returned it to COMPHIBRON FOUR on 6 April 2009 to appoint an O-6 investigating officer and to conduct further investigation.

c. COMPHIBRON FOUR appointed his Deputy to conduct the reinvestigation, which was completed on 16 April 2009. The re-investigation recommended disciplinary action against both the Commanding Officer and the Executive Officer.

d. COMPHIBRON FOUR favorably endorsed the investigation on 17 April 2009, which was subsequently reviewed and endorsed by



23/27 Az

OFFICIAL RECORD COPY

OFFICIAL RECORD COPY

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

CTF-51 on 20 April 2009, and Commander, U.S. FIFTH Fleet (COMFIFTHFLT) on 5 August 2009. In their endorsements, CTF-51 and COMFIFTHFLT refrained from commenting on the recommendations for disciplinary action, referring those recommendations to COMPHIBRON FOUR subject to the concurrence of the administrative chain of command.

e. As discussed above, COMPHIBRON FOUR took what he considered to be appropriate administrative action, counseling CDR Cash for the mishap.

f. In order to adjudicate a request for removal of the Executive Officer's promotion delay resulting from this incident, the Chief of Naval Personnel forwarded enclosure (4) to me on 2 February 2010 for a determination of what, if any, action had been taken with respect to the disciplinary recommendations, as it was not apparent from the investigation and subsequent endorsements. In turn, I forwarded the package to COMNAVSURFLANT on 17 February 2010 for that determination (enclosure (5)).

g. In enclosure (6), COMNAVSURFLANT advised on 19 March 2010 that administrative action had been taken in April 2009 and that the current COMPHIBRON FOUR (who was also the O-6 reinvestigating officer) elected not to take further action. COMNAVSURFLANT similarly concluded that no further action was necessary.

h. As noted above, upon my review of the investigation and subsequent endorsements, and after considering the COMNAVSURFLANT response in enclosure (6), I determined that the Commanding Officer's dereliction in this case warranted adjudication at Admiral's Mast. In the end, the Admiral's Mast was held well within the 24-month statute of limitations for nonjudicial punishment cases. That being said, because of the delay and because of Commander Cash's performance in command in the 14 months since the mishap, I continued to have confidence in his ability to command and did not request his detachment.

6. CDR Cash next raises several design, technical documentation and procedural issues, most of which are not included in the investigation and are being raised now for the very first time. Prior to the Mast proceeding, CDR Cash was afforded an opportunity to provide a written statement and any other material to be considered at Mast, but declined to do so (as it was his right to do). He also declined to request any



24/27 Az

CASH [redacted]

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

witnesses. At Mast, he stated that as Commanding Officer, he is accountable for the actions and inactions of his crew. In response to questions from me, he also explained that he was not aware of the qualifications of the crewmembers involved in the evolution, but he believed them to be qualified and had observed them in the performance of their duties. He acknowledged the importance of his presence on the bridge during the multiple evolutions occurring at the time, including small boat operations, flight operations, and steaming with ships in company. He did not, however, raise any of the technical issues he now asserts on appeal, nor were they addressed in the evidence before me at Mast.

7. Even after considering the new issues raised by CDR Cash, my decision to impose punishment was correct. As noted above, CDR Cash did not have a Special Evolutions Watchbill in place and there were unqualified individuals serving as signalman, crane operator, and crewmembers on the RHIB. Neither CDR Cash nor the Executive Officer were on the bridge maintaining oversight of the evolution at the time of the mishap. Furthermore, the measures which CDR Cash implemented immediately after the incident (paragraph 5 of his appeal) are measures he should have had in place prior to the incident, independent of the technical matters he now raises. In short, as Commanding Officer, CDR Cash has a duty to understand the capabilities and limitations of his ship and crew and make adjustments as necessary to ensure ship evolutions are conducted as safely as possible. In this case, CDR Cash's failure to ensure effective supervision of the boating evolution and his failure to ensure a Special Evolution Watchbill was in place constituted dereliction of duty warranting the imposition of nonjudicial punishment.

8. The punishment awarded in this case was within my authority and does not violate any existing regulations. Based on the aforementioned, I recommend CDR Cash's appeal be denied.

J. C. HARVEY, JR.

Copy to:
CDR Eric C. Cash



25/27Az

OFFICIAL RECORD COPY

CASH [redacted]

DEPARTMENT OF THE NAVY
VICE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

IN REPLY REFER TO:

5800
Ser N09D/0U118097
21 June 2010

From: Vice Chief of Naval Operations
To: CDR Eric C. Cash, USN
Via: Commander, U.S. Fleet Forces Command

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT ICO CDR ERIC C. CASH, USN, XXX-XX-[redacted]

Ref: (a) CDR Eric C. Cash, USN, ltr of 21 May 10 w/ end
(b) Manual for Courts-Martial, Part V
(c) Article 15, UCMJ
(d) Manual of the Judge Advocate General, Chapter 1

1. I have carefully reviewed and considered your appeal, reference (a), of non-judicial punishment imposed by Commander, U.S. Fleet Forces Command on 13 May 2010. For the reasons explained below, your appeal is denied.

2. The imposition of non-judicial punishment in this matter complied with the requirements set forth in references (b) through (d). You were afforded all of your procedural rights. You appealed the imposition of non-judicial punishment and awarding of a punitive letter of reprimand on the ground that it was unjust. I find Commander, U.S. Fleet Forces had a basis in law and fact for his action. The punishment awarded was appropriate considering the nature of the offense and was neither unjust nor disproportionate to the offense committed.

