JUNIOR ELIGIBLE - NOT APPLICABLE

3. FOR PROMOTION TO THE GRADE OF LIEUTENANT, AN ALL-FULLY-QUALIFIED -OFFICERS LIST (AFQOL) CONSISTING OF THOSE OFFICERS RECOMMENDED FOR PROMOTION ON THEIR MOST RECENT FITNESS REPORTS WILL BE SENT TO THE SECRETARY, WHO WILL CERTIFY THE AFQOL AND FORWARD THE LIST WITH LIMITED DUTY OFFICER PERMANENT APPOINTMENT NOMINATIONS ATTACHED TO THE SECRETARY OF DEFENSE. THOSE OFFICERS DETERMINED NOT FULLY QUALIFIED FOR PROMOTION WILL BE OMITTED FROM THE AFQOL, CONSTITUTING A FAILURE OF SELECTION (FOS). THE ALL-FULLY-QUALIFIED (AFQ) STANDARD APPLIES TO ALL COMPETITIVE CATEGORIES. THE AFQ STANDARD WILL ALSO BE UTILIZED FOR THE MID-YEAR ACTIVE-DUTY LIEUTENANT JUDGE ADVOCATE GENERAL'S AND CHAPLAIN CORPS PROMOTIONS AND ANY OFFICERS ADMINISTRATIVELY MISSED WHEN THE ORIGINAL LISTS WERE COMPILED.

4. AN OFFICIAL PHOTO, TAKEN WITHIN THREE MONTHS AFTER ACCEPTANCE OF EACH PROMOTION IS REQUIRED TO BE FILED IN THE OFFICIAL MILITARY PERSONNEL FILE. SEE MILPERSMAN 1070-180 FOR THE SPECIFICATIONS REQUIRED FOR THE SUBMISSION OF PHOTOS.

5. ONLY ELIGIBLE OFFICERS MAY COMMUNICATE WITH A PROMOTION SELECTION BOARD. CORRESPONDENCE MUST ARRIVE NOT LATER THAN THE DAY BEFORE THE CONVENING DATE OF THE BOARD AND SHALL BE ADDRESSED TO: NAVY PERSONNEL COMMAND (NPC) CUSTOMER SERVICE CENTER, PRESIDENT. ACTIVE-DUTY FY-13 (GRADE) (LINE OR STAFF CORPS, AS APPLICABLE) PROMOTION SELECTION BOARD, AND BOARD #XXX. TO CHECK ON RECEIPT OF YOUR PACKAGE, GO TO WWW.NPC.NAVY .MIL/BOARDS/ACTIVEDUTYOFFICER OR CONTACT THE CUSTOMER SERVICE CENTER AT (866) 827-5672. WRITTEN COMMUNICATION MAY CALL TO THE ATTENTION OF THE BOARD ANY MATTER CONCERNING HIMSELF/HERSELF THAT THE OFFICER CONSIDERS IMPORTANT. THE WRITTEN COMMUNICATION MUST BE IN ACCORDANCE WITH MILPERSMAN 1420-010 AND MAY INCLUDE, AS ENCLOSURES, CORRESPONDENCE FROM ANY INDIVIDUAL CONCERNING THE ELIGIBLE OFFICER. CORRESPONDENCE NOT ORIGINATED BY THE ELIGIBLE OFFICER, INCLUDING ENDORSEMENTS TO THE OFFICERS LETTER, AND LETTERS WRITTEN ON BEHALF OF THAT OFFICER, MUST CONTAIN A WRITTEN ACKNOWLEDGEMENT BY THE ELIGIBLE OFFICER THAT HE OR SHE DESIRES THAT SUCH CORRESPONDENCE BE PRESENTED TO THE BOARD. CORRESPONDENCE WITHOUT SUCH ACKNOWLEDGEMENT IS CONSIDERED THIRD PARTY CORRESPONDENCE AND WILL BE RETURNED. CLASSIFIED CORRESPONDENCE WILL NOT BE ACCEPTED.

6. IN-ZONE AND ABOVE-ZONE ELIGIBLE OFFICERS IN THE GRADES OF LIEUTENANT, LIEUTENANT COMMANDER AND COMMANDER, WHOSE PLACEMENT ON THE ACTIVE-DUTY LIST IS WITHIN ONE YEAR OF THE CONVENING DATES OF THESE BOARDS ARE AUTOMATICALLY DEFERRED UNLESS THEY SPECIFICALLY REQUEST TO BE CONSIDERED. THE OFFICER MAY WAIVE THIS DEFERMENT AND REQUEST CONSIDERATION FOR PROMOTION, IN WRITING TO:

COMMANDER, NAVY PERSONNEL COMMAND (PERS-802)
5720 INTEGRITY DRIVE
MILLINGTON, TN 38055-0000

THE REQUEST MUST BE RECEIVED BY PERS-80 NOT LATER THAN 30 DAYS PRIOR TO THE CONVENING DATE OF THE BOARD.

7. THIS NAVADMIN WILL BE CANCELLED FOR RECORD PURPOSES ON 30 SEPTEMBER 2013.

8. RELEASED BY VICE ADMIRAL S. R. VAN BUSKIRK, N1.//

BT
#0000
NNNN

# FITNESS REPORT & COUNSELING RECORD (E7-O6)

RCS BUPERS 1610-1

| | | | |
|---|---|---|---|
| 1. Name (Last, First MI Suffix): CASH, ERIC C | 2. Grade/Rate: CDR | 3. Desig: 1110 | 4. SSN: [redacted] |
| 5. ACT [X] TAR [ ] INACT [ ] AT/ADSW/265 [ ] | 6. UIC: 07207 | 7. Ship/Station: LPD 17 SAN ANTONIO | 8. Promotion Status: REGULAR / 9. Date Reported: 08DEC10 |
| Occasion for Report: 10. Periodic [ ] | Detachment 11. of Individual [X] | Detachment of 12. Reporting Senior [ ] / 13. Special [ ] | Period of Report 14. From: 09MAY01 15. To: 09SEP30 |
| 16. Not Observed Report [ ] | Type of Report 17. Regular [X] | 18. Concurrent [ ] / 19. Ops Cdr [ ] | 20. Physical Readiness: P/WS / 21. Billet Subcategory (if any): CO AFLOAT |
| 22. Reporting Senior (Last, FI MI): GRIPPIN, L D | 23. Grade: CAPT / 24. Desig: 1117 | 25. Title: COMMODORE / 26. UIC: 55336 | 27. SSN: |

28. Command employment and command achievements.
AMMO OFFLOAD, ULTRA-S, PMA-3, ARQ, LOA.

29. Primary/Collateral/Watchstanding duties. (Enter primary duty abbreviation in box.)
CO AFLOAT Commanding Officer - 5. Responsible for trainig, welfare, tactical employment and safety of more than 350 Sailors.

| For Mid-term Counseling Use. (When completing FITREP, enter 30 and 31 from counseling worksheet, sign 32.) | 30. Date Counseled: NOT REQ | 31. Counselor: | 32. Signature of Individual Counseled: |
|---|---|---|---|

PERFORMANCE TRAITS: 1.0 - Below standards/not progressing or UNSAT in any one standard; 2.0 - Does not yet meet all 3.0 standards; 3.0 - Meets all 3.0 standards; 4.0 - Exceeds most 3.0 standards; 5.0 - Meets overall criteria and most of the specific standards for 5.0. Standards are not all inclusive.

| PERFORMANCE TRAITS | 1.0* Below Standards | 2.0 Progressing | 3.0 Meets Standards | 4.0 Above Standards | 5.0 Greatly Exceeds Standards |
|---|---|---|---|---|---|
| 33. PROFESSIONAL EXPERTISE: Professional knowledge proficiency, and qualifications. NOB [ ] | - Lacks basic professional knowledge to perform effectively. - Cannot apply basic skills. - Fails to develop professionally or achieve timely qualifications. [ ] | - - - [ ] | - Has thorough professional knowledge. - Competently performs both routine and new tasks. - Steadily improves skills, achieves timely qualifications. [ ] | - - - [ ] | - Recognized expert, sought after to solve difficult problems. - Exceptionally skilled, develops and executes innovative ideas. - Achieves early/highly advanced qualifications. [X] |
| 34. COMMAND OR ORGANIZATIONAL CLIMATE/EQUAL OPPORTUNITY: Contributing to growth and development, human worth, community. NOB [ ] | - Actions counter to Navy's retention/reenlistment goals. - Uninvolved with mentoring or professional development of subordinates. - Actions counter to good order and discipline and negatively affect Command/Organizational climate. - Demonstrates exclusionary behavior. Fails to value differences from cultural diversity. [ ] | - - - - [ ] | - Positive leadership supports Navy's increased retention goals. Active in decreasing attrition. - Actions adequately encourage/support subordinates' personal/professional growth. - Demonstrates appreciation for contributions of Navy personnel. Positive influence on Command climate. - Values differences as strengths. Fosters atmosphere of acceptance/inclusion per EO/EEO policy. [ ] | - - - - [X] | - Measurably contributes to Navy's increased retention and reduced attrition objectives. - Proactive leader/exemplary mentor. Involved in subordinates' personal development leading to professional growth/sustained commitment. - Initiates support programs for military, civilian, and families to achieve exceptional Command and Organizational climate. - The model of achievement. Develops unit cohesion by valuing differences as strengths. [ ] |
| 35. MILITARY BEARING/CHARACTER: Appearance, conduct, physical fitness, adherence to Navy Core Values. NOB [ ] | - Consistently unsatisfactory appearance. - Unsatisfactory demeanor or conduct. - Unable to meet one or more physical readiness standards. - Fails to live up to one or more Navy Core Values: HONOR, COURAGE, COMMITMENT. [ ] | - - - - [ ] | - Excellent personal appearance. - Excellent demeanor or conduct. - Complies with physical readiness program. - Always lives up to Navy Core Values: HONOR, COURAGE, COMMITMENT. [ ] | - - - - [ ] | - Exemplary personal appearance. - Exemplary representative of Navy. - A leader in physical readiness. - Exemplifies Navy Core Values: HONOR, COURAGE, COMMITMENT. [X] |
| 36. TEAMWORK: Contributions towards team building and team results. NOB [ ] | - Creates conflict, unwilling to work with others, puts self above team. - Fails to understand team goals or teamwork techniques. - Does not take direction well. [ ] | - - - [ ] | - Reinforces others' efforts, meets personal commitments to team. - Understands team goals, employs good teamwork techniques. - Accepts and offers team direction. [ ] | - - - [ ] | - Team builder, inspires cooperation and progress. - Talented mentor, focuses goals and techniques for team. - The best at accepting and offering team direction. [X] |
| 37. MISSION ACCOMPLISHMENT AND INITIATIVE: Taking initiative, planning/prioritizing, achieving mission. NOB [ ] | - Lacks initiative. - Unable to plan or prioritize. - Does not maintain readiness. - Fails to get the job done. [ ] | - - - - [ ] | - Takes initiative to meet goals. - Plans/prioritizes effectively. - Maintains high state of readiness. - Always gets the job done. [ ] | - - - - [ ] | - Develops innovative ways to accomplish mission. - Plans/prioritizes with exceptional skill and foresight. - Maintains superior readiness, even with limited resources. - Gets jobs done earlier and far better than expected. [X] |

NAVPERS 1610/2 (03-02)

# FITNESS REPORT AND COUNSELING RECORD (E7-O6) (cont 'd)

RCS BUPERS 1610-1

| 1. Name (Last, First MI Suffix) | 2. Grade/Rate | 3. Desig | 4. SSN |
|---|---|---|---|
| CASH, ERIC C | CDR | 1110 | [redacted] |

| PERFORMANCE TRAITS | 1.0* Below Standards | 2.0 Progressing | 3.0 Meets Standards | 4.0 Above Standards | 5.0 Greatly Exceeds Standards |
|---|---|---|---|---|---|
| 38. LEADERSHIP: Organizing, motivating and developing others to accomplish goals. NOB [ ] | - Neglects growth/development or welfare of subordinates. - Fails to organize, creates problems for subordinates. - Does not set or achieve goals relevant to command mission and vision. - Lacks ability to cope with or tolerate stress. - Inadequate communicator. - Tolerates hazards or unsafe practices. [ ] | [ ] | - Effectively stimulates growth/development in subordinates. - Organizes successfully, implementing process improvements and efficiencies. - Sets/achieves useful, realistic goals that support command mission. - Performs well in stressful situations. - Clear, timely communicator. - Ensures safety of personnel and equipment. [ ] | [ ] | - Inspiring motivator and trainer, subordinates reach highest level of growth and development. - Superb organizer, great foresight, develops process improvements and efficiencies. - Leadership achievements dramatically further command mission and vision. - Perseveres through the toughest challenges and inspires others. - Exceptional communicator. - Makes subordinates safety-conscious, maintains top safety record. - Constantly improves the personal and professional lives of others. [X] |
| 39. TACTICAL PERFORMANCE: (Warfare qualified officers only) Basic and tactical employment of weapons systems. NOB [ ] | - Has difficulty attaining qualification expected for the rank and experience. - Has difficulty in ship(s), aircraft or weapons systems employment. Below others in knowledge and employment. - Warfare skills in specialty are below standards compared to others of same rank and experience. [ ] | [ ] | - Attains qualifications as required and expected. - Capably employs ship(s), aircraft, or weapons systems. Equal to others in warfare knowledge and employment. - Warfare skills in specialty equal to others of same rank and experience. [ ] | [ ] | - Fully qualified at appropriate level for rank and experience. - Innovatively employs ship(s), aircraft, or weapons systems. Well above others in warfare knowledge and employment. - Warfare skills in specialty exceed others of same rank and experience. [X] |

| 40. I recommend screening this individual for next career milestone(s) as follows: (maximum of two) Recommendations may be for competitive schools or duty assignments such as: LCPO, DEPT CPO, SEA, CMC, CWO, LDO, Dept Head, XO, OIC, CO, Major Command, War College, PG School. | MAJOR COMMAND | JOINT/ FELLOWSHIP |
|---|---|---|

41. COMMENTS ON PERFORMANCE: * All 1.0 marks, three 2.0 marks, and 2.0 marks in Block 34 must be specifically substantiated in comments. Comments must be verifiable. Font must be 10 or 12 Pitch (10 or 12 Point) only. Use upper and lower case.