3. The punitive letter of reprimand you received is accurate and relevant to the offense committed and the punishment imposed.

4. Commander, U.S. Fleet Forces Command is directed to make appropriate service record entries and to file this action in the command's unit punishment book.

J. W. Greenert
J. W. GREENERT
Admiral, U.S. Navy

29/27 Ag

OFFICIAL RECORD COPY

2 February 2018

From: Office of Legal Counsel (BUPERS-00J) 2/2
To: Executive Director, Board for Correction of Naval Records
Via: Assistant for BCNR Matters (BUPERS-3)

Subj: REQUEST FOR COMMENTS AND RECOMMENDATIONS ICO ERIC C. CASH

Ref: (a) BCNR File No. 20170002451
(b) 10 U.S.C. § 1552
(c) SECNAVINST 5420.193

1. I have reviewed reference (a) and recommend disapproval of Petitioner's request. I offer the following comments in support of this recommendation.

2. Facts:

a. On 13 May 2010, Petitioner was given Non-Judicial Punishment (NJP) for an alleged violation of UCMJ, Article 92 (failure to obey order or regulation). He was awarded a Punitive Letter of Reprimand. The NJP was the result of an incident that occurred on 9 February 2009 while Petitioner was the Commanding Officer of the USS San Antonio and a sailor was killed in a Rigid Hull Inflatable Boat (RHIB) accident.

b. Petitioner unsuccessfully appealed his NJP.

c. Petitioner failed to promote to Captain and retired as a Commander on 30 September 2015.

d. On 15 May 2017, Petitioner filed this request with BCNR.

3. Issue: Whether law or equity requires correction of Petitioner's record to remove the Letter of Reprimand, reference to the NJP, and all passovers for promotion from his personnel file, and direct a Special Selection Board?

4. Short Answer: No.

a. As a threshold matter, Petitioner's request may be timely. Pursuant to reference (b), a correction of a military record may only be made if such a request is filed within three years after the discovery of the error or injustice. Petitioner acknowledged that he discovered the error or injustice on 1 May 2010, around the time he received NJP. Petitioner filed this BCNR request seven years later. Petitioner argues that pursuant to the Servicemember's Civil Relief Act (SCRA), the statute of limitations to file any lawsuit, including actions with a federal or state board, are tolled for the period of time the individual is in the military. 50 U.S.C. § 526(a). In this case, Petitioner claims that

his time to file a BCNR claim did not begin until he left active duty in May 2015. Because, as discussed *infra*, the application should be denied on the merits, this opinion will not address the timeliness of the claim.

b. Per reference (b), SECNAV has delegated the authority to correct a Petitioner's record to the BCNR. Pursuant to reference (c), a Petitioner must offer sufficient evidence establishing that a material error or injustice is present. If a Petitioner shows a material error or injustice, BCNR is afforded great latitude to correct their record. *See Boyer v. United States,* 81 fed. Cl. 188, 193-94 (Fed. Cl. 2008); *Porter v. United States*, 163 F.3d 1304, 1324 (C.A. Fed. 1998).

c. Petitioner first argues that the preponderance of evidence did not support that Petitioner was derelict in his duties onboard the USS San Antonio. Petitioner makes a compelling case in that Petitioner had signed all of the watch bills that he was required to sign and that there was no watch bill for small boat operations. He also argues that there was no watch bill requirement for small boat operations and that he had ensured proper supervision for the small boat operation on the day in question. Petitioner further claims that negligence or dereliction of duty was not the proximate cause of the accident, which was the result of RHIB engine failure and a malfunctioning sea painter line. Despite the evidence presented by Petitioner, from a legal standpoint, it is difficult to determine that there was insufficient evidence to support the Article 92 charge at NJP. First, NJP, which is governed by UCMJ, Article 15, does not follow the same stricter rules for judicial proceedings. As a result, there is generally no formal record of proceedings. Therefore, it is difficult to know what evidence was considered by the Admiral who administered Petitioner's NJP. For example, it is unknown whether Petitioner's NJP included all of the evidence presented by Petitioner in this BCNR request or whether there was additional adverse evidence considered that was not presented in this BCNR request. Similarly, NJP proceedings are not constrained by the Military Rules of Evidence. Therefore, information, such as hearsay and documents that lacked a foundation, could have been considered. While Petitioner's claim that there was insufficient evidence at his NJP is compelling, it is not legally persuasive.

d. Petitioner next argues that Petitioner's Letter of Reprimand was an affront to justice and fairness. Petitioner's primary argument is that the Executive Officer on the USS San Antonio, LCDR Sean Kearns, was allowed a court-martial, rather than NJP. This argument is similarly compelling. Pursuant to Article 15, because he was attached to a shore command at the time his command sought NJP, LCDR Kearns was entitled to request a court-martial in lieu of NJP, which he apparently did. Petitioner, who was still attached to a ship, did not have that same right, although his command could have allowed his case to go to a court-martial instead of NJP. LCDR Kearns was found not guilty at a Special Court-Martial that allegedly involved the same nexus of facts and the same charge. As discussed *supra*, there could have been a number of reasons for these disparate results, including different proof presented, a lower standard of proof at NJP, and that different triers of fact simply came to different results, which is permissible. In addition, Petitioner, as the Commanding Officer, may have had different duties than his Executive Officer. The evidence presented is simply insufficient to show that the