Report submitted upon ISIC shift from Amphibious Squadron FOUR to Amphibious Squadron SIX.
*** SCREEN FOR MAJOR COMMAND AFLOAT. ***

Eric is one the best commanding officers I've observed. He consistently led with vision, energy, unflagging resolve and a winning attitude to achieve mission success despite first of ship class challenges. Command awarded Retention Excellence 2nd QTR FY09.
- PHENOMENAL LEADER: Led SAN ANTONIO through a shipyard availability with top results. While assigned a rookie Port Engineer and Project Manager, he succeeded beyond Regional Maintenance CDR, SURFLANT, and NAVSEA's wildest dreams during a high vis and risky first post deployment repair avail of an LPD 17 class ship. AMAZINGLY, he got more accomplished than in the original maintenance package, below budget controls, and even gave back almost $400K so other ships could get required maintenance accomplished.
- BRILLIANT STRATEGIST: Executed a highly successful Engineering Light Off Assessment (LOA). Brilliant from plan start to finish, Eric's crew successfully demonstrated most required checks before LOA started to reduce game day to a mere formality. Used same strategy to make Aviation Readiness Qual a 1 day 1 event cert - INCREDIBLE!

*** Don't pass on promoting a superb officer to CAPTAIN and MAJOR COMMAND AFLOAT! ***

| Promotion Recommendation | NOB | Significant Problems | Progressing | Promotable | Must Promote | Early Promote |
|---|---|---|---|---|---|---|
| 42. INDIVIDUAL | | | | | X | |
| 43. SUMMARY | X | 0 | 0 | 0 | 1 | 1 |

44. Reporting Senior Address
COMMMANDER
AMPHIBIOUS SQUADRON FOUR
UNIT 60032
FPO AE 09501-5803

45. Signature of Reporting Senior: [signature]
Date: 22 OCT 2009

46. Signature of Individual Evaluated. "I have seen this report, been apprised of my performance, and understand my right to make a statement."
I intend to submit a statement. [ ] do not intend to submit a statement. [X]
[signature]
Date: 22OCT09

Member Trait Average: 4.86 | Summary Group Average: 4.86

47. Typed name, grade, command, UIC, and signature of Regular Reporting Senior on Concurrent Report

Date:

NAVPERS 1610/2 (03-02)

RAAUZYUW RUCOMFA3158 2402137-UUUU--RHBVAOW RHBVDVW RHBVEPB RHBVGUN
RHBVHHI RHBVHHQ RHBVHKK RHBVHTB RHBVJLK RHBVJPX RHBVNKP RHBVNWI
RHBVOGB RHBVOUE RHBVPAB RHBVREH RHBVSAN RHBVSBJ RHBVTZX RHBVVED.
ZNR UUUUU ZUI RUCOMCA2191 2402137
R 281900Z AUG 09 PSN 526319K26
FM PEO SHIPS WASHINGTON DC
TO RUCBCLF/COMUSFLTFORCOM NORFOLK VA
ZEN/COMLSDLPDRON SAN DIEGO CA
ZEN/COMNAVSURFLANT NORFOLK VA
ZEN/COMNAVSURFOR SAN DIEGO CA
ZEN/COMNAVSURFPAC SAN DIEGO CA
INFO RUCBTFG/COMLHDRON NORFOLK VA
RULSSEA/COMNAVSEASYSCOM WASHINGTON DC
RHBVOUE/COMPHIBRON FOUR
RHBVHHI/COMPHIBRON TWO
RHBVPAB/COMSECONDFLT
EXPSTRKGRU TWO
RHBVVED/USS MESA VERDE
RHBVSAN/USS SAN ANTONIO
RHRHGRY/USS GREEN BAY
ZEN/CENNAVENGINEERING NORFOLK VA
ZEN/CMC WASHINGTON DC
ZEN/CNO WASHINGTON DC
ZEN/COMAFLOATRAGRU ATLANTIC NORFOLK VA
PAGE 02 RUCOMFA3158 UNCLAS
ZEN/COMAFLOATRAGRUPAC SAN DIEGO CA
ZEN/AFLOATRAGRUWESTPAC YOKOSUKA JA
ZEN/COMEXSTRIKGRU FIVE
ZEN/COMEXSTRIKGRU SEVEN
ZEN/COMEXSTRIKGRU THREE
ZEN/COMFIFTHFLT
ZEN/COMLOG WESTPAC
ZEN/COMMARFORCOM
ZEN/COMMARFORPAC
ZEN/COMMARFORRES
ZEN/COMNAVAIRSYSCOM PATUXENT RIVER MD
ZEN/COMNAVNETWARCOM NORFOLK VA
ZEN/COMNAVSAFECEN NORFOLK VA
ZEN/COMNAVSUPSYSCOM MECHANICSBURG PA
ZEN/COMPACFLT PEARL HARBOR HI
ZEN/COMPHIBRON ONE
ZEN/COMPHIBGRU THREE
ZEN/COMPHIBRON FIVE
ZEN/COMSEVENTHFLT
ZEN/COMSPAWARSYSCOM SAN DIEGO CA
PAGE 03 RUCOMFA3158 UNCLAS
ZEN/COMTHIRDFLT
ZEN/EWTGLANT NORFOLK VA
ZEN/EWTGPAC SAN DIEGO CA
ZEN/FISC NORFOLK VA
ZEN/FISC SAN DIEGO CA
ZEN/MIDLANT RMC DET BAHRAIN
ZEN/MIDLANT RMC DET NAPLES IT
ZEN/MIDLANT RMC NORFOLK VA
ZEN/NAVICP MECHANICSBURG PA
ZEN/NAVMEDIACEN WASHINGTON DC

ZEN/NAVSEALOGCEN MECHANICSBURG PA
ZEN/NAVSHIPREPFAC AND JAPAN RMC DET SASEBO JA
ZEN/NAVSHIPREPFAC AND JAPAN RMC YOKOSUKA JA
ZEN/NAVSHIPYD AND IMF PEARL HARBOR HI
ZEN/NAVSHIPYD AND IMF PUGET SOUND WA
ZEN/NAVSURFWARCEN CARDEROCKDIV BETHESDA MD
ZEN/NAVSURFWARCEN SHIPSYSENGSTA PHILADELPHIA PA
ZEN/NAVSURFWARCENDIV CRANE IN
ZEN/NAVSURFWARCENDIV DAHLGREN VA
ZEN/NAVSURFWARCENDIV PANAMA CITY FL
PAGE 04 RUCOMFA3158 UNCLAS
ZEN/NAVSURFWARCENDIV PORT HUENEME CA
ZEN/PEO C4I SAN DIEGO CA
ZEN/PEO LMW WASHINGTON DC
ZEN/PEO SHIPS WASHINGTON DC
ZEN/PRESINSURV NORFOLK VA
ZEN/RSO SAN DIEGO CA
ZEN/SOUTHWEST RMC SAN DIEGO CA
ZEN/SPAWARSYSCEN ATLANTIC CHARLESTON SC
ZEN/SPAWARSYSCEN PACIFIC SAN DIEGO CA
ZEN/SUPSHIP GULF COAST MS
ZEN/USS NEW ORLEANS
ZEN/PEO IWS WASHINGTON DC
BT
UNCLAS

***THIS IS A 2 SECTION MESSAGE COLLATED BY DMDS***

QQQQ
SIC: N04700
SUBJ: LPD 17 CLASS ADVISORY NR 13-09 - SMALL BOAT HANDLING EVOLUTION/
/
UNCLASSIFIED//
PAGE 05 RUCOMFA3158 UNCLAS
PASS TO OFFICE CODES:
FM PEO SHIPS WASHINGTON DC//PMS317//
TO COMNAVSURFLANT NORFOLK VA//N434/43/431/N43AD/N43T13/N6/N8//
COMNAVSURFOR SAN DIEGO CA//N43/N43AP/N43T/N43T1/N431/N43121/N434
/N6/N7/N8//
COMNAVSURFPAC SAN DIEGO CA//N43/N43AP/N43T/N43T1/N6/N7/N8//
COMUSFLTFORCOM NORFOLK VA//N43//
INFO CENNAVENGINEERING NORFOLK VA//JJJ//
CMC WASHINGTON DC//ASM/AVN/LP/PPO//
CNO WASHINGTON DC//N85/N853//
COMAFLOATRAGRU ATLANTIC NORFOLK VA//N82//
COMAFLOATRAGRUPAC SAN DIEGO CA//N82//
AFLOATRAGRUWESTPAC YOKOSUKA JA//N82//
COMFIFTHFLT//N43//
COMMARFORCOM//G3/G4//
COMMARFORPAC//G3/G4//
COMMARFORRES//G3/G4//
COMNAVSEASYSCOM WASHINGTON DC//SEA05D/SEA05M/SEA05N/SEA05P/SEA05
Z/SEA21/SEA62/SEA91//
COMPACFLT PEARL HARBOR HI//N43//
PAGE 06 RUCOMFA3158 UNCLAS
COMSECONDFLT//N43//

COMSEVENTHFLT//N43//
COMSPAWARSYSCOM SAN DIEGO CA//PMW157/PMW160//
COMTHIRDFLT//N43//
MIDLANT RMC NORFOLK VA//00/N4/PORTENG//
NAVMEDIACEN WASHINGTON DC//MC41//
NAVSHIPREPFAC AND JAPAN RMC DET SASEBO JA//S340/S1202//
NAVSHIPYD AND IMF PEARL HARBOR HI//100/200//
NAVSHIPYD AND IMF PUGET SOUND WA//100/200//
NAVSURFWARCEN CARDEROCKDIV BETHESDA MD//23/24//
NAVSURFWARCEN SHIPSYSENGSTA PHILADELPHIA PA//913/92/97/9421//
PEO IWS WASHINGTON DC//IWS2/IWS6//
PEO SHIPS WASHINGTON DC//FL/FT/FT22/PMS317/PMS470/PMS470RC4/SHIP
SF//
SOUTHWEST RMC SAN DIEGO CA//40/45//
SPAWARSYSCEN ATLANTIC CHARLESTON SC//52//
SUPSHIP GULF COAST MS//100/101/117/157/200//
MSGID/GENADMIN,USMTF,2007/PEO SHIPS PMS 317//
SUBJ/LPD 17 CLASS ADVISORY NR 13-09 - SMALL BOAT HANDLING EVOLUTION//
REF/A/MSGID:GENADMIN/COMNAVSAFECEN NORFOLK VA/111930ZMAR2009/-/NOTAL

//
REF/B/DESC:DOC-NAVSEA TECHNICAL MANUAL S9583-B2-MM-010/-/YMD:20080701
//
REF/C/DESC:DOC-PEO SHIPS (PMS 317) LTR 4200 SER 317-226/-
/YMD:20090618/-/NOTAL//
NARR/REF A IS NAVAL SAFETY CENTER (NAVSAFECEN) SAFETY INVESTIGATION REPORT (SIR) ON SAILOR LOST AT SEA FROM LPD 17 RIB. REF B IS NAVSEA TECHNICAL MANUAL S9583-B2-MMM-010, BOAT AND CARGO CRANE HANDLING AND STOWAGE SYSTEM. REF C IS PMS317 DIRECTING THE LPD 17 CLASS PLANNING YARD TO DEVELOP A WORK SPECIFICATION TO MODIFY THE PORT AND STBD BOAT HANDLING FITTINGS,//
POC/DAN MAHER/CIV/UNIT:PMS 317C/-/TEL:202-781-2909
/EMAIL:DANIEL.MAHER@NAVY.MIL//
GENTEXT/REMARKS/1. THIS CLASS ADVISORY PROVIDES GUIDANCE TO LPD 17 CLASS SHIPBOARD PERSONNEL WHO ARE CONDUCTING SMALL BOAT HANDLING EVOLUTIONS UNDERWAY.
2. BACKGROUND:
A. IN RESPONSE TO REF A, PMS 317, NAVSEA 05Z, AND NSWCCD CODE 97 REVIEWED THE BOAT HANDLING PROCEDURES FOR IN-SERVICE LPD 17 CLASS SHIPS AND DETERMINED THAT STANDARDIZED PROCEDURES FOR BOAT HANDLING

EVOLUTIONS ARE REQUIRED. PRELIMINARY PROCEDURES WERE DEVELOPED AND REVIEWED WITH THE DECK CREWS ON LPD 17 AND LPD 19 AND ARE PROMULGATED BELOW. THESE STANDARDIZED PROCEDURES WILL BE INCORPORATED INTO REF B.
3. ACTIONS: IN ORDER TO REDUCE THE SAFETY RISK DURING SMALL BOAT HANDLING OPERATIONS, THE FOLLOWING PROCEDURES SHALL BE FOLLOWED:
A. PREPARATION FOR PLANNED 7 AND 11 METER RHIB BOAT OPERATIONS SHALL INCLUDE NORMAL PRE-OPERATIONAL CHECKS, PROVIDING WATER SUPPLY TO ENGINE COOLANT SYSTEMS AND STARTING THE ENGINES TO ENSURE PROPER OPERATION PRIOR TO LAUNCHING. THIS DOES NOT INCLUDE THE READY SERVICE LIFEBOAT (STBD 7M RHIB) WHICH SHALL BE STARTED DAILY WHILE UNDERWAY. DO NOT ENGAGE WATERJETS OR OUTDRIVES UNLESS WATERBORNE.
B. MARK THE SEA PAINTER LINE LENGTH FOR EACH TYPE OF BOAT HANDLED, INCLUDING THE 7 AND 11 METER RHIBS. THE SEA PAINTER SHALL BE CLEARLY MARKED TO INDICATE PROPER LINE LENGTH FROM THE RHIB TO THE

SECURING POINT.
C. ESTABLISH DIRECT COMMUNICATIONS BETWEEN THE OFFICER IN CHARGE (OIC), RHIB COXSWAIN, CRANE/DAVIT OPERATOR, BRIDGE AND THE SEA PAINTER LINE HANDLER PRIOR TO COMMENCING SMALL BOAT EVOLUTIONS.
D. LINE HANDLERS SHALL TIE-OFF THE SEA PAINTER TO THE SECURING POINT
PAGE 09 RUCOMFA3158 UNCLAS
AND INFORM THE OIC THAT THE ACTION IS COMPLETE. THE OIC SHALL OBTAIN CONFIRMATION THAT THE LINE IS SECURED PRIOR TO COMMENCING SMALL BOAT LAUNCH. THERE SHALL BE NO HAND TENDING OF THE SEA PAINTER ONCE IT IS TIED-OFF.
E. WHEN LAUNCHING SMALL BOATS THE FOLLOWING ENGINE START PROCEDURE SHALL BE FOLLOWED:
1) STOP LOWERING THE RHIB APPROXIMATELY TEN (10) FEET ABOVE THE WATER TO AVOID WAVE PEAKS.
2) START THE ENGINES AND SIGNAL TO THE OIC THAT THE BOAT ENGINE HAS STARTED. IF LOWERING THE BOAT INTO THE WATER IS DELAYED FOR MORE THAN TEN (10) SECONDS, THEN STOP THE ENGINES TO AVOID BOAT ENGINE IMPELLER DAMAGE AND INFORM THE OIC THAT THE BOAT IS NOT READY FOR LOWERING INTO THE WATER.
3) ONCE ENGINE START IS CONFIRMED, THEN IMMEDIATELY LOWER THE RHIB INTO THE WATER. ENGINES SHALL NOT BE RUN OUT OF THE WATER FOR MORE THAN TEN (10) SECONDS.
F. REF C DIRECTS THE LPD 17 CLASS PLANNING YARD TO DEVELOP A WORK SPECIFICATION TO MODIFY THE PORT AND STARBOARD BOAT HANDLING
QQQQ
FITTINGS. THIS CHANGE HAS BEEN COMPLETED ON LPD 19 AND LPD 20 AND WILL BE DONE ON LPD 21 DURING PSA. THE WORK SPECIFICATION (AWI) HAS BEEN REVIEWED AND APPROVED BY THE ISEA AND TECHNICAL WARRANT HOLDER. PMS317 WILL PROVIDE THE WORK SPECIFICATION TO PMS470 SO THAT A SCD
PAGE 05 RUCOMFA3159 UNCLAS
CAN BE DEVELOPED THAT BACKFITS THIS CHANGE ON LPD 17 AND LPD 18.
G. SEA05 AND NSWCCD SSES CODE 97 WILL CONSIDER ADDITIONAL SYSTEM MODIFICATIONS TO IMPROVE VISIBILITY DURING SMALL BOAT HANDLING OPERATIONS. PROVIDE RECOMMENDED IMPROVEMENTS TO THE TECHNICAL POINT OF CONTACT LISTED IN PARAGRAPH 6.
4. FOR COMUSFLTFORCOM/COMNAVSURFOR: RECOMMEND ALL LPD 17 CLASS SHIPS BE TASKED TO ADHERE TO THIS CLASS ADVISORY.
5. THIS CLASS ADVISORY WILL REMAIN IN EFFECT UNTIL REF B IS UPDATED WITH THE OPERATING PROCEDURES SPECIFIED ABOVE. ADDITIONALLY, THIS CLASS ADVISORY SHALL REMAIN ACTIVE UNTIL ALL SHIPS REPORT COMPLETION OF BOAT HANDLING FITTING MODIFICATIONS TO PMS317 VIA CLASSRON.
6. POINT OF CONTACT FOR LPD 17 CLASS ADVISORY MATTERS IS MR. DAN MAHER, CODE PMS317C, DSN 443-2909 OR COMM (202)781-2909, EMAIL DANIEL.MAHER AT NAVY.MIL; PEO SHIPS TECHNICAL POINT OF CONTACT IS MR CHAD DROZ CODE PMS317CE, DSN 443-1898 OR COMM (202) 781-1898, EMAIL CHAD.DROZ AT NAVY.MIL; SEA 05Z IS MR JOHN BEDNAREK 202-781-3675, EMAIL JOHN.BEDNAREK AT NAVY.MIL; ISEA MR. WALTER NOWAK NSWCCD PHILADELPHIA, COMM (215) 897-7328, EMAIL WALTER.NOWAK AT NAVY.MIL.//
BT
#3159
NNNN

**DEPARTMENT OF THE NAVY**
BOARD FOR CORRECTION OF NAVAL RECORDS
701 S. COURTHOUSE ROAD, SUITE 1001
ARLINGTON, VA 22204-2490

JDR
Docket No: 2451-17

CDR ERIC C CASH USN (RET)
C/O MR DAVID P SHELDON
100 M STREET SE SUITE 600
WASHINGTON DC 20003

Dear Commander Cash:

This is in reference to your application for correction of your naval record pursuant to the provisions of title 10 of the United States Code, section 1552. After careful and conscientious consideration of the entire record, the Board found the evidence submitted was insufficient to establish the existence of probable material error or injustice. Consequently, your application has been denied.

Regarding your request for a personal appearance, the Board determined that a personal appearance with or without counsel will not materially add to their understanding of the issue(s) involved. Therefore, the Board determined that a personal appearance was not necessary and considered your case based on the evidence of record.

A three-member panel of the Board for Correction of Naval Records, sitting in executive session, considered your application on 30 April 2018. However, prior to reaching a conclusion, the Board identified additional potentially mitigating information not provided for review. Specifically, the Board did not have a copy of the Command Investigation (CI) Report. After receiving the CI Report, the panel continued its review of Petitioner's allegations of error and injustice on 30 May 2018. The names and votes of the members of the panel will be furnished upon request. Your allegations of error and injustice were reviewed in accordance with administrative regulations and procedures applicable to the proceedings of this Board. Documentary material considered by the Board consisted of your application, together with all material submitted in support thereof, relevant portions of your naval record, and applicable statutes, regulations, and policies. The enclosed advisory opinions (AO) provided in the Office of Legal Counsel (BUPERS-00J) letter dated 2 February 2018 and the Naval Personnel Command (PERS-801) memorandum dated 11 December 2017 were sent to your counsel for an opportunity to comment prior to being considered by the Board. Your rebuttal statement of 20 April 2018 was also considered by the Board.

On 13 May 2010, you received nonjudicial punishment (NJP) for violation of Article 92 (failure to obey order or regulation) of the Uniform Code of Military Justice (UCMJ) as a result of an incident that occurred on 9 February 2009 while you were the Commanding Officer (CO) of the

330/330/310

# APPLICATION FOR CORRECTION OF MILITARY RECORD UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552

*(Please read instructions on reverse side BEFORE completing this application.)*

OMB No. 0704-0003

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to the Department of Defense, Executive Services Directorate, Information Management Division, 1155 Defense Pentagon, Washington, DC 20301-1155 (0704-0003). Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

**PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ORGANIZATION. APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.**

NR20170002451
CASH, ERIC C

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

**ROUTINE USE**

**DISCLOSURE**
information may ... Social Security number is strictly to assure proper identification of the individual and appropriate records.

**1. APPLICANT DATA** *(The person whose record you are requesting to be corrected.)*

a. BRANCH OF SERVICE *(X one)*: ☐ ARMY ☒ NAVY ☐ AIR FORCE ☐ MARINE CORPS ☐ COAST GUARD

| b. NAME *(Print - Last, First, Middle Initial)* | c. PRESENT OR LAST PAY GRADE | d. SERVICE NUMBER *(If applicable)* | e. SSN |
|---|---|---|---|
| Cash, Eric C. | 0-5 | | [redacted] |

| 2. PRESENT STATUS WITH RESPECT TO THE ARMED SERVICES *(Active Duty, Reserve, National Guard, Retired, Discharged, Deceased)* | 3. TYPE OF DISCHARGE *(If by court-martial, state the type of court.)* | 4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY *(YYYYMMDD)* |
|---|---|---|
| Retired | Honorable | 20150930 |

**5. I REQUEST THE FOLLOWING ERROR OR INJUSTICE IN THE RECORD BE CORRECTED:** *(Entry required)*

See attached memorandum and supporting exhibits.

**6. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST FOR THE FOLLOWING REASONS:** *(Entry required)*

See attached memorandum and supporting exhibits.

**7. ORGANIZATION AND APPROXIMATE DATE** *(YYYYMMDD)* **AT THE TIME THE ALLEGED ERROR OR INJUSTICE IN THE RECORD OCCURRED** *(Entry required)* USS San Antonio LPD 17

**8. DISCOVERY OF ALLEGED ERROR OR INJUSTICE**

| a. DATE OF DISCOVERY *(YYYYMMDD)* | b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THE APPLICATION. |
|---|---|
| 20100501 | N/A. SSCRA. |

**9. IN SUPPORT OF THIS APPLICATION, I SUBMIT AS EVIDENCE THE FOLLOWING ATTACHED DOCUMENTS:** *(If military documents or medical records are pertinent to your case, please send copies. If Veterans Affairs records are pertinent, give regional office location and claim number.)*

See memorandum and supporting exhibits.

**10. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C.** *(At no expense to the Government) (X one)*
☒ YES. THE BOARD WILL DETERMINE IF WARRANTED. ☐ NO. CONSIDER MY APPLICATION BASED ON RECORDS AND EVIDENCE.

**11.a. COUNSEL** *(If any)* **NAME** *(Last, First, Middle Initial)* **and ADDRESS** *(Include ZIP Code)*
David P. Sheldon
100 M Street SE, Suite 600
Washington, DC 20003

b. TELEPHONE *(Include Area Code)* 202 546 9575
c. E-MAIL ADDRESS davidsheldon@militarydefense.com
d. FAX NUMBER *(Include Area Code)* 202 546 0135

**12. APPLICANT MUST SIGN IN ITEM 15 BELOW. If the record in question is that of a deceased or incompetent person, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY THE APPLICATION. If the application is signed by other than the applicant, indicate the name** *(print)* **and relationship by marking one box below.**

☐ SPOUSE ☐ WIDOW ☐ WIDOWER ☐ NEXT OF KIN ☐ LEGAL REPRESENTATIVE ☐ OTHER *(Specify)*

**13.a. COMPLETE CURRENT ADDRESS** *(Include ZIP Code)* **OF APPLICANT OR PERSON IN ITEM 12 ABOVE** *(Forward notification of all changes of address.)*
David P. Sheldon
100 M Street SE, Suite 600
Washington, DC 20003

b. TELEPHONE *(Include Area Code)*
c. E-MAIL ADDRESS davidsheldon@militarydefense.com
d. FAX NUMBER *(Include Area Code)* 202 546 9575

**14. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM.** *(U.S. Code, Title 18, Sections 287 and 1001, provide that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

**CASE NUMBER** *(Do not write in this space.)*
MAR 15 2017

**15. SIGNATURE** *(Applicant must sign here.)* [signature]

**16. DATE SIGNED** *(YYYYMMDD)* 20170223

**DD FORM 149, JUN 2010** PREVIOUS EDITION IS OBSOLETE. Adobe Designer 8.0

**BOARD FOR CORRECTION OF NAVAL RECORDS**

| | | |
|---|---|---|
| *In the Matter of* | ) | |
| | ) | |
| Eric C. Cash | ) | |
| CDR, USN | ) | Docket No. |
| | ) | |
| | ) | |
| | ) | *EXPEDITED REVIEW REQUESTED* |
| *Applicant.* | ) | |
| | ) | |

**Memorandum in support of Application**

## I. INTRODUCTION

Commander (CDR) Eric Crawford Cash, USN hereby submits this memorandum in support of application to the Board for Correction of Naval Records ("BCNR"). On February 4, 2009, Engineman First Class (EN1) Theophilus Ansong, USN was killed in a Rigid Hull Inflatable Boat (RHIB) accident while being lowered off the USS San Antonio. Fifteen months later, on May 13, 2010, CDR Cash was taken to mast for dereliction of duty related to the accident and was wrongfully denied the ability to refuse non-judicial punishment in lieu of a court martial. CDR Cash was also wrongfully found guilty of violating Article 92, Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. § 892 and he was given a punitive letter of reprimand. Based on the evidence record and its legal obligation to afford a successful applicant thorough and fitting relief, the Board for Correction of Naval Records has sufficient reason to remove CDR Cash's letter of reprimand from his record.

## II. STATEMENT OF FACTS

### A. Naval Academy

At the age of eighteen, Commander (CDR) Cash enrolled in the Naval Academy Preparatory School and enlisted in the Navy Reserves on June 3, 1986. *See* Exhibit 1. After

serving in the Naval Academy Prep School for 39 weeks, CDR Cash was honorably discharged to enter the U.S. Naval Academy in May of 1987. *See* Exhibit 2. After successfully completing his education at the U.S. Naval Academy, CDR Cash graduated and was commissioned an Ensign in the Navy on May 29, 1991. *See* Exhibit 4.

**B. Naval Officer Career**

On April 6th, 1992, CDR Cash was assigned to the USS Tarawa. *See* Exhibit 5. CDR Cash spearheaded a number of challenging preparations for the ship's demanding Combat Systems Ship Overhaul Inspection. *See* Exhibit 6. He also successfully developed effective training scenarios for the Combat Systems Training Team, and "excelled as the Command Managed Equal Opportunity Program Manager, significantly improving the program's effectiveness." *Id.* In recognition of his achievements on USS Tarawa and his exemplary leadership, CDR Cash was awarded the Navy and Marine Corps Achievement Medal. *See* Exhibit 7.

In September of 1995, CDR Cash transferred to the USS Vincennes, where he remained until May of 1997. *See* Exhibit 5. CDR Cash excelled in this assignment. He led his division through an intensive training cycle, improved the material condition of the AEGIS suite which saved the Navy $200,000, and played a key role in the completion of a light-off. *See* Exhibit 8. Because of his outstanding accomplishments and service, CDR Cash was awarded a Navy and Marine Corps Commendation Medal. *Id.*

From June 1997 to October 1998, CDR Cash served as Surface Junior Officer Initial Accession Detailer at Millington, Tennessee. *See* Exhibit 9. While stationed in Tennessee, CDR Cash was able to develop an officer tracking database that compiled and correlated officer selection, resignation, and qualification trends. *Id.* This achievement significantly reduced the

manpower previously needed to compile this same information. *Id.* On December 18, 1998, CDR Cash was awarded his second Navy and Marine Corps Commendation Medal for this accomplishment and his exceptionally meritorious service as an officer in Millington. *Id.*

CDR Cash was then assigned to the USS Lake Erie from September to November 1999. *See* Exhibit 10. CDR Cash exhibited a trend of excellent service while aboard the USS Lake Erie where he was a pioneer in Naval Ballistic Missile Defense as Tactical Action Officer for the historic first intercept in space of a Theater Ballistic Missile by a missile launched from a ship at sea, later earning his third Navy and Marine Corps Commendation Medal. *See* Exhibit 11. For his outstanding military service from October 2004 to August 2006, CDR Cash was rewarded the Meritorious Service Medal. *See* Exhibit 13.

From September 2006 to July 2007, CDR Cash served as the Force Structure Analyst on the staff of the Deputy Chief of Naval Operations. *See* Exhibit 14. In this capacity, Rear Admiral (RADM) Davenport noted that CDR Cash

> …[T]irelessly applied his outstanding tactical acumen and analytic skills toward insightful analyses on key warfighting support issues critical to [the program]. His comprehensive efforts were critical to linking individual and unit training to resources and laid the foundation for understanding resource expenditures supporting fleet readiness. Additionally, he aided in the development of a maritime headquarters…supporting student throughput reductions at a savings of $62 million across the future years defense plan.

*Id.* These achievements manifestly demonstrated CDR Cash's exceptional professionalism, unrelenting perseverance, and loyal devotion to duty in accordance with the highest United States Naval Service principles, and he was awarded his fourth Navy and Marine Corps Commendation Medal. *Id.*

**C. Incident Aboard USS San Antonio and Investigation**

Commander Cash reported for duty on the USS San Antonio, a LPD-17 class ship, in December of 2008. *See* Exhibit 15. On September of 2008, before CDR Cash took command of the USS San Antonio, then-commanding officer Commander (CDR) Kurt Kastner, USN sent his wife a personal email stating that the ship, "was on the verge of a major incident or failure and it is very uncomfortable." *See* Exhibit 16. The LPD-17 class of ships has been notoriously riddled with procedural and structural deficiencies such as insufficient manning, lack of established training procedures, lack of funding, and poor quality of construction. *See* Exhibit 17. In 1998, a full decade before the accident, an enhanced crane safety system was recommended during the LPD 17 Boat Issue Workshop. *Id* at 23. This enhanced crane system would remove the need for line handlers, one of the issues present during the accident that resulted in EN1 Ansong's death. *Id.* This enhanced crane system was not implemented at the time of the incident. *See* Exhibit 18.

On February 9th, 2009 while in the Gulf of Aden on an anti-piracy mission, the USS San Antonio experienced a small boating accident. *See* Exhibit 19. Prior to the accident a staff transfer was directed by Admiral McKnight of CTF 150. *See* Exhibit 15. Admiral McKnight mandated the staff transfer be executed via small boats, despite CDR Cash's recommendation it be executed via helicopters to promote efficiency and success. *Id.* At the insistence of the Admiral, however, the staff transfer was executed utilizing small boats. *Id.* The night prior, CDR Cash held a Daily Operations and Intel Brief to discuss all watchbill evolutions including relevant personnel, equipment, and procedural issues for operational risk management and reduction. *Id.* Commander Cash's preparation for the evolution of the 11-m RHIB was the same procedure utilized by prior commanding officer CDR Kastner, and it was the procedure that had been used for numerous small boat operations in the six weeks that CDR Cash was in command.

*See* Exhibit 20. While it was not standard procedure for a special evolutions watchbill to be in place for the staff transfer, CDR Cash did follow protocol by enacting a watch team replacement plan. *See* Exhibit 21. Due to a turnover gap between first lieutenants, CDR Cash and LCDR Kearns entrusted Boatswain Shawn Stacey with supervision of the operation. *See* Exhibit 22. Testimony was submitted describing Boatswain Stacey as "imminently qualified" for the job, and the previous commanding officer CDR Kastner testified that "the crew was fully trained and capable of handling the evolution…if I didn't think I could operate the 11-m RHIB safely, I would never have operated it." *Id*; *see* Exhibit 23.

The morning of the accident, a technical issue occurred as a Rigid Hull Inflatable Boat (RHIB) was lowered into the water to test its engines. *See* Exhibit 19. The RHIB engines failed to start after entering the water. *Id.* This effectively disabled craft station keeping while attached to the sea painter line which had also malfunctioned and caused it to drift aft, striking the portside accommodation ladder. *Id.* This forced three sailors to abandon the RHIB. *Id.* Two sailors were recovered, but EN1 Ansong, the third sailor, was never found in the ensuing ten hour search and rescue mission. *Id.*

Three investigations were conducted. A NCIS investigation determined as causal factors in the accident were manning, training, and equipment matters. *Id.*[1] The NCIS

---

[1] There were 3 investigations. Two initial investigations were simultaneous done by NCIS and LCDR David Faught (staff designated command investigation officer). Normally, command investigation officers are senior to the accused and most senior witness in rank and experience. He was not experienced on amphibious ship operations and LPD 17 ship class operating procedures. He was subsequently fired as Executive Officer of USS Chung-Hoon.

The third investigation was done by CAPT Grippin. CAPT Grippin was directed to conduct an investigation after the initial investigation done by LCDR Faught was reviewed by the first flag officer in the chain of command (Admiral Howard, Commander Task Force 151). LCDR Faught's investigation contained findings of fact and opinions with no recommendations. Admiral Howard asked for a review to include recommendations. LCDR Faught's findings of

investigation was closed on October 21st, 2009 after the Death Review Board voted unanimously to close it. *Id.* The initial investigation conducted by the Immediate Superior in Command (ISIC) was done by LCDR Faught a Commander Amphibious Squadron Four (CPR 4) staff officer. After a flag officer review, another investigation was conducted by the CPR 4 Deputy Commander CAPT Griffin. CAPT Griffin endorsed disciplinary action for CDR Cash, executive officer Lieutenant Commander (LCDR) Sean Kearns, USN and the ship's boatswain. *Id.* After this recommendation, the commanders of Task Force 151 and Fifth Fleet concluded that Captain (CAPT) Brian Smith, CDR Cash's immediate superior, was in the best position to review accountability for the accident. *See* Exhibit 15. Additionally the significant issues in manning, training, and equipment were determined by Fifth Fleet Commander to have been within the responsibility of the Atlantic Surface Force Commander, Rear Admiral (RADM) Kevin M. Quinn. *Id.*

Commander, Amphibious Squadron Four (CPR 4) Captain Brian T. Smith took administrative action, but not punitive action, against CDR Cash in April 2009. *See* Exhibit 24. This administrative action took the form of a counseling session CAPT Smith administered to CDR Cash. *See* Exhibit 25. RADM Quinn and CAPT Grippin subsequently recommended that the administrative action taken in April 2009 was sufficient and no punitive action was needed. *Id.*

**D. Article 15 Proceedings**

---

fact were not true and easily verifiable by the evidence presented during the investigation and subsequently used by the LCDR Kearns defense team.

CAPT Grippin's investigation consisted of a ship tour and limited interviews. Ultimately, his recommendations were heavily influenced by the original findings of fact by LCDR Faught that had already received a flag officer level review. The initial investigation by LCDR Faught resulted in the non-evidence based findings of fact that were used for my NJP.

On May 13, 2010, 15 months after the incident aboard the USS San Antonio, Admiral (ADM) J.C. Harvey brought CDR Cash to mast for an Article 92, UCMJ, 10 U.S.C. § 892 (failure to obey order or regulation) violation. *See* Exhibit 26. This action was taken despite the multiple recommendations that the administrative actions previously imposed on CDR Cash were sufficient. Admiral Harvey stated, "Although the current COMPHIBON FOUR, and Commander, Naval Surface Force Atlantic believe the counseling was sufficient, I do not." *See* Exhibit 25. The specification for this violation was dereliction of duty for failing to approve a special evolutions watchbill for the 11 meter RHIB operation and failing to ensure appropriate supervision of the operation. *Id.* CDR Cash was charged by ADM Harvey with the Article 92 violation despite being previously held accountable by CAPT Brian T. Smith, who determined nonpunitive administrative action was appropriate. *See* Exhibit 24. ADM Harvey issued CDR Cash a punitive letter of reprimand for the Article 92 violation. *See* Exhibit 26. CDR Cash was still attached to the USS San Antonio therefore, he was not given the option to demand trial by court martial in lieu of nonjudicial punishment. *See* Exhibit 15. Lieutenant Commander (LCDR) Sean Kearns, the executive officer of the San Antonio at the time of the incident, was no longer attached to the ship, however, and refused non-judicial punishment. *Id.* At his special court martial, LCDR Kearns was found not guilty of the Article 92, UCMJ, 10 U.S.C. § 892 violation that arose of the same nexus of facts as CDR Cash's Article 15. *See* Exhibit 27. Lieutenant Commander Kearns was subsequently promoted to Commander and Captain. He served as Commanding Officer of the USS Constitution, and he now serves as executive officer for the PCU Michael Monsoor, one of the Navy's future ships.

**E. Post-Article 15**

Despite his non-judicial punishment, CDR Cash continued to flourish as a leader and as a sailor, and he exemplified the core naval values of honor, courage, and commitment. In the evaluation periods following his Article 15,[2] CDR Cash was noted to have greatly exceeded all standards including professional expertise, command of organizational climate, character, military bearing, teamwork, mission accomplishment and initiative, and leadership. *See* Exhibit 28. In the evaluation period from May 9th, 2009 to September 30th, 2009, CAPT Grippin, the same officer that investigated CDR Cash for the incident aboard the USS San Antonio, stated CDR Cash "is one of the best commanding officers I've observed and consistently led with vision, energy, unflagging resolve and a winning attitude to achieve mission success despite first of ship class challenges." CAPT Grippin recommended CDR Cash for promotion to captain and selection for Major Command Afloat. In the evaluation period from June 10th, 2010 to April 30th, 2011, Captain Russell stated, "CDR Cash is exactly the type of leader desired to lead a major acquisition program. One of the best in a budget constrained environment in maximizing resources to improve surface fleet readiness and capability." *Id.* CAPT Russell also recommended CDR Cash for immediate promotion. *Id.* In the evaluation period from January 18th, 2012 to April 30th, 2012, CAPT Graham described CDR Cash as an "an innovative thinker, who quickly gets to the root of complex issues, takes action and gets top results." *Id.* He also stated "CDR Cash hits home runs in all his endeavors. Select for captain…." *Id.*

On December 2011, Rear Admiral James Shannon lauded CDR Cash's leadership and operational capabilities. *See* Exhibit 29. He noted that CDR Cash "brings a perspective vital to ensure, in a resource constrained environment, the Navy is acquiring the right capability and building the product right at an affordable cost." *Id.* CAPT Brian T. Smith, the same officer

[2] Article 15, UCMJ, 10 U.S.C. § 892.

who took administrative action against CDR Cash for the USS San Antonio incident, similarly praised his leadership capabilities. *See* Exhibit 30. With regard to how CDR Cash handled the incident aboard the San Antonio, CAPT Smith described the actions "prior to, during, and following the incident" taken by CDR Cash to be "beyond reproach." *Id.* He also described CDR Cash as an "outstanding Naval officer fully deserving promotion to captain." *Id.*

In 2012, CDR Cash was selected by Assistant Secretary of Navy (Research, Development and Acquisition) Sean Stackley to represent the Navy as a Secretary of Defense Corporate Fellow at ExxonMobil. In the report from ExxonMobil regarding CDR Cash's performance as a Secretary of Defense Corporate Fellow it states, "ExxonMobil is grateful to have a member of the armed forces that exhibits such high quality, character, intellect, and standards of excellence as Commander Cash."

On September 2014, CDR Cash was awarded his fifth Navy Commendation Medal. *See* Exhibit 31. CDR Cash was awarded this medal for his work on the execution of a Naval Strike Missile Test on LCS class ships. *Id.* His "thorough organization, attention to detail, and outstanding communication with all stakeholders" ensured successful testing that demonstrated the missile strike system's strong potential. *Id.* The vice-president of Kongsberg, the firm that designed the missile strike systems, praised CDR Cash's exemplary performance throughout the demonstration. *See* Exhibit 32. The vice-president described CDR Cash's performance:

> His interaction with a myriad of diverse stakeholders…was absolutely sterling. He maintained laser-like focus on the mission, consistently asked the right questions, addressed the critical points, and ensured complete compliance with all safety and technical standards throughout this non-standard (yet high priority) event. Where others would have undoubtedly faltered, CDR Cash prevailed and excelled.

*Id.* Rear Admiral J.A. Hill similarly praised CDR Cash's professionalism, preparation, and personal initiative during the missile demonstration. *See* Exhibit 33.

Despite numerous, glowing recommendations for promotion to Captain, CDR Cash was not promoted due to the unwarranted punitive letter of reprimand that was issued for the incident aboard the USS San Antonio, notwithstanding the determination of immediate supervisors with first-hand knowledge of the circumstances surrounding the incident that punitive action was inappropriate. Exhibit 28.

## III. STATUTORY AUTHORITY OF THE BCNR

10 U.S.C. § 1552 provides for the correction of errors in the record of a member of the military. Upon timely application and consideration, the statute provides:

> The Secretary of a military department may correct any military record . . . when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be made by the Secretary acting through boards of civilians of the executive part of the military department.

10 U.S.C. § 1552(a)(1). The BCNR considers individual applications that are properly brought before it. In appropriate cases, it directs or recommends correction of military records to remove an error or injustice.

The Board has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted). The Board has significant power to grant relief and has sufficient statutory authority to grant relief including reinstatement and back pay. *See, e.g., Knehans v. Alexander,* 566 F.2d 312, 315 (D.C. Cir. 1977); *Chappell v. Wallace*, 462 U.S. 296, 303 (1983) (Board is empowered under 10 U.S.C. § 1552(c) to order retroactive pay and promotion); 10 U.S.C. § 1552(c) (Secretary may pay claims for lost pay, allowances, etc., as the result of a record correction).

The Board for Correction of Naval Records, by statutory mandate, sits in equity. Under 10 U.S.C. § 1552(a), the Board for Correction of Naval Records is vested with the power to "necessary to correct an error or remove an injustice." An examination of the relevant legislative history indicates that Congress "did not intend any limited or technical meaning" for error or injustice and has liberally construed the powers of correction Boards. 41 Op. Att'y Gen. 94 (1952); *see* also 41 Op. Att'y Gen. 251 (1955); 40 Op. Att'y Gen. 504 (1947). Indeed, numerous cases acknowledge correction boards' power to grant broad equitable relief. *See, e.g., Saad v. Dalton*, 846 F.Supp. 889 (S.D. Cal. 1994) (citing *Chappell v. Wallace*, 462 U.S. 296, 303 (1983)); *Bard v. Seamans*, 507 F.2d 765, 769 (1974) ("The Powers of the Board have been liberally construed."); *Kimmel v. United States*, 196 Ct. Cl. 579 (1971) (noting compelling "equitable principles" guiding boards of correction). Thus, the Board has power to grant relief based on two conceptually distinct bases. The Board can assess a case based on evidence of error with regard to particular legal and procedural issues. But the Board's broad authority, as articulated above, also permits assessment of a case based on other considerations such as extreme prejudice suffered by an agency action.

## IV. TIMELINESS AND EXHAUSTION

10 U.S.C. § 1552 provides for the correction of errors in the record of a member of the military. Corrections shall be applied for within three years of the discovery of the error or injustice making the correction necessary. 10 U.S.C. § 1552(b). Commander Cash retired in October of 2015. Therefore, this application is timely.

## V. REQUESTED RELIEF

Commander Cash respectfully requests the following relief from the Board: 1) That the Letter of Reprimand be removed from his personnel file; 2) That any adverse files from the

Article 15[3] hearing be removed from his personnel file; 3) direct removal of all assovers for promotion, directing his case for submission to Special Selection Boards; and 4) That the Board grant any other relief it deems fit.

## VI. ARGUMENT

Commander Cash should have his recorded amended because (a) the preponderance of the evidence supported the fact that CDR Cash was not derelict in his duty and (b) all notions of fairness and justice are affronted by CDR Cash's illegitimate letter of reprimand.

### A. The Preponderance of the Evidence Supports the Fact that CDR Cash Was Not Derelict in His Duty Aboard the USS San Antonio.

Commander Cash was charged under Article 92, UCMJ, 10 U.S.C. § 892 with dereliction of duty for failing to ensure a special evolutions watchbill was in place to support small boating operations. At his Article 15 hearing, ADM Harvey found CDR Cash guilty of this charge. However, the preponderance of the evidence clearly supports the fact that CDR Cash, like LCDR Kearns, was not guilty of any Article 92, UCMJ, 10 U.S.C. § 892 violation.

A violation of the Article consists of three elements: (1) the Accused had certain duties; (2) the Accused knew or reasonably should have known of said duties; and (3) the Accused was negligently derelict of said duty. Article 92, UCMJ, 10 U.S.C. § 892 (2014). All three elements must be satisfied for the violation to be effective. *Id.* Commander Cash did not have a duty to sign a special evolutions watchbill to support small boating operations, and on the night before the incident he signed all watchbills required of him by the Navy Standard Organization and Regulations Manual (SORM).

The watchbills signed by CDR Cash were certified as sufficient in scope, meeting requirements, and accountability. *See* Exhibit 34. Before the incident all required and qualified

[3] Article 15, UCMJ, 10 U.S.C. § 815

supervisors were present at all control stations and the ship was properly positioned for small boat launching. *Id* at 3. The procedure utilized by CDR Cash was the same procedure utilized on the USS San Antonio by his predecessor CDR Kastner. *Id.* This procedure was the most current and applicable at the time, but was only later deemed inadequate by the technical authority. *Id* at 3. As stated by CDR Kastner during his testimony at LCDR Kearns' court martial, there is no watch bill requirement for small boat operations. *See* Exhibit 20. The only requirement was that a watch team replacement plan be in place, which LCDR Kearns confirmed the presence of in his testimony. *Id*; *See* Exhibit 21. Captain Jeffrey Hayhurst, the prosecution expert witness on amphibious ship deck evolutions and operations, also testified that there was no watchbill requirement for small boat operations. Thus, CDR Cash had no duty to ensure a special evolutions watchbill, and he could not possibly have been in dereliction of it.

Commander Cash also ensured that sufficient supervision was established for the small boat operation on February 4, 2009. Boatswain Shawn Stacey had the most experience on board with direct supervision of RHIB operations, and he was rightfully entrusted by CDR Cash and LCDR Kearns to supervise the event. *See* Exhibit 35. LCDR Kearns testified that commanding officers and executive officers never directly supervise small boating operations, such as the one that led to the accident aboard the USS San Antonio, without specific instruction to do so. *See* Exhibit 37. The day of the unfortunate accident resulting in EN1 Ansong's death, there was no specific instruction for CDR Cash to supervise the staff transfer, nor is it likely that any individual's supervision would have prevented EN1 Ansong's death that was due to a myriad of factors related to equipment that were beyond CDR Cash's control. *Id.* In the entirety of his career and amongst the five ships he has served on, LCDR Kearns has never observed a commanding officer or executive officer to completely supervise all RHIB operations. *Id.*

Negligent dereliction of duty was not the actual or proximate cause of the accident; it was a technical deficiency in the LPD 17 class of ships. The RHIB's engine failure, combined with a malfunctioning sea painter line and the inability of the line handler to maintain control, was the direct cause of the incident. *See* Exhibit 19; *See* Exhibits 21-22; *See* Exhibits 35-36. In 1998 an enhanced crane system for the small boat operations was proposed for the LPD 17 class of ships, but it was never implemented. *See* Exhibit 25. This enhanced crane system would have removed the need for line handlers and would have likely negated the loss of life as a result of the USS San Antonio accident. An inherent deficiency in the MK-1 life preserver, the same that EN1 Ansong was wearing when he drowned, was also identified by the Commander of Naval Surface Force Atlantic RADM Quinn. *See* Exhibit 34. Rear Admiral Quinn stated, "MK-1 life preservers are not adequate protection for man overboard. They are not inherently buoyant, they do not have crotch straps to prevent slipping out and they do not support an unconscious wearer's head above water. Had a properly fitted, USCG approved type 1 personal floatation device been available and used by the Navy instead of the MK-1, the mishap victim may have survived the incident". *Id* at 3-4. Commander Cash's immediate superior during the time of the incident reiterated the culpability of technical issues with the LPD 17 class ships in causing the incident. *See* Exhibit 30. Captain Brian Smith stated, "The investigation uncovered numerous materiel, training, equipping, and procedural issues stemming from the well documented poor fleet introduction of the LPD 17 ship class and the USS San Antonio in particular. Most of the investigation findings were related to issues that should have been corrected through a fleet introduction process prior to Commander Cash reporting for duty as commanding officer." *Id.*

As stated by his immediate superior CAPT Smith, CDR Cash's actions prior to and throughout the incident aboard the USS San Antonio were "beyond reproach." *Id.* Commander

Cash neither breached any duty borne by his position as commanding officer, nor did any of his actions or lack thereof directly or proximately cause the death of EN1 Ansong. Imposing NJP and issuing CDR Cash a punitive letter of reprimand was entirely inappropriate under these circumstances. Military service is inherently dangerous, and EN1 Ansong's death was a most unfortunate mishap beyond CDR Cash's control. The preponderance of the evidence suggests that CDR Cash was not derelict in his duty, thus not violating UCMJ article 92. As such, ADM Harvey wrongfully rendered a guilty verdict at CDR Cash's Article 15 proceeding.

**B. All Notions of Fairness and Justice Are Affronted by CDR Cash's Illegitimate Letter of Reprimand.**

Admiral John C. Harvey's decision to administer non judicial punishment and a punitive letter of reprimand to CDR Cash is an affront to all notions of fairness and justice. Commander Cash's entire record of service and contributions to the Navy can be characterized as nothing less than exemplary. Lieutenant Commander Sean Kearns, CDR Cash's executive officer at the time, was afforded the full rights and protections of a special court martial and found not guilty for the same violation amongst the same nexus of facts that CDR Cash was found guilty of. Thus, it is a dishonor to allow CDR Cash's punitive letter of reprimand to stand in his record when he clearly should have been giving the opportunity to refuse NJP and argue his case in a court martial.

Commander Cash's personal decorations include the Meritorious Service Medal, five Navy and Marine Corps Commendation Medals, the Navy and Marine Corps Achievement Medal. In all of his latest fitness reports, CDR Cash was ranked as greatly exceeding all standards including professional expertise, command of organizational climate, character, military bearing, teamwork, mission accomplishment and initiative, and leadership. *See* Exhibit 28. For the last four years, all his senior raters, along with his immediate superiors, recommended CDR Cash for promotion to captain. *Id.* This clearly reflects the strength of CDR

Cash's operational prowess, strategic expertise, character, and dedication to the service. However since his wrongful letter of reprimand and despite numerous recommendations for promotion, he was unjustly twice passed for promotion. *See* Exhibit 37. Commander Cash's personnel record should reflect his exemplary military career, and it should not be tarnished by a wrongfully rendered letter of reprimand.

On May 13th, 2010, fifteen months after the incident aboard the USS San Antonio, ADM Harvey administered non-judicial punishment to CDR Cash for the events of that incident. Lieutenant Commander Kearns was also to be administered punishment by ADM Harvey. However, LCDR Kearns was able to demand trial by court martial in lieu of NJP, as he was no longer attached to the USS San Antonio. Inequitably, CDR Cash was not given this same opportunity. Because of the greater rights, protections, and discovery process afforded by a court martial, LCDR Kearns was found not guilty while CDR was found guilty from the same nexus of facts and for the same charge. Had CDR Cash been given the same opportunity to defend himself in front of a panel of military officers in the court of law, he too would have been found not guilty of the tenuous charges levied against him by ADM Harvey.

It is clear from the evidence that CDR Cash is a well-respected and exemplary leader in the U.S. Navy not only before the incident, but throughout and after as well. CDR Cash's exemplary service, and the clear and manifest injustice of him not being given the opportunity for a court martial, provides sufficient incentive to remove the letter of reprimand from his record in the interest of equity and justice.

## VII. CONCLUSION

Commander Cash was deprived of the ability to defend himself in a court martial by ADM Harvey. In his career before and after the incident, CDR Cash exhibited an outstanding

operational expertise and dedication to service. Commander Cash is an exemplary naval officer whose career should not be tarnished by a procedural technicality that deprived him of the full rights and protections of a special court martial. Commander Cash was wrongfully administered non-judicial punishment, and his guilty verdict was unsupported by a preponderance of the evidence. As such, the U.S. Navy has committed clear errors of both law and equity.

In the interest of justice, for the integrity of the U.S. Navy, and because the Board has good and sufficient evidence to grant the relief requested, it should grant CDR Cash's request. The Board should also grant any other relief as justice so requires.

Respectfully submitted,

David P. Sheldon
LAW OFFICES OF DAVID P. SHELDON, PLLC
1100 New Jersey Ave, SE, Suite 720
Washington, DC 20003
(202) 546-9575
*Attorney for Applicant*

February 28, 2017

[redacted]

**DEPARTMENT OF THE NAVY**
COMMANDER
U.S. FLEET FORCES COMMAND
1562 MITSCHER AVENUE, SUITE 250
NORFOLK, VA 23551-2487

5812
Ser N00/ 144
3 Jun 10

FIRST ENDORSEMENT on CDR Eric C. Cash, USN, ltr of 21 May 2010

From: Commander, U. S. Fleet Forces Command
To: Vice Chief of Naval Operations

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

Encl: (1) Report of Disposition of Offense (NAVPERS 1626/7) of 13 May 10
(2) Punitive letter of Reprimand of 13 May 10
(3) JAGMAN investigation into RHIB mishap
(4) CHNAVPERS ltr 5800 Ser N1/020 of 2 Feb 10
(5) USFF ltr 5800 Ser N00/035 of 17 Feb 10
(6) COMNAVSURFLANT ltr 5800 Ser N00/031 of 19 Mar 10

1. Readdressed and forwarded, recommending denial.

2. On 13 May 2010, CDR Eric C. Cash appeared before me at Admiral's Mast regarding an allegation of dereliction of duty, in violation of Article 92 of the Uniform Code of Military Justice, while serving as Commanding Officer, USS SAN ANTONIO (LPD 17). At Mast, I ascertained that CDR Cash had been advised of and understood his rights with respect to the charge and specification. After carefully considering the evidence in the case, which consisted of a command investigation, including all subsequent endorsements and supplemental investigation reports, and verbal statements made by CDR Cash at Mast, I found that CDR Cash had committed the alleged violation and awarded him a punitive letter of reprimand. CDR Cash now appeals his punishment on the basis that it was unjust. CDR Cash's appeal was submitted in a timely manner. Enclosures (1) through (6) are relevant to the appeal.

3. The dereliction of duty charge stems from a small boat mishap that occurred on February 4, 2009, in the Gulf of Aden. While launching SAN ANTONIO's 11-meter RHIB, several missteps occurred which led to the RHIB tipping and the boat crew entering the water. Tragically, EN1(SW) Theophilus Ansong was lost at sea. An investigation into the mishap found that the Commanding Officer had failed to ensure an approved Special Evolution Watchbill was in place to support small boat

OFFICIAL RECORD COPY

CASH [redacted]

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

operations and that there was ineffective supervision of boating operations. Some of the personnel involved in the small boat evolution were not qualified for their positions and mistakes were made which resulted in the mishap.

4. CDR Cash begins his appeal by asserting that his former Commodore and Immediate Superior in Command (ISIC), CAPT Brian T. Smith (former Commander, Amphibious Squadron (COMPHIBRON) FOUR), previously held him accountable for his failure to ensure a Special Evolution Watchbill was in place prior to the 4 February 2009 RHIB incident. Significantly, CDR Cash does not dispute his failure, but asserts only that it was previously addressed. Specifically, Commodore Smith counseled CDR Cash but did not take punitive action. Although the current COMPHIBRON FOUR and Commander, Naval Surface Force Atlantic (COMNAVSURFLANT) believe counseling was sufficient, I do not. Accordingly, I exercised my independent judgment as a Commander in USS SAN ANTONIO's administrative chain of command to address CDR Cash's documented failure to promulgate a Special Evolution Watchbill, as well as his negligent failure to ensure effective supervision of the small boat operations.

5. CDR Cash also believes that imposition of punishment more than 14 months after the incident is unjust, especially taking into account the administrative action taken by COMPHIBRON FOUR. An understanding of the case's procedural history will help put the 14-month delay into context.

a. After the 4 February 2009 mishap, COMPHIBRON FOUR appointed an O-4 to conduct the investigation. After it was completed on 11 March 2009, COMPHIBRON FOUR endorsed the investigation on 15 March 2009, recommending disciplinary action against both the Commanding Officer and the Executive Officer.

b. After receiving the investigation from COMPHIBRON FOUR, Commander, Task Force FIVE ONE (CTF-51) returned it to COMPHIBRON FOUR on 6 April 2009 to appoint an O-6 investigating officer and to conduct further investigation.

c. COMPHIBRON FOUR appointed his Deputy to conduct the reinvestigation, which was completed on 16 April 2009. The re-investigation recommended disciplinary action against both the Commanding Officer and the Executive Officer.

d. COMPHIBRON FOUR favorably endorsed the investigation on 17 April 2009, which was subsequently reviewed and endorsed by



14/18 Az

OFFICIAL RECORD COPY

CASH [redacted]

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

CTF-51 on 20 April 2009, and Commander, U.S. FIFTH Fleet (COMFIFTHFLT) on 5 August 2009. In their endorsements, CTF-51 and COMFIFTHFLT refrained from commenting on the recommendations for disciplinary action, referring those recommendations to COMPHIBRON FOUR subject to the concurrence of the administrative chain of command.

e. As discussed above, COMPHIBRON FOUR took what he considered to be appropriate administrative action, counseling CDR Cash for the mishap.

f. In order to adjudicate a request for removal of the Executive Officer's promotion delay resulting from this incident, the Chief of Naval Personnel forwarded enclosure (4) to me on 2 February 2010 for a determination of what, if any, action had been taken with respect to the disciplinary recommendations, as it was not apparent from the investigation and subsequent endorsements. In turn, I forwarded the package to COMNAVSURFLANT on 17 February 2010 for that determination (enclosure (5)).

g. In enclosure (6), COMNAVSURFLANT advised on 19 March 2010 that administrative action had been taken in April 2009 and that the current COMPHIBRON FOUR (who was also the O-6 reinvestigating officer) elected not to take further action. COMNAVSURFLANT similarly concluded that no further action was necessary.

h. As noted above, upon my review of the investigation and subsequent endorsements, and after considering the COMNAVSURFLANT response in enclosure (6), I determined that the Commanding Officer's dereliction in this case warranted adjudication at Admiral's Mast. In the end, the Admiral's Mast was held well within the 24-month statute of limitations for nonjudicial punishment cases. That being said, because of the delay and because of Commander Cash's performance in command in the 14 months since the mishap, I continued to have confidence in his ability to command and did not request his detachment.

6. CDR Cash next raises several design, technical documentation and procedural issues, most of which are not included in the investigation and are being raised now for the very first time. Prior to the Mast proceeding, CDR Cash was afforded an opportunity to provide a written statement and any other material to be considered at Mast, but declined to do so (as it was his right to do). He also declined to request any



15/18Ag

OFFICIAL RECORD COPY

CASH [redacted]

OFFICIAL RECORD COPY

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

witnesses. At Mast, he stated that as Commanding Officer, he is accountable for the actions and inactions of his crew. In response to questions from me, he also explained that he was not aware of the qualifications of the crewmembers involved in the evolution, but he believed them to be qualified and had observed them in the performance of their duties. He acknowledged the importance of his presence on the bridge during the multiple evolutions occurring at the time, including small boat operations, flight operations, and steaming with ships in company. He did not, however, raise any of the technical issues he now asserts on appeal, nor were they addressed in the evidence before me at Mast.

7. Even after considering the new issues raised by CDR Cash, my decision to impose punishment was correct. As noted above, CDR Cash did not have a Special Evolutions Watchbill in place and there were unqualified individuals serving as signalman, crane operator, and crewmembers on the RHIB. Neither CDR Cash nor the Executive Officer were on the bridge maintaining oversight of the evolution at the time of the mishap. Furthermore, the measures which CDR Cash implemented immediately after the incident (paragraph 5 of his appeal) are measures he should have had in place prior to the incident, independent of the technical matters he now raises. In short, as Commanding Officer, CDR Cash has a duty to understand the capabilities and limitations of his ship and crew and make adjustments as necessary to ensure ship evolutions are conducted as safely as possible. In this case, CDR Cash's failure to ensure effective supervision of the boating evolution and his failure to ensure a Special Evolution Watchbill was in place constituted dereliction of duty warranting the imposition of nonjudicial punishment.

8. The punishment awarded in this case was within my authority and does not violate any existing regulations. Based on the aforementioned, I recommend CDR Cash's appeal be denied.

J. C. HARVEY, JR.

Copy to:
CDR Eric C. Cash



16/187Ag

CASH [redacted]

**DEPARTMENT OF THE NAVY**
COMMANDER
U.S. FLEET FORCES COMMAND
1562 MITSCHER AVENUE, SUITE 250
NORFOLK, VA 23551-2487

5812
Ser N00/ 144
3 Jun 10

FIRST ENDORSEMENT on CDR Eric C. Cash, USN, ltr of 21 May 2010

From: Commander, U. S. Fleet Forces Command
To: Vice Chief of Naval Operations

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

Encl: (1) Report of Disposition of Offense (NAVPERS 1626/7) of 13 May 10
(2) Punitive letter of Reprimand of 13 May 10
(3) JAGMAN investigation into RHIB mishap
(4) CHNAVPERS ltr 5800 Ser N1/020 of 2 Feb 10
(5) USFF ltr 5800 Ser N00/035 of 17 Feb 10
(6) COMNAVSURFLANT ltr 5800 Ser N00/031 of 19 Mar 10

1. Readdressed and forwarded, recommending denial.

2. On 13 May 2010, CDR Eric C. Cash appeared before me at Admiral's Mast regarding an allegation of dereliction of duty, in violation of Article 92 of the Uniform Code of Military Justice, while serving as Commanding Officer, USS SAN ANTONIO (LPD 17). At Mast, I ascertained that CDR Cash had been advised of and understood his rights with respect to the charge and specification. After carefully considering the evidence in the case, which consisted of a command investigation, including all subsequent endorsements and supplemental investigation reports, and verbal statements made by CDR Cash at Mast, I found that CDR Cash had committed the alleged violation and awarded him a punitive letter of reprimand. CDR Cash now appeals his punishment on the basis that it was unjust. CDR Cash's appeal was submitted in a timely manner. Enclosures (1) through (6) are relevant to the appeal.

3. The dereliction of duty charge stems from a small boat mishap that occurred on February 4, 2009, in the Gulf of Aden. While launching SAN ANTONIO's 11-meter RHIB, several missteps occurred which led to the RHIB tipping and the boat crew entering the water. Tragically, EN1(SW) Theophilus Ansong was lost at sea. An investigation into the mishap found that the Commanding Officer had failed to ensure an approved Special Evolution Watchbill was in place to support small boat



Enclosure (6)

22/27Az

OFFICIAL RECORD COPY

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

operations and that there was ineffective supervision of boating operations. Some of the personnel involved in the small boat evolution were not qualified for their positions and mistakes were made which resulted in the mishap.

4. CDR Cash begins his appeal by asserting that his former Commodore and Immediate Superior in Command (ISIC), CAPT Brian T. Smith (former Commander, Amphibious Squadron (COMPHIBRON) FOUR), previously held him accountable for his failure to ensure a Special Evolution Watchbill was in place prior to the 4 February 2009 RHIB incident. Significantly, CDR Cash does not dispute his failure, but asserts only that it was previously addressed. Specifically, Commodore Smith counseled CDR Cash but did not take punitive action. Although the current COMPHIBRON FOUR and Commander, Naval Surface Force Atlantic (COMNAVSURFLANT) believe counseling was sufficient, I do not. Accordingly, I exercised my independent judgment as a Commander in USS SAN ANTONIO's administrative chain of command to address CDR Cash's documented failure to promulgate a Special Evolution Watchbill, as well as his negligent failure to ensure effective supervision of the small boat operations.

5. CDR Cash also believes that imposition of punishment more than 14 months after the incident is unjust, especially taking into account the administrative action taken by COMPHIBRON FOUR. An understanding of the case's procedural history will help put the 14-month delay into context.

a. After the 4 February 2009 mishap, COMPHIBRON FOUR appointed an O-4 to conduct the investigation. After it was completed on 11 March 2009, COMPHIBRON FOUR endorsed the investigation on 15 March 2009, recommending disciplinary action against both the Commanding Officer and the Executive Officer.

b. After receiving the investigation from COMPHIBRON FOUR, Commander, Task Force FIVE ONE (CTF-51) returned it to COMPHIBRON FOUR on 6 April 2009 to appoint an O-6 investigating officer and to conduct further investigation.

c. COMPHIBRON FOUR appointed his Deputy to conduct the reinvestigation, which was completed on 16 April 2009. The re-investigation recommended disciplinary action against both the Commanding Officer and the Executive Officer.

d. COMPHIBRON FOUR favorably endorsed the investigation on 17 April 2009, which was subsequently reviewed and endorsed by



23/27Az

OFFICIAL RECORD COPY

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

CTF-51 on 20 April 2009, and Commander, U.S. FIFTH Fleet (COMFIFTHFLT) on 5 August 2009. In their endorsements, CTF-51 and COMFIFTHFLT refrained from commenting on the recommendations for disciplinary action, referring those recommendations to COMPHIBRON FOUR subject to the concurrence of the administrative chain of command.

e. As discussed above, COMPHIBRON FOUR took what he considered to be appropriate administrative action, counseling CDR Cash for the mishap.

f. In order to adjudicate a request for removal of the Executive Officer's promotion delay resulting from this incident, the Chief of Naval Personnel forwarded enclosure (4) to me on 2 February 2010 for a determination of what, if any, action had been taken with respect to the disciplinary recommendations, as it was not apparent from the investigation and subsequent endorsements. In turn, I forwarded the package to COMNAVSURFLANT on 17 February 2010 for that determination (enclosure (5)).

g. In enclosure (6), COMNAVSURFLANT advised on 19 March 2010 that administrative action had been taken in April 2009 and that the current COMPHIBRON FOUR (who was also the O-6 reinvestigating officer) elected not to take further action. COMNAVSURFLANT similarly concluded that no further action was necessary.

h. As noted above, upon my review of the investigation and subsequent endorsements, and after considering the COMNAVSURFLANT response in enclosure (6), I determined that the Commanding Officer's dereliction in this case warranted adjudication at Admiral's Mast. In the end, the Admiral's Mast was held well within the 24-month statute of limitations for nonjudicial punishment cases. That being said, because of the delay and because of Commander Cash's performance in command in the 14 months since the mishap, I continued to have confidence in his ability to command and did not request his detachment.

6. CDR Cash next raises several design, technical documentation and procedural issues, most of which are not included in the investigation and are being raised now for the very first time. Prior to the Mast proceeding, CDR Cash was afforded an opportunity to provide a written statement and any other material to be considered at Mast, but declined to do so (as it was his right to do). He also declined to request any



24/27Az



OFFICIAL RECORD COPY

CASH [redacted]

Subj: APPEAL FROM NON-JUDICIAL PUNISHMENT

witnesses. At Mast, he stated that as Commanding Officer, he is accountable for the actions and inactions of his crew. In response to questions from me, he also explained that he was not aware of the qualifications of the crewmembers involved in the evolution, but he believed them to be qualified and had observed them in the performance of their duties. He acknowledged the importance of his presence on the bridge during the multiple evolutions occurring at the time, including small boat operations, flight operations, and steaming with ships in company. He did not, however, raise any of the technical issues he now asserts on appeal, nor were they addressed in the evidence before me at Mast.

7. Even after considering the new issues raised by CDR Cash, my decision to impose punishment was correct. As noted above, CDR Cash did not have a Special Evolutions Watchbill in place and there were unqualified individuals serving as signalman, crane operator, and crewmembers on the RHIB. Neither CDR Cash nor the Executive Officer were on the bridge maintaining oversight of the evolution at the time of the mishap. Furthermore, the measures which CDR Cash implemented immediately after the incident (paragraph 5 of his appeal) are measures he should have had in place prior to the incident, independent of the technical matters he now raises. In short, as Commanding Officer, CDR Cash has a duty to understand the capabilities and limitations of his ship and crew and make adjustments as necessary to ensure ship evolutions are conducted as safely as possible. In this case, CDR Cash's failure to ensure effective supervision of the boating evolution and his failure to ensure a Special Evolution Watchbill was in place constituted dereliction of duty warranting the imposition of nonjudicial punishment.

8. The punishment awarded in this case was within my authority and does not violate any existing regulations. Based on the aforementioned, I recommend CDR Cash's appeal be denied.

J. C. HARVEY, JR.

Copy to:
CDR Eric C. Cash

OFFICIAL RECORD COPY



25/37Az

*DEPARTMENT OF THE NAVY*

# VOLUNTARY STATEMENT

1. PLACE: USS SAN ANTONIO LPD 17

2. DATE AND TIME: 07 FEB 09 [illegible]

I, CHARLES T. STILLINGER JR., make the following

Free and voluntary statement to LCDR David K. Faught, USN,

Whom I know to be Preliminary Investigating Officer.

**I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:**

I WAS THE BOAT COXSWAIN FOR THE 11 METER RHIB ON 04 FEB 09. THE DAY AND THE START OF THE EVOLUTION WAS TEXT BOOK NORMAL. EVERY SAFETY PRECAUTION ON MY END WAS CHECKED AND THE ENGINEER AND BOWHOOK HAD ALSO MADE THE BOAT READY TO BE LAUNCHED. WE WERE GIVEN THE ORDER TO LOAD THE BOAT AND PREPARE TO BE LAUNCHED. WE BEGAN TO BE LOWERED INTO THE WATER AND EVERYTHING WAS OPS NORMAL.COMMUNICATIONS WERE SAT AS WELL AS ALL CIRCUITS ON THE SWITCHBOARD WERE ON AND READY. WHEN WE REACHED THE WATER THE BOAT WOULDN'T START AND A TOLD MY ENGINEER, EN1(SW) ANSONG, THAT I COULD NOT GET THE BOAT STARTED. HE TOLD MEW TO CHECK TO ENSURE THAT THE ENGINES WERE DISENGAGED AND I LEANED DOWN TO VISUALLY AND MANUALLY CHECK THE INDICATION LEVER. AFTER CHECKING AND MAKING SURE I LOOKED UP AND TOLD HIM THAT IT WAS GOOD TO GO AND I TRIED TO START THE ENGINES REPEATEDLY WITH NO SUCCESS. AT THAT TIME WE STRUCK THE ACCOMODATION LADDER WHICH CAUSED THE RHIB TO TURN SIDEWAYS AND TURNED UPRIGHT DUMPING THE CREW INTO THE SEA. AFTER SURFACING I FLOATED BETWEEN THE ACCOMODATION LADDER AND THE SHIP AND JUST BEFORE I REACHED THE STERN I PUSHED AWAY AND BEGAN SWIMMING AWAY FROM THE SHIP. I HAD MY HANDS RAISED TO SIGNAL TO EVERYONE THAT I WAS OKAY. I THEN SAW A GREEN LIFE [illegible]T FLOATING IN THE WATER AND ASSUMED THAT IT WAS MY ENGINEER AND BEGAN SWIMMING TOWARDS [illegible]AS FAST I COULD. I WANTED TO MAKE SURE HE WAS OKAY ANDKNEW IT WOULD BE BETTER IF WE WERE [illegible]OGETHER TO BE RECOVERED THEN IF WE WERE SEPARATE. WHEN I ARRIVED TO THE LIFE VEST THERE WAS A LIFE RING NEXT TO IT AND I SPUN THE VEST AROUND AND THERE WAS NOBODY IN IT. I RAISED THE LIFE VEST INTO THE AIR AND PLACED IT ON THE LIFE RING TO SHOW THAT THERE WAS NOBODY IN IT. THEN I WAS TAPPED ON THE SHOULDER BY THE AIR CREW SEARCH AND RESCUE SWIMMER. HE CHECKED ME TO MAKE SURE I WAS OKAY AND PUT A HARNESS AROUND ME AND I WAS HOISTED OUT OF THE WATER AND RETURNED TO THE USS SAN ANTONIO.

INVESTIGATOR'S NOTE: "SAFETY PRECAUTIONS" [illegible]

DEPARTMENT OF THE NAVY

1 PLACE USS SAN ANTONIO LPD 17

# VOLUNTARY STATEMENT

2 DATE AND TIME FEB 8, 2009 1515

I, BMSN Mark Hernandez, make the following

Free and voluntary statement to LCDR DAVID K. FAUGHT, USN

Whom I know to be PRELIMINARY INVESTIGATING OFFICER

I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

On the day of man over board that resulted in the loss of EN1 Ansong I was in mooring station 2 manning the sea painter. It was the usual routine for putting the 11m rhib in the water. The rhib was at the rail on the port side of the ship. It was being lowered and I noticed the sea painter was a little too tight. I started giving the line slack at this point I had no visual of the rhib due to the fact that I have to look out the viewports to see the rhib. So I started giving the line a little slack so I checked the line a bit but some slack came out of it. At this point I started to take some turns off the bitts as soon as I was about to take the turn off the line just started running out the chock. .I was yelling what the heck is going on. I was confused about what was going on. I tried to hold on to the line as tight as I could so I could put another turn on the bitts but the line kept running out of my hands it happened so fast that when I tried to pull back the line just jerked me forward and made me hit my lip on the bitts. I tried to hang on but the line went so fast but it was difficult, it made my hands blister up. When I put the turn on the bitts the line stopped running out the chock when I looked out the viewport window the boat was on the accom ladder and it was taking on water. I took the turns off the bitts and took the line to the capstan to try and lift it from the water. When I did that I looked out the viewport once again and I saw the personnel go in to the water. I saw SN Evans holding on to the accom and I saw him being pulled back on to the ship. I looked up and I saw BM2 Stillinger swimming to a life jacket believed to be EN1 Ansong. i thought they were fine so I continued to put some turns on the capstan to heave around on the sea painter. I looked out the viewport once again and saw BM2 pulled out the [illegible]r by the sar swimmer from the helo. That's when I heard that we still had EN1 in the water but I couldn't see him [illegible] the green life jacket. After that we picked up the boat out the water.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXEND OF STATEMENT XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

THE ABOVE STATEMENT CONSISTING OF 1 PAGE(S) WAS WRITTEN BY [illegible] AS WE DISCUSSED THE ABOVE EVENTS. I HAVE BEEN GIVEN THE OPPORTUNITY TO MAKE ANY CHANGES I DESIRE. THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Subscribed to and sworn before me this date of [illegible], onboard the [illegible]

[signature] USN
WITNESSED

Signature: [signature]
Date/Time: [illegible]

OPNAV [illegible]

DEPARTMENT OF THE NAVY

1. PLACE
USS SAN ANTONIO LPD 17

# VOLUNTARY STATEMENT

2. DATE AND TIME
08 FEB 09 / 1513

I, Coleman,Jarvis,T. , make the following

Free and voluntary statement to LCDR DAVID K. FAUGHT, USN

Whom I know to be PRELIMINARY INVESTIGATING OFFICER.

I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

On the day of the accident I was the signalman. I gave all of the signals to the crane operator. On this particular day we were doing personnel transfers with other ships. I signaled the boat out of the boats skids and to the rails. The boat crew entered the boat at the rails. Everything was going good at this point. I gave the signal to lower the boat, the boat hit the water perfectly. After a couple of seconds the coxain yelled up that the boat wouldn't start. This has happened before, usually the sea painter holds the boat alongside the ship to give the crew enough time to start the bought or bring it back to the rails. But this time by the time he yelled up to tell us that the boat wouldn't start the sea painter surged causing the current to push the boat aft. When this happened we lost control of the forward steadying line also, so the boat was being pushed af and turning sideways with the ship at the same time. Within a couple of seconds it seems like the boat hit the port side accommodation ladder. As soon as it hit it flipped on its starboard side. I saw the crew jump out quickly. I saw SN Evans come up quickly and grab the ladder, by the time I saw BM2 Stillenger he was aft of the ship, I never saw EN1 Ansong come back up.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXEND OF STATEMENT XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
THE ABOVE STATEMENT CONSISTING OF 1 PAGE(S) WAS WRITTEN BY [illegible] AS WE DISCUSSED THE ABOVE EVENTS. I HAVE BEEN GIVEN THE OPPORTUNITY TO MAKE ANY CHANGES I DESIRE. THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Subscribed to and sworn before me this date of [illegible], onboard the [illegible]

[signature] USN
WITNESSED

Signature: [signature]
Date/Time: [illegible]

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. PLACE
USS SAN ANTONIO LPD 17

2. DATE AND TIME
08 FEB 09, 1630

I, SN Anthony, make the following

Free and voluntary statement to LCDR DAVID K. FAUGHT, USN

Whom I know to be PRELIMINARY INVESTIGATING OFFICER.

I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of:

I was original suppose to be the bow hook of the 11 meter. Senior Chief Dunn and I got into because she told me that theres no point of me being bow hook if Im not gonna be a BM. So I told her " fuck it I don't wanna do it" That's when SN Evans got in to the boat. My job during this evolution was Aft line handler. I am qualified line handler. I done it for like a year. The evolution was like any other one. We lowered the boat into water. But this time the boat wouldn't start no matter how much they tired. The Ship was going atleast 10 knots. Since were going at the speed the boat started drag and hit the Accommodation ladder. The boat started to flip and start gathering water. That's when everyone jumped out. All I saw was SN Evans grabbing the accommodation ladder and BM2 Stillinger drift away back aft. I never saw EM1 in the water. The Green Life jacket that I taught was his was empty. While man over board is going I was pulling aft line and tying it done so we didn't lose the 11 meter.

STATEMENT 18
NEEDS TO BE
IN FRONT OF
THIS. THIS IS
STATEMENT 19

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXEND OF STATEMENT XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
THE ABOVE STATEMENT CONSISTING OF 1 PAGE(S) WAS WRITTEN BY [illegible] AS WE DISCUSSED THE ABOVE EVENTS. I HAVE BEEN GIVEN THE OPPORTUNITY TO MAKE ANY CHANGES I DESIRE. THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Subscribed to and sworn before me this date of [illegible], onboard the [illegible].

[signature] USN
WITNESSED

Signature: [signature]
Date/Time: [illegible]

DEPARTMENT OF THE NAVY

# VOLUNTARY STATEMENT

1. PLACE
USS SAN ANTONIO LPD 17

2. DATE AND TIME
February 8, 2009 1930

I, Domingo, Denise, make the following

Free and voluntary statement to LCDR DAVID K. FAUGHT, USN,

Whom I know to be PRELIMINARY INVESTIGATING OFFICER.

I make this statement of my own free will and without any threats or promises extended to me. I fully understand that this statement is given concerning my knowledge of: the events that took place on 4 February 2009. After receiving word we were putting the 11meter in the water all who were standing by took station either as line handlers, signalman, safety or the crane crew. I was standing by dresses out should the need me. The 11 meter was at the rail and the boat crew boarded. BM2 Stillinger was boat coxswain, SN Evans as bow hook and EN1 Ansong as boat engineer. As the boat was getting lower BM 2 yelled up EN1 needed 5 mins to look at the engine before continuing with the pax transfer. The 11meter hit the water as normal, but the bow started turning out Bos'n yelled to BM2 to take control of the boat. BM2 yelled back that the engine would not start. With the bow of the 11 meter still turning out the forward line handlers had a lot of tension on the line that's when I jumped on the forward line and started to heave around on it. Before I knew it the boat was turning over and the crew jumped. I heard Bosn get on the radio called the OOD and ordered to go all stop and notified them we hade a man overboard port side. SN Evans was able to hang on to the Accommodation ladder and get pulled up by BM1 Johnson and BMC Miller. I saw BM2 aft of the accom swimming away from the ship. I never saw EN1. A few seconds later we saw the green float coat we thought was EN1. Senior Chief Dunn told me to go down the sea painter and tell BMSN Hernandez to when ordered start heaving around on the sea painter slowly. I ran down to the sea painter where BMSN Hernandez, BM3 Coleman, and SN Matthews were already on station. While standing by we saw the helo doing a search, the 7 meter was inbound from the Pax transfer and was heading towards BM2 stillinger. BM2 stillinger at the time was swimming ov[illegible] to the green float coat he picked up the coat we all realized that EN1 was not in the coat. The helo lowered its [illegible]oser to the water and the swimmer jumped in to pick up BM2. I heard over the 1mc that all personnel should [illegible]opside and look for the missing person. I told BMSN Hernandez I was heading back up to the boat valley and left him and SN Matthews there. When I got to the boat valley someone gave me a pair of Binos and I started looking on the port side then made my way over to the Starboard side the back to the port and then to Starboard. After about 45 minuets of looking I started getting frustrated so I passed on the binos. I Stayed on the boat Valley for approximately 30 more minutes just going from port to starboard.

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXEND OF STATEMENT XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

THE ABOVE STATEMENT CONSISTING OF 1 PAGE(S) WAS WRITTEN BY [illegible] AS WE DISCUSSED THE ABOVE EVENTS. I HAVE BEEN GIVEN THE OPPORTUNITY TO MAKE ANY CHANGES I DESIRE. THIS STATEMENT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Subscribed to and sworn before me this date of [illegible], onboard the [illegible]

[signature] USN
WITNESSED

Signature: [signature] BM3(SW)
Date/Time: 8 FEB 2009 2019

**BOAT ENGINEER PRE-UNDERWAY CHECKLIST**

Date: ____________

From: Boat Engineer, ______________________
To: Boat Officer/Boat Coxswain

Subj: BOAT ENGINEER PRE-UNDERWAY CHECKLIST

1. I have conducted pre-underway checks as indicated below on ______________________.

BEFORE BOAT IS LOWERED/LAUNCHED

_____ 1. Check bilge plugs to ensure they are in.

_____ 2. Inspect propeller and associated nuts and ensure they are not loose.

_____ 3. Inspect exhaust, overboard discharge and intake lines.

_____ 4. Inspect sea strainers.

_____ 5. Check engine's lube, transmission and fuel oil levels.

_____ 6. Check fresh water level.

_____ 7. Inspect all lines and fittings on engine, transmission and pumps.

_____ 8. Ensure foot valve for bilge pump is unobstructed.

_____ 9. Inspect blower flap door is opened and locked.

_____ 10. Inspect belt tension.

_____ 11. Inspect bilge/engine compartment for loose tools, equipment or rags.

_____ 12. Ensure tools are onboard.

AFTER BOAT IS IN THE WATER

_____ 1. Inspect shaft and rubber post packing glands for leaks.

_____ 2. Inspect bilge plugs, exhaust and engine compartment for leaks. Start engine and inspect overboard discharges to ensure proper operations of cooling system.

_____ 3. Check all gauges, oil and fuel levels and sea strainers before departure.

BOAT ENGINEER _______________

BOAT OFFICER/COXSWAIN _______________

BCNR added to case file -- from eclient



single arm davits which was not installed. As described in the report, "These provide for safer boat handling by reducing the boat movement during launching and recovering and may be used without line handlers. A sample system would also include a tow boom from the side of the ship for the sea painter. This enables the boat to remain parallel to the ship during launch and recovery, which is particularly crucial concerning the curvature of the ship's hull."

c. Navy Ships Technical Manual (NSTM) 583 (Boats and Small Craft) at paragraph 583 - 9.4.5. GENERAL OPERATING PROCEDURES FOR CRANE OR BOOM BOAT HANDLING states, "Cleats, padeyes and other fittings shall be provided for use of handling and steadying lines." Cleats, padeyes, and other fittings were not installed on SAN ANTONIO during the initial construction or any period prior to the boat accident for boat operations using the knuckle boom crane.

d. NAVSEA PMS 317 letter 4200 SER 317-226 dated June 18 2009 directed the LPD 17 Class Planning Yard to develop a work specification to modify the port and starboard boat handling fittings. This modification was directed after the boat accident and provides positive proof that design issues created unique problems for boat handling on SAN ANTONIO.

e. Mitigating actions promulgated by Commander, Naval Sea Systems Command for immediate implementation because of the risk to personnel that could have prevented the boating accident were released to the fleet in NAVSEA PMS 317 MSG DTG 281900ZAUG09, LPD 17 CLASS ADVISORY NR 13-09 - SMALL BOAT HANDLING EVOLUTION

(a) Paragraph 2.A. states, "PMS 317, NAVSEA 05z, and NSWCCD Code 97 reviewed the boat handling procedures for in-service LPD 17 class ships and determined that standardized procedures for boat handling evolutions are required."

(b) Paragraph 3.B. provides guidance to preclude adjusting the sea painter as was the standard practice on SAN ANTONIO when she deployed.

(c) Paragraph 3.E. provides an engine start procedure when launching small boats. Specifically:

1. Stop lowering the RHIB approximately ten (10) feet above the water to avoid wave peaks.



6/27/Az

2. Start the engines and signal to the OIC that the boat engines have started. If lowering the boat into the water is delayed for more than ten (10) seconds, then stop the engines to avoid boat engine impeller damage and inform the OIC that the boat is not ready for lowering into the water.

(d) Paragraph 3.F. states, "REF C DIRECTS THE LPD 17 CLASS PLANNING YARD TO DEVELOP A WORK SPECIFICATION TO MODIFY THE PORT AND STARBOARD BOAT HANDLING FITTINGS. THIS CHANGE HAS BEEN COMPLETED ON LPD 19 AND LPD 20 AND WILL BE DONE ON LPD 21 DURING PSA. THE WORK SPECIFICATION (AWI) HAS BEEN REVIEWED AND APPROVED BY THE ISEA AND TECHNICAL WARRANT HOLDER. PMS 317 WILL PROVIDE THE WORK SPECIFICATION TO PMS470 SO THAT A SCD CAN BE DEVELOPED THAT BACKFITS THIS CHANGE ON LPD 17 AND LPD 18."

(e) Because of the restricted visibility to see boats throughout the entire launching process from the Bridge and Boat Deck NAVSEA in paragraph G. states, "SEA05 and NSWCCD SSES CODE 97 will consider additional system modifications to improve visibility during small boat handling operations. "

6. Manning and training issues, in addition to, ship design and procedural problems were either contributing or causal factors in the boat accident. Foundational documents vital to ensuring ships are adequately manned and crews provided appropriate and required training, such as a final Navy Training System Plan (NTSP) which is the primary document identifying manpower, personnel, and training requirements or a Ship Manning Document were not approved prior to SAN ANTONIO deploying. The Ship Manning Document is still not approved almost 5 years after SAN ANTONIO was commissioned and 3 LPD 17 class ship deployments. The NTSP was approved in 2009 (after 2 ship deployments). The below information is provided to supplement or clarify significant issues noted in the investigation.

(1) Personnel assignments and Boat Bill (signed 10 May 2006 by the commanding officer my predecessor relieved) for boating operations were consistent with positions manned to train the crew, certify the ship for operations, and as executed on deployment prior to me assuming command. Subsequently, I updated the Boat Handling Bill to include for the first time a procedure for launching/recovery boats using the knuckle boom crane, a mooring station line handler supervisor, established communications paths (primary, secondary, tertiary) between the bridge, deck launching crew, and boat crew, as well as guidance to ensure the engines for the 11-meter water drive RHIB are started prior to the boat entering the water.



7/27Az